UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

┌─────────────────────────────────────────┐

UNITED STATES OF AMERICA

- v. -                                        21 Cr. 379 (VSB)

CARLOS ORENSE AZOCAR,
   a/k/a "El Gordo,"

                    Defendant.

└─────────────────────────────────────────┘


# THE GOVERNMENT'S MOTIONS *IN LIMINE*


DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
One Saint Andrew's Plaza
New York, New York 10007

Kaylan E. Lasky
Michael D. Lockard
Kevin T. Sullivan
Assistant United States Attorneys
   *Of Counsel*

## **TABLE OF CONTENTS**

BACKGROUND ................................................................................................................ 2

I.      The Defendant Imports Tons of Cocaine to the United States and Uses Military-Grade Weapons to Protect the Cocaine Loads .................................... 4

II.     The Defendant Sells Military-Grade Weapons, Including to the FARC, in Exchange for Cocaine ........................................................................................ 9

III.    The Defendant Pays Millions of Dollars to Facilitate the Transportation of Cocaine Loads ..................................................................................................... 11

IV.     The Defendant Launders Narcotics Proceeds Through State-Owned Venezuelan Companies ....................................................................................... 12

V.      The Defendant Partners with Major Colombian Drug Traffickers to Transport Multiple Drug Loads Totaling Over Thousands of Kilograms of Cocaine ................................................................................................................ 13

VI.     The Defendant Smuggles Narcotics Proceeds from Mexico to Venezuela Via Planes with Assistance from the Venezuelan National Guard ..................... 14

VII.    The Defendant Transports 1,500 Kilograms of Narcotics Via Plane Using Venezuelan Military Transponder Codes .......................................................... 15

VIII.   The Defendant Seeks to Build Additional Boats for Transporting U.S.-Bound Drugs to the Dominican Republic ......................................................... 17

IX.     U.S. Law Enforcement Seizes a Ton of the Defendant's Cocaine in April 2016 .................................................................................................................... 17

X.      The Orense DTO Transports a Load of Approximately Seven Tons of Cocaine as Well as Military-Grade Weapons to Venezuela in December 2016 .................................................................................................................... 18

XI.     The Defendant Is Arrested and Extradited From Italy to the United States ............... 20

ARGUMENT ................................................................................................................... 24

I.      Evidence of Narcotics-Related Corruption Is Admissible as Direct Evidence and Pursuant to Rule 404(b) .............................................................. 24

        A.      Applicable Law ....................................................................................... 25

                1.      Direct Evidence of the Defendant's Guilt ................................... 25

2.    Other Acts Evidence Pursuant to Rule 404(b) ...................................... 25

B.    Discussion .................................................................................................... 26

II.    Evidence of Statements By Drug Traffickers and Government Officials to CC-5, CC-14, and Witness-1 Is Admissible Under the Hearsay Rules ..................... 28

A.    Relevant Statements .................................................................................... 29

B.    Applicable Law ............................................................................................ 31

1.    Rule 801(d)(2)(B): Adoptive Admissions ........................................... 31

2.    Rule 801(d)(2)(E): Co-Conspirator Statements ................................. 31

3.    Rule 804(b)(3): Statements Against Interest....................................... 32

C.    Discussion .................................................................................................... 34

1.    Statements by CC-2, CC-11, CC-19, CC-21, and CC-20 to CC-5 and in CC-5's Presence Relating to Narcotics Trafficking ..................................................................................... 34

2.    Statements by CC-3 to CC-5 Relating to Military Corruption, in Service of Narcotics Trafficking ................................ 35

3.    Statements by CC-6, CC-2, and CC-4 in CC-5's Presence Regarding Money Laundering of Narcotics Proceeds ...................... 35

4.    Statements by CC-11 and CC-13 to CC-14 Regarding Protection by Venezuelan Police and Military .................................. 36

5.    Statements by Venezuelan Military Officials Regarding Venezuelan Government and Military Sanction of Narcotics and Weapons Transportation ............................................................. 37

III.    Evidence or Argument Concerning the Punishment the Defendant May Face if Convicted Should Be Precluded .................................................................. 38

CONCLUSION.................................................................................................................... 39

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| - v. - | 21 Cr. 379 (VSB) |
| CARLOS ORENSE AZOCAR,<br>        a/k/a "El Gordo," | |
| Defendant. | |

      The Government respectfully submits this memorandum in support of its motions *in limine*

seeking the following rulings with respect to the defendant's upcoming trial:

1. Evidence of the defendant's narcotics-related corruption, including his use of drug proceeds to bribe military officers to facilitate his narcotics trafficking, is admissible as direct evidence and pursuant to Rule 404(b);

2. Evidence of statements made by the defendant's co-conspirators, including by Venezuelan military officers and drug traffickers who conspired and worked with the defendant, is admissible pursuant to Rules 801(d)(2)(B), 801(d)(2)(E) and 804(b)(3); and

3. Evidence or argument concerning the punishment the defendant may face if convicted should be precluded.

## BACKGROUND[1]

For more than a decade, the defendant worked with other large-scale drug traffickers in Venezuela and elsewhere to import tens of thousands of kilograms of cocaine into the United States. The defendant's planes and boats, laden with tons of cocaine, traveled from Venezuela, through Central America and transshipment points in the Caribbean, with an ultimate destination of the United States. To accomplish cocaine distribution on this massive scale, the defendant partnered with and bribed high-ranking Venezuelan military officers who protected and facilitated the transportation of his cocaine loads through Venezuela. He also employed his own security detail and worked with military officers armed with military-grade weapons, including machineguns, who protected the defendant and his cocaine loads.

The defendant was the leader of the Venezuela-based drug-trafficking organization (the "Orense DTO"), with connections to, among other criminal organizations, the *Fuerzas Armadas Revolucionarias de Colombia* ("FARC")[2] in Colombia and the *Cartel de los Soles*[3] in Venezuela.

---

[1] The Government respectfully submits that all of the evidence described in this brief is admissible as direct evidence and background to the charged conspiracy, or, alternatively, pursuant to Rule 404(b). The Government also hereby provides notice to the defendant that it intends to offer the evidence described herein, in the alternative, pursuant to Rule 404(b). The Government will continue to meet with potential witnesses between now and trial and will further supplement this notice as necessary should the Government learn of any additional potential Rule 404(b) evidence.

[2] For decades, the FARC was one of the largest cocaine producers in the world, operating cocaine fields and laboratories in Colombia and Venezuela. The FARC has also directed violent acts against U.S. persons and property in foreign jurisdictions, including, but not limited to, Colombia. Consistent with these activities, in 1997, the U.S. Department of State designated the FARC as a Foreign Terrorist Organization. The FARC remained so designated until November 30, 2021.

[3] The *Cartel de los Soles* is a Venezuelan drug-trafficking organization comprised of high-ranking Venezuelan officials who facilitated the importation of tons of cocaine into the United States, in part through its partnership with the FARC. In approximately March 2020, Nicolas Maduro Moros ("Maduro"), the former president of Venezuela, was charged in this District in *United States v. Maduro Moros*, et al., S2 11 Cr. 205 (AKH), with participating in a narco-terrorism conspiracy with several other current and former high-ranking members of the Venezuelan Government and

The defendant worked with numerous high-ranking Venezuelan officials to facilitate these profitable narcotics deals, including ███████████████ ("CC-1"),[4] who was a high-ranking member of the Venezuelan Directorate of Intelligence and Prevention Services ("DISIP"); ███████████████ ("CC-2"), who was the head of the Venezuelan Directorate of Military Intelligence ("DIM"); ██████████████[5] ("CC-3"), who was a General in the National Bolivarian Armed Forces of Venezuela; and the chief executive ("CC-4") of a U.S.-based company ("Company-1") which is wholly owned by a Venezuelan state-owned company ("Company-2"). As further detailed below, the defendant made huge sums of money by importing tons of cocaine into the United States and then laundered his narcotics proceeds through Company-1, Company-2, and other entities.

The Government will establish its case at trial through, among other evidence, testimony from the defendant's former co-conspirators and a Venezuelan law enforcement officer; photographs and videos relating to a U.S. law enforcement seizure of nearly a ton of the defendant's cocaine in April 2016 from a go-fast boat ("GFB") off the coast of the Dominican Republic; photographs of the defendant's planes that he used to transport cocaine and the firearms

---

the FARC, several of whom are described herein. As alleged in the indictment, Maduro was one of the leaders of the *Cartel de los Soles*.

