NBR3AZO1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4            v.                        21 Cr. 379 (VSB)

5  CARLOS ORENSE AZOCAR,
      a/k/a "El Gordo,"
6
                Defendant.
7                                      Trial
   ------------------------------x
8
                                       New York, N.Y.
9                                      November 27, 2023
                                       8:45 a.m.
10 Before:

11
                   HON. VERNON S. BRODERICK,
12                                   District Judge
                                     –and a Jury–
13
                        APPEARANCES
14
   DAMIAN WILLIAMS
15      United States Attorney for the
        Southern District of New York
16 BY:  MICHAEL D. LOCKARD
        KAYLAN E. LASKY
17      KEVIN T. SULLIVAN
        Assistant United States Attorneys
18
   FOY & SEPLOWITZ LLC
19      Attorneys for Defendant
   BY:  JASON E. FOY
20      ERIC J. SARRAGA

21 Also Present:  Cristina Weisz
                            Humberto Garcia
22                          Mercedes Avalos
                            Vivian Goa
23                          Erika de los Rios
                            Interpreters (Spanish)
24
                   William Sirmon, Paralegal Specialist
25                 Meusette Gonzalez, Paralegal
                   Special Agent Matthew s. Passmore

           SOUTHERN DISTRICT REPORTERS, P.C.
                   (212) 805-0300

NBR3AZO1

1           (In open court; defendant not present)

2           THE COURT:  My understanding is that Mr. Azocar is on

3    the way.

4           First, I want to discuss initially the juror issues.

5    And Mr. Foy, I would ask that you, obviously, you don't have to

6    make any decisions now, but I wanted to go through my thoughts

7    about what to do.

8           So Juror 10 is the juror who has sent I guess what

9    amounts to a doctor's note indicating she is ill.  And the

10   doctor's note says that she's excused from work and school

11   until the 30th.

12          A few things the parties should know.  Juror 10

13   expressed, after being selected, expressed issues relating to

14   her ability to serve, asked a question, well, what if -- I

15   can't remember, basically what if she wasn't able to make it or

16   something like that.  Obviously, it is unfortunate that she's

17   ill, but I'll point out that she said in jury selection that

18   she was laid off from her job and so that she doesn't have a

19   job.  So, I don't know whether she just didn't tell them that

20   what she needed the note for was because she was chosen as a

21   juror, or what actually is going on.  But in any event, she's

22   not going to come today, I wasn't going to force her to come

23   based upon the notes that were given.  And so, my thought was

24   that we go ahead without her.

25          With regard to Juror No. 11, who expressed -- and I

NBR3AZO1

1    think these notes were shared with counsel -- whose mother was

2    hospitalized I think Friday.  I'm not sure.  But whose mother

3    was hospitalized and whom she is a caregiver for.  And she also

4    expressed issues relating to her own mental state concerning

5    being a juror.

6           She is going to be here and she's going to be across

7    the street.  I intend to bring her over to ask her questions.

8    I suspect, obviously, if her mother is still in the hospital,

9    and she's still dealing with that, I would be inclined to

10   excuse her on that basis, but I want to get more information

11   and actually get more information concerning her -- I think she

12   described it as depression.

13          But assuming that those two are relieved, we spoke to

14   the jury clerk last week, there are still Jurors 43 through 59

15   who were here and heard my initial comments to everyone and

16   also heard the questionnaire.  My intention would be to bring

17   all of those folks back, with the idea that we would hopefully

18   get four out of those folks, and I would give the parties one

19   challenge each to those four, so that we could get two

20   alternates.

21          The idea being that Juror No. 13 would take over Juror

22   No. 10's slot, Juror No. 14 would take over Juror 11's slot,

23   Juror 15 would then become Juror 13, and then the two folks who

24   we choose today would become 14 and 15.  So we'd get back to

25   three alternates.  So that's my thought on how to proceed.

NBR3AZO1

1          The other juror issues about the gentleman with the

2     interviews and other things we can talk about that, but I think

3     the critical issue now is that we get to 12 jurors and three

4     alternates, swear the jurors in, and then start proceeding.

5          I did receive the *Brady* letter.  The defense letter

6     and the government's response, and also the motion with regard

7     to the search of the cell phone.  I do have some questions

8     related to that, but I think it probably makes sense to wait

9     for Mr. Azocar to get here.

10         And Mr. Foy, with regard to the jury stuff, let me

11    ask, I can repeat it for Mr. Azocar if, after you discuss it

12    with him, he's willing to waive his appearance prior to this.

13    Or I could leave it to you to explain to him what the issues

14    are.  It's up to you.

15         MR. FOY:  Well, may it please the Court.  Jason Foy

16    for Mr. Carlos Azocar.  With me at counsel table is attorney

17    Eric Sarraga and Paralegal Specialist Muesette Gonzalez.  Also

18    in the front row is Christopher Corcoran who I mentioned to you

19    worked with my office and has been assisting the case.  I guess

20    we can take up with the issue whether he can sit in the front

21    row.

22         THE COURT:  I think at one point one of the marshals

23    said it was okay.  But I'll verify it when they get here.

24         MR. FOY:  Sounds good.  Good morning to you.  You were

25    asking me about the jury.

NBR3AZO1

```
1           THE COURT:  Correct.  If you want some time to think
2   about it and speak to the government concerning my proposal,
3   you should feel free.  But go ahead.
4           MR. FOY:  I think when Mr. Orense does arrive, I'd
5   like him to hear from you your thoughts.  I am going to end up
6   discussing it with him obviously.
7           THE COURT:  That's not a problem.
8           MR. FOY:  My inclination, and the government and I did
9   have a conversation about juror -- is it Lin the one with
10  the --
11          THE COURT:  Correct.  Juror 11.
12          MR. FOY:  We were on the same page with excusing her.
13  I know you wanted to have more questions with her, but once I
14  see she's talking about her own mental health as being
15  affected, that's not generally a one-day occurrence.  And a
16  serious case and serious matter going to be discussed, some
17  that may be disturbing at some point.  So, we're definitely on
18  the same page with that.
19          With regard to juror Khodosh.
20          THE COURT:  Yes.
21          MR. FOY:  It is not a surprise to me we're here with
22  her, actually, based on the voir dire.  I didn't have enough
23  preempts, so that's why she's here.  So, I'm willing to let her
24  go because it is the defense position, like, this is
25  orchestrated and planned from the juror's perspective, so we
```

NBR3AZO1

1    don't need such distractions.

2             I guess the question I didn't contemplate is

3    continuing jury selection.  I recall at the end of jury

4    selection I was trying to encourage the Court to swear the jury

5    so we could tighten it up.  The government didn't.  You

6    understood the issues, you ruled, here we are.  I guess it was

7    a good thing you did.

8             THE COURT:  Yes.

9             MR. FOY:  From one perspective, anyway.

10            THE COURT:  Yes.

11            MR. FOY:  You know, I'm willing to pick some more

12   jurors.  That's fine.  I want to talk to him about it, what

13   that means, and give him a chance to express to me his

14   thoughts.  But based on the history of my representation with

15   him, I expect him to follow my lead on the issue.  So, with

16   that said, he's an independent thinker who, you know, has

17   expressed some things where I've had to adjust my approach

18   based on his thoughts, so I want to give him that opportunity.

19            THE COURT:  Perfectly understandable.

20            As I mentioned, I'll wait because I was able to read

21   the government's response, I do have some questions with regard

22   to both the *Brady* motion and the search motion.  But as I said,

23   I am going to wait until Mr. Azocar is here.

24            Once Ms. Lin, once we're notified and we had asked her

25   to be there, she might be over across the street right now,

NBR3AZO1

1     I'll bring her over to just ask her a few questions.

2          With regard to Juror No. 10, I think right now we've

3     told her that I needed to speak with the parties before

4     indicating whether she is excused.  And I may speak to the jury

5     clerk about whether this will count for her or not.  Although I

6     don't doubt she went to -- I think one way or the other, I

7     suspect -- well, all I'll say is the jury wasn't sworn, she was

8     here for one day, but I may leave it up to the jury clerk after

9     speaking to the jury clerk about that.  But I intend to excuse

10    her because we're not going to wait until the 30th obviously.

11         Does the government have any thoughts?

12         MS. LASKY:  We are fine with the plan.  Thank you,

13    your Honor.

14         THE COURT:  What I may do, depending upon when we get

15    the 13 folks, just so they're not sitting back there wondering

16    what's going on, I might bring them in to basically tell them

17    that we still have some -- well, I guess what I'll say is I

18    would tell them that over the holidays, some -- well, that we

19    need two additional jurors and just leave it at that.  And so

20    that I am going to continue jury selection.  But, obviously

21    I'll take my lead from the parties.

22         MR. FOY:  I am going to take the opportunity to think

23    out loud with you for a minute.  Of course I've had juror

24    issues before, that's not unusual.  Although less so when I'm

25    in the district versus state court.  Right.

NBR3AZO1

1          This is obviously your courtroom and the jury, and how

2     you engage the jury should be consistent with how you deal with

3     jurors.  But, I guess it's my thought that they need to

4     understand, like, this is important, this is a commitment, this

5     is not an optional thing that takes second place to their

6     personal life circumstances.

7          I don't know how you want to convey that, or whether

8     you want to convey that.  But, like, we got to stop with the

9     shenanigans.

10         THE COURT:  I guess what I would say is the following.

11    I could say that one juror took ill, and that we received

12    information from that juror's doctor.  And another juror's

13    mother had to be hospitalized.  In other words, a family

14    medical emergency.

15         Rather than not saying anything and basically saying

16    they shouldn't sort of speculate as to why people aren't here.

17    But, I think that conveys the fact that people had very unique

18    circumstances, and that's why they're not here.

19         MR. FOY:  Actually I agree with that.  That makes

20    sense.  The reason why I say that is because Juror No. 10's

21    issue, I literally during jury selection thought, oh, if she

22    gets on the jury, she'll be a problem with attendance, there

23    will be some delay with her not coming.  And then it's like,

24    day one or before day one, we're here.  So I don't know that

25    there is any other juror that I could say I got that feeling

NBR3AZO1

1    for, and I didn't have enough preempts to address the issue.

2    So maybe this is just a delayed start and everything will be

3    smooth from here on out.

4              THE COURT:  Although I will say Juror No. 10 I think

5    was really after, at least from my perspective or comments to

6    my deputy clerk, gave me an indication that she was not

7    inclined to participate.

8              Juror No. 11, I think in her e-mail she basically said

9    she didn't disclose the issue because she thought she could

10   handle it.  And circumstances I think have overtaken her prior

11   thoughts.

12             MR. FOY:  Right.

13             THE COURT:  So, does the government have any initial

14   thoughts concerning what, if anything, to say to the jurors who

15   are the 13?

16             MR. SULLIVAN:  Yes, your Honor.  I think on that

17   point, we think it would be helpful to convey in terms of

18   messaging on the schedule that we don't expect this to

19   materially push back the time frame for the trial.  The

20   government now, closer to our witness line up, thinks that the

21   schedule still remain, in terms of the outer end of it, the

22   same.

23             THE COURT:  Okay.

24             MR. SULLIVAN:  The other question we had, just because

25   we do have witnesses traveling today, flights, travel

NBR3AZO1

1    arrangements later today as well as tomorrow, have Jurors 43

2    through 59 already been contacted to come in?

3              THE COURT:  Yes, they were coming in anyway.

4              MR. SULLIVAN:  Great.

5              THE COURT:  And initially we thought there would be

6    other jurors, but then that would take a lot longer.  So I'm

7    hoping that we can get two out of the remaining jurors.

8              MR. SULLIVAN:  Thank you, your Honor.

9              THE COURT:  All right.

10             (Recess)

11             (Defendant present)

12             THE COURT:  If we could go on the record.

13             Mr. Foy, I understand you had a request.

14             MR. FOY:  I do.  Your Honor, in court today is my

15    client's daughter and her husband.  She hasn't been in contact

16    or been able to see her father since he was taken in custody in

17    Italy in 2021.

18             We're seeking permission to allow her to have, at the

19    rail, a conversation that's going to include a hug.  I spoke to

20    the marshals about it, they're willing to allow it to happen

21    only with the permission of the Court, obviously.  I wanted to

22    do it while we're waiting versus at the end of the day when it

23    is a long day and he needs to get back to MDC and all that.

24    That's why we're seeking authorization for that.

25             THE COURT:  Marshals, I'll take my cue from you, if

NBR3AZO1

1    you want to.

2             THE MARSHAL:  It is against our policy.

3             THE COURT:  I know the physical contact.

4             THE MARSHAL:  Absolutely.

5             THE COURT:  I think, Mr. Foy, I think, I don't want

6    to, because I also don't want to subject them to some kind of a

7    search also.

8             So, I guess, I'm fine with Mr. Azocar turning in his

9    seat or speaking with his family members, they could come up,

10   but they need to stay on the other side of the rail, obviously,

11   and no physical contact.

12            MR. FOY:  Okay.  Thank you.

13            THE MARSHAL:  Thank you, your Honor.

14            (Pause)

15            THE COURT:  Mr. Azocar, if we could go on the record.

16            So, Mr. Azocar, I had a brief conversation with the

17   attorneys concerning the jury, and I want to explain to you

18   where things stand.

19            Juror No. 10 has sent an e-mail to my staff indicating

20   that she is ill, and attached a doctor's note indicating her

21   diagnosis, and I did not require her to come to court today.

22            Juror No. 11 sent an e-mail to my staff last week

23   indicating that her mother had been hospitalized, and that she,

24   although she didn't express it during the jury selection

25   process, she has been suffering from I think what she described

NBR3AZO1

1    as depression, and she was concerned that the combination of

2    things would make it very difficult for her to be a juror in

3    this case.

4           Juror 11 is here, not in the courtroom, but across the

5    street, and it's my intention to ask her some questions,

6    follow-up questions, obviously, after expressing everyone's

7    hope that her mother is doing okay, but questions designed to

8    get at issues that make it difficult for her to be a juror

9    here.

10           (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NbrWore2

1           THE COURT:  In all likelihood, both of those jurors

2      are going to be excused, which means we are going to utilize

3      two of the alternates.

4           The proposal I made to the parties is that juror No.

5      13 would become juror No. 10 and juror No. 14 would become

6      juror No. 11.  That would leave us with one alternate.

7      However, there were, I think, around ten jurors who were here

8      last week, who heard my initial comments and also heard the

9      questions that I asked and actually had a copy of the

10     questionnaire, who were reporting today across the street for

11     jury service.  So it was my recommendation to the parties that

12     prior to swearing in the 13 jurors that we have, we would

13     continue jury selection so that we can get two additional

14     alternates out of that group, and in essence, we would seek to

15     get four people out of that group and each party would have the

16     ability to challenge one person each to those four so that we

17     would get two people.

18          It's my intention that prior to bringing juror No. 11

19     here from across the street, I'm hoping that we'll have all 13

20     folks here, and I will explain to them that there is going to

21     be a slight delay in beginning the actual opening statements

22     and testimony because we need to select two additional

23     alternates, and I'll explain to the jurors who were alternates

24     13 and 14 that they are now on the jury.

25          I will also let them know the reason that two of the

NbrWore2

1    jurors aren't able to make it: one was a medical condition, for

2    which we received a doctor's note indicating that she would not

3    be able to participate for at least several days in the case;

4    and the other juror had a medical emergency -- her mother was

5    hospitalized.  And then I would excuse the 13.  They could sit

6    in the jury room and we would proceed to get the two

7    alternates.

8              So that's the way I intend to proceed, and obviously,

9    you can speak with your attorneys about that concerning that

10   process going forward.

11             MR. FOY:  Your Honor, with regard to the juror issue,

12   I did have a chance to speak to Mr. Orense about what occurred

13   before he arrived at court today, and he's prepared to continue

14   jury selection.  We don't have any applications with regard to

15   that, so we're ready to move forward.

16             THE COURT:  All right.  Thank you.

17             Now, should I refer to him as, I note that you

18   referred to him as Mr. Orense.  I'd been referring to him as

19   Azocar.

20             MR. FOY:  Orense, I think, is most appropriate.

21             THE COURT:  All right.  OK.

22             Let me now switch gears a little.

23             MR. FOY:  Thank you, your Honor.

24             THE COURT:  OK.  Well, let me ask just a process

25   question.  In terms of the evidence that the government intends

NbrWore2

1    to offer today, would that have included information from Mr.

2    Orense's cell phone?

3            MS. LASKY:  No, your Honor.

4            THE COURT:  OK.  Let me deal, first, with the

5    *Brady*-related motion.  Does anybody have a copy of the email?

6    I don't think I received a copy of the email that is being

7    referenced.  Does anybody have a copy of it, by any chance?  If

8    not, that's fine.  It's just that I'd be curious to see, was

9    there anything more to the email chain, or was that the total

10    that the parties have advised me of?

11            Yes, Mr. Foy.

12            MR. FOY:  Those are exact quotes in my submission as

13    to what's on there.  The only other thing, there's some

14    redacted address and stuff, but there's no other context around

15    it.  It's a confirmation of a conversation just as reflected in

16    the motion papers.

17            THE COURT:  OK.  In connection with its production,

18    did the government produce it as -- well, how was it produced?

19    In other words, was there a description that went along with

20    it?  Was it just produced along with a whole bunch of other

21    emails?  In other words, was there a discovery letter, and what

22    did that discovery letter say?  I know it was produced in 2022,

23    but I'm just trying to get a sense of that.

24            MR. SULLIVAN:  Yes, your Honor.

25            It was produced in the first production in December of

NbrWore2

1    2022.  It wasn't a particularly large production.  There's no

2    additional description provided with it.

3         THE COURT:  OK.  All right.  Did the government

4    produce it because it was *Brady*-esque or *Giglio*-esque?  In

5    other words, just based upon its face, it doesn't appear to be

6    anything that the government wouldn't seek to offer, because I

7    don't believe the two people involved -- I mean, there's a

8    prosecutor and then there's an agent, neither of whom

9    necessarily has, I don't believe, personal knowledge with

10   regard to -- in other words, they are investigating but

11   wouldn't have personal knowledge.  Is that accurate?

12        MR. SULLIVAN:  So, what's accurate is that, in an

13   abundance of caution, the government did produce it in that

14   production.  In terms of the workings of that office's

15   knowledge or what was on their minds, there was nothing further

16   provided in the production about that.

17        THE COURT:  I was just curious about the thought

18   process of it being produced here.

19        MR. SULLIVAN:  Yes.

20        THE COURT:  And I take it from the government's

21   comments about follow-up that there were no other emails that

22   the government was made aware of that continued the discussion

23   in the email that was produced.

24        MR. SULLIVAN:  Just to make sure I'm understanding

25   your Honor's question, there were no more emails from the

NbrWore2

1   Southern District of Florida is what you're saying?

2            THE COURT:  Correct.  In other words, where the agent

3   was, like, I want more information or where there was an

4   exchange, in other words, any further exchange about the issue

5   of what appears to be a declination by the Southern District of

6   Florida.

7            MR. SULLIVAN:  That's correct.  No further inquiry.

8            THE COURT:  All right.  Do you know if there were

9   discussions?

10           MR. SULLIVAN:  Discussions?

11           THE COURT:  Between the agent and the assistant.

12           MR. SULLIVAN:  Again, just to be clear, the agent in

13   the Southern District of Florida?

14           THE COURT:  Southern District of Florida.

15           MR. SULLIVAN:  In terms of -- no, I don't believe we

16   do, in terms of the --

17           THE COURT:  OK.

18           MR. SULLIVAN:  Their back-and-forth about what was in

19   the email we produced.

20           THE COURT:  All right.  And I take it the -- do the

21   folks here know one way or the other whether any of the

22   witnesses that are going to be called by the government here in

23   the case were, I guess, in the minds of or were they witnesses

24   that were considered by the Southern District of Florida?

25           MR. SULLIVAN:  I think what, and let me just say from

NbrWore2

1    the outset, in terms of whatever witnesses were referred to in

2    that email, that's all we have in terms of that's what the

3    email says.

4                THE COURT:  Sure.

5                MR. SULLIVAN:  It's not specific as to a particular

6    witness.  We were aware, and obviously, defense is aware,

7    because we produced it in 3500, certain of our witnesses in

8    this case that have met with this office did previously meet

9    and were debriefed at various points by the Southern District

10   of Florida.

11               THE COURT:  OK.  And I'm sorry.  The notes or DD-5s or

12   302s, whatever agency it is that was in the Southern District

13   of Florida, to the extent they had them, were notes that were,

14   they were included in the 3500 for the witness who is going to

15   testify here even if it was produced, generated in the Southern

16   District of Florida.

17               MR. SULLIVAN:  Yes.  So, in an abundance of caution,

18   the Southern District of New York did seek from the Southern

19   District of Florida, both from the U.S. Attorney's Office and

20   the investigating agencies on that team in the Southern

21   District of Florida, any sort of reports of investigation,

22   DEA-6s, notes reflecting debriefings of any of the witnesses

23   that they had interacted with that are now in this case here in

24   New York.

25               THE COURT:  OK.  And do you know when the Southern

NbrWore2

1    District of Florida was speaking to the witnesses who overlap,

2    were they cooperators, either signed up by the Southern

3    District of Florida or signed up here?

4                 MR. SULLIVAN:  I can say certainly not signed up here.

5                 THE COURT:  OK.

6                 MR. SULLIVAN:  Let me just confer with my cocounsel

7    for a brief moment.