[4] The Government is providing under seal as Exhibit A key for the co-conspirator and company references used herein.

[5] On June 29, 2023, ██████, who is charged in the same indictment as Maduro, pled guilty to a superseding information charging him with providing, and aiding and abetting the provision of, material support or resources to a foreign terrorist organization, *i.e.*, the FARC, in violation of Title 18, United States Code, Sections 2339B and 2. ██████ is currently awaiting sentencing before the Honorable Alvin K. Hellerstein, United States District Judge for the Southern District of New York.

CC-2 is also charged in the same indictment as Maduro and Alcala. He was extradited earlier this year to the United States from Spain. His case remains pending before Judge Hellerstein.

that the defendant obtained for his security detail, including machine guns and other high-powered, military-grade, weapons; evidence from the phone seized when the defendant was arrested in connection with this investigation, including photographs of one of the ranches (known as *fincas*) that the defendant operated as a storage facility and transshipment point for cocaine, planes, and weapons, as well as communications with co-conspirators; and expert testimony regarding drug trafficking patterns and features of the weapons used by the defendant and his co-conspirators in connection with their drug trafficking.

**I.      The Defendant Imports Tons of Cocaine to the United States and Uses Military-Grade Weapons to Protect the Cocaine Loads**

The defendant owned and operated *fincas* in Venezuela where he stored tons of cocaine that he would then distribute north for distribution to the United States. To protect this cocaine and aid in its transport, the defendant employed teams of armed security, including ████████████ ████ ("CC-5"). From at least in or about 2003 through at least in or about 2010, CC-5 worked for the defendant, first as a member and later as the leader of the defendant's security detail. In this capacity, CC-5 assisted the defendant with the receipt, transportation, and payment for the defendant's cocaine loads. CC-5 was present for dozens or hundreds of conversations between the defendant and his associates in the Orense DTO regarding large-scale cocaine trafficking. These business associates included Venezuelan officials such as CC-1 and CC-2, in addition to Venezuelan drug traffickers such as ████████████████████ ("CC-6").

When CC-5 worked for the defendant, the defendant purchased massive quantities of cocaine from sources of supply located in or around Colombia and Venezuela. The defendant then facilitated the transportation by airplane and boat of the cocaine he had purchased through Central America and Mexico, as well as through the Caribbean, including through the Dominican Republic, Tortola, and Puerto Rico, so that the cocaine could be imported into the contiguous

United States. On average, CC-5 recalls that the defendant distributed approximately one ton of cocaine each week, for approximately ten months of the year (*i.e.*, not during the end-of-year holidays)—or 40 tons of cocaine per year.

The Orense DTO obtained its cocaine primarily through CC-2 and his connections to high-ranking FARC members who managed clandestine cocaine laboratories in Colombia. Among these FARC members were ███████████ and ███████████████ ("CC-7" and "CC-8," respectively, and collectively, "██████"). [6] CC-2 along with CC-7 and CC-8 supplied tens of thousands of kilograms of cocaine to the Orense DTO, but were not the Orense DTO's only sources of supply. The Orense DTO also received cocaine from Colombian drug trafficker ██ ███████ ("CC-9") and FARC member ██████████████████████ ("CC-10"). CC-10 met with the defendant at one of the defendant's *fincas* in the Venezuelan state of Guarico called "Los Garanones." The defendant once said, in CC-5's presence, that CC-10 owned all of the cocaine laboratories in his area. As described further below, the defendant also worked with ██████████████ ("CC-11"), one of the leaders of the Colombia-based *Cartel del Norte del Valle* ("NVC"). [7]

The defendant received loads of cocaine by truck and by airplane. The cocaine was sometimes transported across the Colombian-Venezuelan border to the defendant's heavily-guarded *fincas*. On various occasions, CC-5 supervised the receipt of these shipments of cocaine that were transported from Colombia to Orense's *fincas* in Venezuela by airplane. Near the

---

[6] ████████████████████████████████████████████
█████████████████████████████████████████

[7] The NVC was a powerful drug cartel that operated principally in the north of the Valle del Cauca department of Colombia.

airstrips where the airplanes landed in Venezuela, which were on or around the border with Colombia, security stood guard, some of whom were armed with AK-47 rifles and some of whom were wearing Venezuelan military uniforms. CC-5 also observed FARC members at these landing strips.

After he received the cocaine, the defendant was responsible for storing and then sending the cocaine to Mexico or Central America, for ultimate distribution to the United States. One way that the defendant transported drugs north for distribution to the United States was through the use of planes outfitted specifically for cocaine transportation. The defendant and his co-conspirators took multiple steps to outfit these planes to transport cocaine. For example, the seats were usually removed to make room for additional fuel tanks—necessary to allow the plane to carry its heavy drug load farther—and a special pump, colloquially referred to as an "enchonche," was installed to run the added fuel to the plane's main fuel tanks. The defendant used multiple airports in Venezuela, as well as multiple airstrips on properties owned by the defendant in the states of Apure and Guarico, including on and near his *finca* called Los Garanones, to load the cocaine on these planes once they were reconstructed for flight. For example, at Los Garanones, the defendant's workers transferred cocaine from what they referred to as the "crib"—a hidden, underground water tank with approximately 30,000-liter capacity, located inside a warehouse on the *finca*—to load onto the planes. When CC-5 supervised the loading and transportation of these cocaine loads, he was typically armed with a machinegun, and other associates of the Orense DTO were also armed with machineguns. A photograph of one of the defendant's planes, a Turbo Commander AC-690, taken at Los Garanones by CC-5, appears below.



(GX 607). After CC-5 took this photograph, CC-5 recalls that the defendant's workers loaded the plane with approximately 600 kilograms of cocaine, which was transported to Guatemala.

The defendant's customers included, among others, members of the Beltran-Leyva Organization, including an individual known as "Don Arturo." [8] Around 2003 or 2004, the defendant, accompanied by CC-5 and other security members, traveled to Mexico on multiple occasions to arrange drug business with the Beltran-Leyva Organization and other prolific, violent, Mexican cartels. An individual named "El Indio," who negotiated on behalf of the Beltran Leyva Organization in Colombia, was the defendant's primary contact for cocaine deals, and the defendant also negotiated with "Don Arturo." The defendant transported many loads for the Beltran-Leyva Organization, some of which were as large as five tons, and which were destined for ultimate distribution to the United States.

---

[8] The Beltran-Leyva Organization was a powerful Mexican drug cartel that was run by five brothers, one of whom was Marcos Arturo Beltran Leyva.

The defendant was often paid in U.S. dollars for the tons of cocaine he distributed. On certain occasions, the defendant received as much as $20 million in a single payment, in exchange for one or several of the cocaine shipments that he had transported. CC-5 assisted the defendant on multiple occasions by receiving these payments.

According to CC-5, the defendant used a security detail when traveling in Venezuela, including to assist with his drug-trafficking activities. The defendant's security detail typically consisted of approximately eight individuals traveling in at least two vehicles. The security detail typically stored an M4 rifle in each of the vehicles. The defendant himself often carried at least one additional machinegun on his person or in the vehicle in which he was traveling, including an FN P90 submachine gun, which CC-2 had given him. The defendant gave CC-5 an FN P90 submachine gun as well, and CC-5 frequently carried it, including when assisting with the transport of shipments of cocaine or narcotics proceeds. Photographs of some of the weapons used by the defendant's security detail, which were taken by CC-5, appear below. (GXs 611, 608 612 (below, clockwise)).

 



The defendant's security detail and the defendant had fraudulent official Venezuelan government identification cards and licenses for their firearms. CC-5 obtained these identification cards directly through CC-1, who was a high-ranking member of the DISIP, and, on at least one other occasion, through CC-2, who was the head of the DIM. CC-2 also provided training to the defendant's security detail, and he allowed them to practice shooting at the range at *Fuerte Tiuna*, a Venezuelan miliary complex in Caracas. (*See, e.g.*, GX 605 (showing CC-5 at firearms range at Fuerte Tiuna)).