8                 THE COURT:  Absolutely.

9                 MR. SULLIVAN:  So, in terms of, again, we don't know

10   what witnesses were the subject of that email.

11                THE COURT:  Sure.

12                MR. SULLIVAN:  But for the witnesses that we know from

13   the 3500 we have produced to defense that were talking to the

14   Southern District of Florida, again, not signed up with the

15   Southern District of New York at that point, and in terms of

16   whether any of those overlapping witnesses were signed up with

17   the Southern District of Florida -- and again, as is reflected

18   in the 3500 -- I think certain of them were cooperating.

19                In terms of the Southern District of Florida's, how

20   they sign up witnesses, what they require of them, I don't want

21   to speak to that, but in terms of were they cooperating and

22   providing information, we are aware of that.  We've produced,

23   to the extent we've obtained it, we've produced it in our 3500.

24                THE COURT:  And the witnesses that the government

25   intends to call here, I guess the ones that overlap, were those

NbrWore2

1    witnesses actually signed cooperators in this district?  Are

2    they signed cooperators in this district?

3              MR. SULLIVAN:  So by Southern District protocols, none

4    of them are signed-up cooperators with the U.S. Attorney's

5    Office in this district.  One or more of them may be CSs,

6    confidential sources, who have been signed up by the Drug

7    Enforcement Administration, but in terms of having been signed

8    up as a cooperator with the U.S. Attorney's Office, none are.

9              THE COURT:  OK.  And then, meaning just the overlap

10   people; is that what we're talking about?

11             MR. SULLIVAN:  Correct.

12             THE COURT:  OK.

13             MR. SULLIVAN:  I mean that's the only one we have

14   visibility on in terms of we know that they were previously

15   talking to the Southern District of Florida.

16             THE COURT:  Sure.  OK.

17             Is Special Agent Brian Whitworth -- I didn't go back

18   and look.  Is Agent Whitworth going to be a witness in this

19   case?

20             MR. SULLIVAN:  No.

21             THE COURT:  And I take it the person, the assistant

22   isn't a witness.

23             MR. SULLIVAN:  No.

24             THE COURT:  OK.

25             All right.  Mr. Foy, again, why isn't the

NbrWore2

1    information -- I understand the issue with regard to witnesses

2    who might be witnesses here, but why is sort of the thought

3    process of the Southern District of Florida something that

4    would be discoverable?  In other words, putting aside sort of

5    their view -- and again, I don't know whether they came to a

6    view or what, but their view of any particular witness.

7            MR. FOY:  Before I respond to the question --

8            THE COURT:  Sure.

9            MR. FOY:  -- if you wish, we have queued up the actual

10    document that I can email to your Honor so you can see it.

11            THE COURT:  Sure.

12            MR. FOY:  Let's email that to the Court, the deputy

13    and the government, with the attached email.  This is under

14    Bates No. 168.

15            Now, in the email, right, Special Agent Whitworth

16    speaks to the AUSA, who at the time, we believe, was

17    prosecuting the witness that's going to testify today, Boada.

18    I don't know if they're talking about Boada or not.  Right?

19    But they're talking about a witness, and they're talking about

20    Orense.  Right?  I assume because it was produced they're

21    talking about my client.  Right?

22            So what I'm asking is what were they talking about?

23    Right?  Because they talk about specifically concerns about

24    witness credibility and availability as it relates to Mr.

25    Orense.  Right?  So I don't have notes.  Right?  Because the

NbrWore2

1   one thing that -- I do have 6s of debriefings with witnesses in

2   this case.  We don't have underlying notes to those briefings.

3   I'm clear that there's a DEA policy that handwritten notes

4   should be preserved.  I haven't made an issue of it yet because

5   we have to see what happens during the trial as to whether

6   that's going to be a factor at all in the case.  But when I see

7   this, I'm, like, I'm thinking I'll just get the answer, like,

8   well, at the time this is what the issue was.  I don't know

9   what it is.

10          The reason why I filed with the Court is because when

11  I made the inquiry, thinking there would be some sort of

12  explanation, because I really don't know what it is.  I know

13  that a witness's credibility affected law enforcement's

14  decision to pursue my client, and now we're here with a case

15  some years after, I guess.  Right?  This case starts to

16  formally get filed in 2021, so two years elapses and, right, I

17  want to identify what the change was that overcame the

18  credibility issue.  Right?  Availability to some extent, but

19  that's less of an issue.  The credibility does relate directly

20  to favorable information, potential favorable information to

21  Mr. Orense.  So when I ask the question, what were they talking

22  about, there was some sort of conversation knowing that there

23  was a policy to document investigative efforts, particularly

24  with witnesses, I'm assuming that the credibility determination

25  was based upon interviews with the witness.  There's a

NbrWore2

conversation about that credibility determination from a

prosecuting attorney who prosecuted one of the witnesses in

this case, meaning our case today; I just want to know what

they were talking about.

They chose, apparently, intentionally, other than the

email to reflect that there was a conversation, to not record

the detail, so that would require the government to seek out

and learn, as the Rule 5 order indicates, that they do have an

obligation to find out, not via private investigator, because

this is not a private investigation.  They're all in the

Department of Justice.  I know they're in a different district,

but the government's one government.  There's one United

States.  So when they go to have a conversation, they

coordinate their investigations, it's a question, what were you

guys talking about?  Someone must have a note, what was the

credibility issue that made you decide not to pursue the case?

So when the question is met in an unresponsive way,

I'm coming to the Court for relief in hopes of just learning

what the credibility issue was.

Now, in the written response, that's the closest to an

answer we've gotten, because they gave more there than in our

attempt to have a conversation, where they said they made

efforts and couldn't find out.  But they wouldn't even say

that; all they said was the unresponsive, I followed -- we're

aware of our obligation and we followed, disclosed everything.

NbrWore2

1    That's not an answer to my pointed questions of, well, tell me

2    what you -- who did you talk to, who's -- it's got to be

3    something.

4            I think the something, the issue that caused the

5    decision -- I'm not suggesting that the AUSAs themselves or the

6    agent necessarily, you know, are a witness and they have the

7    information that's exculpatory.  They learned of it.  They

8    discussed it.  They made a decision not to prosecute my client

9    based upon that decision.  How is it that we're not entitled to

10   know?  They had to know that it's something of significance,

11   which is why they have the email to confirm they had the

12   conversation at all.  At least that's one interpretation, not

13   knowing the full context of what was going on on January 8,

14   2019.

15           So that's what I'm seeking from the Court, some

16   affirmative inquiry to learn what the credibility issue is,

17   because I suspect -- I don't know -- it relates to the witness

18   Boada, who I know lied to the government.  Like, I know.

19   There's no question.  He's going to admit to lying to the

20   government.  All right?

21           THE COURT:  And are the lies something that's

22   documented in the 3500 material that was generated in the

23   Southern District of Florida as compared to the 3500 material

24   that's been generated here?

25           MR. FOY:  Let me think about that.

NbrWore2

1          THE COURT:  And let me just make just a -- there are a

2    lot of leaps you were making, and I'm not in any way accepting

3    those leaps.

4          MR. FOY:  Right.

5          THE COURT:  But just to point out that the email has

6    been in the possession of the defense since December of 2022.

7    It has only now been brought to my attention and only recently

8    been the subject of the back-and-forth between the government

9    and the defense.  So I think that as a general matter, other

10   than the issue of potential -- the thought process of the

11   Southern District of Florida or the Southern District of New

12   York and their thought process and making a charging decision

13   is typically a deliberative process and outside any sort of

14   discovery.

15         The only potential here, at least from my perspective,

16   is that there is something that a witness said before that is

17   different than what they're saying now.  I don't know, and it

18   sounds like there may be some of that in the 3500 material for

19   the witness that you mentioned, but let me ask.

20         MR. FOY:  Can I respond to one thing?

21         THE COURT:  Sure.  Go ahead.

22         MR. FOY:  I'm not seeking the deliberative process.

23   I'm seeking what was the information -- I mean I see -- that

24   led to the decision?  All right.  They made a decision.  What's

25   the credibility thing that decision was based upon?  Because it

NbrWore2

1    could be based upon stuff I already have.  That's true, I

2    guess.  But I don't know.  It could be something that I don't

3    know.  So all I'm asking the government to do is go verify and

4    tell me how it was verified so I understand that that's, OK,

5    because I probably would be willing to accept it if I

6    understood what happened to look into it.  I don't know what

7    happened that looked -- I don't know whether I should accept it

8    as there's nothing additional.  I already have what they're

9    discussing in the materials.  I don't know.

10          THE COURT:  Well, I imagine that that -- well, let me

11    ask, and I don't know who undertook the efforts.  But what

12    actually was done or requested of the Southern District of

13    Florida with regard to this?  In other words, because the other

14    route, Mr. Foy, is to make a *Touhy* request and basically speak

15    to these folks yourself.  I mean, in other words, to find out

16    what was in their mind, because to find out what was in their

17    mind is, I assume, based upon whatever notes and things like

18    that they generated.

19          But let me hear from the government concerning the

20    diligence inquiry with the Southern District of Florida.

21          MR. SULLIVAN:  Yes, your Honor.

22          This office inquired with the Southern District of

23    Florida about any credibility issue, and based on that inquiry,

24    we have no additional *Giglio* to produce on the matter.  We

25    believe our obligations with respect to *Brady*, *Giglio*, Rule

NbrWore2

1    5(f) are satisfied.

2              THE COURT:  OK.

3              MR. SULLIVAN:  I would also just underscore there was

4    an overall effort outside of the issue that Mr. Foy is now

5    raising to collect from the Southern District of Florida all of

6    the reports, notes, 6s from those prior meetings; they've been

7    turned over.  The defense has a wealth of information regarding

8    the credibility of these witnesses that's been produced.  That

9    includes, obviously, of course, our notes in meeting with them

10   more recently, and it includes all the crimes that they've

11   committed and been charged with or not been charged with and

12   pled guilty to.  So in terms of a credibility assessment of our

13   witnesses and what's been produced, what we've collected, there

14   is a wealth of information that has been provided to the

15   defense.

16             THE COURT:  OK.  And I take it in the inquiry with the

17   Southern District of Florida, the only email is the email --

18   that you're aware of is the email, the January 8, 2019, email

19   between -- is it AUSA Gonzalez and Special Agent Whitworth?

20             MR. SULLIVAN:  One moment, your Honor?

21             Yes, your Honor.  That's the only record we received

22   from the SDFL on the matter.

23             THE COURT:  OK.  Let me ask.  Did the inquiry include

24   a conversation with one or both of these folks, in other words,

25   AUSA Gonzalez or Special Agent Whitworth?

NbrWore2

1          MR. SULLIVAN:  Yes, your Honor.

2          THE COURT:  OK.  And in the conversation with them,

3    did they, either of them, point to any specific witness whose

4    credibility they were referring to in this exchange?

5          MR. SULLIVAN:  One moment, your Honor?

6          THE COURT:  Yes.

7          MR. SULLIVAN:  As far as we're aware, your Honor, no

8    specific witness was discussed in the inquiry.

9          THE COURT:  OK.  All right.  I'm not sure -- so as far

10   as you're aware -- but am I correct, was it one of the

11   prosecutors here, or was it somebody else who had the

12   conversation?

13         MR. SULLIVAN:  It was not anybody at government

14   counsel's table, your Honor.

15         THE COURT:  Oh, OK.  Was it someone who was previously

16   on the trial team?  I guess I'm just trying to figure out,

17   because, again, it's one thing to have the folks here, who may

18   have had the conversation, but it sounds like it's a little bit

19   of telephone.

20         MR. SULLIVAN:  Our understanding is no specific

21   witness was discussed and that there was, what was conveyed is

22   there was no credibility concerns with any witness.

23         THE COURT:  OK.  So -- all right.

24         MR. FOY:  May I be heard, your Honor?

25         THE COURT:  Yes.

NbrWore2

1                MR. FOY:  I just want to see if I understand the
2        colloquy.  There was an email about a conversation about
3        witness credibility and a law enforcement decision not to
4        pursue a case.  When the government followed up with the people
5        involved in the email, they said there was no witness they were
6        talking about?
7                THE COURT:  My understanding is that when the
8        communication was had with the folks, they said there wasn't
9        anybody they were referring to; in other words -- well, why
10       don't I hear from the government.
11               MR. SULLIVAN:  Yes.
12               THE COURT:  I thought that's what I heard.
13               MR. SULLIVAN:  Yes.  No specific individual witnesses
14       were discussed, but what was conveyed is that there were no
15       credibility concerns on the part of the Southern District of
16       Florida.
17               THE COURT:  OK.
18               MR. FOY:  But the email says something different than
19       that.
20               THE COURT:  Yes.
21               MR. FOY:  OK.
22               THE COURT:  Well, the email says for all the reasons
23       we discussed concerning witness credibility.  I mean you're
24       assuming -- well, witness credibility and availability?  I mean
25       I don't know whether, what was going on in that conversation,

NbrWore2

1    and -- all I know is what I've heard here, so --

2              MR. FOY:  Based on past experience with law

3    enforcement, a decision not to prosecute coupled with a

4    conversation of credibility, the inference isn't it was a

5    positive credibility finding that led to a decline to

6    prosecute.  Right?  To me, the fact that they're bringing up

7    credibility as an issue that leads to no charges, decline to

8    prosecute, suggests that it's adverse credibility findings or

9    learning of adverse credibility.

10             Now, I'm trying to think.  Is there a world in which

11   they're saying that guy we really believe who is not -- I mean,

12   I don't know.

13             THE COURT:  Well, I guess there may be a world in

14   which the prosecutor is, that they don't want to do the case

15   and they're giving this as a reason and they didn't really have

16   concerns.  But again, I don't --

17             MR. FOY:  Well, that would be interesting.  Right?  It

18   would be interesting that the government would generate an

19   email, because they don't need a reason to not pursue a case.

20   They have full discretion.  It's not like you have to come up

21   with something, but the fact that they could potentially come

22   up with a reason to not -- between the email between them and

23   then there would really be no reason, that would be strange.

24             THE COURT:  All I can say is what I've heard here

25   today.  Let me ask, because rather than --

NbrWore2

1          Who at the U.S. Attorney's Office spoke with the folks

2   in the Southern District of Florida?

3          MR. SULLIVAN:  It was a previous member of the case

4   team, who is still in the office.

5          THE COURT:  OK.  All right.

6          MR. FOY:  May I provide your Honor with a little more

7   context to what's going on back in 2019?  In the Southern

8   District of Florida, based on my review of the documents

9   produced?

10         THE COURT:  OK.  Although I do want to try and --

11         MR. FOY:  I know.  I know.  I'm going to move it

12  along.

13         THE COURT:  All right.

14         MR. FOY:  We have a star --

15         THE COURT:  I'm sorry, Mr. Foy.  Go ahead.

16         MR. FOY:  In this case, you're going to see a star

17  witness.  His name is Antonio Arvelaiz.  Right?  Antonio

18  Arvelaiz at this time is cooperating with the Southern District

19  of Florida.  You will learn, along with the jury, that at some

20  point Boada gets arrested.

21         THE COURT:  One second.

22         Go ahead.

23         MR. FOY:  Boada gets arrested, who is being prosecuted

24  by the AUSA in the email.  There are issues that come up during

25  Arvelaiz's cooperation with the Southern District of Florida

NbrWore2

1    that result in him getting new charges of fraud that will be

2    the subject of cross-examination -- of five years.

3          Now, I know there's going to be times that Boada and

4    Arvelaiz were in jail together -- right -- I submit, talking

5    about the case.  I don't know how that affected what happened.

6    Right?  There was an AUSA Richard Gregorie, a/k/a Dick

7    Gregorie -- Gregorie with an I-E on the end -- who appeared at

8    his sentencing, upon information and belief, to advocate for a

9    lesser sentence for Mr. Arvelaiz.  The judge didn't agree and

10   gave him five years.

11         There's a lot of unusual things that are going to

12   develop during the trial about the interaction between the

13   government, its cooperators, the cooperators interacting with

14   one another.  And I learned that dynamic, the fact that

15   cooperators were used to pay other cooperators on behalf of the

16   government during this case; that cooperators lived together at

17   some point in this case, only through the 3500, not through the

18   Rule 16 discovery.  So seeing the email by itself doesn't -- I

19   mean I saw it, but I'm figuring there will be more; I'm going

20   to see it in the 3500.  But it's not clear.

21         Now that I have everything and I can see what the case

22   is, I ask the question thinking I would get the answer.  We're

23   discussing this now because they refused to answer the

24   question.  Right?  So it's a strange case.  There are going to

25   be things that are going to be talked about that I've never

NbrWore2

1    talked about in a court of law before with regards to a

2    criminal case, which can explain some of the troubles we've

3    been having and challenges we've been having in preparing for

4    the case, and things have been shifting and when we get to the

5    issue of the, whether we're going to get into Arvelaiz trying

6    to kill my client, I'm probably not going to make a final

7    decision to my opening until we have this conversation and you

8    rule on what we can and cannot do.

9            But I say all that because then when you drop this

10   into the context of all of that, I definitely want to know what

11   they were talking about and if what they were talking about was

12   nothing and they made an email to make it seem like there was

13   an issue when there was no issue, even though issues actually

14   exist that I'm aware of, I'm trying to understand so that when

15   I go on the offense against the government, I understand what

16   I'm doing and why I'm doing it or don't get blindsided because

17   I didn't ask the question and they say, oh, no, it's this

18   legitimate thing that if I had known, well, maybe I wouldn't

19   have taken that position.  So that's why I'm pressing the

20   issue.  That's why I took the time from trial prep to file a

21   motion *in limine* on the eve of trial.  It's not something I

22   generally do.  I try to get things out of the way and focus.

23   It's enough to just learn and deal with the witnesses that are

24   actually going to come versus creating more legal issues.

25            So I give you that context as to why I feel like it's

NbrWore2

1   an important thing.  I understand.  I guess I could do the

2   *Touhy*, but that sounds like a little bit of a cumbersome

3   process, to do all of that.  I guess we'll see, because

4   ultimately you'll rule and then we'll accept it and move

5   forward, obviously.

6               THE COURT:  All right.

7         Do you know how long ago the conversation occurred

8   between the assistant in this district and the Southern

9   District of Florida?  Was there more than one conversation, or

10  do we really not have a sense of that?

11              MR. SULLIVAN:  So, your Honor, I'm caveating this, I

12  don't know for certain, but I believe it was sometime in 2021.

13              THE COURT:  OK.  Because I may ask for that

14  assistant's -- again, just to close the loop, because again,

15  what I'm hearing is a little bit of telephone.  In other words,

16  I understand you're relating what you're hearing from that

17  person, but I just want to close the loop on this.

18        I mean I do think, Mr. Foy, to the timing issue, you

19  could have started the process once you received the email

20  either with the questioning of the government or with the *Touhy*

21  back when the email was received.  What I'm trying to do is get

22  the information about who might have been the person, if

23  anyone, being referred to in this email and what the nature of

24  the conversation was between the assistants in this district

25  and the Southern District of Florida.

NbrWore2

1          MR. FOY:  I can't disagree with your Honor about what

2     I could have done.  That's true.  The government could have

3     followed the order of the Court that says I don't have to ask

4     for favorable information.  They don't have to wait for me to

5     ask.  They have a duty to move forward and get -- the email

6     begs the question, what are you talking about?

7          THE COURT:  My understanding, from what they've said

8     in the letters, is that they've done that; in other words, that

9     there was an inquiry made and what came back has been,

10    obviously, you know, fleshed out a little bit more here, but

11    that they've done that inquiry and there was nothing else to

12    report and that they've provided the 3500 material that was

13    generated -- you know, the reports and things like that -- they

14    received from the Southern District of Florida.

15         MR. FOY:  Well, I could tell you this.  My application

16    is certainly not that they didn't provide any 3500.  I do have

17    some things to work with.  I just don't know what that email

18    was about and the level of detail, and I believe we're entitled

19    to know.  And the 3500 -- I actually expected them to say,

20    well, it's the thing in the 3500 that we told you about, but

21    that's not the answer I received.  So that's why we're here.  I

22    didn't think it was going to be a big deal, but here we are.

23         THE COURT:  All right.

24         Yes.

25         MR. SULLIVAN:  Your Honor, so, it was June of 2020,

NbrWore2

1    and it's not that we're --

2          THE COURT:  I'm sorry.  June of 2020, that's when the

3    conversation occurred?