## II. The Defendant Sells Military-Grade Weapons, Including to the FARC, in Exchange for Cocaine

In addition to trafficking massive quantities of cocaine that were ultimately bound for the United States, the defendant also sold military-grade weapons, including to the FARC, in exchange for cocaine. The defendant's primary weapons supplier was a Venezuelan police officer named ▮▮▮▮▮▮▮▮ ("CC-12"). CC-12 supplied a veritable arsenal to the defendant—weapons that included Galil 5.56 automatic rifles, which, in addition to firing bullets, could launch grenades so potent that they could blow up a house or car; Heckler & Koch G3 semi-automatic rifles; Browning machine guns, which could cut a car in half; AK-47s; M16s; Steyr Arms AUG semi-automatic rifles and other types of automatic rifles; handguns; and ammunition. CC-12 provided around 20 loads of weapons to the defendant while CC-5 was working for the Orense DTO, often bringing

50 or 60 weapons and as many as 50 boxes of ammunition in one trip. The defendant kept these huge stashes of weapons and ammunition in his warehouse at Los Garanones. The defendant often stashed his ammunition inside more than 100 metal barrel drums—approximately 10 or 20 million rounds total.

The defendant's security detail  kept some of the weapons brought by CC-12, to protect the defendant as well as his *finca* and the valuable cocaine that was secreted in the "crib" in the warehouse. For example, on one occasion when CC-12 brought ten Browning machine guns to Los Garanones, the defendant's security detail kept two of them, one of which they stashed away and one of which was positioned to protect the *finca* in case someone attempted to rob the *finca* of valuable cocaine, weapons, or narcotics proceeds stored at the *finca*.

The defendant sold the firearms that he did not keep for use by his security detail. While CC-5 was working for the defendant, he observed loads of weapons leave Los Garanones at least ten times. On these occasions, the defendant's workers loaded the weapons in vehicles, which typically traveled in a caravan, for safety. On one occasion, the defendant told CC-5 that an official vehicle was coming and would take some "stuff," referring to firearms. Soon after the defendant told CC-5 about this forthcoming vehicle, a Toyota Land Cruiser with a National Guard insignia and license plate arrived at Los Garanones. The vehicle was backed up to the warehouse, where the defendant's workers, as well as uniformed military officers who had been inside the vehicle, loaded 60 or more firearms into the vehicle. Then, the military officers got back inside the vehicle and drove away.

On at least one occasion, CC-5 heard the defendant discuss exchanging weapons for cocaine. The defendant was showing certain of friends, in the presence of CC-5 and some of the defendant's workers at Los Garanones, a selection of weapons that he had received. The defendant

noted that the weapons could be exchanged for two "cosos" (*i.e.*, "thingies," slang for kilograms of cocaine), and that is where "the business is at." CC-5 understood that the defendant was describing exchanging weapons for cocaine with the FARC, the defendant's principal cocaine supplier.

### III.   The Defendant Pays Millions of Dollars to Facilitate the Transportation of Cocaine Loads

The defendant also engaged in massive corruption to ensure that his cocaine traveled through Venezuela without interference from the police. One individual the defendant bribed was CC-3. . For example, in around 2008 or 2009, the defendant, accompanied by CC-5 and other members of his security detail, met CC-3 at a restaurant in Valencia, Venezuela. At the restaurant, the defendant and CC-3 discussed money, and CC-3 appeared to be clearly dissatisfied about the topic of their discussion. The next day, the defendant directed CC-5 to bring two duffle bags from an associate's house to CC-3; the defendant told CC-5 to make the payment because he did not want any more trouble. CC-5 understood this to be a reference to the prior day's conversation. CC-5 retrieved the two bags, which were stuffed with twenty-dollar bills in U.S. currency and which CC-5 estimates contained several million dollars. CC-5 then delivered the money to four men in an official vehicle with a National Guard license plate.

CC-3 helped the defendant soon after CC-5 delivered this payment. As one example, a few months later, CC-5 was helping to escort trucks carrying approximately 1,000 kilograms of the Orense DTO's cocaine. Although CC-5 had paid off certain National Guard officers to ensure the cocaine would make it through Venezuela without police interference, his car—which was ahead of the trucks carrying the cocaine—was still stopped for inspection. CC-5 showed his official DIM credentials, but the officers nevertheless asked to search his vehicle, which contained around a million dollars and weapons. CC-5 called the defendant, and the defendant said that CC-3 was

going to call CC-5. Several minutes later, CC-3 called CC-5 and told CC-5 to put an officer on the phone. CC-5 passed his phone to the officer, who then spoke with CC-3. Soon after, the officer allowed the convoy containing the defendant's cocaine load to proceed, without inspection.

## IV.   The Defendant Launders Narcotics Proceeds Through State-Owned Venezuelan Companies

Owing to the massive profits the defendant was making through his narcotics trafficking, he also found ways to launder his proceeds back to Venezuela. In or about 2004, CC-4, the defendant's close associate, became the CEO of Company-1. CC-4's accession to CEO was arranged by the defendant, CC-2, and CC-6. CC-5 is expected to testify that once CC-4 became CEO, he facilitated the laundering of narcotics proceeds through Company-1 on behalf of the Orense DTO. The defendant did the same directly through Company-2, with which he had contracts related to oil-drilling.

The defendant, CC-4, and their associates used contracts with shell companies located in the United States to launder the money. CC-4 and others at Company-1 arranged for Company-1 to enter into a contract with a shell company, pursuant to which the shell company provided, and Company-1 received, goods and services. But the shell company would never actually provide the goods and services, and Company-1 would never actually pay the shell company any money. Instead, the shell company would take proceeds from the sale of narcotics in the United States, deposit them into a bank account, and transfer them to a bank account controlled by the Orense DTO in Venezuela or another country. The shell company avoided scrutiny for transferring a large amount of money from the United States to a foreign bank account because the money appeared to be legitimate payments that Company-1 had paid the shell company for legitimate goods and services.

The defendant, in conversations with CC-4 and others, discussed his laundering of narcotics proceeds using Company-1 in CC-5's presence. For example, in or about 2005, before CC-4 became the CEO of Company-1, CC-5 attended a meeting with the defendant, CC-6, CC-4, and others, in which the group discussed taking advantage of CC-4's new role to get funds out of the United States. Subsequently, CC-5 attended a party at CC-4's *finca* near Los Garanones with the defendant, CC-4, CC-2, CC-6, and others, to celebrate CC-4's new position. At the party, the defendant told CC-4 that the ball was now in his court—in other words, in light of CC-4's new role, he was able to help the defendant launder narcotics proceeds.

## V.    The Defendant Partners with Major Colombian Drug Traffickers to Transport Multiple Drug Loads Totaling Over Thousands of Kilograms of Cocaine

In addition to the drug-trafficking activity outlined above, the defendant also partnered with the NVC to transport massive loads of U.S.-bound cocaine. For example, in 2006, the defendant met with CC-11, one of the leaders of the NVC, and two other Colombian drug traffickers: ███████████████ ("CC-13"), a former leader of the NVC running his own drug-trafficking organization, and CC-13's associate, ███████████████ ("CC-14").

CC-13 had asked CC-11 to assist with transporting a significant load of cocaine to Europe that had been stalled for several months. CC-11 agreed to help. He told CC-13 he knew someone in Venezuela who could transport the drugs and set up a meeting for October 2006 at hotel in Caracas. To get to the meeting, CC-13 and CC-14 met CC-11's associate in Cucuta, a city at the Colombian-Venezuelan border, where the associate drove them across the border. Once on the other side of the border, they drove to Caracas accompanied by an SUV carrying multiple, armed Venezuelan police or military personnel in uniform.