4          MR. SULLIVAN:  That's correct.

5          It's not that we're playing a game of telephone here

6    *per se*.  It's that our arguments are focused on not what was

7    the SDFL's prosecution decision.  It's whether there was any

8    *Brady* or *Giglio* that requires disclosure and whether we've

9    satisfied our obligations under *Brady* and *Giglio*, and we have

10   obtained and produced all materials.  So apologies to the Court

11   for the game of telephone, but it's that we're focused on

12   whether we have complied, whether there's anything else for us

13   to produce pursuant to our obligations, and we believe we have

14   complied.

15         THE COURT:  All right.

16         Mr. Foy, it seems like what you want to know is who,

17   what they based the decision on.

18         MR. FOY:  I want to know the information that relates

19   to credibility that, yeah, ultimately they declined to

20   prosecute, but that doesn't matter.  I know that already.  I

21   know they declined to prosecute.  So I don't want to know that,

22   because I do know that.

23         What I want to know is the information it was based

24   upon as it relates to credibility specifically.  That.  That's

25   what I want to know, the information it was based upon.  I

NbrWore2

1    already know the decision.

2            THE COURT:  Well --

3            MR. FOY:  And maybe it's in the materials, and they

4    could say, yeah, remember when he said this was the first time

5    he ever took a trip like this?  I go OK, I know that already.

6    Or maybe they'd say remember when he changed his story and

7    said, in 2002, when José asked me to do it and made it seem

8    like this was only the second time and they realized he's doing

9    it every month over several years, not just two times.  Maybe

10   that's what it is, but I don't know.  Maybe it's, you know, oh,

11   right, and then I got convicted and did nine years in

12   Venezuela, when I got caught out there.  Maybe it's that that

13   he didn't disclose in the beginning.  Maybe it's when he said

14   it was Carlos who was with -- meaning Carlos Jr., and then he

15   IDs Abdonis, a different son.  And then the name of Carlos is

16   under Abdonis's name.  Maybe it's that that I know that they

17   were talking about.  I don't know what they were talking about.

18           THE COURT:  Well, my understanding from what I've

19   heard from the prosecutor, is that --

20           MR. FOY:  It might not be Boada.  It might be somebody

21   else.  It might be Arvelaiz.  It might be a witness who isn't

22   in this case and they can tell me that, that they're not going

23   to call.  That doesn't mean it's not valuable if there's still

24   favorable information for a witness they're not going to call.

25   I still think they're obligated to tell us, but I don't know,

NbrWore2

1    and they don't want to say.

2                THE COURT:  Well, but I think what they say is they've

3    collected all the materials from the Southern District of

4    Florida that they've been provided and they've turned that

5    over.

6                MR. FOY:  They have said that.  They said they turned

7    over all the material.  They have, but I'm not asking for

8    material.  I'm asking for information.  That means things

9    people said, their recollection.  Oh, yeah, I remember that

10   conversation.  I sent that email because, you know what?  The

11   witness had -- I'm making this up now, they had child

12   pornography on their computer, so we didn't want to proceed

13   with it.  It's not in any reports.  We're not calling them.

14   That's just information.  That's somebody relating information,

15   which is *Brady*.  It's not just reports and materials.  So I'm

16   looking for information within the possession of the

17   government, because it's government conversations between law

18   enforcement regarding charging decisions against the man on

19   trial.

20               That's what I want to know, the information that, yes,

21   eventually led to decline to prosecute.  But I know that.  I

22   don't need them to tell me that.  I need them to tell me what

23   the information is.

24               THE COURT:  Yes.

25               MR. SULLIVAN:  Your Honor, what the defense is, in

NbrWore2

1   effect, seeking here is the internal deliberations of the

2   Southern District of Florida based on the information that we

3   have gone to the Southern District of Florida and collected and

4   produced.  And if I'm hearing Mr. Foy correctly, it sounds

5   like, given the wealth of information we have already turned

6   over, the *Giglio*, the *Brady*, the disclosures about prior

7   criminal conduct, it sounds like, as Mr. Foy is talking about

8   what he believes are inconsistent statements, it sounds like

9   there's enough there that the defense has what it needs to

10  assess the credibility of our witnesses and to challenge that

11  credibility here in these proceedings.

12          THE COURT:  Well, let me just ask.  It sounds as if

13  the prosecutor, back in 2020, spoke to these folks and the

14  information that at that time that the prosecutor got was the

15  Southern District of Florida didn't have any issues with

16  witness credibility.  Is that an accurate statement?

17          MR. SULLIVAN:  That it didn't have any credibility

18  concerns.

19          THE COURT:  Credibility concerns.  Witness credibility

20  concerns.

21          MR. SULLIVAN:  And since that time, we have, as

22  Mr. Foy well knows, collected voluminous materials from the

23  Southern District of Florida and from the various agencies on

24  that team and we have turned it over in this case.

25          THE COURT:  OK.  All right.  So, with regard to the

NbrWore2

1    issue of *Brady*, and -- Mr. Foy, you're obviously free to reach

2    out to these folks.  I don't remember whether *Touhy* really

3    relates to testimony or whether it relates to contacting.  But

4    from what I understand, the conversation that you're requesting

5    was had in 2020 and what came back is what the prosecutor just

6    said; in other words, they didn't have any -- and I

7    apologize -- credibility concerns, witness credibility

8    concerns, and then that the government here has basically

9    collected all of the information that they're aware of that the

10   Southern District of Florida had with regard to the witnesses

11   who are going to testify here in this case, which apparently

12   includes certain things, it sounds like, they may have said,

13   one or more may have said X or Y and it turns out X or Y in the

14   Southern District of Florida and it turns out X or Y wasn't

15   accurate or true.  I mean I don't know.  It sounds like, again,

16   from the conversation -- again, I haven't looked at the 3500

17   material, but that's what it sounds like.  The government

18   collected the information from the Southern District of

19   Florida.  The information that is really being sought sounds as

20   if it is really what you want to know is, well, why did they

21   make that decision.  And based upon what I've heard here, to

22   the extent there was some credibility issue, the materials

23   would be what was generated, in other words, whatever reports

24   or anything that the Southern District of Florida generated at

25   that time.

NbrWore2

1          Again, I'm not privy to the conversations that were

2    had with or what was in the mind of AUSA Gonzalez or Agent

3    Whitworth.  So I'm going to deny the issue, the *Brady* motion,

4    but obviously, Mr. Foy, you can pursue the issue if you like in

5    trying to speak with those folks.

6          I'm hesitating, because again -- who was the AUSA?

7    I'm note sure why this is such a --

8          MR. SULLIVAN:  Who made the inquiry?

9          THE COURT:  Yes.

10          MR. SULLIVAN:  It's Assistant U.S. Attorney Jason

11    Richman.

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

NBR3ORE3

1          THE COURT:  And again, what I want to do to close the

2     loop is I'd like to hear from AUSA Richman so we have,

3     basically, the person who had the conversation at the time,

4     understanding that you've collected all of the information from

5     the Southern District of Florida.

6          We don't have to do it now.  I made my preliminary

7     ruling.  I don't believe that that will change, based upon what

8     he said.  But so Mr. Foy will have, I guess, and again, to the

9     extent that AUSA Richman recalls the conversation, he can

10    relate it here, rather than through you folks.

11         MR. SULLIVAN:  Understood, your Honor.

12         THE COURT:  All right.  So what I propose to do is

13    that I call out the 13 jurors who are here, that I let them

14    know there is going to be a little bit more of a delay because

15    we need to continue the jury selection process without them

16    being in the courtroom.  And that we lost two jurors, one

17    because she has become ill and we received correspondence from

18    her physician that she would not be able to attend the trial

19    for several days at a minimum.  And the other juror -- well.

20         So maybe what I'll do first though is have Ms. Lin

21    come here so we'll have the jury clerk bring Ms. Lin here, I'll

22    make a brief inquiry of her just to make the record.  I think

23    if that inquiry goes the way I suspect, I will end up excusing

24    her for cause.  And with regard to Juror No. 10, I'm already

25    going to excuse her for cause, and I think there's agreement

NBR3ORE3

1    about that.  Is that correct?

2              MR. FOY:  Yes, it is.

3              MR. SULLIVAN:  Yes, your Honor.

4              MR. FOY:  Question, your Honor.  When you tell the 13

5    jurors that we are going to have a little bit of a delay, are

6    you releasing them until the afternoon?

7              THE COURT:  No.

8              MR. FOY:  Okay.

9              THE COURT:  No.  I wouldn't release them and have them

10   come back.  I prefer to have them here.  I'll put it that way.

11             MR. FOY:  Does it look like, and we'll see, we

12   probably won't get started until 2 o'clock.  Do the morning for

13   selection.  You think it will go quicker because we have to go

14   through the 80 questions?

15             THE COURT:  I'm hoping that, although we're going to

16   hand them questionnaires, I'm hoping since they're familiar

17   with it, it should go fairly quickly.  But, we may not get

18   started until then.  Again, it depends upon how quickly it

19   goes.

20             MR. FOY:  Understood.

21             THE COURT:  I still have the rest of my preliminary

22   remarks to give to the whole jury.

23             MR. FOY:  Right.

24             THE COURT:  So we're going to bring over Juror No. 11.

25   I'll be back in a moment.

NBR3ORE3

```
 1              (Recess)

 2              (Juror No. 11 present)

 3              THE COURT:  Ms. Lin, if you can step up, you can have

 4     a seat in the first seat right here.

 5              Ms. Lin, my deputy clerk shared the e-mail that you

 6     had sent.  First, I hope your mom is doing okay.  Is she still

 7     in the hospital or she's been released?

 8              JUROR:  She's been discharged, yeah.

 9              THE COURT:  So, let me just ask because I know that

10     you mentioned -- so, does your mom -- I think you said your

11     mom, does she live with you?

12              JUROR:  Yeah, she lives with me.

13              THE COURT:  Are you the primary caregiver for your

14     mom?

15              JUROR:  Most of the time, yes.  Majority of the time.

16              THE COURT:  You had also mentioned that you didn't --

17     after the jury selection, that you felt that although you

18     thought you could handle the trial, that you thought otherwise

19     after you left us on that day.  So, you mentioned concentration

20     issues and things like that.

21              If you could just describe for me what you're talking

22     about and have you had these issues for a while?

23              JUROR:  For almost 10 years.

24              THE COURT:  One second.

25              So almost 10 years?
```

NBR3ORE3

1            JUROR:  Yeah.

2            THE COURT:  And is it something that you take

3      medication for or not?

4            JUROR:  I never seeked professional help.

5            THE COURT:  But is it something that you feel it would

6      make it difficult for you to be a juror in this case?

7            JUROR:  I think concentrating mainly, and a little bit

8      of memory problems, and not like feeling extremely well

9      emotionally, like, on a certain day, then I kind of have like,

10     on like the verge of breakdown sometimes.

11           THE COURT:  Would you prefer to talk about it at

12     sidebar or are you okay talking about it?

13           JUROR:  Sidebar.

14           (At the sidebar)

15           THE COURT:  So, you mentioned that you had, you

16     mentioned the issue of breakdown.  Have you had issues in the

17     past where you've had, maybe not a breakdown, but where you've

18     struggled with your mental health?

19           JUROR:  Yeah.  A lot of work, too.  Sometimes at home.

20     But like, I try to manage at home.  But it's not always

21     possible.

22           THE COURT:  When you say at work, you mean where

23     issues come up at work?  And I wasn't sure what you --

24           JUROR:  Yeah, like certain things at work stress me

25     out, and like the smallest inconvenience and I kind of just,

NBR3ORE3

1    you know, I kind of don't want to be there anymore and kind of

2    like start crying.

3                THE COURT:  Say that again?

4                JUROR:  Start crying.

5                THE COURT:  Obviously, jury service is important but

6    it's more important that it not impact your mental health.  And

7    I understand that your mom just was released from the hospital.

8    So, I'm going to excuse you from being a juror on this case.  I

9    don't know whether you need to go -- she can leave from here?

10   Hold on two seconds.  We'll find out whether you need to go

11   across the street to pick anything up or anything.  Is your

12   phone across the street?

13               JUROR:  Yeah, my phone is across the street.

14               THE COURT:  So we'll find out.  But, obviously you can

15   pick up your phone, but thank you for coming in today.  I

16   wanted to follow up on your e-mail to us.

17               JUROR:  Sorry to cause any inconvenience.  Maybe I

18   should have mentioned it on the day that we came in.

19               THE COURT:  Yeah, look, obviously, that would have

20   been a little better.  And the only thing I'd say, I understand

21   the hesitance to talk about things that are so personal and I

22   also understand that you thought you could handle it.  But it's

23   also important that you let us know, because it would have

24   created more of an issue I think if you had started and then

25   reached a point where you just, you decided you just couldn't

NBR3ORE3

1   do it.  So, thank you for letting us know and we'll, we can --

2   it would have been better, but it's okay.

3       So my understanding is once -- you can go across

4   street and get your phone and then you can go home.  Okay?

5       JUROR:  Thank you so much.

6       THE COURT:  Thank you very much.

7       (In open court)

8       MS. LASKY:  Your Honor, if I may.  So, just as far as

9   administrative matters to take off, I wanted to make sure that

10  it was on the Court's radar the ruling with respect to

11  Ms. Taul.  And the reason for that, some of it is trying to

12  account for witness schedules and flights, and then and also

13  may on the margins affect the government's opening statement.

14  We can adjust for that if the Court prefers not to rule on it

15  now.  But just wanted to raise it to the Court's attention.

16      THE COURT:  All right.  What I would say is I would --

17  and again I will try.  I need to give closer scrutiny to the

18  follow-up that was sent to me.  So if you can make adjustments

19  to that, to the opening statement, that would be wise I think.

20  And I'm not in any way projecting what my ruling will be.  I'm

21  trying to make sure that the arguments are clean and not

22  impacted by a ruling that will follow.

23      MS. LASKY:  Understood, your Honor.

24      THE COURT:  So what I'd like to do is bring out the 13

25  right now -- no.  I'm sorry.  Yes.  Bring out the 13 and to

NBR3ORE3

1    tell them two of the jurors are not with us.  One because she

2    is ill and we received information from her physician

3    indicating she wouldn't be able to do the trial for several

4    days at least.  And the other juror because her mother was

5    hospitalized and she has to care for her elderly parents and

6    that they have been excused.  That we need to select two

7    additional jurors to join their ranks, but that the slight

8    delay today isn't going to push back the timing of what we

9    predicted for the trial.

10             Anything before we bring them out?

11             MS. LASKY:  Not from the government, your Honor.

12             THE COURT:  From the defense?

13             MR. FOY:  No.

14             THE COURT:  All right.  Ms. Disla.

15             (Jury present)

16             THE COURT:  Ladies and gentlemen, first of all, I

17    apologize for the delay.  But, as you can see, there are two

18    seats for two of the jurors who are not here.

19             Now, one of the jurors has taken ill, and has provided

20    information from her doctor saying she cannot participate in

21    the trial for at least several days.  Another juror,

22    unfortunately, her mother was hospitalized, after the jury

23    selection, and she is the primary caregiver for her mother.

24    For those two jurors, I have excused them from participating.

25             What does that mean for us here?  Number one, the

NBR3ORE3

1   parties and I are going to endeavor to get folks to fill in

2   those slots.  But what that means for you here is that Juror

3   No. 13, Mr. Rodriguez, you are now Juror No. 10.  Juror No. 14,

4   DiNicuolo, you are now Juror 11.  So you can shift down.  What

5   that means is you're no longer alternates, you are now part of

6   the jury.

7           And so, what we're going to endeavor to do is get two

8   additional alternates.  I hope the process will be somewhat

9   streamlined because the folks that we're going to be speaking

10  to are folks who were here with you last week.  So they're

11  familiar with the questions that we asked, so I'm hoping to

12  speed that process along.

13          However, that does mean there will be some additional

14  delay, in other words, before we get to opening statements and

15  complete that.  Just so we have the number of alternates to

16  make sure that we're able to complete the trial without any

17  bumps in the road, because the law requires 12 jurors to decide

18  the case.

19          Now, so I would ask that you go back to the jury room

20  and while we're continuing the jury selection out here and

21  we'll come being and get you.  I hope, I hope to do that, to

22  complete that before we would take our lunch break, but if

23  we're not able to, we'll obviously let you know and we can take

24  the lunch break.

25          You have to remember the same instructions I gave you

NBR3ORE3

1    when you left last week, you're not to discuss the case, you

2    are not to -- obviously you can tell folks you are on the jury,

3    but you are not to discuss the case even with one another, and

4    you are not to do any research or anything of the like.

5        I apologize, but these things sometimes do happen.

6    And we're going to try and move forward as quickly as we can.

7    And as I indicated, it is not going to change the time frame

8    that we indicated previously for the case.

9        And I know that we had gotten some other notes with

10   regard to professional obligations.  We will discuss that down

11   the line.  But, all right.

12       Yes, actually.  I apologize, Mr. Matthews, but you're

13   now Juror 13, sorry.  I should have shifted everybody.  You can

14   return to the jury room.  Just sit back, relax, and have some

15   coffee.  If you run out of coffee, let us know, or other

16   things, and we'll endeavor to get it for you.  Okay?  Thank you

17   very much and thank you for your patience.

18       (Jury excused)

19       THE COURT:  I've been informed that we're going to

20   have enough folks, but Juror No. 60 is apparently back across

21   the street.  Juror 60 was the young woman from the Queens

22   District Attorney's Office, so I'm not bringing her back over

23   here.  I've excused her.  Maybe she'll get on another case.

24   But all the other folks are coming over right now.  And I think

25   there will be a total of 15.  So, I hope that with 15 we should

NBR3ORE3

1    be able to get four and then two.  All right?  Thank you.

2              MR. FOY:  Excuse me, your Honor.  Is it okay if I go

3    use the facilities?  If the jury comes, don't wait for me.

4    Mr. Sarraga can take care of it from there.

5              THE COURT:  They'll have to get seated, and just so

6    you know, we're going to go through the same process.  We'll

7    call out four names.

8              MR. FOY:  I want to get your permission to leave but I

9    don't want you to wait for me.

10             THE COURT:  I might wait anyway.

11             (Voir dire under separate cover)

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

NBR3ORE3

1          THE COURT:  Ladies and gentlemen, the 13 jurors who
2    were in the back, thank you for your patience.  We have been
3    successful and you'll now note two colleagues have joined you.
4    So we have a total of 15 jurors.
5          Now, we are going to take our lunch break now, but
6    before we do, Ms. Disla will swear you all in as jurors on this
7    case.  Ms. Disla.
8          THE DEPUTY CLERK:  Please stand and raise your right
9    hand.
10          (A jury of 12 jurors and three alternates were
11    impaneled and sworn)
12          THE COURT:  You may be seated.
13          Now, ladies and gentlemen we are going to take our
14    lunch break.  We are going to come back at 2 o'clock, at which
15    point I will have some additional introductory remarks and then
16    we'll begin opening statements and have the first witness.
17          Now, you are now the jury, ladies and gentlemen, but
18    the same rules apply.  You can't talk about the case, you can't
19    do any research about the case.  That includes talking with one
20    another, or talking with your family members or friends.
21          Just go, enjoy your lunch, and I'll see everybody at
22    2 o'clock.  And remember we will take an afternoon break -- oh,
23    we are going to break today at 5:15 and tomorrow at 5:15.  You
24    might recall I mentioned I would let you know if there was an
25    adjustment in the schedule, so we'll break a little bit

NBR3ORE3

1    earlier, and this afternoon we'll take our break, and if

2    Ms. Disla has done her job, there will be a snack back there.

3    You see that face?  But a light snack for you this afternoon.

4         Ladies and gentlemen, have a good lunch and we'll see

5    you at 2 o'clock.  And do not come to the courtroom.  Just

6    report to the jury room.  We'll come get you when we're ready

7    to go.  Thank you very much.

8         (Jury excused)

9         THE COURT:  I understand was there an issue the

10   government wished to raise.

11        MR. SULLIVAN:  No, your Honor.  We're fine.

12        THE COURT:  Anything from the defense before we take

13   our lunch break?

14        MR. FOY:  Not before lunch, but the issue of how much

15   we are allowed to, if at all, get into the issue of the

16   attempted --

17        THE COURT:  Let me ask.  Again, Mr. Foy, is that

18   something that you -- I know the government has made a request

19   affirmatively to go into it.  I'm still not 100 percent

20   convinced that I would independently allow that, but a lot of

21   it has to do with whether that's something you believe you

22   would inquire about.

23        Are you going to open -- I guess the question is does

24   either party intend to open on that?

25        MR. FOY:  Depending on your ruling.  If your ruling is

NBR3ORE3

1    the government can go into it, because they have this direct

2    evidence theory about it, and then of course I would like to be

3    heard about why that's not the case.  But, then I probably

4    would address it.  I and I guess we need to, right, because it

5    is not our position that the motive -- it's not motive but I

6    think it's bias, clearly.  But it's not really why we're here.