Once at the hotel in Caracas, CC-13 and CC-14 first met with CC-11. CC-11 explained to CC-13 and CC-14 that the individual they were about to meet assists him with using the police and

military in Venezuela to move drugs. CC-11 then took CC-13 and CC-14 to another room where they all met with the defendant and the defendant's associate, among others. CC-11, CC-11's associate, and the defendant's associate were armed with handguns. During the meeting, the defendant agreed to help move CC-13's stalled drug load out of Venezuela and discussed the various ways to do so, including via plane and by dumping the drugs at sea to be retrieved by boats. The defendant then proposed that while he worked on that, he, CC-11, and CC-13 partner in transporting approximately 2,000 to 3,000 kilograms of cocaine to the Dominican Republic via an immediately accessible route of the defendant's. They all agreed to do so and planned to move an initial 1,200 kilograms via two 600-kilogram plane shipments. As part of the deal, CC-13 agreed to supply the drugs and invest in half of each load. At the meeting, CC-13 instructed CC-14 to immediately arrange for the delivery of the initial 1,200 kilograms. The defendant's associate provided CC-14 with the phone number of an individual who would receive the drugs in Venezuela. The defendant told CC-13 and CC-14 at the time not to worry because he would have the Venezuelan military pick up the drugs.

Following the October 2006 meeting, approximately four loads consisting of about 600 kilograms each successfully made it to the Dominican Republic for eventual transport to Puerto Rico.

## VI.    The Defendant Smuggles Narcotics Proceeds from Mexico to Venezuela Via Planes with Assistance from the Venezuelan National Guard

In approximately 2006, the defendant met in Caracas with ███████████████ ("CC-15"), a Venezuelan money launderer and narcotics. The defendant had been introduced to CC-15 by ███████████████████████ ("CC-16"), then a captain in the Venezuelan

national guard.[9] CC-16, who provided the defendant with security and logistics assistance in transporting narcotics, had previously worked with CC-15 to smuggle narcotics proceeds through the Maiquetía Simón Bolívar International Airport in Caracas (the "Maiquetía Airport"). CC-16 attended this meeting, as did the defendant's security detail, consisting of several men armed with guns.

At this meeting, the defendant explained that he was transporting a large amount of narcotics proceeds from Mexico to Venezuela, and asked CC-15 to use his contacts at the Maiquetía Airport to ensure that there were no issues with the money's arrival. CC-15 agreed, and ultimately assisted the defendant with the transportation of narcotics proceeds from Mexico to Venezuela on four occasions. Each time, four Mexican individuals arrived in Caracas on a commercial flight from Mexico, each carrying a suitcase containing $1 million. Upon arrival, CC-15 arranged for officers of the Venezuelan National Guard to meet the passengers and escort them from the gate directly to CC-15 at another location within the airport. There, CC-15 took the suitcases for delivery to the defendant. Based on conversations that CC-15 had with the defendant about the money, CC-15 understood that it was proceeds from narcotics that the defendant had transported to Mexico. For CC-15's assistance in smuggling the $16 million in narcotics proceeds, the defendant paid him $200,000 in total.

## VII.  The Defendant Transports 1,500 Kilograms of Narcotics Via Plane Using Venezuelan Military Transponder Codes

Given the success of their 2006 transaction, a few years later the defendant called upon CC-15 again. In 2009, the defendant contacted CC-15 for help in arranging for one of his planes

---

[9] On October 11, 2011, an indictment was unsealed charging CC-16 with international narcotics conspiracy and distribution. *See* No. 11 Cr. 247 (BMC) (E.D.N.Y). CC-16 was arrested in Venezuela in about 2015, and remains there currently.

to fly out of Valencia, Venezuela, and ultimately to Guatemala. This was intended to be a "black flight," meaning it was operating without a flight plan. They met at a hotel in Caracas to discuss the matter, and the defendant's usual armed security detail was present. During the meeting, the defendant explained to CC-15 that the plane would arrive at the Valencia airport from Caracas under a legitimate flight plan but would then need to fly without a flight plan to the defendant's *finca* to be loaded with 1,500 kilograms of cocaine before continuing to Guatemala, where the cocaine would then be transported into Mexico. The only planes that could fly without a flight plan in Venezuela were military planes with the necessary military transponder codes that would identify the plane as a military flight to radar and air traffic control authorities. At the time, CC-15 had been working with ███████████████ ("CC-17"),[10] a major Venezuelan drug trafficker who effectively controlled the flow of narcotics and narcotics proceeds through the Valencia airport. Among other things, CC-15 arranged for planes to arrive and take off without flight plans and could obtain the necessary military transponder codes from a lieutenant within the Venezuelan National Guard whom he bribed.

CC-15 agreed to assist the defendant. In exchange, the defendant gave CC-15 a 100-kilogram investment in the 1,500-kilogram load, which would be paid out in U.S. dollars upon the load's delivery in Mexico. In addition, the defendant paid CC-15 $150,000 to cover the cost of bribing CC-15's contacts within the Valencia airport's control tower and the Venezuelan military, including his Venezuelan National Guard contact.

---

[10] ███████████████████████████████████

Within approximately a month of the 2009 meeting at the hotel in Caracas, the defendant's plane landed at the Valencia airport. The defendant had told CC-15 when to expect it, and CC-15 met the pilots after their arrival to give them the military transponder codes. Later, after delivery of the 1,500 kilograms in Mexico, CC-15 gave the defendant the contact information for an associate to whom CC-15's payment could be made in Mexico. CC-15 earned $600,000 from his 100-kilogram share in the defendant's load.

## VIII.   The Defendant Seeks to Build Additional Boats for Transporting U.S.-Bound Drugs to the Dominican Republic

To continue moving thousands of kilograms of cocaine to Puerto Rico by way of the Dominican Republic, including through maritime routes, the defendant sought at one point to build additional speedboats or GFBs. In 2012, he approached CC-15 for help. He knew that CC-15, who built and raced speedboats, had previously built speedboats able to conceal and transport drug loads. The defendant and CC-15 discussed the build specifications for the boats, such as engine type and quantity and the fuel capacity and range. The defendant explained to CC-15 at the time that the boats were intended to transport upwards of 500 kilograms per trip to the Dominican Republic where the drugs would continue onto Puerto Rico and then New York. The defendant further asked CC-15 if he was interested in investing in the drug loads, and told CC-15 that payment for the cocaine would occur in New York. Ultimately, CC-15 did not assist in building the boats and did not finalize the terms of any investment in the drug loads prior to CC-15's arrest in September 2012.

## IX.   U.S. Law Enforcement Seizes a Ton of the Defendant's Cocaine in April 2016

In April 2016, a member of the Orense DTO contacted ███████████ ("CC-18"), a Venezuelan fisherman and drug trafficker, to ask if CC-18 would assist with transporting a drug load, in exchange for approximately $15,000. CC-18 agreed. A few days later, Orense DTO

members drove CC-18 and several other recruited boat crew members to a *finca* in Guarico. At the *finca*, CC-18 saw the defendant and the defendant's son (whom CC-18 did not know), as well as heavily-armed individuals in Venezuelan military uniforms providing security. An Orense DTO member told the boat crew that he was introducing the defendant to them, indicating that the defendant owned the drugs. When he met the members of the boat crew, the defendant asked if "these were the guys that are doing the job." An Orense DTO member answered, "Yes," and the defendant said, "ok." Soon after, Orense DTO members, including Orense's son (but not the defendant) and the boat crew, including CC-18, traveled to a second *finca*, this one in Falcón state, where armed men were also stationed. Orense DTO members then traveled to a nearby beach with CC-18 and the other boat crew members, as well as a double-engine go-fast boat (the "GFB"). Approximately ten Orense DTO members stuffed 1,000 kilograms of cocaine inside a compartment in the GFB, while approximately 15 armed men provided security. Orense DTO members provided the boat crew with satellite phones and GPS coordinates, directing them to travel to a beach in the Dominican Republic. On April 7, 2016, less than a day after the boat departed, the U.S. Coast Guard interdicted the GFB, with no indicia of nationality, in international waters south of the Dominican Republic. The U.S. Coast Guard recovered over 900 kilograms of cocaine.

## X.    The Orense DTO Transports a Load of Approximately Seven Tons of Cocaine as Well as Military-Grade Weapons to Venezuela in December 2016

On December 15, 2016, Venezuelan law enforcement officers stopped a convoy of more than approximately 15 vehicles in Zulia state, Venezuela, traveling away from the border with Colombia. The convoy, most of which was armored, included black Toyota SUVs, pick-up trucks, and military-style trucks without license places. Security personal armed with AK-47 and AK-103 rifles were protecting the caravan. The individuals inside the vehicles presented various credentials

identifying themselves to an individual ("Witness-1") to include, among others the defendant, General Castor Perez Leal ("Perez Leal"), General Tito Urbano Melean ("Urbano Melean"), and General Enrique Nuñez Hernandez ("Nuñez Hernandez"), including credentials of the Bolivarian National Intelligence Service ("SEBIN") in the name of the defendant. All of them were armed with handguns and bulletproof vests with SEBIN markings on them. Perez Leal indicated that he was with the National Anti-Drug Office ("ONA"). Witness-1 informed the members of the convoy that he had the right to search the contents of the convoy; the members complied, but Perez Leal stated that only Witness-1 and his second-in-command could conduct the search because high-ranking SEBIN official were involved, and Perez Leal also asked to relocate to a National Guard station nearby in El Guayabo, Zulia state for the search.