7    And we have a different reason as to why Arvelaiz has targeted

8    my client that is beyond the fact that he tried to kill him.

9    So, I think it makes sense as part of the credibility

10   determination to explore bias, which killing someone clearly

11   is, to me at the top of the bias list.

12          But, if that means we have to get into all these other

13   collateral things that I don't think rehabilitate the witness

14   on the bias issue, I can maybe forgo it all together and just

15   focus.  But then I'm thinking this open the door theory.  If

16   I'm saying it's because of this, is it no, it's because he

17   tried to kill him.  So I don't know if they are going to hear

18   it.

19          THE COURT:  I'll take a closer look at the

20   government's letter, most recent letter to me.  And understand,

21   I understand what you are saying, Mr. Foy.

22          Let me ask, was the government going to open on it?

23          MS. LASKY:  No, your Honor.

24          THE COURT:  I take it from what you said, Mr. Foy, if

25   I indicate that the government can go into it that, you intend

NBR3ORE3

1  to open on it?

2           MR. FOY:  I got to think over lunch.

3           THE COURT:  In any event, I'll make the ruling before

4  opening statements.

5           MR. SULLIVAN:  So, your Honor, just one housekeeping

6  matter.  In light of the 5:15 end time today, we expect our

7  first witness will go on the stand today.  But we would hope

8  that we could complete him.  We expect he should be about an

9  hour.  It would be a substantial hardship if we had to keep him

10  overnight and bring him back.  He is a private citizen.

11          THE COURT:  Let me ask, who is giving the opening and

12  how long do you expect it to be?

13          MS. LASKY:  Your Honor, I'm giving the opening.  I

14  expect it will be between 10 and 12 minutes.

15          THE COURT:  All right.  Mr. Foy, I take it from your

16  comments that you are giving the opening statement.

17          MR. FOY:  I am.

18          THE COURT:  Do you have a sense of how long that will

19  be?

20          MR. FOY:  It will be relatively brief.  Meaning like

21  probably max at 15 minutes.

22          THE COURT:  I think we should be able to get through

23  that witness.  Barring anything, my comments are -- I'm on page

24  15 of them right now.  Well, page 14, and they go to 29.  And

25  they're large font, so it will take 10 or 15 minutes to read

NBR3ORE3

1    through that.

2             MR. FOY:  Is the first witness the U.S. Coast Guard

3    witness?

4             MR. SULLIVAN:  It is.

5             MR. FOY:  So we'll see the video and all that?

6             MR. SULLIVAN:  Yes.

7             THE COURT:  The only thing I ask, and that you just

8    make sure that the electronics are all working.  Sometimes it

9    is a little wonky, and it could have worked when you tested it

10   but it may not work today.  So, that would be great just so we

11   don't have any delays.

12            Anything else before we take the lunch break?

13            MR. SULLIVAN:  No, your Honor.  Thank you.

14            THE COURT:  Anything from Mr. Foy?

15            MR. FOY:  The cross-examination of the Coast Guard

16   witness will either be zero or very little.

17            THE COURT:  All right.

18            MR. FOY:  Just so you know.

19            THE COURT:  That's helpful certainly for the

20   government's purposes.  All right.  Thank you very much.

21            (Luncheon recess)

22            (Continued on next page)

23

24

25

NbrWore4

                         AFTERNOON SESSION

1                                2:00 p.m.

2        (Jury not present)

3        THE COURT:  I have reviewed the government's letter

4   regarding CC-5's attempt to kill the defendant and his theft of

5   firearms from defendant's *finca*.  Is there anything else the

6   government wants to say about the letter?

7        MS. LASKY:  No, your Honor.

8        THE COURT:  All right.

9        Defense.

10       MR. FOY:  What the government is attempting to do is

11  take advantage of a proper cross-examination of a witness's

12  bias towards the defendant in this case and then use it to

13  elicit evidence of guns on the farm.  That's not really

14  addressing or remediating the bias.  It's just a way of getting

15  in other evidence that they wouldn't be able to get in

16  otherwise.  Right?  Because they did it 404(b).  They could

17  have given notice of their desire to talk about these guns that

18  were stolen from a hidden place on the farm.  And I obviously

19  think it should be precluded.

20       Here's my real issue, though.  Even if I were to say

21  OK, fine.  I won't ask any questions about the fact that

22  there's a witness that's testifying that wanted to and tried to

23  make efforts to actually kill the defendant, I do want to put a

24  reason, and I guess what I need to be clear on is simply by

NbrWore4

giving a reason as to why this person's motivated opens the door anyway, then there's no way around it, because what I can't do is not bring that out before the jury, that there is actual bias.

THE COURT:  I understand.  I'll just make it easier in that regard.

**I wouldn't solely allow the statement in if you raised an issue on defense, in other words, other motive for bad blood or purported bad blood between the defendant and CC-5.  I've looked at the government's letter.  The evidence of the $9 million, the evidence of the theft of the *finca* is directly related to and part of the nature of the narcotics conspiracy and the drug conspiracy.  Although there is no charge relating to CC-5's attempt to kill the defendant, it clearly is tied in with and explains the result of the loss of the $9 million and explains and serves to underscore the relationship of the defendant, CC-5 and CC-1 and CC-2 in connection with the conspiracy.**

So I'm going to allow the government to elicit from CC-5 the issue with regard to the $9 million, the loss of that $9 million, CC-5's involvement with that and purportedly at the defendant's request and then the meeting that occurred and basically as laid out in the government's letter.  My understanding, though, is that there isn't going to be any testimony about, in footnote 5, about CC-5's -- and I'm not

NbrWore4

1    sure of the actual context of this and how CC-5 came to know

2    that the defendant purportedly murdered another individual over

3    a debt.  But the government would seek, as I understand it, to

4    offer that on redirect examination if CC-5's credibility is

5    challenged.  I have not ruled on that issue, in other words,

6    whether on redirect I'll allow that.  I think I'll need more

7    details about what that's all about, what the underlying facts

8    were surrounding that, concerning whether or not I'll allow

9    that as appropriate redirect in order to -- appropriate

10   redirect of CC-5.

11          OK.  I also find that that testimony -- and by that

12   testimony, I mean the testimony about CC-5 attempting to kill

13   the defendant -- is not overly unduly or unfairly prejudicial

14   in light of the fact that there is going to be testimony not

15   only about thousands of kilograms of drugs but about, as I

16   understand it, the numerous firearms, machine guns and

17   otherwise, as well as violent acts committed perhaps not by the

18   defendant but committed in connection with others' involvement

19   in the narcotics conspiracy.

20          OK.  Anything else with regard to that issue?

21          MR. FOY:  I just want to make sure I understand.  So

22   they, in fact, could talk about the fact that that witness

23   tried to kill --

24          THE COURT:  Correct.

25          MR. FOY:  All right.

NbrWore4

1          THE COURT:  Correct.

2          MR. FOY:  So if I were to mention him, ultimately I'm

3     not violating any rule.

4          THE COURT:  That's correct.

5          You know, I'm allowing them to do it.  They haven't

6     done it yet, Mr. Foy, so what I'm saying is you can do what you

7     want to do in your opening, but if they, for whatever reason,

8     decide not to ask and the evidence doesn't come in, then I'll

9     have to -- you know, I guess you could -- I mean it would be

10    odd if they don't raise it for you to raise it.  That's all I'm

11    saying.  In other words, the evidence is not in.  I'm assuming

12    because I'm giving them, I'm ruling that they can ask it, I'm

13    assuming that they will, but -- I'm assuming that they will.

14         Yes.

15         MS. LASKY:  Your Honor, would you like for the parties

16    to propose a limiting instruction?

17         THE COURT:  Yes.  I neglected to mention that.

18         The parties should meet and confer about a limiting

19    instruction.  Mr. Foy, by involving yourself in a limiting

20    instruction, you're in no way -- I recognize your objection.

21    The limiting instruction I view as something separate that I

22    would like your input on, and your objection will be preserved

23    to the underlying evidence.  OK?

24         The parties should meet and confer whenever,

25    considering the timing of that.  In other words, I have no

NbrWore4

1    problem giving it after the jury hears the testimony and then

2    during the ultimate charge that I give the jury.  I'll leave it

3    up to the parties to consider where it would be most

4    appropriate.

5              MS. LASKY:  Yes, your Honor.

6              THE COURT:  OK?

7              All right.  Is there anything else we need to deal

8    with before we bring the jury out?

9              MS. LASKY:  Not from the government.

10             MR. FOY:  No.

11             THE COURT:  OK.  All right.

12             Ms. Disla, if we could bring out the jury.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

NbrWore4

```
 1              (Jury present)
 2              THE COURT:  You may be seated.
 3              Ladies and gentlemen, I hope you had a relaxing lunch.
 4              Now, you are now the jury, as I mentioned.  Ms. Disla
 5    swore you in.
 6              There's no greater function in our legal system.  From
 7    now on, as you saw when you came in, whenever you enter and
 8    leave the courtroom, as a jury, the parties and the audience
 9    will rise the same as they do for me, because you're every bit
10    as powerful and important as any judge.
11              Let me introduce or reintroduce to you some of the
12    people who are here in the courtroom.  You have already met the
13    defendant and his attorneys and the prosecution team.
14              My courtroom deputy, as you know, is Ms. Disla.  She's
15    seated to my right, and she is the person you will talk to the
16    most during this trial.  If you have any questions or
17    difficulties, she is the person to consult with.
18              Ms. Aden Tedla, who is seated in front of me, is my
19    law clerk, and her job is to help me to research any legal
20    issues that may come up during the trial.  Throughout this
21    trial, there will also be court reporters, who you'll see.
22    One's here right now.  You'll see them coming and switching off
23    during the day, and their job is to take down everything that
24    is said here at trial so that there is a verbatim record of
25    what happened.
```

NbrWore4

1          Now, with regard to the roles, my role and your role,

2    here, in the American system of justice, the judge and the jury

3    have separate roles.  My job is to instruct you as to the law

4    that governs the case.  I will give you some instructions now

5    and others from time to time during the trial.  At the end of

6    the trial, I will give you detailed instructions about the law

7    you will need to apply when you deliberate.

8          Your job as jurors is to determine the facts based on

9    the evidence presented at trial.  You are the only triers of

10   the facts, and your decisions on factual issues will determine

11   the outcome of the case.  You must not take anything I say or

12   do during the trial as indicating what my opinion is or what

13   your verdict should be.  It is not my job to even have such an

14   opinion, and if I did, it should not influence you in any way.

15         With regard to the evidence, you must pay close

16   attention to all the evidence presented.  Evidence consists of

17   the testimony of witnesses, exhibits that are admitted as

18   evidence and stipulations agreed to by the attorneys.

19         A stipulation is simply an agreement between the

20   lawyers about facts or testimony.

21         Certain things are not evidence in the case, and you

22   must not consider them as evidence.  For example, statements

23   and arguments by the lawyers are not evidence.  They are simply

24   arguments in which they tell you what they think the evidence

25   proves or how they think you should analyze the evidence.  You

NbrWore4

should consider these statements and arguments only to the

extent they appeal to your own common sense, and you should,

under no circumstances, consider them as evidence.

My statements are not evidence either.  Questions by

the lawyers are not evidence.  Only the answers given by the

witness are evidence.  For example, if a witness is asked, "It

was raining that day, wasn't it?"  And the witness says, "No,

it wasn't," then based upon that question and answer, there is

no evidence in the case that it was raining that day, no matter

how convinced the lawyer sounded when he or she was asking the

question.

Objections to questions are not evidence.  The lawyers

are obligated to make an objection when they believe evidence

being offered is improper under the rules of evidence.  You

should not be influenced by the objection or by my ruling on

it.  If an objection is sustained, ignore the question and any

answer that may have been given.  If it is overruled, treat the

answer like any other.

Any testimony that I exclude or strike or tell you to

disregard is not evidence, and you must not consider it.  If I

instruct you that some evidence is only to be considered for a

certain purpose, you must follow that instruction.  And of

course, anything you may see or hear outside the courtroom is

not evidence and should be disregarded by you.

You are to decide the case only on the evidence

NbrWore4

1    presented here in the courtroom.

2            Witnesses.

3            In deciding the facts of the case, you will have to

4    decide the credibility of the witnesses; that is, how truthful

5    and believable they are.  How do you decide what to believe and

6    what not to believe?  You're going to listen to the witnesses,

7    observe them, and then decide just as you would decide such

8    questions every day in your ordinary life.  Did they know what

9    they were talking about?  Were they honest, open and truthful?

10   Did they have reason to falsify, exaggerate or distort their

11   testimony?  Is there any reason to think they might be mistaken

12   about what they are telling you?  What was their demeanor or

13   manner when testifying?  How did their testimony square with

14   the other evidence in the case?  In other words, is there other

15   evidence that supports their testimony or undermines it?

16   Considering these sorts of issues will help you determine what

17   testimony to accept and what testimony to reject.

18           Keep an open mind.  As the trial proceeds, you may

19   have impressions of a witness or a subject, but you must not

20   allow these impressions to become fixed or hardened, because if

21   you do, in a sense, you foreclose consideration of the

22   testimony of other witnesses or other evidence that is to come.

23   This would be unfair to one side or the other.

24           A case can be presented only step by step, witness by

25   witness, until all the evidence is before you.  We know from

NbrWore4

experience, frequently we hear a person give his version of an
event which sounds most impressive and even compelling, and yet
when we hear another person's version of the same event or even
the same witness questioned further with respect to it, what
seemed quite compelling and impressive may be completely
dissipated or weakened.

Likewise, if a witness testifies about something and
it does not make much of an impression but later evidence
supports what the witness said, what did not seem particularly
compelling or impressive when you first heard it may be
considerably strengthened.  So remember that there may be
another side to any witness's story, and there may be more to
come on any issue.

I cannot emphasize strongly enough that you must keep
an open mind until the trial is over.  You should not reach any
conclusions until you have heard all the evidence, until it's
all before you.

First, some rules of conduct that we will follow here.

In order to ensure that you decide the case only on
the evidence and that you not be influenced in any way by
anything that might occur outside the courtroom, I must give
you a specific set of instructions:

First, do not discuss this case with anybody while the
case is going on.  That includes even members of your own
family and close friends.  You may tell your family, friends,

and employer that you are a juror in a case and how long it is
expected to last, but do not tell them anything else about the
case until after you have been discharged.  Not discussing the
case includes not blogging, tweeting, texting, using Facebook
and the like.  Until you are discharged, you cannot say
anything by any means or in any forum other than that you are
on a jury.  I cannot emphasize strongly enough how important it
is that you not discuss the case in person, by social media or
otherwise until the case is over.

        Now, my instructions not to discuss the case also
includes not discussing it even among yourselves while the
trial is ongoing.  You will have the opportunity, and indeed
the duty, to discuss the case among yourselves later on, but
that can happen only after all of the evidence is in and the
case has been given to you to discuss and decide in the jury
room.  This rule is important because experience has shown that
when people express an opinion about the case or about a
witness they may become attached to that opinion and their
views may harden, and it is important that that not happen and
that you keep an open mind until you have heard all the
evidence.  So do not talk about the case even with each other
until I tell you to do so.  Not talking to each other about the
case includes not texting, emailing, creating a Facebook group
or doing anything like that.

        Second, you are not to read anything in the newspaper

NbrWore4

1    or elsewhere about this case if that should occur.  Also, you

2    should not listen to or view any reporting about this case if

3    it is broadcast on TV, over the radio or on the internet.

4            Third, do not do any research or any investigation

5    about the case on your own.  Do not go visit any place you may

6    hear described during the trial.  Do not do any research on the

7    internet or in the library or any other reference source.  Do

8    not Google anyone or anything related to the case.  I know it

9    is hard in this day and age not to go to the internet when you

10   are curious about something, but I cannot emphasize it to you

11   more clearly, that you do not and you are not permitted to do

12   that or to conduct any form of outside research relating to

13   this case while the trial is going on.

14           The reason for the rules against media reports and

15   independent research is that what you might learn could be

16   wrong, and it would be unfair to the parties if you were to

17   have information from outside sources that the parties did not

18   know about and did not have an opportunity to address.

19           Fourth, be sure that I am informed if any person that

20   you recognize comes into the courtroom.  This is a public

21   trial, so that this could happen, but it is important that you

22   do not hear from them what may have happened in court while the

23   jury was not present.  If you should see a friend, relative, or

24   acquaintance come into the court, please send a note to me

25   through Ms. Disla at your first opportunity.

NbrWore4

1          Fifth, you are not to allow anyone to speak to you

2     about this case.  If you are approached by anyone to speak

3     about it, politely tell them that the judge has directed you

4     not to do so.  If any person approaches you or seeks to contact

5     you about the case, you are required to report the incident

6     promptly to me, and you can do this, again, by telling

7     Ms. Disla.

8          As I mentioned earlier, the lawyers, the parties and

9     the witnesses are not supposed to talk to the jury outside the

10     courtroom, even to offer a friendly greeting.  So if you happen

11     to see any of them outside the courtroom, they will and should

12     ignore you.  Please take no offense at this.  They are only

13     acting properly by doing so.  Experience has shown that even

14     innocent conversations with jurors can sometimes be

15     misinterpreted, so courts have hard-and-fast rules that

16     lawyers, parties and witnesses cannot speak to jurors, period.

17          The parties are entitled to have you personally render

18     a verdict in the case on the basis of your independent

19     evaluation of the evidence presented here in this courtroom.

20     Speaking to others about this case or exposing yourself to

21     information outside the courtroom would compromise your

22     fairness to the parties.  So that is why you cannot communicate

23     about the case or learn anything about the case from any source

24     other than what is presented in the courtroom during trial.

25          Finally, if anything should happen involving any juror

NbrWore4

which is of an unusual nature or which you think I should be

told about, do not discuss it with any other juror.  Simply

give Ms. Disla a note to the effect that you want to speak to

me about it, and I will then hear what it is and what you have

to say.  Now, I make these remarks not expecting that anything

unusual or improper will happen.  It's just safer to take the

precaution of alerting you in advance of what actions you

should take.

                Trial procedure.

                Finally, let me say a few words about trial procedure.

The trial essentially has four parts:

                First, each side will have an opportunity to make

opening statements to you.  As I have told you already, these

statements are not evidence.  Their purpose is to give you an

idea in advance of the evidence that the lawyers expect you to

hear and see.  These statements allow the lawyers to give you a

preview of what this case is about, but the only evidence comes

from the witnesses, exhibits and stipulations.

                The government has the burden of proof, so it will go

first.  The defendant has no burden of proof and does not have

to do anything at this trial.  So the defendant does not have

to give an opening statement, but if he chooses to do so, the

defendant's lawyer will go next.

                Second, after opening statements, you will hear the

testimony of the witnesses.  This is the longest part of the

NbrWore4

trial.  The government's witnesses go first.  Each witness will give direct testimony, and then he or she may be cross-examined by the other side.  Sometimes there will be redirect testimony and occasionally recross-examination.  Again, a defendant does not have to question witnesses but may choose to do so.

Documents or physical objects or stipulations will be received in evidence.  Following the government's case, the defendant may, but need not, present witnesses and other evidence.  If the defendant does call witnesses, those witnesses will be examined and cross-examined just as the government's witnesses were.  If the defendant chooses to present evidence, it is possible that the government would then present some brief rebuttal to that evidence.

Third, after all of the evidence has been received, each party will have the opportunity to make closing arguments.  The lawyers will review the evidence and make arguments to you as to what conclusions they think you should or should not draw from the evidence.  These arguments also are not themselves evidence, but they may be helpful to you in summarizing the case before your deliberations.

Fourth, after these arguments, or summations, as they are called, I will give you detailed instructions as to the law that applies and controls in this case, and you must follow those instructions.  These instructions to the jury are sometimes referred to as the jury charge.  After the jury

NbrWore4

1    charge, you will go to the jury room to deliberate and discuss

2    the evidence in order to decide the facts and render a verdict.

3          Some final issues with regard to mechanics.

4          Now, Ms. Disla has already shown you the jury room,

5    and that is where you will report every day for trial at

6    approximately 10 o'clock, at 10 o'clock, unless I instruct you

7    otherwise.  Do not come to the courtroom.  Go directly to the

8    jury room.

9          You should also have her telephone number and contact

10    information in case of emergency, and I believe that she has

11    collected all of your contact information.  If she hasn't, she

12    will do so by the end of the day.

13          Now, as I mentioned, we'll sit Monday through

14    Thursday.  The trial is expected to last approximately 14

15    business days.  Our trial day will begin at 10 a.m.  We will

16    take a lunch break from 12:45 to 2:00, and we will end usually

17    at 5:30 each day.  However, as I mentioned, today we'll end by

18    5:15 and tomorrow, similarly, we'll end around the same time.