Once the convoy relocated to the National Guard station in El Guayabo, the Venezuelan law enforcement officers opened and inspected the trunks of the approximately 15 vehicles. They found an estimated seven tons of cocaine (which Nuñez Hernandez referred to as cocaine), some in boxes bearing Company-2's logo; as well as approximately 30 boxes containing weaponry including explosives and detonators, rocket-propelled grenades, iglas (Russian-made surface-to-air missiles), and AK-47 and AK-103 rifles.

After this initial search, Witness-1 notified individuals in his chain of command what had transpired and awaited further instructions. Around this time, the defendant, Perez Leal, Urbano Melean, and Nuñez Hernandez placed several phone calls, and Witness-1 heard Nuñez Hernandez say "yes, General" several times. Orense admonished Witness-1, stating that this was a police operation and there was no reason for concern. Soon thereafter, Witness-1's superior ordered Witness-1 to call off the investigation because the convoy was sanctioned by the Venezuelan military.

Immediately after this incident, Witness-1, his superior, and his second-in-command were relocated to other posts and demoted.

**XI.     The Defendant Is Arrested and Extradited From Italy to the United States**

On May 13, 2021, Italian law enforcement authorities arrested the defendant in Italy. Italian authorities seized a phone from the defendant, which was subsequently searched pursuant to a search warrant authorized in this District, and which contained, among other things, numerous images of the defendant; images of weapons; and conversations with co-conspirators. Examples of evidence from the defendant's phone include:

- Among the defendant's WhatsApp contacts are communications with contacts bearing CC-2's nickname (*e.g.*, "El Pollo3," "Pollo Diputado" (*i.e.*, deputy)).

- On July 18, 2016, a contact saved in the defendant's phone as "Sierralta" sent the defendant a message via WhatsApp attaching an image of firearms and ammunition, which Phone Contact-1 told the defendant had been received. The defendant stated, "thanks for everything!" (GX 501 (below)).



- On June 23, 2017, a contact saved in the defendant's phone as "Marin" sent the defendant a message via WhatsApp indicating that a "friend" has not sent a "list" yet, but wanted to know if the defendant could transport and had customers for ammonia, and the friend would also plant the "urea" when at the *finca* tomorrow. (GX 502). Urea is a precursor used in the production of cocaine, and it is also used

to clandestinely produce ammonia, which is used to purify coca base and to transform it into cocaine hydrochloride.[11]

- On September 16, 2017, a contact saved in the defendant's phone as "Henry Wood USA" sent the defendant a message via WhatsApp stating that he had a co-pilot, to which the defendant responded, "ok brother." On September 19, 2017, Henry Wood USA sent the defendant several images of a plane, noting, "Learjet 55 airplane belonging to pdvsa entered with rain below the minimum [the] runway [was] very short for this type of airplane and swallowed the Santa Elena de Uairen runway it exited the runway and broke fences crossed street at the entrance of the airport…apparently there aren't deaths…" (GX 503-H (below); *see also* GXs 503-A - G).



- On June 11, 2018, the defendant sent a message to a contact saved in his phone as "Gordo Moreno" attaching photographs of a damaged airplane. (GXs 504-A, -B (below, left to right); *see also* GX 504-C).

---

[11] *See* https://insightcrime.org/news/venezuelas-urea-production-colombia-cocaine-processing-labs/ (last accessed Oct. 29, 2023).




- A document dated August 22, 2018, on National Land Institute ("INTI") letterhead that is addressed to a National Guard captain indicates that "Abdonis Jesus Orense Ydler," the defendant's son, properly occupies "Los Garanones" in Guarico. (GX 505).

- On April 1, 2019, the defendant sent a message via WhatsApp to a contact saved in his phone as "Daniel Haro3" to say that "Carlito" had been arrested, to call so he would be released, that the "Police" were not paying attention to the police credentials. "Daniel Haro3" responded that he had called "Pedro Luis" about the defendant's "son," but he was not answering. (See GXs 506-A – G).

- On June 12, 2019, the defendant received a voice note via WhatsApp from a contact saved in his phone as "Benavidez Primo" ("Phone Contact-6").[12] In the voice note, Primo stated that the "guerillas" had decapitated one of the "escorts" by the border. (GX 507).

- On January 31, 2020, the defendant sent Gordo Moreno a message via WhatsApp stating, "Municipio Zaraza agropecuria los Garanones," a reference to the town of Zaraza's agricultural area, Los Garanones (i.e., the defendant's *finca*), and attaching photos. (See, e.g., GXs 508-A, -B, -D (below, left to right)).

---

[12] He also attaches a photo of a decapitated head, which the Government does not intend to offer at trial.

  

- On April 18, 2020, a contact saved in the defendant's phone as "ADN Nuevo" which contains the same initials as CC-6, who commonly goes by the name "Alex") forwarded the defendant a screenshot of a chat. The defendant responded by quoting the chat, including, "brother, with reason and without reason, we can have differences, argue but Alex, Pedro and Carlos Orense are not going to separate us. No inhuman upstart acolyte and no felon, we will always be brothers"; after that, the defendant commented, "listen please this Mariachi." ADN Nuevo responded, "thank you brother, I know."

- On August 13, 2020, Phone Contact-3 sent the defendant a message via WhatsApp attaching several photographs of an airplane in the water as well as photographs of possibly deceased crew members and their identifying documents. (*See*, *e.g.*, GXs 509-E, -C (below, left to right)).

 

The defendant was first charged by criminal complaint in this case on April 3, 2021, with one count of narcotics importation conspiracy, in violation of Title 21, United States Code, Section 963; one count of conspiracy to violate maritime drug enforcement laws, in violation of Title 46, United States Code, Sections 70506(b) and 70504(b)(2); one count of possession of machineguns and destructive devices, in violation of Title 18, United States Code, Sections 924(c)(1)(A), 924(c)(1)(B)(ii), and 2; and one count of conspiracy to possess machineguns and destructive devices, in violation of Title 18, United States Code, Section 924(o). On June 3, 2021, a grand jury in this District returned an indictment (the "Indictment") charging the defendant with the same offenses set forth in the complaint. On June 22, 2022, the defendant was extradited from Italy to the United States. The defendant was transferred to U.S. custody, and was transported by plane by DEA officials to the Westchester County Airport, located in White Plains, New York.

## **ARGUMENT**

### I.   **Evidence of Narcotics-Related Corruption Is Admissible as Direct Evidence and Pursuant to Rule 404(b)**

The defendant and his co-conspirators, including cooperating witnesses and a confidential sources who are expected to testify at trial, relied on drug proceeds to bribe high-ranking Venezuelan military officers. In return, the recipients of these cocaine-fueled bribes helped ensure that the defendant had a consistent supply of cocaine, the safe passage of the defendant's cocaine through Venezuela, and protection from arrest and prosecution in Venezuela. Thus, evidence of narcotics-related corruption is admissible at trial, as direct evidence and pursuant to Rule 404(b), to establish the nature of the conspiracy and the defendant's role in it, the relationships between co-conspirators, and the defendant's motive and intent.

24

### A.    Applicable Law

#### 1.    Direct Evidence of the Defendant's Guilt

Relevant evidence "need only tend to prove the government's case," such as "evidence that adds context and dimension to the government's proof of the charges." *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997). Thus, background evidence is relevant and admissible, pursuant to Rule 401, where it tends "to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed." *Id.* (internal quotation marks omitted). Evidence is also admissible if it relates to conduct that: (i) "'arose out of the same transaction or series of transactions as the charged offense'"; (ii) "'is inextricably intertwined with the evidence regarding the charged offense'"; or (iii) "'is necessary to complete the story of the crime on trial.'" *United States v. Gohari*, 227 F. Supp. 3d 313, 317 (S.D.N.Y. 2017) (quoting *United States v. Robinson*, 702 F.3d 22, 36-37 (2d Cir. 2012)). "Evidence fitting within one of these three categories is considered direct evidence and Rule 404 is not applicable." *United States v. Fiumano*, No. 14 Cr. 518, 2016 WL 1629356, at *3 (S.D.N.Y. Apr. 25, 2016).