19          Now, with regard to lunch, you can bring your lunch

20    and eat it in the jury room, or you can go out and walk around

21    and get lunch from outside.  If you need a break before the

22    scheduled break in the morning or afternoon, just raise your

23    hand.  But if you can wait until the scheduled break, please do

24    so.

25          Please be on time after the breaks and in the morning.

1    If you are late, we can't start if one of you is missing, so we

2    ask that you try and be prompt in the morning.

3           Now, as I mentioned, if we deviate from that

4    schedule -- in other words, 10 a.m. to 5:30 -- I will let you

5    know.

6           I think Ms. Disla has handed you each a notepad.

7    Whether you take notes is entirely up to you, but you must

8    leave those notes in the jury room at the end of every day.  If

9    you like, you can make a notation on the front or somewhere in

10   the book just so that you know which are your notes.

11          Now, remember that notes are for your own personal use

12   to help you recall or focus, but they are not to be relied on

13   by anyone else.  It is completely up to you whether you take

14   notes.  Some people it helps them concentrate or remember.

15   Other people find it distracting.  It's entirely your call.  If

16   you do not take notes, you should rely on your independent

17   recollection of the evidence.  Either way, when you deliberate,

18   you should discuss what the evidence was, not what one juror's

19   or another's notes do or do not say.

20          OK.  Are we ready to begin opening statements?

21          MS. LASKY:  Yes, your Honor.

22          THE COURT:  All right.  The government's opening

23   statement.

24          MS. LASKY:  Tons of cocaine, guns, bribery and

25   corruption.

NbrWore4                    Opening - Ms. Lasky

1          This man, Carlos Orense Azocar, the defendant,

2    trafficked massive amounts of cocaine.  For years, he was a

3    leader of a drug-trafficking organization in Venezuela that

4    flooded the United States with cocaine.  The defendant shipped

5    his cocaine, using boats and airplanes, and he protected his

6    cocaine with armed men using machine guns.  The defendant's

7    cocaine operation thrived because of his corrupt connections in

8    Venezuela.  Public officials, military generals, police

9    officers, the defendant bribed them all.  And they protected

10   the defendant and his cocaine operation.  The defendant bought

11   and paid for them all with the dirtiest of drug money.

12         Now, because he did these things, because he agreed to

13   distribute cocaine into the United States and because he used

14   firearms to protect his cocaine, the defendant has been charged

15   with federal crimes.  And we will prove to you that he

16   committed those crimes beyond a reasonable doubt.

17         Now, this opening statement is my opportunity to

18   provide you with a brief road map to give context as you see

19   and hear evidence in this case.  Here is some of what the

20   evidence will show.

21         First, the evidence will show that the defendant was a

22   powerful man in Venezuela, a powerful man with important

23   connections: connections in the Venezuelan government, the

24   military, the police; connections to his partners, major drug

25   traffickers, both inside and outside of Venezuela.  The

1    evidence will show that the defendant used all these

2    connections to send tons of cocaine to the United States.

3           You will learn that the defendant used -- you will

4    learn that the defendant transported around a ton of cocaine --

5    that's a thousand kilograms -- nearly every week.  He did this

6    for years.  The value of this cocaine, while it's staggering,

7    each ton was worth millions of dollars here in the United

8    States, and the defendant is responsible for trafficking many,

9    many times that amount.

10          So, how did he do it?

11          You will learn that the defendant owned a ranch in

12   Venezuela.  At the ranch he stored huge amounts of cocaine in

13   underground tanks hidden inside a warehouse.  He stored the

14   airplanes that he used to transport that cocaine, and he stored

15   the guns that he used to protect the cocaine.  From his ranch

16   the defendant transported the cocaine by plane and by boat out

17   of Venezuela.  You'll learn that the defendant's connections

18   gave him an edge that other drug traffickers didn't have -- his

19   connections to top public officials and military leaders in

20   Venezuela, connections that the defendant bought and paid for

21   with drug money.

22          Using these connections, the defendant had the power

23   to turn airport radars on and off so that his planes, loaded

24   with cocaine, could fly undetected.  He had the power to make

25   flight plans disappear so that records of his dirty drug

NbrWore4                    Opening - Ms. Lasky

flights did not exist, and he had the power to ensure that

boats slipped out of Venezuela without inspection.  And the

evidence will show that he abused these powers time and time

again to transport massive quantities of cocaine to the United

States.

         The evidence will also show that along the way, to

protect his cocaine as it made its way north, the defendant

relied on an armory of high-powered weapons, grenades,

automatic weapons, millions of rounds of ammunition, machine

guns so powerful they could shoot through armored cars; weapons

the defendant and his partners used day in and day out to

protect and grow their cocaine-trafficking network.

         So, that's what the evidence will show -- that the

defendant was a powerful drug trafficker who sent tons of

cocaine into the United States each year; that he protected his

cocaine with machine guns and other weapons; that he was part

of a corrupt political system that allowed his drug business to

flourish.

         So, how will the evidence show this?

         Well, first, you'll see evidence that in 2016, the

defendant sent a speedboat packed with nearly a ton of cocaine

from Venezuela to the Dominican Republic.  The U.S. Coast Guard

stopped that boat at sea, and when the Coast Guard boarded that

vessel, they found the cocaine hidden inside.  You will see

photos of the defendant's cocaine from that seizure, photos of

NbrWore4                    Opening – Ms. Lasky

1   the boat, photos of the defendant's crew.  You'll even see a

2   video of the Coast Guard boarding that boat.  And you'll hear

3   from one of the Coast Guard officers who was there that day, an

4   officer who stood on the boat who seized the defendant's

5   cocaine.

6        You'll also hear from expert witnesses.  They will

7   provide important background and context for the other

8   testimony and evidence you'll see and hear.  For instance, you

9   will hear from an expert in machine guns and other weapons.

10  The expert will tell you about the capabilities of weapons like

11  the weapons that the defendant used to protect his cocaine,

12  deadly, high-powered weapons, many with modifications to make

13  them even more deadly.

14       And you'll hear from four former drug traffickers who

15  worked with the defendant.  They will give you the inside look

16  into the defendant's drug operation.  They will tell you about

17  the enormous amounts of cocaine the defendant distributed,

18  about the weapons he used to protect the cocaine, about how he

19  pulled it all off.

20       And who are these witnesses?

21       Well, remember the seizure of cocaine from a boat that

22  I just mentioned?  The boat carrying nearly a ton of the

23  defendant's cocaine?  One of the witnesses is a crew member

24  from that boat.  This witness will tell you how he was brought

25  before the defendant, the boss, at a ranch, before the boat

left Venezuela.  Another witness is the defendant's nephew, his

right-hand man in the drug trade for years.  He will tell you

about the ins and outs of the defendant's drug operation, about

where the defendant got the cocaine, where he sent it, all

about the armed men he used to protect it, who he worked with,

who he paid off.

        You'll also hear from a former drug trafficker from

Colombia whose organization partnered with the defendant.  He

will tell you how he personally worked together with the

defendant and his associates to send over 2,000 kilograms of

cocaine to the Dominican Republic, cocaine that was bound for

the United States.

        And you'll hear from a former drug trafficker whose

specialty was smuggling large shipments of cocaine and money

through Venezuela's airports, who helped the defendant send his

drugs out of Venezuela without detection and who helped the

defendant smuggle his drug money back into Venezuela, drug

money paid in U.S. dollars.

        Now, let's be clear.  You'll hear these witnesses

describe awful things they've done -- about murders and

violence, about their own cocaine distribution, about fraud,

unspeakable violence, horrible crimes.  But these are the

people the defendant chose to work with, chose to transport

cocaine with and chose to partner with.  The defendant chose

them, and they will give you an insider's view into his

NbrWore4                          Opening – Ms. Lasky

1    criminal activities, of the tons of cocaine the defendant

2    distributed and of the enormous arsenal of weapons that he used

3    to protect it.

4            At the end of the trial, the question will not be

5    whether you like these witnesses.  It will be whether you

6    believe what they say about their drug trafficking with the

7    defendant.  So please listen to them carefully and scrutinize

8    their testimony.  Ask yourself if it is consistent with and

9    supported by the other evidence in the case.  And after you've

10   seen and heard all of the testimony, all of the evidence, it

11   will be clear to you that the defendant was a cocaine

12   trafficker and that he protected his cocaine with machine guns.

13           Finally, you will see photos of the defendant's ranch

14   that was used to store the cocaine, photos of planes, photos of

15   guns, evidence he didn't know would be found and used in a

16   courtroom here in the United States.

17           (Continued on next page)

18

19

20

21

22

23

24

25

1          MS. LASKY:  All of this evidence will lead to one

2     conclusion beyond a reasonable doubt, that the defendant is

3     guilty as charged.  He worked with others to import thousands

4     of kilograms of cocaine into the United States, and used

5     machine guns to protect his cocaine operation.

6          At the end of the trial, after you have seen all of

7     the evidence, we will have an opportunity to speak with you

8     again.  Until then, I'm going to ask you to do three things:

9     First, pay careful attention to the evidence.  Second, follow

10    Judge Broderick's instructions on the law.  And third, use your

11    common sense, the same common sense that you use in your

12    everyday life.  If you do those things, you will reach the only

13    verdict consistent with all of the evidence and the law.  The

14    defendant is guilty.

15         THE COURT:  Thank you.  Mr. Foy.

16         MR. FOY:  Ladies and gentlemen of the jury, good

17    afternoon.  I have the distinct honor to represent Carlos

18    Orense Azocar in this very serious case.  Very.

19         And let me tell you something.  This case isn't about

20    whether cocaine is being trafficked from South America.

21    Cocaine's trafficked from South America.  In fact, you are

22    going to see a fantastic video of our U.S. Coast Guard chasing

23    down a speedboat with 992 kilograms of cocaine.  It's so good,

24    I started getting seasick watching it.  American flag up on

25    top.  They got their vest on, their machine guns, throwing off

1    the first shot to make sure they stop as they try to flee,

2    board the boat, and take into custody traffickers on their way

3    to the Dominican Republic.  That's true.

4            This case isn't about whether drugs are trafficked

5    from Venezuela, from Colombia, or anyplace else in South

6    America.

7            This case ultimately, your decision, okay, the

8    evidence that's going to be material to your job at the end is

9    whether Carlos Orense Azocar knowingly participated in the

10   conspiracy alleged by the cooperators to traffic cocaine to the

11   United States.  That's what the case is about.

12           So the question becomes what are the proofs?  Because

13   even though he's not an American citizen, he still enjoys the

14   presumption of innocence just like you do.  Just like I do.

15   Just like every person that sits in that chair when they come

16   before citizens like yourself.  So it's on the government, the

17   United States, our country, to determine whether they can

18   overcome that presumption.  So, let's talk about what the

19   evidence will show.

20           The evidence will show that four traffickers will come

21   into this courtroom and testify for personal benefits from the

22   United States of America.  All of them, all of them are

23   testifying in exchange for what?  To stay here in our country.

24   Every single one of them.  None of them want to go back to

25   Venezuela.  And their testimony and their cooperation banks on

1    them coming before you to tell you what they have to say.

2              Now, I say that to you because they have to sit in

3    that chair, and I get to ask questions and confront, use our

4    Sixth Amendment right of confrontation, to challenge their

5    credibility as witnesses.  And I submit to you, you will find

6    that every single witness has a motive to not be truthful, has

7    bias against Mr. Orense, has lied in the past about things

8    related to the subjects in this case.  And you are going to be

9    asked to believe them beyond a reasonable doubt.

10             With that said, from a defense perspective, there's

11    one witness that brings this case to us, that has us together

12    today.  You heard the government talk about a nephew.  Well, I

13    guess technically he is a nephew, because the evidence will

14    show that Carlos Orense Azocar married this person's aunt many

15    years ago.  This aunt, who is an attorney, who married that

16    businessman many years ago.  When the witness Antonio

17    Arvelaiz -- emphasize on the "lies" by the way -- comes before

18    you to tell you a lot of things.

19             Now, when I say a lot of things, what I mean, right,

20    the government has apparently already conceded that he was

21    trafficking drugs.  You heard them talk about fraud.  Arvelaiz

22    is a fraudster manipulator who is on the payroll of the

23    government.  When I say on the payroll, I mean direct deposits.

24    And this is the evidence you are going to hear.  You are going

25    to hear how our government paid this man over $70,000 to

provide information.  You are going to hear how our government

allowed him to communicate with other cooperators in this case.

You are going to hear evidence of how this cooperator literally

tried to kill and murder my client in Venezuela.

You are going to hear from one of the participants on

the 992 kilograms of cocaine on the boat.  You are going to

hear evidence about what he had to say when he got arrested,

what he had to say when they took him to the Dominican

Republic, what he had to say when he comes to the United

States.  By the time -- and I believe the date is April 7,

2016, when this seizure happened in the ocean.  They take him

to the D.R.  That's what the evidence will tell you.  And then

they bring him to the United States.

When they bring law enforcement here to talk about

that, we're going to talk about how the Southern District of

Florida, that's where the U.S. attorney's office is down here.

So we're here in the Southern District of New York.  There is a

U.S. attorney for each state.  Some states they have multiple

U.S. attorneys.  And they knew they were coming.

You are going to hear evidence about this prosecutor,

his name is Richard Gregorie a/k/a Dick Gregorie who made a

career of convicting traffickers from South America.

Now, by this time, and I'm not going to get into it,

all right, now, but trust and believe at this time Antonio

Arvelaiz, the alleged nephew, and I guess he really is, I can't

1    call him alleged because by marriage they are related, okay.

2    He was in jail already for frauds committed.  Okay.  And it

3    just so happens he's convicted, he's doing his five years for

4    stealing millions of dollars from Venezuelans by the way.  He's

5    moved to the jail the same day that Mr. Boada on the boat is.

6    Carlos Orense's name isn't mentioned by Boada until they get to

7    the jail together.  All right.

8            This is a coordinated, the evidence will show, a

9    coordinated effort by Arvelaiz for revenge.  Revenge from what?

10   The evidence will show that Arvelaiz fled Venezuela because of

11   all of the deception and things he did in Venezuela.  The

12   government's going to try to counter and say, well, my client,

13   he thought my client was going to kill him or something.

14   There's a lot of people that want to harm Arvelaiz and has

15   nothing to do with drugs by the way.

16           He leaves seeking asylum in our country.  Before he

17   gets arrested for his fraud, he starts cooperating with the

18   government in Florida.  He sets up his cousin on gun

19   trafficking.  Fine.  He sets up his cousin.  What happens?  The

20   evidence will show my client's family is educated.  Civil

21   engineers, attorneys, doctors.  When they became aware of what

22   happened to their family member, they hired a lawyer to go to

23   the U.S. attorney to let them know that while he's cooperating

24   with our government, he's committing frauds in Miami.  They

25   arrest him, he does his five years.

1          What does he do when he realizes that the Orense

2     family brought a case or helped bring a case to the U.S.

3     attorney that caused him to serve five year?  He let them know

4     he's not going to forget.

5          Here we are.  Here we are.  Focus on this man.  Focus

6     on how he had ability to affect the testimony of other

7     witnesses in this case.  He couldn't affect all of them, no,

8     that's true.  So there will be some people who came who he

9     didn't have that ability.  So for example, the evidence will

10    show that there will be this former Venezuelan police officer

11    that's going to come here that's going to talk about stopping a

12    convoy of drugs, and he sees a bunch of things, and the convoy

13    goes, and the military calls, and they make the package go

14    through.  Okay.

15         Lack of evidence, there will be nothing to support

16    what he says.  Nothing.  They are going to ask you to rely on

17    the word of men who are desperate to stay here.  Who are

18    getting paid and getting benefits from the government to

19    testify here today.

20         What my job will be is to confront those issues and

21    bring them out for you to see and evaluate.  What I'm asking

22    you to do is make sure that your trust is earned, earned.  Not

23    automatic.  Because it sounds bad.  Because drugs are bad.

24    Because violence is bad.  It is bad.  I'm not defending drug

25    trafficking, I'm not defending murder.  I'm defending a human

1    being who deserves all the rights of any person who sits in

2    that seat.  And in order to be convicted, they're right, they

3    must prove the case beyond a reasonable doubt.

4                And I submit to you, after you've heard all the

5    evidence, not only will I be able to stand up here at the end

6    of the case and say to you why there's a reasonable doubt that

7    he knowingly participated in narcotics trafficking from 2003 to

8    2021.  There will be multiple reasons, multiple reasons to

9    doubt.  Not just a doubt.  A reasonable doubt.  Multiple

10   reasons to doubt whether he voluntarily and knowingly

11   participated in drug trafficking that does go on in South

12   America and Venezuela, it does.

13               The government came up here and told you that they are

14   going to give you evidence about his link to officials,

15   government officials, President Maduro.  Other politicians.

16   And to some degree, it's true that he knew some of these

17   people.  That's true.  As a successful businessman, he knew a

18   lot of people.  He also knew famous singers.  One of them

19   Vincente Fernandez.  One of the most famous singers, mariachi.

20   They got pictures of them together.  He knew a lot of people.

21   But it doesn't make him a famous Mexican singer because he's

22   taking pictures with Vincente Fernandez, I don't think so.  But

23   they want to show the association because he knows some people.

24   He knows a lot of people.  That's true.

25               But you know what the evidence won't show?  Him with

NBR3ORE5                    Opening – Mr. Foy

drugs.  You know what the evidence won't show?  Him with guns.
You know what the evidence won't show?  Him on a boat with
992 kilograms.  You know what the evidence won't show?
Wiretap.  You know what the evidence won't show?  Video
surveillance.

        We're going to have the word of desperate men who have
lived their lives in a way consistently where they put their
own self interests over that of their own community, take
advantage of others, commit crimes, pay to kill.  And you are
being asked to trust them that they're telling you truth
because they are going to bring four of them in here.

        I'm telling you right now we are going to get to the
bottom of it.  I am going to be direct.  I'm not letting them
off the hook.  I apologize in advance if anyone's going to feel
sensitive about it, but I won't be playing with these people,
I'm telling you, and I feel some type of way about it.  Because
they're coming in here, lying about a man who's done everything
he can for his family to make sure that they're educated, that
they do the right thing in a difficult situation.  In a
country -- oh, by the way, did they say he was going to flood
the United States with cocaine?  Guess who else said that?
President Maduro.  There's something bigger going on than just
some allegations of trafficking of cocaine.

        I need you guys -- this is a very smart jury, a
diverse jury -- to pay attention to literally everything you

NBR3ORE5                        Mills - Direct

1    see happening.  What people say, how they say it, how they act.

2    Let them earn your trust.

3           You're fortunate to be here in this case, and I say

4    that because it's an important case, and what happens here

5    matters a lot, apparently to a lot of people.  But the number

6    one person it matters to is that man right there.  And

7    literally, I'm going to go to war for him.  So let's do it.

8           THE COURT:  Thank you Mr. Foy.  The government's first

9    witness.

10          MR. SULLIVAN:  Government calls Travis Mills.

11          THE COURT:  Ms. Disla is always afraid I'll break into

12   song when I have the microphone, so she wanted to make sure I

13   turned it off.

14    TRAVIS MILLS,

15        called as a witness by the Government,

16        having been duly sworn, testified as follows:

17   DIRECT EXAMINATION

18   BY MR. SULLIVAN:

19   Q.  Good afternoon.

20   A.  Good afternoon.

21   Q.  Up until July of this year, where were you employed?

22   A.  I was employed with the United States Coast Guard.

23   Q.  Why did you leave?

24   A.  I retired July 1st.

25   Q.  How long have you served in the United States Coast Guard?

1   A.  I served in the Coast Guard for 21 years.

2   Q.  At the time of your retirement this past July, what was

3   your rank?

4   A.  My rank at the time of retirement was chief petty officer.

5   Q.  So for those of us not familiar where that might fall

6   within the military or the Coast Guard, where generally is

7   that?

8   A.  Sure.  That would be upper echelon for enlisted management.

9   The military ranks are broke down pretty much the same for all

10  five branches, E-1 to E-9, and I retired as an E-7.

11  Q.  In 2016, what was your rank?

12  A.  In 2016 I was a petty officer first class, E-6.

13  Q.  Where were you stationed in 2016?

14  A.  I was stationed aboard the Coast Guard cutter Richard Dixon

15  in San Juan, Puerto Rico.

16  Q.  That's Dixon with a D?

17  A.  That's correct.  D-I-X-O-N.

18  Q.  Did the Coast Guard stationed there or that particular

19  cutter out of San Juan, Puerto Rico, have a particular mission

20  in that area?

21  A.  Yes, sir, we had two primary mission sets.  Handling

22  migrant interdiction operations and counter drug operations.

23  Q.  What was the area that the Coast Guard was responsible for

24  operating out of San Juan, Puerto Rico?