#### 2.    Other Acts Evidence Pursuant to Rule 404(b)

Under Rule 404(b), courts "may allow evidence of other acts by the defendant if the evidence is relevant to an issue at trial other than the defendant's character and if the risk of unfair prejudice does not substantially outweigh the probative value of the evidence." *United States v. Ulbricht*, 79 F. Supp. 3d 466, 479 (S.D.N.Y. 2015). "This Circuit follows the inclusionary approach, which admits all other act evidence that does not serve the sole purpose of showing the defendant's bad character and that is neither overly prejudicial under Rule 403 nor irrelevant under Rule 402." *United States v. Curley*, 639 F.3d 50, 56 (2d Cir. 2011) (internal quotation marks omitted). In general, evidence is admissible under Rule 404(b) "if (1) it is introduced for a proper

purpose, (2) it is relevant to the charged offense, (3) its prejudicial effect does not substantially outweigh its probative value and (4) is admitted with a limiting instruction if requested." *United States v. Rutkoske*, 506 F.3d 170, 176-77 (2d Cir. 2007).

### B.   Discussion

As is clear from the facts set forth above, one of the defining characteristics of the charged drug trafficking conspiracy and related weapons offenses is the defendant's and his co-conspirators' reliance on and involvement of high-ranking Venezuelan military officers and public officials to ensure a consistent supply of cocaine and to obtain protection and support for its trafficking operations. This required the use of significant sums of drug proceeds to bribe such officials in exchange for their protection and support. The Government will establish this deeply corrupt *quid pro quo* through, *inter alia*, testimony from witnesses and evidence from the defendant's cellphone showing his relationship with public officials and the military.

The defendant's reliance on and bribes to military officers and public officials was staggering in magnitude. As described above, a primary source of cocaine supplied to the Orense DTO was the FARC and its members like CC-7 and CC-8, who, through CC-2's connections, supplied tens of thousands of kilograms to the Orense DTO. Some of that cocaine was exchanged for weapons provided to the FARC that the defendant obtained from sources like the Venezuelan National Guard and Venezuelan police officer Renato CC-12. With drugs sourced from Colombia and needing to cross the Colombia-Venezuela border and then move freely within Venezuela, the defendant, on CC-2's recommendation, turned to CC-3 and the Venezuelan military for help. CC-3 earned millions of dollars from the Orense DTO in exchange for facilitating and protecting its transport of drugs into and around Venezuela. And CC-5, at the defendant's direction, regularly paid off military officials so that the defendant's drug and money loads could pass through checkpoints. The defendant similarly relied on CC-15's connections with corrupt officers within

the Venezuelan National Guard, like CC-16, to facilitate the smuggling of narcotics proceeds through the airport in Caracas and kilograms of cocaine via his plane flying under the guise of military transponder codes. Indeed, the defendant touted these connections to convince other drug traffickers, like CC-11 of the NVC and CC-13 and CC-14 of Colombia, to work with him.

Thus, evidence of high-level government corruption involving the defendant, CC-2, CC-3, and other officials and traffickers is admissible as direct proof because it is inextricably intertwined with the charged crimes and necessary to complete the story of the crime on trial. *See Gohari*, 227 F. Supp. 3d at 317; *see also* Feb. 12., 2021 Pretrial Conf. Tr., *United States v. Fuentes Ramirez*, No. 15 Cr. 379 (PKC) (S.D.N.Y. Feb. 12, 2021) at 5-8 (ECF No. 251) (finding evidence of bribery and corruption, including of members of Honduran law enforcement to protect drug shipments and laboratories, admissible as direct evidence of the charged narcotics conspiracy); Sept. 13, 2019 Pretrial Conf. Tr., *United States v. Juan Antonio Hernandez Alvarado*, No. 15 Cr. 379 (PKC) (S.D.N.Y. Sept. 13, 2019) at 3-8 (ECF No. 85) (same). The evidence tends to explain, for example, why the co-conspirators came together, how they operated, and why they were able to continue crimes of this magnitude unabated for almost a decade. *See United States v. Delligatti*, No. 15 Cr. 491, 2018 WL 1033242, at *6 (S.D.N.Y. Feb. 23, 2018) ("[W]here potential evidence explains the development of the illegal relationship . . . and explains the mutual trust that existed between the coconspirators, it will be plainly admissible." (internal quotation marks omitted)); *cf. United States v. Robles*, 193 F.3d 519, 1999 WL 707902, at *7 (5th Cir. 1999) (finding evidence sufficient in drug-trafficking case where jury could infer that defendant "intend[ed] to pay bribes or otherwise provide protection to the [drug-trafficking organization] by finding out whether members of the organization were targets of police investigations").

In the alternative, and for similar reasons, the corruption evidence is admissible pursuant to Rule 404(b) because it illustrates the broader criminal plan of the defendant, his co-conspirators, and others, to use drug-trafficking to help assert power and control in Venezuela, and is probative of the defendant's motive and intent in joining the conspiracy, *i.e.*, to enrich himself by partnering with powerful military officers and public officials to facilitate his successful large-scale drug trafficking. *See United States v. Pipola*, 83 F.3d 556, 566 (2d Cir. 1996) (noting that evidence is admissible under Rule 404(b) "to explain how a criminal relationship developed" and "help the jury understand the basis for the co-conspirators' relationship of mutual trust"). Thus, evidence of narcotics-related corruption involving the defendant and his co-conspirators is relevant and has substantial probative value.

Finally, this evidence is not unduly prejudicial relative to other proof the Government expects to offer. The defendant's narcotics loads moved into, out of, and around Venezuela with impunity due to support from Venezuelan officials and the Venezuelan miliary. Venezuelan military personnel escorted his cocaine so that it would not be seized. The defendant, the military personnel, and other security personnel of the defendant's participated in these activities while heavily armed, including at times with military-grade weapons. Indeed, against a backdrop of testimony regarding the trafficking of tons of cocaine as protected by military-grade weapons, testimony about corruption and bribes is far less inflammatory. Accordingly, evidence of the full breadth of the corruption involved in the defendant's crimes is not barred by Rule 403.

## II.   Evidence of Statements By Drug Traffickers and Government Officials to CC-5, CC-14, and Witness-1 Is Admissible Under the Hearsay Rules

Over the course of more than a decade, numerous drug traffickers and government officials made statements to CC-5 relating to the defendant's large-scale cocaine trafficking. Similarly, in 2006, CC-11 and CC-13 made statements to CC-14 also regarding the defendant's drug trafficking.

And in 2016, Venezuelan military officials made statements to Witness-1 regarding the convoy carrying the defendant, several tons of cocaine, and weapons. Testimony regarding such statements is admissible under one or more of Rules 801(d)(2)(B), 801(d)(2)(E), and 804(b)(3).

### A.    Relevant Statements

The Government respectfully submits that the following statements are admissible through the expected testimony of CC-5:

### 1.    Statements by CC-2, CC-11, CC-19, CC-21, and CC-20 to CC-5 and in CC-5's Presence Relating to Narcotics Trafficking

- o   Early on in his tenure working for his uncle, CC-5 overheard a discussion between the defendant, CC-2, and CC-11 regarding transporting a cocaine load. CC-2 stated that they were going to arrange for transport through Apure state by land to a *finca*; in response, CC-11 stated that this could not happen again. Upon hearing the conversation, another member of the defendant's security detail named "████" (CC-19") commented to CC-5 that CC-11 was a big shot.

- o   During a meeting in approximately 2007 or 2008, CC-2 told the defendant, in CC-5's presence, that with the "patas de goma" (*i.e.*, the FARC), the defendant could not be late with his money.

- o   At some point after CC-5 stopped working with the defendant in 2010, ████████████████████████ ("CC-20"), a wealthy drug trafficker who operated speedboats and worked with the defendant, told CC-5 that the defendant was sending cocaine to the mainland United States through Puerto Rico.