25  A.  We could operate anywhere in the Caribbean.

1   Q.  Why does the U.S. Coast Guard operate in the Caribbean?

2   A.  Caribbean is a known drug smuggling route for narcotics

3   from South America through the Caribbean and onwards to other

4   countries.

5   Q.  What were some of your responsibilities and duties aboard

6   the Coast Guard cutter Richard Dixon?

7   A.  Aboard the cutter, my primary duties included driving the

8   ship, operating the ship, as well as a federal law enforcement

9   officer.  I was a pursuit mission commander for our pursuit

10  team.

11  Q.  Is every Coast Guard personnel qualified in those various

12  responsibilities and duties?

13  A.  No, sir.  Our pursuit team consisted of five members.

14  Q.  So, you mentioned pursuit mission commander.  What is that?

15  A.  So, pursuit mission commander, I would be underway on our

16  cutter small boat.  My responsibilities were overall charge of

17  the small boat and the team, as well as maintaining

18  communications with other assets that were assisting us in the

19  pursuit.

20  Q.  You are using the term "small boat," I might know what a

21  small boat is.

22          In terms of Coast Guard parlance, what is a small

23  boat?

24  A.  So a small boat in the Coast Guard, any boat over 65 feet

25  is considered a ship or a cutter.  Any boat less than 65 feet

1   is considered a small boat.  For this scenario, our cutter or

2   ship had a small boat attached to it that we could launch out

3   of the back of it in deploy teams.

4   Q.  You were talking about the small boat in the context of

5   pursuit mission commander.  What does the pursuit mission

6   commander do with respect to the small boat?

7   A.  Help prep the team, ensure overall communications are

8   achieved and everybody knows their role.

9   Q.  By April of 2016, how long had you been stationed in the

10  Coast Guard station in San Juan, Puerto Rico?

11  A.  About two years at that time.  Little less than two years.

12  Q.  During that time, out of Puerto Rico, had you conducted

13  vessel interdictions?

14  A.  Yes, I had.

15  Q.  What sorts of vessels did you interdict?

16  A.  Drug smuggling vessels and migrants vessels.

17  Q.  What kind of drug smuggling vessels would you stop?

18  A.  Any.  Cocaine and marijuana were the primary narcotics.

19  Q.  I was talking about the type of vessel.

20  A.  So small boats.  When I say narcotics smuggling boats, they

21  are a primarily smaller, very agile, very fast vessels, usually

22  less than 30 feet.

23  Q.  Directing your attention to April 7, 2016.  Were you

24  working that day?

25  A.  Yes, sir, I was.

NBR3ORE5                        Mills - Direct

1    Q.  Where were you?

2    A.  I was underway on board the Richard Dixon.

3    Q.  Did you deploy from the cutter that day to respond to any

4    vessels?

5    A.  Yes, sir, I did.

6    Q.  How did you know to deploy?

7    A.  We had received word that there was a possible go-fast

8    operating in our area.  My C.O. briefed myself and then briefed

9    the rest of our team, and we conducted a risk assessment and

10   launched the boat.

11   Q.  You used the term go-fast.  What does that mean?

12   A.  Go-fast is a smaller very, very fast and agile vessel.

13   Most of the time they're faster than our Coast Guard vessels.

14   Q.  So what type of vessel were you responding to that day?

15   A.  Possible go-fast.

16   Q.  Had you previously intercepted go-fast boats before?

17   A.  Yes, sir, I had.

18   Q.  So how does the Coast Guard go about intercepting a go-fast

19   boat?

20   A.  So, the process of interdicting a go-fast boat is -- it is

21   pretty lengthy.

22            Initially we would start with any information we had

23   on board the ship conducting our brief.  Then we would launch

24   our boat.  The object of launching the boat is utilizing our

25   small boat to obtain the pursuit and get eyes on the actual

NBR3ORE5                         Mills - Direct

1     vessel.   Our cutter would normally drop us 10, 12, 14 miles

2     away to stay out of the line of sight of the suspected go-fast

3     vessel.

4              Once we were on scene or approaching on scene, I would

5     be getting realtime directions from aircraft normally where to

6     go, where to turn, so we could intercept them.   At this point

7     we would have no visibility of them until we got up close

8     enough to them.

9     Q.   How many crew are on board the Coast Guard, the small boat

10    intercept vessel?

11    A.   We launch with five personnel, including myself.

12    Q.   What are the positions of the various members on the boat?

13    A.   The driver of the boat would be the pursuit coxswain.   I

14    would be to his right as the pursuit mission commander.   We

15    would have a translator, another boarding team member, and then

16    a gunner that would sit on the aft part of our small boat.

17    Q.   Is there a Coast Guard protocol for intercepting a vessel?

18    A.   Yes, sir, there is.

19    Q.   Could you please take the members of the jury through that.

20    A.   So we would utilize a step process for our use of force

21    continuum when dealing with a pursuit chase.

22             Step one would be make communications with the vessel,

23    via the radio or our small boat loud hailer.   I would be

24    utilizing English and Spanish to get the vessel to stop and

25    heave to.   If that step did not work, we would move on to step

NBR3ORE5                      Mills - Direct

1   two.  Step two would involve the deployment of an entanglement

2   device.  The easiest analogy is to think of it as spike strips

3   police would use on the road, but we would use it on the water.

4   Third step would be warning shots, and the fourth step would be

5   disabling with firearms.

6   Q.  You mentioned disabling with fire.  What do you mean by

7   that?

8   A.  We would engage the engines directly with weapons.

9   Q.  So, turning your attention back to April 7, 2016.  Did you

10  in fact deploy from the cutter Richard Dixon?

11  A.  Yes, we did.

12  Q.  Was there any video taken that day?

13  A.  Yes, there was.  Our gunner had a GoPro on his helmet.

14  Q.  Is that a Coast Guard issued GoPro?

15  A.  Yes.  It was bought by our ship utilized for law

16  enforcement purposes specifically.

17  Q.  You are referring to a GoPro camera?

18  A.  Yes, that's correct.

19  Q.  Chief Mills, if you could direct your attention to the

20  screen in front of you.  And Mr. Sirmon, if you could play just

21  for the witness, the Court, and the parties the first few

22  seconds of what's been marked for identification as Government

23  Exhibit 701.

24         Chief Mills, do you recognize what's shown in this

25  video?

NBR3ORE5                         Mills - Direct

1    A.  Yes, I do.

2    Q.  What is it?

3    A.  This would be the GoPro footage from that day during our

4    pursuit chase.

5    Q.  Have you viewed this footage before?

6    A.  I have.

7    Q.  Does it fairly and accurately show the pursuit of the

8    go-fast boat on that day April 7, 2016?

9    A.  Yes, sir, it does.

10            MR. SULLIVAN:  The government offers Government

11   Exhibit 701.

12            MR. FOY:  No objection.

13            THE COURT:  Government Exhibit 701 is admitted into

14   evidence.

15            (Government's Exhibit 701 received in evidence)

16            MR. SULLIVAN:  May we publish to the jury, your Honor?

17            THE COURT:  You may.

18            MR. SULLIVAN:  Mr. Sirmon, if we could cue up the

19   video that's Government Exhibit 701 and play from the start to

20   the 30 second mark.

21            (Video playing)

22            MR. SULLIVAN:  Your Honor, I believe one of the

23   jurors' monitors is not working.

24            THE COURT:  Is it the first one?

25            A JUROR:  We can see that screen though.

1          THE COURT:  We'll call and we'll get that fixed for

2    tomorrow.  You think it is easier to look straight ahead?

3          A JUROR:  I think that one.

4          THE COURT:  Is it working now?

5          A JUROR:  We're good.

6          THE COURT:  Sometimes the technology, I mentioned to

7    the parties, is a little hinky.  So ladies and gentlemen, I

8    should have said this earlier.  If at any point in time

9    something happens and it goes out, just raise your hand and

10   we'll try and get it fixed.  Okay?  Go ahead, counsel.

11         MR. SULLIVAN:  Thank you, your Honor.

12   BY MR. SULLIVAN:

13   Q.  Chief Mills, what are we looking at here?

14   A.  We are looking at a paused video of our chase on that day.

15   Q.  Looking at the shot that we see right here.

16         MR. SULLIVAN:  My screen is also not working, your

17   Honor.  We'll make do, your Honor.

18         THE COURT:  You can probably look over at Mr. Foy's

19   screen and the audio/visual folks are on their way, but let's

20   proceed.

21   Q.  Looking at the still shot we have right here, what are the

22   positions of the various crew members we see in the image right

23   here?

24   A.  The positions on the forward right, that would be myself as

25   the pursuit mission commander.  On the forward left would be

1    the pursuit coxswain.  That would be the individual operating

2    the small boat.  And then the two people behind them are

3    boarding team members to help with the boarding.

4    Q.  I'm sorry.  And from whose perspective is the video being

5    shot?

6    A.  The prospective would be from the gunner, which is sitting

7    behind those four individuals in the picture.

8            MR. SULLIVAN:  Mr. Sirmon, if we could move to the

9    4:50 mark and play the video until the 6:10 mark.

10           (Video playing)

11   Q.  Chief Mills, what's happening here in the clip we just

12   played?

13   A.  This is when we first made visual contact with the vessel,

14   and we started to, I started to try to communicate with them

15   via the small boat loud hailer, and also channel 16 on our

16   radio in English and Spanish to get him to heave to.

17   Q.  Is the loud hailer just the loudspeaker on the small boat?

18   A.  Yes, sir.

19   Q.  You had mentioned those steps for interdiction.  What step

20   of the protocol is this?

21   A.  This is step one.

22   Q.  I'm not going to attempt with the monitors to try to mark

23   the screen or anything.

24           You said you got a visual of the boat.  Approximately

25   where in relation to the Coast Guard small boat is it?

NBR3ORE5                          Mills - Direct

1   A.  It would be off the starboard bow or front right side.  If

2   you look at the sun on the horizon line and go directly left,

3   you will see that small white speck to the right of the helmet

4   in the middle of the screen.

5        MR. SULLIVAN:  Mr. Sirmon, if we could please play

6   Government Exhibit 701 from the 6:45 mark to the 7:13 mark.

7        (Video playing)

8   Q.  What's happening here in this clip?

9   A.  So now as we're working through step one trying to

10  communicate with the vessel and have them stop, they are

11  non-responsive to our commands.  We then went into possibly

12  utilizing step two.  In this scenario step two is a safety --

13  it is a bad idea.  The boat is entirely too fast, we are in

14  open ocean.  The boat can turn right, left, back up in an

15  instant and miss our entanglement device.  So we decided to

16  move directly to step three after relaying that information

17  back to our ship and getting confirmation from our commanding

18  officer.

19  Q.  And step three is what?

20  A.  We are going to deploy warning shots.

21  Q.  Is that what we'll see in this next clip?

22  A.  Yes, sir.

23        MR. SULLIVAN:  Mr. Sirmon, if we can play Government

24  Exhibit 701 from the 7:13 mark to the 8:23 mark.

25        (Video playing)

1    Q.   So what just happened there, Chief Mills?

2    A.   So our gunner utilized a LA51 round and shot as a warning

3    shot in front of the go-fast vessel, which succeeded in getting

4    the vessel to stop.

5    Q.   You mentioned LA51 what is that?

6    A.   Basically it is a flash bang that's fired out of a shotgun,

7    non-lethal round.

8            MR. SULLIVAN:  And finally, Mr. Sirmon, if we can play

9    Exhibit 701 from the 8:23 mark to the 9:50 mark.

10           (Video playing)

11   Q.   At this point, Chief Mills, do you know what the go-fast

12   boat here is carrying?

13   A.   At this point we do not.  We do see the 55-gallon barrels

14   on the deck in open view, which is a good indicative sign of

15   smuggling.

16   Q.   Why is that?

17   A.   They're trying to get from point A to point B without

18   stopping anywhere to refuel.  So they will carry the fuel on

19   board that they need to make it there and make it back.

20   Q.   Why are the guns drawn by the Coast Guard personnel?

21   A.   It was our policy to have our weapons drawn whenever we

22   made stops like this.  We had been through a case south of

23   Dominican Republic where the vessel had gotten away and the

24   smugglers had gotten into a gunfight with the Dominican Navy.

25   So we were weapons out every time that boat was stopped until

NBR3ORE5                          Mills - Direct

1    the subjects were detained and searched.

2    Q.  So, the go-fast boat stopped now.  What are some of the

3    conditions upon which the Coast Guard can board the vessel?

4    A.  There's two conditions that we can board this vessel.  We

5    can determine the nationality of the vessel itself and ask that

6    country if we can board it.  The second is if the nationality

7    of the vessel cannot be determined, we can classify it as

8    stateless, belonging to no nationality, and then we can legally

9    board it.

10   Q.  Did there come a time with respect to this vessel that you

11   in fact boarded it?

12   A.  Yes, sir, we did.

13   Q.  Why did you board it?

14   A.  The vessel was deemed as being stateless.

15   Q.  Upon boarding the vessel -- first let me ask you.  About

16   when did that happen?

17   A.  That happened in the evening.  We had through our

18   investigation tried to determine the nationality of the vessel

19   itself.  We could not find out that information.  We found out

20   the nationalities of the crew, and one of them claimed that the

21   boat was from Colombia.  We passed that information up our

22   chain of command and then passed it on to the people who make

23   the bigger decisions than I do, and Colombia did not claim the

24   vessel as a Colombian vessel.

25   Q.  So, once you boarded the vessel, what did you do?

NBR3ORE5                          Mills – Direct

1    A.  Once we boarded the vessel, we started what is considered

2    an ISS or an initial safety sweep.  It is for the safety of my

3    boarding team, to ensure that that vessel is seaworthy, it's

4    not flooding, it's not on fire, and my people will not get hurt

5    being on it.  It is very quick.  It's very cursory.  As we are

6    doing that, my other boarding team members are searching and

7    detaining the four people on board the go-fast.

8    Q.  Did you conduct the initial safety sweep?

9    A.  Yes, sir, I did.

10   Q.  What, if anything, did you encounter during that safety

11   sweep?

12   A.  We encountered, through my training and experience, what

13   appeared to be narcotics in the front of the boat in the bow.

14   Q.  At that point what did you do?

15   A.  We continued with the ISS to ensure that my team was safe.

16   Q.  Did there come a point in which the crew was offloaded from

17   the go-fast boat?

18   A.  Yes, sir, there was.  We offloaded the crew from the

19   go-fast boat onto our small boat and transferred them to the

20   Richard Dixon.

21   Q.  Where was the Richard Dixon at that point?

22   A.  The Richard Dixon was alongside of us on scene at that

23   point.

24   Q.  So after you transferred the crew off and onto the Coast

25   Guard cutter, what did you do next?

NBR3ORE5                         Mills - Direct

1   A.  Then we continued our investigation of the go-fast vessel.

2   Q.  What did that entail?

3   A.  We found what appeared to be a VHF marine radio.  We found

4   various Pelican cases which are watertight cases containing

5   various artifacts and pieces of evidence, and we found 35 bales

6   of suspected narcotics in the bow of the boat.

7   Q.  Chief Mills, were photos taken of the go-fast boat and the

8   items found and taken from the go-fast that day?

9   A.  Yes, sir.  I was responsible for taking those photos as the

10  boarding officer.

11  Q.  You have in front of you a binder there, and in it is

12  what's been marked for identification as Government Exhibits

13  617, 618, 629 through 645, and 650 and 651.  Can you take a few

14  minutes, sir, however long you need to flip through those and

15  look up when you're done.

16          Do you recognize what's in the binder there?

17  A.  Yes, sir, I do.

18  Q.  What are those?

19  A.  These are pictures taken from the day of the chase.

20  Q.  Do those photos fairly and accurately depict the go-fast

21  boat and the items on it or seized from it?

22  A.  Yes, sir, they do.

23          MR. SULLIVAN:  Your Honor, the government offers

24  Government Exhibits 617, 618, 629 through 645, and 650 through

25  651.

1          THE COURT:  Let me ask counsel, 629 through 645, are

2   they all consecutive?  There are no numbers that are skipped?

3          MR. SULLIVAN:  Correct.

4          THE COURT:  Any objection?

5          MR. FOY:  No objection.

6          THE COURT:  Government Exhibits 617, 618, 629 through

7   645, 650 and 651 are admitted in evidence.

8          (Government's Exhibit 617, 618, 629 through 645, 650,

9   651 received in evidence)

10          THE COURT:  You may publish them to the jury.

11          MR. SULLIVAN:  Thank you, your Honor.

12          Mr. Sirmon, if we could put up Government Exhibit 618.

13   Now the defense table's monitors are not working I believe.

14          THE COURT:  Counsel, perhaps what will make sense is

15   we can take our afternoon break now.  The A/V folks will come

16   back and hopefully rectify the situation.

17          In the meantime, ladies and gentlemen, we'll take our

18   afternoon break.  Remember, do not discuss the case.  Just go

19   back, relax, and we'll come and get you as soon as we're ready.

20   You can either take your pads with you or you can leave them on

21   your seats, whatever you like.  Okay?  Thank you very much.

22   We'll see you in a few minutes.  It will be about 10 minutes or

23   so.

24          (Jury excused)

25          THE COURT:  Mr. Mills, you can step down if you'd

NBR3ORE5                    Mills - Direct

 1   like.

 2              THE WITNESS:  Thank you, sir.

 3              THE COURT:  Are we about on track to complete

 4   Mr. Mills' testimony?

 5              MR. SULLIVAN:  I'm sorry, your Honor?

 6              THE COURT:  Are we on track to complete Mr. Mills'

 7   testimony?

 8              MR. SULLIVAN:  Yes, I think so.

 9              THE COURT:  So hopefully the audio/visual folks will

10   be here shortly and we'll have them check obviously first the

11   defense.  Had the one at the podium started working again or

12   no?

13              MR. SULLIVAN:  It hasn't at all.

14              THE COURT:  We'll have them check that.

15              Yes, Mr. Foy?

16              MR. FOY:  I will have very limited brief

17   cross-examination, but fortunately I won't need the monitors.

18              THE COURT:  I was going to ask Mr. Mills this.  He

19   used the phrase, although I'm sure the jury recognized, heave

20   to.  You may want to ask him what that means.

21              MR. SULLIVAN:  Thank you, your Honor.

22              THE COURT:  See you in a few minutes.

23              (Recess)

24              THE COURT:  Do we need to take anything up?

25              MR. FOY:  Yes.

NBR3ORE5                          Mills - Direct

1          THE COURT:  Go ahead.

2          MR. FOY:  So, on the break, I was talking to

3   Mr. Orense.  Apparently, he has some hypertension issues and

4   it's stressful.  And he's experiencing some sort of bleeding

5   from the mouth or something where he's supposed to take some --

6   I guess he was due to take medication at 4:30 and we're not at

7   4:30 yet.  Apparently they won't let you leave with medication.

8   I asked him should we take a break so he can go back early.  He

9   wants to go to 5:15.  But I don't know if there is something we

10  can do so he can take his medication while he's here, he can

11  take it on time.  I don't know that's going to resolve what

12  he's experiencing.

13         THE COURT:  Just so that I understand.  Is his

14  medication -- is it in the cell?  Is it here?  Or are you

15  saying in the future.

16         MR. FOY:  In the future, because it is not here.  They

17  wouldn't --

18         THE COURT:  The answer is I don't know.  I haven't had

19  experience, but we can check into that.

20         MR. FOY:  Okay.

21         THE COURT:  I'd ask the government if you can contact

22  MDC just to see how that could be accomplished.  I obviously

23  will issue an order.  And Mr. Foy, if you could give the

24  government as much detail as possible.  Is it one medication,

25  what that medication is.  That might facilitate us being able

NBR3ORE5                          Mills – Direct

1    to ensure that Mr. Orense is able to take medication at 4:30

2    here.

3              MR. FOY:  Thank you so much.

4              THE COURT:  Anything else or can we bring the jury

5    out?

6              MR. FOY:  We can bring the jury.

7              MR. SULLIVAN:  Yes, your Honor.

8              THE COURT:  Do you want to get the witness?

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  We're going to continue with the direct

3    examination of Mr. Mills.

4    BY MR. SULLIVAN:

5    Q.  Chief Mills, before we get to Government Exhibit 618,

6    before the break you used a term that I just wanted to clarify

7    for the jury.  You said heave to in relation to the go-fast

8    boat.  What did you mean by that?

9    A.  So heave to is a nautical term for stop.

10   Q.  For boat that's leading the chase to actually -- not pull

11   over, there is nowhere to pull over to, but just stop and for

12   you to board?

13   A.  Yes, sir, that's affirmative.

14          MR. SULLIVAN:  Mr. Sirmon, we can put up Government

15   Exhibit 618.

16   Q.  Chief Mills, what are we looking at in Government Exhibit

17   618?

18   A.  This is a photograph of the go-fast vessel and our small

19   boat.

20   Q.  And about when was the photograph taken?

21   A.  It was sometime close to dusk.  You can see the sun

22   starting to set, and it's getting a little darker.