- o   Around 2014 to 2016, an individual who was working for the defendant named ████████ ("CC-21") told CC-5 that the Orense DTO was very busy during this time period, and that the defendant was continuing to send boats and planes laden with massive amounts of cocaine, including to the Dominican Republic, Puerto Rico, and Tortola, from various locations in Venezuela, including from Falcon state.

### 2.    Statements by CC-3 to CC-5 Relating to Military Corruption, in Service of Narcotics Trafficking:

- o   Around 2008 or 2009, CC-5 was stopped by National Guard officials, who sought to search his vehicle, which contained around a million dollars and weapons. CC-5 called the defendant, and the defendant said that CC-3 was going to call CC-5. Several minutes later, CC-3 called CC-5. CC-3 stated

that CC-5 should put an officer on the phone. CC-5 passed his phone to the officer, who then spoke with CC-3. Soon after, the officer allowed the convoy to proceed, without inspection.

3. **Statements by CC-6, CC-2, and CC-4 to CC-5 Regarding Money Laundering of Narcotics Proceeds:**

o Before CC-4 became the CEO of Company-1, CC-5 participated in a meeting in an office at a commercial complex in Caracas, with the defendant, CC-6, CC-4, and others. At the meeting, CC-6 stated, and the group more generally discussed, that once CC-4 became the CEO of Company-1, there was no way that they were not going to get money out of the United States, and that they had to take advantage of CC-4's position for as long as it lasted.

4. **Statements by CC-11 and CC-13 to CC-14 Regarding Protection by Venezuelan Police and Military**

o In approximately 2006, CC-11 told CC-13, who later told CC-14, that the defendant was good at narcotics transportation and could transport CC-13's stalled narcotics load. CC-11 later told CC-13 and CC-14 that that the defendant assists CC-11 in using the Venezuelan military and police for protection in Venezuela with respect to moving narcotics and reiterated the same to them once in the presence of the defendant after the defendant informed CC-13 and CC-14 that he would have the Venezuelan military pick up their narcotics loads.

5. **Statements by Venezuelan Military Officials to Witness-1 Regarding Venezuelan Government and Military Sanction of Narcotics and Weapons Transportation**

o After Witness-1 stopped the defendant's convoy on December 15, 2016, the high-ranking members of the convoy also identified themselves by name and title to Witness-1. Perez Leal stated that only Witness-1 and his second-in-command could conduct the search because high-ranking SEBIN official were involved; he also asked to relocate to a National Guard station nearby in El Guayabo, Zulia state for the search.

o During the same stop of the defendant's convoy on December 15, 2016, Witness-1's superior ordered Witness-1 to call off the investigation because the convoy was sanctioned by the Venezuelan military.

### B.   Applicable Law

#### 1.   Rule 801(d)(2)(B): Adoptive Admissions

Rule 801(d)(2)(B) of the Federal Rules of Evidence provides in relevant part that "[a] statement is not hearsay if . . . the statement is offered against an opposing party and . . . is one the party manifested that it adopted or believed to be true." "When a statement is offered as an adoptive admission, the proponent must show that the party against whom the statement is offered adopted or acquiesced to the statement and that 'adoption or acquiescence may be manifested in any appropriate manner.'" *Penguin Books U.S.A., Inc. v. New Christian Church of Full Endeavor, Ltd.*, 262 F. Supp. 2d 251, 258 (S.D.N.Y. 2003) (quoting Fed. R. Evid. 801(d)(2)(B), advisory comm. notes). Adoption is evaluated by "examining the behavior of the party it is to be offered against," and the "adoption of another's statement can be manifest by any appropriate means, such as language, conduct or silence." *Id.*; *see also United States v. Rollins*, 862 F.2d 1282, 1296 (7th Cir. 1988) (explaining that the rule does not require an explicit statement of adoption; all that is necessary is some "manifestation of a party's intent to adopt another's statements, or evidence of the party's belief in the truth of the statements").

#### 2.   Rule 801(d)(2)(E): Co-Conspirator Statements

Rule 801(d)(2)(E) of the Federal Rules of Evidence provides in relevant part that "[a] statement is not hearsay if . . . the statement is offered against an opposing party and was made by the party's co-conspirator during and in furtherance of the conspiracy." To admit a statement pursuant to this Rule, the Court must find two facts by a preponderance of the evidence: *first*, that a conspiracy that included the declarant and the defendant existed; and *second*, that the statement was made during the course and in furtherance of that conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987).

Once a conspiracy is shown to exist, the "evidence sufficient to link another defendant to it need not be overwhelming," and "the 'in furtherance' requirement of Rule 801(d)(2)(E) is satisfied" when, for example, "a co-conspirator is apprised of the progress of the conspiracy, or when the statements are designed to induce his assistance." *United States v. Paone*, 782 F.2d 386, 390 (2d Cir. 1986) (internal quotation marks omitted). Statements between co-conspirators that "provide reassurance, serve to maintain trust and cohesiveness among them, or inform each other of the current status of the conspiracy," further the conspiracy, *United States v. Simmons,* 923 F.2d 934, 945 (2d Cir. 1988), as do statements "that apprise a co-conspirator of the progress of the conspiracy," *United States v. Rahme*, 813 F.2d 31, 36 (2d Cir. 1987).

### 3.    Rule 804(b)(3): Statements Against Interest

Under Rule 804, if a declarant is "unavailable," there is an exception to the hearsay rule where:

> (A) a reasonable person in the declarant's position would have made [the statement] only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability; and

> (B) is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.

Fed. R. Evid. 804(b)(3). This rule "is founded on the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true." *Williamson v. United States*, 512 U.S. 594, 599 (1994).

To satisfy Rule 804(b)(3), the proponent of the statement must show by a preponderance of the evidence: "(1) that the declarant is unavailable as a witness, (2) that the statement is sufficiently reliable to warrant an inference that a reasonable man in [the declarant's] position

would not have made the statement unless he believed it to be true, and (3) that corroborating circumstances clearly indicate the trustworthiness of the statement." *United States v. Wexler*, 522 F.3d 194, 202 (2d Cir. 2008) (internal quotation marks omitted). A declarant is unavailable for purposes of Rule 804 if, as relevant here, the declarant is "exempted from testifying about the subject matter of the declarant's statement because the court rules that a privilege applies," Fed. R. Evid. 804(a)(1), or "is absent from the trial or hearing and the statement's proponent has not been able, by process or other reasonable means, to procure the declarant's attendance or testimony," *id.* 804(a)(5)(B).

"A statement will satisfy Rule 804(b)(3)'s requirement that it 'tended' to subject the declarant to criminal liability if it would be probative in a trial against the declarant." *United States v. Persico*, 645 F.3d 85, 102 (2d Cir. 2011) (internal quotation marks omitted). Moreover, a declarant need not "be aware that the incriminating statement subjects him to immediate criminal prosecution," but instead, that the "incriminating statement sufficiently tended to subject the declarant to criminal liability so that a reasonable man in his position would not have made the statement unless he believed it to be true." *United States v. Lang*, 589 F.2d 92, 97 (2d Cir. 1978) (internal quotation marks and citation omitted).

Finally, the Second Circuit requires corroboration of both the declarant's and the statement's trustworthiness. *United States v. Doyle*, 130 F.3d 523, 543-44 (2d Cir. 1997). Statements made to co-conspirators, not in response to questioning, and not made in coercive atmospheres are sufficiently reliable for purposes of this Rule. *See, e.g.*, *United States v. Matthews*, 20 F.3d 538, 546 (2d Cir. 1994).

C.      **Discussion**

1.      **Statements by CC-2, CC-11, CC-19, CC-21, and CC-20 to CC-5 and in CC-5's Presence Relating to Narcotics Trafficking**

The statements by CC-2, CC-11, CC-19, CC-21, and CC-20 relating to narcotics trafficking are relevant and admissible under the hearsay rules.