23   Q.  When in relation to the pursuit and the safety inspection

24   was the photograph taken?

25   A.  This is prior to the initial safety sweep being conducted,

NBR3ORE5                          Mills – Direct

1    and also prior to the crew members being detained and removed

2    from the go-fast.

3    Q.  From where is this photo in Government Exhibit 618 being

4    taken?

5    A.  This photo is being taken from the Coast Guard cutter

6    Richard Dixon.

7    Q.  So at this point the Coast Guard cutter has caught up to

8    both of these vessels?

9    A.  That's correct.

10   Q.  We see some individuals there on the blue boat.  Who are

11   they?

12   A.  That would be the crew members of the go-fast.

13   Q.  Are you on the orange boat there?

14   A.  Yes, I am.  I would be the individual to the most left on

15   the orange boat.

16   Q.  Behind the structure that looks like it has the blue siren?

17   A.  Yes, that's correct.

18              (Continued on next page)

19

20

21

22

23

24

25

NbrWore6                         Mills - Direct

1    BY MR. SULLIVAN:

2    Q.  At this point in the day's events, what's happening?

3    A.  Right now, we're waiting on word whether Colombia's going

4    to take ownership of this vessel or if it's going to be

5    considered stateless.  So that we can board the vessel.

6            MR. SULLIVAN:  All right.  Mr. Sirmon, if we could put

7    up Government Exhibit 634 -- I'm sorry.  Government Exhibit

8    632.

9            OK.

10   Q.  Chief Mills, take a look at that, and if you could, tell us

11   what we're looking at in this photograph, in Government Exhibit

12   632.

13   A.  This is a photograph of the front, or the bow, of the

14   go-fast.

15   Q.  And where is it taken from?

16   A.  This photograph's taken from our small boat.

17   Q.  And for those of us that are not that up to speed on boat

18   terms, the bow refers to what?

19   A.  The front of the boat.

20   Q.  All right.  You used starboard.  How about you orient the

21   jury.  What are the four sides of the boat?

22   A.  Sure.  Four sides of the boat.  The front's called the bow.

23   The aft, or back, is called the stern.  Starboard is right

24   side.  Port is left side.

25   Q.  And so this right here is the bow?

1    A.  Correct.

2    Q.  And who are the individuals sitting there on the bow?

3    A.  Those were crew members that were all on the go-fast.

4            MR. SULLIVAN:  All right.  And if we could now turn

5    to, Mr. Sirmon, Government Exhibit 634.

6    Q.  What are we looking at here?

7    A.  This is another picture of the bow, or front, of the

8    go-fast.  Specifically, you're looking at the two doors, or

9    hatches -- the one to the left of the picture is the smaller

10   one, and then the, more towards the right of the picture is the

11   large one.

12   Q.  And you talked about previously the initial safety

13   inspection.  Where are some of the areas on the boat that have

14   to be looked at in an initial safety inspection?

15   A.  One of the key areas is the bilge, or lowest point, of the

16   vessel.  Architecturally speaking, the bilge normally runs from

17   the bow, or front, of the boat all the way to the stern, or

18   back of the boat.

19   Q.  And why do you have to look at the bilge, or that lowest

20   portion of the boat?

21   A.  With the bilge being the lowest portion of the boat, that

22   is going to be the first place that water collects if the boat

23   is flooding.  So it's imperative that we take a quick look to

24   ensure that there's not an excessive amount of water or

25   continual flooding happening while we're onboard that boat.

1    Q.  And in this particular vessel, the go-fast boat here in

2    Government Exhibit 634, where is the bilge?

3    A.  So, the bilge would run from the aft of the boat, normally

4    where the engines are mounted on the back of the boat, all the

5    way to the front, or bow, of the boat through those

6    compartments most likely.

7    Q.  Where would you have to look to inspect the bilge?

8    A.  I would have to look inside of those compartments.

9    Q.  And did you, in fact, look inside those compartments?

10   A.  Yes, I did.

11   Q.  And what, if anything, did you find inside those

12   compartments?

13   A.  I found suspected narcotics through my training and

14   experience that I had seen before.

15          MR. SULLIVAN:  All right.  Mr. Sirmon, if we could put

16   up Government Exhibit 636.

17   Q.  What's shown in this photograph here?

18   A.  This is another picture taken of the go-fast.  What we're

19   looking at here is the bow of the boat, and the picture's taken

20   from onboard the go-fast.  If we look in the front of the

21   picture, towards the top, you'll see the big, large hatch and,

22   in front of that, the smaller hatch on the bow.

23   Q.  And at this point, are you on the boat?

24   A.  Yes, I am.

25   Q.  And I see it looks like it's nighttime.  Where in the sort

NbrWore6                          Mills - Direct

1   of sequence of events are we at this point?

2   A.  So, we're still on a quest for evidence.  We are still

3   searching the boat, looking for evidence.

4   Q.  Where is the crew of the boat at this time?

5   A.  It is now, has been transferred via our small boat to the

6   Coast Guard cutter Richard Dixon.

7       Excuse me.  Did you say the crew of the small boat --

8   Q.  I'm sorry.

9   A.  -- or the crew of the go-fast?

10  Q.  I should clarify.  The crew of the go-fast boat that was

11  on --

12  A.  Yes.  The crew of the go-fast is transferred from, via our

13  small boat to the Coast Guard cutter Richard Dixon.

14          MR. SULLIVAN:  All right.  Mr. Sirmon, if we could

15  please put up Government Exhibit 637.

16  Q.  All right.  Chief Mills, if you could take a look at that

17  and tell us what we're looking at in Government Exhibit 637.

18  A.  So, this is a picture of the bow of the boat again.  This

19  is the larger compartment of the two compartments that were

20  pictured on the bow.  Inside of this compartment were what I

21  had deemed, through training and experience, to be narcotics

22  bundled into bales, a popular transportation method.

23  Q.  I'm sorry.  Did you say which of the two hatches this is?

24  A.  This would be the larger of the two hatches.

25      Also, as we're looking at the packaging, of note would be

NbrWore6                    Mills - Direct

1    the handmade handles that are fashioned out of the leftover
2    sacks themselves with the twine.
3    Q.  If you could, just using the touch pad there, just circle
4    in red what you're talking about.
5            THE COURT:  I'm not sure it's working.
6    A.  I was able to circle it on mine.
7            THE COURT:  Yes.  Unfortunately, it doesn't appear on
8    the other screens.
9            THE WITNESS:  Yes, your Honor.
10           MR. SULLIVAN:  There we go.  I see it.  Looks like
11   it's in blue.
12   Q.  Is that what you're referring to?
13   A.  Yes, that is what I was referring to.
14           THE COURT:  Counsel, I can't see where the microphone
15   is.  If you could just speak a little bit more directly into
16   the microphone.
17           MR. SULLIVAN:  Is that better, your Honor?
18           THE COURT:  Yes.  Thank you.
19           MR. SULLIVAN:  Mr. Sirmon, if you could zoom out.  Get
20   rid of the blue mark, that's great.  All right.
21           Let's just move on to the next exhibit.  Mr. Sirmon,
22   could you put up Government Exhibit 642.  Looks like we're
23   going to continue to have that blue mark there.  My touch pad's
24   not working.
25           Sorry about that.

NbrWore6                              Mills - Direct

1   Q.  OK.  Looking at Government Exhibit 642, what's this a shot

2   of?

3   A.  This is a shot of that exact same compartment with a few of

4   the bales removed to figure out how deep the compartment went.

5   Q.  And what specifically -- did you handle these sacks in the

6   photo?

7   A.  I did, some of them, yes.

8   Q.  And what's inside those sacks?

9   A.  It's believed to be cocaine.

10  Q.  I'm talking about in terms of the sacks bundle up some

11  other objects or --

12  A.  They -- the sacks contain kilos.  Kilos are small bricks

13  that weigh two and a half pounds -- or 2.2 pounds.  Normally

14  these bales have anywhere from 20 to 25 kilos per bale, and

15  there was a total of 35 bales onboard this go-fast.

16          MR. SULLIVAN:  Mr. Sirmon, if we could please put up

17  Government Exhibit 638.

18  Q.  And what are we looking at in this photograph here, Chief

19  Mills?

20  A.  So, this would be the smaller compartment towards the very

21  front of the bow.

22  Q.  And what do we see inside the compartment?

23  A.  More bales, consistent with the other bales found in the

24  larger compartment.

25          MR. SULLIVAN:  Mr. Sirmon, if we could please put up

NbrWore6                              Mills – Direct

1   Government Exhibit 629.

2   Q.  Chief Mills, what's shown in this photograph here,

3   Government Exhibit 629?

4   A.  So, this is a picture of the go-fast.  The picture

5   primarily was taken to show the amount of 55-gallon drums that

6   are onboard as well as the smaller green 25-gallon drums, and

7   there's a few gray 25-gallon drums as well, assumed to be water

8   and most likely oil for the engines, if needed, as well as

9   fuel.

10  Q.  And how many drums are we looking at there?

11  A.  I see 13 in this picture.  I counted 14 total onboard.

12          MR. SULLIVAN:  All right.  And if we could,

13  Mr. Sirmon, put up Government Exhibit 630.

14  Q.  And Chief Mills, what's this a shot of?

15  A.  This is a shot of the stern, or back, of the go-fast.

16  Q.  And do we see more of those fuel drums there on the left

17  side?

18  A.  Yes, we do.

19          MR. SULLIVAN:  Mr. Sirmon, if we could please put up

20  Government Exhibit 639.

21  Q.  All right.  Chief Mills, if you could take a look at that

22  and explain to the jury what we're looking at here.

23  A.  So, what we're looking at here is the console, or where the

24  boat is operated from.  You can see on the bottom right hand of

25  the corner, the steering wheel.

1          Above that is a compass.

2          To the right, in the middle of the steering wheel, you see

3    some gauges there.  This is where the boat is driven from.

4          To the left of the picture you can see the yellow cases.

5    Those are referred to as pelican cases, and they are

6    watertight.

7    Q.  And what's that white object there on the left-hand side?

8    A.  That's another compartment.

9    Q.  And you mentioned the pelican case.  What is a pelican

10   case?

11   A.  It's a -- it's just a way to carry objects in a watertight

12   case.  Primarily used in oceangoing ventures.

13            MR. SULLIVAN:  Mr. Sirmon, could you please put up

14   Government Exhibit 641.

15   Q.  All right.  Chief Mills, what are we looking at in this

16   photograph here?

17   A.  So, this photograph is what was inside the compartment from

18   the last photograph.  The white board is open, as you can see

19   from the top of the photo itself.  Of interest is what's to the

20   right of the photo.  That is a suspected VHF marine radio and

21   you can see the microphone just to the left of it hanging on

22   the wall there.

23   Q.  What's a VHF radio?

24   A.  VHF radio, VHF stands for very high frequency, a standard

25   type of radio found on boats to communicate ship to ship.

1  Q.  Can a VHF radio be used for any other types of

2  communications?

3  A.  It would depend on your setup, but I'm not that

4  knowledgeable with it.

5          MR. SULLIVAN:  All right.  Mr. Sirmon, if we could

6  please put up Government Exhibit 640.

7  Q.  All right.  Chief Mills, if you could take a look at that

8  and tell us what we're looking at here in Government Exhibit

9  640.

10 A.  Sure.  So, this is a picture of one of the yellow pelican

11 cases that had been opened, and these are the materials that

12 were found inside.

13 Q.  And what are we looking at inside there?

14 A.  So, we're looking at a, what appears to be a sat phone or

15 satellite radio of some sort, handheld.  That would be the

16 object on the top.

17     The piece of paper to the top right of the photo contains

18 what appears to be a latitude and longitude as in north 18, 24

19 minutes; west 69, 19 minutes, along with what could be possible

20 phone numbers.

21     Underneath that piece of paper was a handheld GPS device as

22 well as extra batteries.

23 Q.  And directing your attention to that yellow piece of paper

24 there in the shot in the upper right corner, where it says U.S.

25 13, what does that mean to you?

NbrWore6                          Mills - Direct

1    A.  Channel 13 is used in VHF radios for bridge-to-bridge

2    communications.  When I say bridge to bridge, I mean ship to

3    ship.  It's primarily utilized for passing arrangements between

4    ships or maneuvering arrangements between ships as they're

5    meeting each other so that they don't collide.

6    Q.  And you mentioned the north-west coordinates there.  For

7    those unfamiliar with navigation, what do coordinates denote?

8    What do they tell you?

9    A.  So, the coordinates are latitude and longitude.  You can

10   blot those coordinates and they intersect.  And where they

11   intersect is the point of those coordinates.  It's another way

12   to navigate without using a GPS, if you have a proper chart and

13   a map.

14   Q.  Now, Chief Mills, after conducting the search on the

15   go-fast boat, did there come a point where the drugs were

16   transferred off the boat?

17   A.  Yes, there was.

18   Q.  And to be clear, I'm talking about -- sorry -- the go-fast

19   boat.

20   A.  Yes, the drugs were transferred off of the go-fast boat.

21   Q.  Where were they transferred to?

22   A.  They were transferred to the Coast Guard cutter Richard

23   Dixon via our small boat.

24   Q.  Were you involved in that transfer?

25   A.  Yes, sir, I was.

1    Q.  Of all of the bales of suspected narcotics?

2    A.  Of most.

3    Q.  And how did it get to the Coast Guard cutter Richard Dixon?

4    A.  So, we would hand the bales over to the small boat.  They

5    would stack them until we felt comfortable stability wise to

6    transfer them back.  They would pull alongside the Richard

7    Dixon, hand them up to our crew, and then they were guarded

8    from then on out.

9    Q.  And just to be clear, when you say small boat, are you

10   referring to that Coast Guard orange small boat?

11   A.  Yes, sir, I am.

12         MR. SULLIVAN:  Mr. Sirmon, if you could please put up

13   Government Exhibit 644.

14   Q.  All right.  Chief Mills, what are we looking at in this

15   photograph, in Government Exhibit 644?

16   A.  This is the photograph of the larger compartment on the bow

17   that is now empty.

18   Q.  And when was it taken?

19   A.  After the bales had been removed.

20   Q.  And whose legs are that in the shot right there?

21   A.  Those are my legs.

22         MR. SULLIVAN:  Mr. Sirmon, could you please put up

23   Government Exhibit 643.

24   Q.  All right.  Chief Mills, what are we looking at here in

25   Government Exhibit 643?

1   A.  This is the smaller hatch on the very front of the bow,

2   just above, or just forward of the larger hatch pictured last.

3            MR. SULLIVAN:  All right.  Mr. Sirmon, could you

4   please put up Government Exhibit 645.

5   Q.  All right.  Chief Mills, if you could take a look at that

6   and tell us what we're looking at here.

7   A.  This is a picture of the go-fast with the whip antenna

8   fully raised.

9   Q.  What is the whip antenna?

10  A.  The whip antenna is that white cylindrical object.  It's a

11  radio antenna utilized with the VHF radio that was onboard to

12  get a signal out.

13  Q.  That's the radio we looked at in the white compartment?

14  A.  That's correct.

15  Q.  Chief Mills, with the transfer of the go-fast boat crew and

16  the drugs to the cutter, was the cutter nearby for all of this?

17  A.  Yes.  The cutter was -- once the cutter got on scene, the

18  cutter was within 25 yards of our small boat and the go-fast.

19           MR. SULLIVAN:  All right.  Mr. Sirmon, if you could

20  just put up Government Exhibit 650.

21  Q.  OK.  Looking at the photograph here, Chief Mills, do we see

22  anywhere in the photograph the Coast Guard cutter?

23  A.  Yes, sir, we do.

24  Q.  Where is it?

25  A.  In the center of the picture.  All the way at the top, you

NbrWore6                          Mills - Direct

1   will see a port, or left side, aspect of our -- the cutter

2   Dixon.

3   Q.  And just to be clear, what are we looking at in the rest of

4   the photo?

5   A.  The rest of the photo, to the left would be the go-fast and

6   to the right is our small boat.

7          MR. SULLIVAN:  And just for another angle, could we

8   put up, Mr. Sirmon, Government Exhibit 651.

9   Q.  And what do we see in this photograph, Chief Mills?

10  A.  This is a picture from the aft, or back, of the go-fast

11  with the Coast Guard cutter Richard Dixon in the foreground.

12         MR. SULLIVAN:  Mr. Sirmon, if we could please put up

13  Government Exhibit 617.

14  Q.  OK.  Chief Mills, if you take a look at that and tell us

15  what's shown in this photograph.

16  A.  This is a picture of the narcotics confiscated from the

17  go-fast.

18  Q.  And are these the narcotics that were found in the hold of

19  the boat, the go-fast boat?

20  A.  It appears to be -- if you would look at the packaging of

21  the bales along with the way the handles were made or with the

22  twine, it is very similar packaging to the pictures that were

23  on the go-fast.

24         MR. SULLIVAN:  Mr. Sirmon, could you put up Government

25  Exhibit 640 again.

NbrWore6                          Mills - Direct

1   Q.  All right.  Chief Mills, directing your attention to that

2   yellow piece of paper in the shot here and the north-west

3   coordinates you were talking about, did you determine where

4   those coordinates resolved to?

5   A.  Yes.

6   Q.  And what was used to determine that?

7   A.  Google Maps.

8   Q.  And did the coordinates resolve to a location on a map?

9   A.  Yes, they did.

10          MR. SULLIVAN:  All right.  Mr. Sirmon, if you could

11  please put up just for the witness, the Court and the parties

12  Government Exhibit 211.

13  Q.  All right.  Chief Mills, if you could just take a look at

14  that, take a minute, look up when you're done.

15      Do you recognize what's shown here and what's been marked

16  for identification as Government Exhibit 211?

17  A.  Yes, I do.

18  Q.  And what is it?

19  A.  This is a map of the coordinates that we dropped.

20  Q.  And does it fairly and accurately depict where the

21  coordinates resolved to on the map?

22  A.  Yes, it does.

23          MR. SULLIVAN:  Your Honor, the government offers

24  Government Exhibit 211.

25          MR. FOY:  No objection.

NbrWore6                         Mills - Direct

1          THE COURT:  All right.  Government Exhibit 211 is

2    admitted in evidence.

3          (Government Exhibit 211 received in evidence)

4          MR. SULLIVAN:  May I publish, your Honor?

5          THE COURT:  You may.

6          MR. SULLIVAN:  Mr. Sirmon, if you could please put up

7    Government Exhibit 211 for the jury.

8    Q.  All right.  Chief Mills, what are we looking at here?

9    A.  This would be a map of the Dominican Republic.

10   Q.  And directing your attention to the red dot there, what is

11   that?

12   A.  The red dot is the latitude and longitude taken from the

13   yellow piece of paper in the yellow pelican case.

14         MR. SULLIVAN:  If I may have a minute, your Honor?

15         THE COURT:  Yes, you may.

16   BY MR. SULLIVAN:

17   Q.  Chief Mills, did you have any further involvement with the

18   seizure of narcotics in this case?

19   A.  No, I did not.

20         MR. SULLIVAN:  Nothing further, your Honor.

21         THE COURT:  OK.

22         Just a brief question.  You mentioned that contact

23   with -- that the Colombian authorities were contacted about

24   whether they would take ownership of the go-fast.  Am I correct

25   that the vessel was deemed stateless?

NbrWore6                      Mills - Cross

1           THE WITNESS:  Yes, your Honor, you are correct.

2           THE COURT:  And what would have happened if Colombia

3    had basically said yes, that's one of ours, flying under our

4    flag, whatever?

5           THE WITNESS:  We, under our bilateral agreement with

6    Colombia, we would have had to get permission from Colombia to

7    board that vessel.

8           THE COURT:  All right.  Thank you.

9           Cross-examination.

10   CROSS-EXAMINATION

11   BY MR. FOY:

12   Q.  Good afternoon, Chief Mills.

13   A.  Good afternoon.

14   Q.  How many years did you serve in the United States Coast

15   Guard?

16   A.  21.

17   Q.  Thank you for your service, and congratulations on your

18   retirement.

19   A.  Thank you.

20   Q.  So, U.S. Coast Guard is part of the military, correct?

21   A.  Yes, sir.  We are one of five branches of the military.

22   Q.  But your function has also kind of a law enforcement aspect

23   to it as well, correct?

24   A.  Yes, that is correct.

25   Q.  And you receive training that's more law enforcement-based

NbrWore6                          Mills - Cross

1   in addition to your military training, correct?

2   A.  We receive some law enforcement training, yes, that is

3   correct.

4   Q.  And some of that training has to do with the investigation

5   of criminal activity, correct?

6   A.  That is correct.

7   Q.  And that's what you were doing on April 7, 2016,

8   investigating criminal activity, correct?

9   A.  Yes, that is correct.

10  Q.  And as you're doing that, would you agree that you're not

11  there to just arrest someone?  Would you agree with that?