The statements by CC-2, CC-11, and CC-19 are admissible under Rule 801(d)(2)(E). The Government will establish by a preponderance of the evidence that the defendant worked with, among others, CC-2, CC-11, and CC-19, each of whom were members of the charged drug-trafficking conspiracy. Through testimony from CC-5 and other cooperating witnesses, for example, the Government will establish that CC-2 secured cocaine fromCC-7 and CC-8 and the FARC for the Orense DTO; CC-11, a member of the NVC, partnered with the Orense DTO on drug loads; and CC-19 worked for the defendant, as a member of his security detail.

The statements at issue were also in furtherance of the conspiracy. The statements by CC-2 (regarding the route a drug load would take, and about paying the FARC on time) and CC-11 (regarding the route for a cocaine load) conveyed requests or instructions to the defendant regarding drug-trafficking activities. *See United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999) (finding "in furtherance" requirement met where statements "induce a coconspirator's assistance"); *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1199 (2d Cir. 1989) (finding "in furtherance" requirement met where statements "prompt the listener to respond in a way that facilitates the carrying out of criminal activity" (internal quotation marks omitted)); *United States v. Persico*, 832 F.2d 705, 716 (2d Cir. 1987) (finding "in furtherance" requirement met where statements "solicited [listener's] assistance"). CC-19's statement also furthered the conspiracy because it assisted CC-5 with understanding the relationships among members of the Orense DTO and hence enabled CC-5 to be in a better position to further its drug-trafficking goals.

Finally, the statement regarding drug-trafficking are not unduly prejudicial, as they are in line with most of the other evidence that will be presented at trial. Thus, admitting the statements would not violate Rule 403.

### 2.   Statements by CC-3 to CC-5 Relating to Military Corruption, in Service of Narcotics Trafficking

For similar reasons, the statement by CC-3 to CC-5 that CC-5 should put an officer on the phone (so that CC-5's narcotics load could get through the checkpoint) is admissible. First, insofar as this statement reflects a request and instruction to CC-5, it is not hearsay and therefore admissible. *See, e.g.*, *United States v. Kuthuru*, 665 F. App'x 34, 38 (2d Cir. 2016) ("Questions and commands are ordinarily not hearsay . . . ."). Second, Alaca's statement is admissible pursuant to Rule 801(d)(2)(E). The Government will establish through CC-5's testimony that CC-3 was the defendant's co-conspirator and the statement was made to another co-conspirator to "facilitate[] the carrying out of criminal activity"—in this case to ensure the safe passage of CC-5 and the DTO's narcotics load through the checkpoint. Last, CC-3's statement is not unduly prejudicial in the context of other evidence and testimony at trial as to the Orense DTO's extensive use of and reliance on Venezuelan military officials to protect and ensure the transportation of narcotics loads. Thus, admitting the statements would not violate Rule 403.

### 3.   Statements by CC-6, CC-2, and CC-4 in CC-5's Presence Regarding Money Laundering of Narcotics Proceeds

The statements regarding money laundering of the proceeds of the defendant's narcotics trafficking are admissible under Rule 801(d)(2)(E). The Government will establish by a preponderance of the evidence that CC-4 and CC-6 were members of the charged drug trafficking conspiracy, seeking, in part, to leverage drug trafficking to maintain and enhance their power and the control in connection with Company-1. *See United States v. Russo*, 302 F.3d 37, 45 (2d Cir. 2002) ("[T]he objective of the joint venture that justifies deeming the speaker as the agent of the

defendant need not be criminal at all."). Through the testimony of CC-5 and other evidence, the Government will establish by a preponderance of the evidence that once CC-4 became CEO, he and his associates facilitated the laundering of narcotics proceeds through Company-1 on behalf of the Orense DTO and that the DTO sought to use CC-4's new position to target getting money out of the United States. *See Persico*, 832 F.2d at 716.

Admitting the statements would not violate Rule 403. This case involves evidence of massive amounts of cocaine smuggled through the Caribbean and Central America into the United States, as well as the corruption of some of the highest-ranking public officials in the Venezuelan government to facilitate that narcotics trafficking. In context, the statements regarding laundering narcotics proceeds are not unduly prejudicial.

### 4. Statements by CC-11 and CC-13 to CC-14 Regarding Protection by Venezuelan Police and Military

The statements by CC-11 and CC-13 are admissible under Rule 801(d)(2)(E). The Government will establish by a preponderance of the evidence that the defendant, CC-11, and CC-13 were members of the charged drug trafficking conspiracy. Through testimony from CC-14, for example, the Government will establish that the defendant, CC-11, and CC-13 partnered in the transportation of thousands of kilograms of cocaine from Venezuela to the Dominican Republic that was ultimately bound for the United States. The statements at issue were also in furtherance of the conspiracy because they were made in relation to how the defendant would ensure the protected transport of the narcotics and to induce CC-13 to proceed in moving the narcotics with the assistance of the defendant. *Gigante*, 166 F.3d at 82; *Beech-Nut Nutrition Corp.*, 871 F.2d at 1199.

The statement by CC-11 to CC-13 and CC-14 in the presence of the defendant is not hearsay under Rule 801(d)(2)(B) because indeed the defendant was present when it was made and

manifested that he believed the statement to be true. Specifically, CC-11 had reiterated what he told CC-13 and CC-14 earlier regarding the defendant's assistance in Venezuelan, and he did so right after the defendant had just told CC-13 and CC-14 not to worry because he would have the Venezuelan military pick up the drugs. Thus, with respect to CC-11's statement in the presence of the defendant, the defendant's behavior and participation in the discussion plainly establishes his intent to adopt the statement as true.

The statements by CC-11 are also admissible under Rule 804(b)(3) because the declarant is unavailable and his remarks would be probative of their guilt were they to stand trial on drug-trafficking. CC-11 is unavailable because he is deceased. The statements are also sufficiently reliable because they were made in confidence and to "a person whom the declarant[s] believe[d] [was] an ally, not a law enforcement official." *Sasso*, 59 F.3d at 349. Finally, the statements would not violate Rule 403 for substantially the same reasons as described above in Section II.C.2.

### 5. Statements by Venezuelan Military Officials Regarding Venezuelan Government and Military Sanction of Narcotics and Weapons Transportation

The statements by the officials riding in the convoy are admissible under Rule 801(d)(2)(E). The Government will establish by a preponderance of the evidence that the officials were members of the charged drug trafficking conspiracy. Through testimony from Witness-1, the Government will establish that convoy was carrying drugs and weapons and that one of the individuals with the convoy presented credentials identifying himself as the defendant. The statements at issue were also in furtherance of the conspiracy because they were made to ensure the safe passage of the narcotics and prevent their seizure by Witness-1 and his fellow law enforcement officers. *Gigante*, 166 F.3d at 82; *Beech-Nut Nutrition Corp.*, 871 F.2d at 1199. The statements are also not violative of Rule 403, for substantially the same reasons as described above in Section II.C.2.

37

III.   **Evidence or Argument Concerning the Punishment the Defendant May Face if Convicted Should Be Precluded**

The defendant should be precluded from offering evidence or argument concerning the punishment or consequences he faces if convicted, which includes a mandatory minimum term of imprisonment for the charged narcotics offenses. Where the jury has no role at sentencing—such as in this case—it "should be admonished to 'reach its verdict without regard to what sentence might be imposed.'" *Shannon v. United States*, 512 U.S. 573, 579 (1994) (quoting *Rogers v. United States*, 422 U.S. 35, 40 (1975)). This is so for good reason: argument concerning punishment "invites [jurors] to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion." *Id.* The Second Circuit has directly held that a jury should not be instructed on or aware of possible mandatory minimum sentences. *See United States v. Pabon-Cruz*, 391 F.3d 86, 91-92 (2d Cir. 2004). Accordingly, the defendant should be precluded from offering evidence or argument concerning the punishment or other potential consequences stemming from a conviction in this case.

## <u>CONCLUSION</u>

For the foregoing reasons, the Government respectfully submits that the Court should grant

the relief requested herein.

Dated:  New York, New York
         November 3, 2023

                                          Respectfully submitted,

                                          DAMIAN WILLIAMS
                                          United States Attorney for the
                                          Southern District of New York


                              By:      ____/s/_____
                                          Kaylan E. Lasky
                                          Michael D. Lockard
                                          Kevin T. Sullivan
                                          Assistant United States Attorneys
                                          212-637-2315 / 2193 / 1587

Cc:     Defense Counsel
        *Via ECF & Email (Unredacted*)