12  A.  Yes, I would agree with that.

13  Q.  You have to preserve evidence of the thing you're arresting

14  the person for, correct?

15  A.  That is one of our duties, is to preserve evidence as we

16  can, safely.

17  Q.  So, for example, you testified about how you stopped the

18  go-fast boat, correct?

19  A.  Yes, that is correct.

20  Q.  And there was a video being taken contemporaneously with

21  the chase, correct?

22  A.  Yes, that's correct.

23  Q.  And that's 701 in evidence, correct?

24  A.  Yes, that is correct.

25  Q.  And part of the purpose of that is to corroborate the

NbrWore6                        Mills - Cross

1    efforts of law enforcement, correct?

2    A.  Yes, video can be used to corroborate efforts of law

3    enforcement.

4    Q.  It's also used for your safety, correct?

5    A.  Yes.

6    Q.  And it's used as a tool to prove what happened, correct?

7    A.  Yes.

8    Q.  So, for example, the photographs that are in evidence,

9    those photographs -- were those photographs taken by you?

10   A.  Yes, they were.

11   Q.  And you took those photographs so you had evidence of what

12   you were talking about today, correct?

13   A.  Yes, that is correct.

14   Q.  Meaning you didn't want it just to be based on your word,

15   correct?

16   A.  Yes.

17   Q.  You wanted something to support what you had to say not

18   knowing whether you would have to come to court to testify

19   about it, correct?

20   A.  That is correct.

21   Q.  In fact, evidence like that, meaning photographs, can also

22   help you remember what happened sometimes years ago, right?

23   A.  Yes, absolutely.

24   Q.  So, for example, here, this interdiction happened in 2016,

25   correct?

NbrWore6                           Mills - Cross

1    A.  Yes, that is correct.

2    Q.  And if you don't have the photos, it may be difficult to

3    remember, correct?

4    A.  Not necessarily.  Part of our law enforcement training is

5    also documentation besides videos, besides photos.  They're our

6    backups to our evidence.

7    Q.  Correct.  And I'm going to get to that.  So, for example,

8    you took photos, correct?

9    A.  That is correct.

10   Q.  You did reports about what happened as well, correct?

11   A.  That is correct.

12   Q.  You did those reports close in time to the activity that

13   took place, correct?

14   A.  It was that night.

15   Q.  When it was fresh in your mind, correct?

16   A.  Yes, that is correct.

17   Q.  Now, the coordinates that were found on the boat were for

18   the location right outside -- that was in exhibit 211, correct?

19   A.  That is correct.

20   Q.  And that's right off the coast of the Dominican Republic,

21   correct?

22   A.  Directly off the southern coast of the Dominican Republic,

23   yes.

24   Q.  Now, where this stop ultimately took place in the ocean,

25   where was that in relation to the United States?

NbrWore6                    Mills - Cross

1    A.  We were 70 or 80 miles south of the Dominican Republic, so

2    I couldn't give you an exact -- unless we're looking at a

3    chart, I couldn't give you a roundabout, couple hundred miles.

4    But Puerto Rico, which is also U.S. territory.  Not far.  50

5    miles, maybe.

6    Q.  Meaning the stop was 50 miles from Puerto Rico?

7    A.  No.

8    Q.  What do you mean?

9    A.  I mean where -- five zero miles.  The stop was somewhere

10   south of Dom. Rep. and off the west coast of Puerto Rico.  I

11   could not give you an accurate distance to U.S. mainland.

12   Q.  Do you have an estimate?  I don't need an exact, but do you

13   have an estimate?

14   A.  I don't.

15   Q.  Do you believe it was more than 12 miles?

16   A.  Yes, I do.

17   Q.  Now, in the exhibit that has the photograph of the yellow

18   piece of paper with the coordinates -- do you remember that?

19   A.  Yes, I do.

20   Q.  Did you see any information in there that tied the boat to

21   Carlos Orense Azocar?

22   A.  No, I did not.

23   Q.  On April 7, 2016, were you aware of the name, in any way,

24   of Carlos Orense Azocar on that date?

25   A.  I was not.

NbrWore6                          Mills - Cross

1   Q.  In your investigation on April 7, 2016, did you get any

2   information as a result of your efforts that led you to the

3   name Carlos Orense Azocar?

4   A.  I did not.

5   Q.  You mentioned that the crew of the go-fast boat indicated

6   they were from Colombia, is that correct?

7   A.  No, that is not correct.  The three indicated Venezuelan

8   and one Colombian, I believe.

9   Q.  So was that, they said that the boat was under the flag of

10  Colombia?

11  A.  No.  The gentleman that was operating the boat when we

12  stopped it claimed that the boat had left Colombia.

13  Q.  OK.  So when you took pictures of the boat, you took

14  multiple pictures, correct?

15  A.  Yes, sir, I did.

16  Q.  And you made sure you captured what the boat looked like

17  before you actually physically seized the narcotics, correct?

18  A.  Yes, sir, before and after.

19  Q.  You also took photos to kind of corroborate that the cutter

20  ship was with you, is that -- was that intentional?

21  A.  That was intentional --

22  Q.  OK.

23  A.  -- to have the cutter be seen close to our small boat and

24  the go-fast.

25  Q.  And is part of the reason to accurately document the things

NbrWore6                          Mills - Cross

1    that were happening that day?

2    A.  That is part of the reason.

3    Q.  Now, I don't know if this is the correct way to say this,

4    but the art and science of criminal investigation, would you

5    agree that that's not something that's exclusive to the United

6    States?

7    A.  Yes, I would.

8                MR. SULLIVAN:  Objection, your Honor.

9                THE COURT:  If you could rephrase the question,

10   Mr. Foy.

11   BY MR. FOY:

12   Q.  Would you agree there are times where, in your duties and

13   responsibilities, you work with other countries in criminal

14   investigations?

15   A.  Yes, that is correct.

16   Q.  And the training and investigative techniques are not

17   exclusive to the United States.  Would you agree with that?

18   A.  Yes, I would agree with that.

19   Q.  So, for example, taking photos to corroborate evidence,

20   that's a fundamental investigative technique, correct?

21   A.  I would agree.

22   Q.  Taking reports contemporaneously with the investigative

23   efforts, a fundamental investigative technique?

24   A.  Yes.

25   Q.  Taking notes that get generated into a report later, a

NbrWore6                           Boada - Direct

1   fundamental investigative technique?

2   A.  For some, yes.

3           MR. FOY:  May I have a moment, your Honor?

4           THE COURT:  Yes.

5           MR. FOY:  Thank you, sir.

6           THE COURT:  OK.  Any redirect?

7           MR. SULLIVAN:  No, your Honor.

8           THE COURT:  OK.  Thank you, Chief.

9           THE WITNESS:  Thank you, your Honor.

10          THE COURT:  Take care.  Safe travels.

11          (Witness excused)

12          THE COURT:  OK.  The government's next witness.

13          MR. SULLIVAN:  Your Honor, the government calls Ronmel

14  José Boada.

15          THE COURT:  OK.

16   RONMEL JOSÉ BOADA,

17       called as a witness by the government,

18       having been duly sworn, testified through the

19       Spanish-language interpreter as follows:

20          THE COURT:  You may proceed.

21          MR. SULLIVAN:  Thank you, your Honor.

22  DIRECT EXAMINATION

23  BY MR. SULLIVAN:

24  Q.  Good afternoon, Mr. Boada.

25  A.  Good afternoon.

1   Q.  Mr. Boada, where are you from?

2   A.  Venezuela.

3   Q.  Did there come a time when you were arrested and charged in

4   the United States?

5   A.  Yes.

6   Q.  When were you arrested?

7   A.  In April 2016.

8   Q.  Why were you arrested?

9   A.  Drug trafficking.

10  Q.  And where were you arrested?

11  A.  Caribbean waters.

12  Q.  And who arrested you in the Caribbean waters?

13  A.  The -- an American cutter.

14  Q.  And after you were arrested -- well, let me ask you.  What

15  do you mean by an American cutter?

16  A.  The U.S. Coast Guard.

17  Q.  Mr. Boada, after you were arrested by the U.S. Coast Guard,

18  did you face criminal charges?

19  A.  Yes.

20  Q.  Where?

21  A.  Miami.

22  Q.  Were you brought to the United States?

23  A.  Yes.

24  Q.  And after you were charged in the United States, did you

25  plead guilty?

1    A.  Yes.

2    Q.  What crime did you plead guilty to?

3    A.  Drug trafficking.

4    Q.  Were you sentenced to a term of imprisonment after you pled

5    guilty?

6    A.  Yes.

7    Q.  What was that sentence?

8    A.  11 years and three months.

9    Q.  Are you still serving that sentence today?

10   A.  Yes.

11   Q.  Mr. Boada, before you faced criminal charges in the United

12   States, had you been arrested before that?

13   A.  Yes.

14   Q.  And about when was that?

15   A.  In 2007.

16   Q.  And what were you arrested for in about 2007?

17   A.  Drug trafficking.

18   Q.  And where were you arrested then?

19   A.  International waters.

20   Q.  Where in international waters?

21   A.  North of Paramaribo.

22   Q.  And what country is Paramaribo in?

23   A.  Surinam.

24   Q.  And what were you arrested for?

25   A.  Drug trafficking.

NbrWore6                        Boada - Direct

1   Q.  And did you face criminal charges for that?

2   A.  Yes.

3   Q.  Where did you face criminal charges for that drug

4   trafficking?

5   A.  Venezuela.

6   Q.  Did you plead guilty to those charges in Venezuela?

7   A.  Yes.

8   Q.  And were you sentenced to a term of imprisonment in

9   Venezuela?

10  A.  Yes.

11  Q.  And what was that sentence?

12  A.  Nine years.

13  Q.  Mr. Boada, I'd like to go back a bit, before you were first

14  charged and arrested in Venezuela.  How old are you?

15  A.  55.

16  Q.  And how far did you go in school?

17  A.  Sixth grade.

18  Q.  And why did you stop school?

19  A.  Because I needed to work to help my mom.

20  Q.  And what did you do for work at that point?

21  A.  My first job was washing cars.

22  Q.  Did you have any other jobs after that?

23  A.  Yes.

24  Q.  Where else?

25  A.  At a shoe store.

NbrWore6                          Boada - Direct

1    Q.  And did you have any other jobs after that?

2    A.  Yes.

3    Q.  Where else did you work?

4    A.  I moved to Carupano to work in fishing.

5    Q.  I'm sorry.  That's Carupano?

6    A.  Yes.

7    Q.  You were a fisherman?

8    A.  Yes.

9    Q.  What kind of fishing boats did you start off working on in

10   Carupano?

11   A.  Small wooden fishing boats.

12   Q.  And where would these small wooden fishing boats go?

13   A.  To work there around the coast.

14   Q.  And did there come a time when you first started to work

15   with others to transport drugs on those fishing boats?

16   A.  Yes.

17   Q.  About when was that?

18   A.  That was approximately in 2000, in the year 2000.

19   Q.  How did it start?

20   A.  Some people came by for, looking for a job to be done

21   towards Trinidad.

22   Q.  And when you say job, what are you referring to?

23   A.  To transport drugs to Trinidad.

24   Q.  And would you get paid for this job?

25   A.  Yes.

NbrWore6                              Boada - Direct

1    Q.  Did you agree to do it?

2    A.  Yes.

3    Q.  And back then, around 2000, how much would you get paid to

4    move drugs on a fishing boat?

5    A.  1,000 to $1,500.

6    Q.  And is that overall?  Is that per boat?  What is it?

7    A.  Per boat and amount.

8    Q.  And this was in the smaller fishing boats that you were

9    talking about?

10   A.  Uh-huh.

11   Q.  Is that a yes?

12   A.  Yes.

13   Q.  Do you know how the drugs would get onto the fishing boat?

14   A.  I have no knowledge about that.

15   Q.  Do you know where the drugs came from?

16   A.  No, not that either.

17   Q.  Did there come a time in your work as a fisherman where you

18   started working on larger fishing boats?

19   A.  Yes, that's correct.

20   Q.  And what kind of fishing boats are those?

21   A.  Wooden boats.

22   Q.  Are they bigger than the smaller ones you used to work on?

23   A.  Yes.

24   Q.  And if you could, give the jury a sense of how many crew

25   members a smaller boat might have.

1   A.   Four people.

2   Q.   And then how about these larger fishing boats that you

3   started to work on?

4   A.   12 people.

5   Q.   And would you also work moving drug loads on the larger

6   fishing boats?

7   A.   Yes.

8   Q.   How big were these larger boats?

9   A.   They were approximately 17, 18 meters, 19 meters in length.

10  Q.   And, I'm sorry.  I forget.  Did you already tell us how

11  many crew members they would have?

12  A.   12, yes.

13  Q.   Now, when you would work on a drug load moving on a fishing

14  boat, would the entire crew know about the drugs on the boat?

15          MR. FOY:  Objection.

16          THE COURT:  Yes.  If you could rephrase it, rephrase

17  the question.

18  BY MR. SULLIVAN:

19  Q.   When you worked on a fishing boat moving drugs, did you

20  know about the drugs -- you knew about the drugs on the boat?

21  A.   Yes, of course I did.

22  Q.   Did anybody else?

23          MR. FOY:  Objection.

24          THE COURT:  From your understanding, did anyone else

25  know?

1          THE WITNESS:  Yes.  Those of us that were on the boat,

2    we all knew.

3    BY MR. SULLIVAN:

4    Q.  On these larger fishing boats, how much would you get paid

5    to move drugs?

6    A.  Ten to $12,000.

7    Q.  And just to clarify, is that overall?  Is that per boat?

8    What is it?

9    A.  Overall.

10   Q.  For each boat?

11   A.  Yes.  Yes, per job.

12   Q.  And where would these larger fishing boats transport the

13   drugs?

14   A.  International waters.

15   Q.  What would happen out in international waters?

16   A.  We would make the delivery to another boat that was on high

17   sea waiting for it.

18   Q.  And how frequently would you work on these larger boats

19   with drugs?

20   A.  Once a month.

21   Q.  Mr. Boada, I would like to now turn to your first arrest

22   and the sentence you served in Venezuela.  About when did you

23   get released from prison for that sentence?

24   A.  I was incarcerated in 2007, and I was released

25   approximately in 2015.

NbrWore6                         Boada - Direct

1    Q.  And about when in 2015?

2    A.  Late.

3    Q.  And after you got out of prison in late 2015, what did you

4    do?

5    A.  I started fishing.

6    Q.  Did you move any other drug loads after that?

7    A.  Well, four months after that, yes.

8    Q.  So what happened around that time, four months after you

9    got out of prison?

10   A.  This person showed up, offering a job, offering to pay

11   $15,000 for drugs to be moved to the Dominican Republic.

12   Q.  And did you agree to do the job?

13   A.  Yes.

14   Q.  Was it just you alone?

15   A.  No.  There were three others.  Three Venezuelan guys.

16   Q.  Where were you living at the time when this happened?

17   A.  Carupano.

18   Q.  Is that in Venezuela?

19   A.  Yes.

20   Q.  And were you approached in Carupano?

21   A.  Yes.

22   Q.  And how were the drugs going to move to the Dominican

23   Republic?

24   A.  Fiberglass speedboat.

25   Q.  And after you agreed to take the job, what happened next?

NbrWore6                        Boada - Direct

1    A.  Approximately two days later, we were taken to Guarico.

2    Q.  And when you say we, who are you referring to?

3    A.  Me and my two fellow crew members.

4    Q.  And who took you -- I'm sorry.  You mentioned Guarico.

5    What is Guarico?

6    A.  Guarico is in Zaraza.

7    Q.  Are we talking about in Venezuela?

8    A.  Yes, yes.  Venezuela.  Yes, in Venezuela.

9    Q.  And when you say Guarico, are you referring to a town, a

10   region, a city, a state?  What are you referring to?

11   A.  The state of Guarico.

12   Q.  So that's a state in Venezuela?

13   A.  Yes.

14   Q.  And you mentioned, is it Zaraza?

15   A.  Yes.

16   Q.  What is Zaraza?

17   A.  Well, it's near Guarico.  It belongs to Guarico.

18   Q.  Is it in Guarico?

19   A.  Around Guarico.

20   Q.  And so you were taken to Zaraza, and where did you go once

21   you arrived in Zaraza?

22   A.  To a hotel.

23   Q.  Let me ask you.  How far of a trip is it from Carupano to

24   Zaraza?

25   A.  Approximately 24 hours.

NbrWore6

```
 1              THE COURT:  Counsel, it is 5:15.  Is this a good place
 2      to take our evening break?
 3              MR. SULLIVAN:  It's fine, your Honor.
 4              THE COURT:  OK.
 5              All right.  Ladies and gentlemen, we're going to take
 6      our evening break now.  Remember, do not discuss the case.  No
 7      research of the case.  Just go home.  Relax.  We'll see you
 8      tomorrow morning at 10 o'clock.  Remember, go directly to the
 9      jury room.  Do not come to the courtroom in the morning.  OK?
10              Thank you very much.
11              Remember, please leave your pads in the back.
12              (Continued on next page)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

NbrWore6

1          (Jury not present)

2          THE COURT:  Thank you.  You may be seated.

3          Is there anything we should take up this evening?  I

4    know I still have to make a ruling on the search warrant issue.

5    We could take that up in the morning if that makes sense.  Why

6    don't we plan on getting here, why don't we say by 9:30.  OK?

7          After Mr. Boada, who are the next few witnesses?  Is

8    it Mr. Spears, Agent Hacker and then Arvelaiz?

9          MR. SULLIVAN:  That's correct, your Honor.

10          THE COURT:  OK.  All right.  Anything else we should

11    talk about this evening?

12          Oh, counsel, be sure to have the conversation about

13    the medication, and I can follow up and issue an order if

14    that's necessary.  If it's a problem, I understand there may be

15    certain rules about that, but perhaps if we're specific about

16    the medication and when it needs to be taken, perhaps we can

17    get that done.

18          MR. FOY:  We did provide the government with the name

19    of the medication so that they can communicate with legal and

20    assist us in that matter.

21          THE COURT:  OK.

22          MR. LOCKARD:  And just a quick update, your Honor, we

23    did email the MDC legal department.  We haven't yet gotten a

24    response.  Given the hour, I expect staff probably is no longer

25    there for the day, so we may not get this resolved until

NbrWore6

1    tomorrow.

2              THE COURT:  All right.

3              Sorry.  I'm just smiling because email is any time,

4    but I understand that people have working hours.

5              MR. LOCKARD:  I think BOP doesn't have access to their

6    email outside the building.

7              THE COURT:  Oh, is that right?

8              MR. LOCKARD:  That's part of the problem.  Your Honor

9    may have better access to people after close of business than

10   we do.

11             THE COURT:  Yes.  I've never tried to contact anybody

12   at BOP.  I didn't realize that they don't.  OK.  All right.

13             Yes, Mr. Foy.

14             MR. FOY:  When are we scheduling the AUSA Jason

15   Richman?

16             THE COURT:  Perhaps, maybe we should start at 9:15.

17             Do you know if Mr. Richman would be available to come

18   at 9:15?

19             MR. SULLIVAN:  We can certainly check, your Honor.  I

20   would assume that's not a problem, unless he's traveling, but

21   we'll check.

22             THE COURT:  OK.  Thank you.

23             So we'll say 9:15 unless he's unavailable.  Then we

24   could do it at some other point during the day tomorrow.

25             MR. SULLIVAN:  Yes, your Honor.

NbrWore6

1              THE COURT:  Anything else?

2              From the government.

3              MR. SULLIVAN:  Nothing from the government, your

4    Honor.

5              THE COURT:  From the defense, Mr. Foy?

6              MR. FOY:  Let me just check something?

7              THE COURT:  Sure.  Absolutely.  Go ahead.

8              MR. FOY:  Nothing further.

9              THE COURT:  OK.  All right.  Thank you very much.

10   We'll stand adjourned.  Obviously if anything comes up in the

11   evening, just email us and we can always arrive a little bit

12   earlier.  OK?

13             MS. LASKY:  Thank you, your Honor.

14             (Adjourned to November 28, 2023, at 9:15 a.m.)

15

16

17

18

19

20

21

22

23

24

25

```
1                      INDEX OF EXAMINATION

2   Examination of:                              Page

3    TRAVIS MILLS

4   Direct By Mr. Sullivan . . . . . . . . . . . 100

5   Cross By Mr. Foy . . . . . . . . . . . . . . 136

6    RONMEL JOSÉ BOADA

7   Direct By Mr. Sullivan . . . . . . . . . . . 143

8                      GOVERNMENT EXHIBITS

9   Exhibit No.                               Received

10   701   . . . . . . . . . . . . . . . . . . 107

11   617, 618, 629 through 645, 650, 651  . . . . 115

12   211   . . . . . . . . . . . . . . . . . . . 135
```

```
13

14

15

16

17

18

19

20

21

22

23

24

25
```