NbsWore1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

                v.                          21 Cr. 379 (VSB)

CARLOS ORENSE AZOCAR,
    a/k/a "El Gordo,"

                Defendant.
                                            Trial
------------------------------x

                                            New York, N.Y.
                                            November 28, 2023
                                            9:50 a.m.
Before:

                    HON. VERNON S. BRODERICK,

                                            District Judge
                                            -and a Jury-

                        APPEARANCES

DAMIAN WILLIAMS
      United States Attorney for the
      Southern District of New York
BY:   MICHAEL D. LOCKARD
      KAYLAN E. LASKY
      KEVIN T. SULLIVAN
      Assistant United States Attorneys

FOY & SEPLOWITZ LLC
      Attorneys for Defendant
BY:   JASON E. FOY
      ERIC J. SARRAGA

Also Present:   Cristina Weisz
                Erika de los Rios
                Mercedes Avalos
                Vivian Goa
                Interpreters (Spanish)

                William Sirmon, Paralegal Specialist
                Meusette Gonzalez, Paralegal
                Special Agent Matthew s. Passmore

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

NbsWore1

(Trial resumed; jury not present)

THE COURT:  You can be seated.

If we could go on the record, just a few housekeeping matters with regard to the jurors.  I believe my deputy clerk had shared with you juror No. 1 has two business obligations that he'd like to be able to do, one on Tuesday, 12/5, which is currently scheduled for 3 to 4 p.m., and it's a presentation that he's indicated he could do virtually.  I'm going to suggest that I ask if he could -- he indicates that he might be able to see if he can move the order of the panels that are going to be part of this business meeting.  So I would suggest that he either move it to around our lunch hour or further toward the end of the day so that to the extent we have to miss any time, it will just be a short period of time, or no time, at the end of the day.

That would be my suggestion for December 5.

With regard to the 13th, which is the other date he indicated he had a presentation, he indicates that's from one to three.  I'd make a similar request with regard to that, if possible, but he's indicated that the one to three, obviously, encompasses part of our lunch hour, and he may not need the whole window he's indicated.

I don't know where -- he's indicated he could do it virtually.  I don't know how long it would take him to get from wherever he's going to do it, or he can do it somewhere close

NbsWore1

on or on his phone.  That's my proposal with regard to juror No. 1's request.

I don't know if the parties have any thoughts about that.

Yes, Mr. Foy.

MR. FOY:  With regards to -- I think it's good that he can do it virtually, but I know if that's the case, he's probably going to want to use the computer.  I don't know if that's the case.  It's just a matter of getting him permission to be able to bring the computer in to do that.  I know they have the conference rooms here for witnesses that, maybe, he can use, because I'm sure he can't do it in the jury room with his fellow jurors in there.

THE COURT:  Yes.

MR. FOY:  When you talk about the day where he said that it overlaps with the lunch, I know you said you want to check to see if he can move it, but it seems like an opportunity to take advantage of the lunch even though our lunch may be a little extended because of it.

THE COURT:  Yes.

MR. FOY:  So, I don't know.

THE COURT:  What I would say to him -- my communication will be through Ms. Disla -- is that either he can keep it then or move it; if it can be moved to the end of the day, I just think that would be better.  But if not, he

NbsWore1

could keep it then and he could utilize the lunch hour for that, and we can figure out whether the lunch hour needs to be extended, and if so, by how long.

MR. FOY: OK. I think that's really all about, because the other date, I guess, if he could move it, great.

THE COURT: Yes. We'll see. I don't know. He said it's possible, but we'll see if he can do that for the Tuesday conference.

Yes.

MR. SULLIVAN: Your Honor, we'd simply note just on Monday, the 4th, we are not sitting until two.

THE COURT: Oh, I totally forgot. Perhaps he could move the panel to the morning --

MR. SULLIVAN: But Monday.

THE COURT: Oh, I'm sorry.

MR. SULLIVAN: If he can move it just one day earlier, I don't know, because we're not sitting.

THE COURT: OK. Apparently the days are set with different panels, so he can move the time but not the day.

OK. And just so you know, we are missing several jurors, so they're not waiting on us.

Juror 14 has made a request that perhaps on December 12 we break at about 4:30. Her daughter is part of a sports awards dinner that she'd like to be able to attend. She indicated that yesterday she didn't get home until seven, and

NbsWore1

the dinner is at 6:30, and that's why the request for an early break. We can accomplish leaving early by, if possible, starting a little bit early so we don't lose that hour or so. I guess what I would say is that I would propose letting her know we could break early on that day. We may need to adjust the schedule otherwise, but I would like to be able to accommodate her so that she can attend the event.

Any thoughts from either party?

MR. SULLIVAN: The government has no objection, your Honor.

THE COURT: All right.

MR. FOY: No objection.

THE COURT: All right. Thank you.

We'll communicate that. Ms. Disla will communicate that at an appropriate time to juror No. 1 and juror 14.

OK. Is Mr. Richman here?

Mr. Richman, I'll hear from you with regard to the issue. You can stand at the podium. That's fine. I apologize. Yesterday, you were sitting right there, and I totally missed you.

Do you recall when you had the conversation with the folks down in the Southern District of Florida, approximately when?

MR. RICHMAN: Early June 2020, your Honor.

THE COURT: OK. In connection with that, did you

NbsWore1

speak to two different people, or did you speak to one person at that time?

MR. RICHMAN:  Just one person, your Honor.

THE COURT:  OK.  And was that the assistant?

MR. RICHMAN:  It was, your Honor.

THE COURT:  OK.  And what was the substance of that conversation?

MR. RICHMAN:  He conveyed to me that he had no credibility concerns with any witness, including Mr. Arvelaiz.

THE COURT:  OK.  Did he at all indicate, to your recollection, anything about the email exchange?

MR. RICHMAN:  Not beyond that, your Honor, and that their decision-making was their internal, deliberative processes, but nothing specific.

THE COURT:  OK.  All right.  Approximately how long, do you recall, the conversation being?

MR. RICHMAN:  I recall it being very quick, your Honor, but I don't recall how long.

THE COURT:  OK.  Anything else that you recall about the conversation?

MR. RICHMAN:  Not beyond those two points, your Honor -- that there were no credibility concerns with any witness and that they had their internal, deliberative processes that led them to their decision-making.

THE COURT:  OK.  And I take it that other than the

NbsWore1

conversation with the assistant, you didn't have a conversation with the agent who was on the email?

MR. RICHMAN:  Not that I recall, your Honor.  I may have spoken to him in some other context.  Not about this, though.

THE COURT:  OK.  All right.

Thank you.

MR. RICHMAN:  Thank you, your Honor.

THE COURT:  All right.  I think, again, I thought it made sense to hear from Mr. Richman just simply because he had the conversation.  As I mentioned yesterday, it doesn't alter my thought process with regard to the motion.

Now, there are several things just to revisit.

The actual email was produced in 2022.  Under the case law relating to *Brady*, the issue is whether or not -- and again, to the extent the letter is considered *Brady*, whether the defense is given ample opportunity to make use of the information.  The questions relating to it arose more recently, in October.  There was the exchange between the government and the defense, which eventually led to this point, where we got the information concerning the call.  But I guess putting the -- and with regard to, though, any possible issues, because obviously the conversation occurred in 2020; the email was from 2019.  To the extent that the assistant in the Southern District of Florida just either didn't recall or what have you,

NbsWore1

the bottom line here is that -- my understanding, and I'll confirm it again in a moment -- is that all of the 3500 material -- well, the witness statements, my understanding, to the extent they were documented by the Southern District of Florida, were obtained by the government here and produced for the witnesses they are calling.

Is that an accurate statement?  In other words, whatever DD-5s, 302s that were obtained from the Southern District of Florida, relating to the witnesses, the government witnesses here, were turned over.

MR. SULLIVAN:  So, we asked the Southern District of Florida for everything that they had.  They provided us what they could locate, we produced it, with respect to our witnesses here.

THE COURT:  OK.  Do you have an understanding of whether, because you mentioned "they could locate."  Were there materials that they believed that they had at one point that they weren't able to locate, or is that just the way you were phrasing it?

MR. SULLIVAN:  No.  So, with respect to any HSI reports that we were able to get from HSI or from the SDFL's files or DEA-6s, we turned those over.  At some point Mr. Foy had asked about any additional notes with respect to AUSAs that might have attended meetings that are reflected in the debriefings, reported in the 6s and reported in the HSI

NbsWore1

reports. And so we went back to SDFL, and we asked for them to look in their files, their case files for anything of that nature. And they looked for our witnesses.

With respect to two of our witnesses, Arvelaiz and Perdigon, they could not locate their case file for it. Their file room showed that the case had been closed and that the files should be there. The physical search of the file room could not locate it. We made Mr. Foy aware of that once we were aware of that.

THE COURT: All right. Thank you.

So the issue concerning the reports and the like from the Southern District of Florida, efforts were made by the U.S. Attorney's Office here through the U.S. Attorney's Office in the Southern District of Florida to get those materials. My understanding is that there were, in fact, materials obtained from the Southern District of Florida that were produced in connection with the witnesses who are going to testify here. So I maintain my ruling, that I'm not going to require anything else of the government.

And again, I don't know whether -- Mr. Foy, I'll leave it up to you what, if any, other steps you want to take with regard to the Southern District of Florida, either the assistant or the agent.

MR. FOY: OK.

I appreciate the Court's inquiry and taking the steps

NbsWore1

to try to clarify what actually happened.  I think the reason why I brought it to your attention is because I was unsuccessful in doing that without your assistance.  Now that I'm clear on what occurred from the Southern District of New York's perspective towards the Southern District of Florida, I have no problem with the Southern District of New York's approach to it, other than the fact that I had to get you involved.  But that's OK to happen sometimes.

But what is my issue now?

I understand that the Department of Justice presides over the U.S. Attorney's Offices and the federal Bureau of Prisons and other agencies.  I understand that they're run by different personnel, have different policies.  And hey, our courts even have different perspectives of the law in different districts.  So there's nothing unusual about that reality.  OK?  But with that said, when I speak in court and I talk about the government, I'm talking about one entity.  Right?  It just so happens sometimes I'm in the District of New Jersey, sometimes I'm in the Southern District.  And it just so happens I'm present there making arguments.  But what I'm thinking, the way I'm approaching cases, is one entity, the United States of America, my country, your country.  Like, it's a weird dynamic sometimes when you're fighting these cases this way.  Right?

So when I hear that the government -- not the attorneys here but the government -- had a case file with a

NbsWore1

cooperating witness who's paid, on the payroll of the government, who has a history of fraud, of violence, and the file's missing -- right? And I also know that there's this dynamic that's starting to be a part of the narrative of the defense case of why this witness has a vendetta against Mr. Orense, and I'm aware that when it came to him being sentenced to five years, that apparently the government advocated for less and it was the judge who felt like, given the victim impact statements that were part of that proceeding, that five years was appropriate despite the government asking for less. Right?

I'm also aware, upon information and belief -- and I don't know Richard Gregorie. I've never had interaction with him. My understanding is he was a well-known, long-term career prosecutor, who was successful in some named prosecutions, Noriega and some other things out of South America. Based on what I'm seeing from the 3500, in fact, there's going to be cross-examination on Arvelaiz stating he was pressured by the Southern District of Florida to give information. It feels uncomfortable to me because I'm operating in a way where it's not just the case that I'm looking at. I'm looking at the context of what I know the history to be of the United States of America. Right?

Now, I'm not saying corruption. I'm not saying that. I'm saying I'm uncomfortable because it's a road that I'm,

NbsWore1

like, what's going on?  How can it be he's still on the payroll?  He's still working for them.  There are still investigations going on that he's impacting and we can't have missing files.  Right?  For a witness like this, for an individual like this, who, I believe, part of the way I'm going to be approaching him is I'm dealing with somebody with a mental health issue -- and to be specific, antisocial personality disorder.  Right?

That's what I believe this man, that's what he has.  That's why he acts the way he acts.  That's why he does, has the heart or lack of heart that he has.  And I say that based on speaking to the people in Venezuela, in the United States, people that have had interactions with him from different aspects of his life.  So it's not something I'm just doing because it's my job to advocate for Carlos Orense.

So now that that's clarified and it's been cleared up a few minutes ago, I still have to think about what it all means.  So I guess it's to be continued.  Hopefully it's to be continued here and then never to be revisited again.  But if it's not, there may be a higher court someday that needs to think about this and other counsel that needs to think about this.  So I'm thinking about that too.

THE COURT:  What I would say is vis-à-vis this U.S. Attorney's Office here, the U.S. Attorney's Office in the Southern District of New York, decisions are made with regard

NbsWore1

to prosecutions -- and apparently here -- that are separate and apart.  The Southern District of Florida or the Southern District of New York and the Eastern District of New York, could see a case and one decide to prosecute it and the other not.  So with regard to that, I think there absolutely is, and I'm not saying for purposes of  making any ruling for purposes of one government or not, but certainly with regard to the deliberative process that goes into making a decision.

Here, the issue about the files for the two witnesses, and as I understand it, it's the United States Attorney's Office files for those two witnesses that are missing, although it sounds as if there is some record that they should be there, but they're not there.

So, Mr. Foy, are you saying that you have concern that they didn't do a diligent search?  What is it?  I guess what I would say is the following.  I don't know and I don't have any control over the Southern District of Florida.  I have no doubt that they did conduct a search.  If you want to make it -- well, I'll just leave it at that.

MR. FOY:  Well, I agree with what your Honor said, and during this colloquy over the past two days, the idea that I was trying to understand the deliberative process is not true. I didn't -- because I think I know what it was, meaning they had their concerns, they decided not to prosecute, and that's fine.  I agree that prosecutors should have autonomy and

NbsWore1

discretion to decide to prosecute or not to prosecute. So that's not even an issue to me.

The issue is really just learning what the information is, because the difference in taking that discretion, is that there's this email that says something that triggers, as a matter of law, and the Constitution, I believe, when there's a credibility issue with a witness that's now in this case, I need to be alerted to it so I can figure out how it can be used or not. And it's fine that it doesn't exist. If that's what they say, I can accept that it doesn't exist.

Then the problem is why are you writing an email that says there's a credibility issue? Right? Because the email is clear. They assert in the email that based on a discussion about credibility and availability, they're not pursuing it. There could be other things too. I'm not saying it's an exclusive list. It could be other things too, outside of a lot of things. But it sounds like a false statement in an email communication that's not the basis of why they decided not to prosecute, because that's what they're saying, there wasn't a credibility issue. Then it begs the question, well, why? Why are you asking someone to send you an email to confirm a conversation that now you're saying didn't really happen that way? And that's what is the discomfort of it.

I don't know. And here's the thing. I don't know the answer as to why that's the case. Right? And you're right. I

NbsWore1

can call and do some things.

THE COURT:  Yes.

MR. FOY:  All right.  My client's facing a minimum of 40 years.  I'm trying to defend the case now.  That's fine. That's my job, and I'm going to take it on.  I don't have a hundred attorneys behind me to divvy up and delegate these things.  The government's working hard.  We're working hard. Everyone up in here has been sleeping late, taking their four, three hours of sleep.  I understand.  And we signed up for it. We know it's part of the job, so it's not a problem.  But for me to then do that, take away from the preparation process that goes on during a trial to go investigate the Southern District of Florida -- I can't go down there, not now.  I guess I could get an investigator.  I'd have to go through a process to get approval, all these different things I'd have to do, to go travel somewhere to get it approved so it's covered because economics matter in how we prosecute these cases, to go find out this thing that I feel like I shouldn't even have to go find out.

We should just understand what it is, and I don't. And that's the discomfort.  I'm not sure I have the time or resources to fully take it there, because it could be something that doesn't affect what we're doing and I just don't know. And that's the problem.

The good thing is I have some materials to work with

still.  There are some things I can still do to advocate effectively for Mr. Orense.  I don't think anything that I'm saying would suggest I can't represent him well.  OK?  But I want to give him the maximum opportunity to be successful, and this little thing is discomforting, when my government makes these type of representations.  And that's not being disparaging about my esteemed counsel at the prosecution table.  And I say those things with a context of what I believe, in my personal life experience, and what I've learned about government, things happen sometimes.  Corruption is not something that's exclusively a Venezuelan thing.  Misconduct is not something that happens somewhere else.  We have that issue here.  Not these individuals.  I'm not even talking about the Southern District of New York right now.  I'm talking about the government of the United States.  Right?

So that's where my discomfort comes.  I guess we'll see what happens and I'll develop it.  And if something else occurs, I'll raise it.  I'll ask them first, and then of course, if we can't resolve it, like I've done here, I'll bring it to you.

THE COURT:  OK.  All right.

MR. FOY:  I forgot.  There's one other thing, though.

We're not there yet, but the one thing that I could imagine asking for, at a later time, after we see what happens during the trial, is some sort of adverse inference, possibly.

NbsWore1

Arvelaiz has to testify first.  We have to see how that goes. I think that would impact any application along those lines, so that's the one thing, I think, that's out there that, maybe, might be available as an argument depending on how a lost file that may or may not have information that's impactful here.

THE COURT:  OK.  Again, with regard to the issue and investigation and the like, I have no idea whether if you were to call either the prosecutor or the agent, whether or not they would speak with you.  I don't know.  I think *Touhy* typically relates to getting testimony.  So it's up to you.  I don't know.  Obviously, I don't have the contact information for those folks, but it's up to you.

With regard to the files, if you're going to make a motion at some point, then I'll hear you at that time.

OK.  Are all the jurors here?

THE DEPUTY CLERK:  Yes.

THE COURT:  I had intended that we would discuss the search of the phone.

Let me ask the government.  When did the government intend to offer information that was obtained from the phone?

MS. LASKY:  Your Honor, we are expecting to offer that tomorrow.

THE COURT:  OK.

MS. LASKY:  It would be helpful to get a ruling, if possible, but we'd defer to the Court on that.

NbsWore1

THE COURT:  What I'd like to do, because I do have several questions about it.  I'd like to at some point do that argument.  Perhaps, if we're going to break at 5:15, perhaps a little bit -- well, I'll figure out a time, just because there are some things that I just wanted to get clarification on.

All right.

MR. SULLIVAN:  Your Honor, one thing with respect to Mr. Boada, the witness that was on the stand yesterday, we have had our case agents sitting outside of MDC since 8 a.m. this morning.  For some reason he couldn't be brought -- well, there's only one bus coming from MDC, and for obvious reasons, he couldn't be on that bus, so we had to use our case agents to transport.  We have gotten word that they are en route right now.  The last ETA we had is about 15, 20 minutes.

That's where we are right now.  We have other witnesses if you'd like us to put somebody on the stand, but we wanted to at least apprise the Court of the delay with respect to Mr. Boada.

THE COURT:  Sure.  Who would be the other witnesses?  And then I'll hear from Mr. Foy with regard to taking certain witnesses out of order.

MR. SULLIVAN:  We have DEA Supervisory Special Agent Jeff Spears and then also DEA Supervisory Special Agent Scott Hacker.

THE COURT:  All right.

NbsWore1

Mr. Foy.

MR. FOY:  Your Honor, I would prefer not to take them out of order.  Normally I am flexible with that, but I don't want to lose the focus that's required of dealing with this very important witness.  It's 10, 15 minutes.

Now, if we want to use the 10 or 15 minutes to have the argument about the phone --

THE COURT:  Yes, let's do that.

My understanding of the timeline is that the defendant was arrested on April 23 of 2021, in Italy -- or, excuse me, a warrant for his arrest was issued; that the defendant was arrested by Italian authorities on May 13 of 2021; the indictment was returned June 3 of 2021, and that Mr. Orense was extradited to the United States on June 22, I think, of 2022; and that in connection with the request, not only for a provisional arrest warrant and then subsequent extradition, my understanding is that the government also requested assistance in seizure and search of any electronic devices that Mr. Orense was in possession of.

Let me ask.  Was the request for the search and seizure done in advance of the arrest, or was there -- in other words, as part of the package that went to the Italian authorities for the arrest?  Was it basically, as part of the request, not only the arrest but the search and seizure of any electronic devices that were on Mr. Orense's person at the time

NbsWore1

of arrest?

MR. SULLIVAN:  Yes.  So, the request was made, we believe, after the arrest but before the indictment.

THE COURT:  OK.

MR. SULLIVAN:  That's my understanding.

THE COURT:  All right.  And I take it it was made pursuant to the treaty; in other words, it was made however the official channels would be made pursuant to the treaty with Italy.

MR. SULLIVAN:  Yes, the mutual legal assistance treaty with Italy, pursuant to which the request was made.

THE COURT:  OK.  Now, let me ask, because I wasn't able to find, and I did some searches, a situation where -- obviously I'm aware that such requests can be made not only with regard to obtaining information that might be on a prisoner's -- someone who's arrested, but also to get witness statements and other things in gathering evidence that those sorts of requests are made.  But what I couldn't find was a situation where the information was then used, in other words, obtained in a foreign jurisdiction, let's say documents were then used in a case.  I certainly couldn't find a situation where a phone was used.  And I guess my question is, is there any case law that the government was able to find that indicates in the context of a phone, that the search and seizure by a foreign government obviates the need for folks in

NbsWore1

the United States to obtain a search warrant; in other words, where that material, whatever was obtained was utilized in connection with a trial or a hearing.

MR. SULLIVAN:  I don't believe we found a particular case with respect to a phone.  We are aware of case law in which there are recorded communications abroad that have been recorded and provided pursuant to a mutual legal assistance treaty request, and that those have been used in U.S. proceedings; and that, as we argue here, those foreign authorities are not subject to the Fourth Amendment and that the foreign national in that country that was the subject of those recordings enjoyed no Fourth Amendment rights with respect to those recordings.

THE COURT:  Let me ask.  This is with regard to timing.  My understanding is there was a request.  Am I correct that a forensic copy of Mr. Orense's cell phone was produced in discovery on December 19 of 2022?

MR. SULLIVAN:  That's correct, your Honor.

THE COURT:  OK.  And there was an indication, I think, in the letter that the government made a request for a stipulation related to the, I guess, chain of custody or authenticity of the phone, I take it to obviate the need to call folks from Italy.  When was that request made?

Well, let me ask.  Was it before seeking the search warrant?

NbsWore1

MR. SULLIVAN:  One moment, your Honor?

THE COURT:  Yes.

MR. SULLIVAN:  We would just need to check our emails. I think it was close in time, but I can't say whether it was before or after.

THE COURT:  OK.  All right.  If you could check that, that would be great.

MR. SULLIVAN:  Your Honor, with respect to whether there was a case on a phone, we have not found a case particularly with respect to a phone, but we would draw your Honor's attention to *U.S. v. Verdugo Urquidez*, 494 U.S. 259. It's on page 5 of our letter.  That was a house search that was conducted by the Italian authorities -- I'm sorry -- U.S. authorities in Mexico.  And there, the court held that the defendant did not have any rights under the Fourth Amendment with respect to the search.  It was a foreign national in Mexico.

THE COURT:  OK.  I apologize.  There was a subsequent challenge or a motion to suppress or something like that?  I'm just wondering what the context was in connection with that case.

MR. SULLIVAN:  So, it was a house search of a foreign national in Mexico that involved the DEA conducting the search, and the Supreme Court held that the foreign national did not have a Fourth Amendment right in that scenario.

NbsWore1

THE COURT:  OK.  So, as I understand the government's argument, it's, I guess, severalfold.  One is that the seizure and search of the phone by the Italian authorities divested Mr. Orense of the interests he might have had, the privacy interests he might have had in the phone and that the government could have utilized the image, whatever, that the Italians sent over and done searches on that and utilized those materials in connection with the trial.  However, that would have involved or could have involved connecting up that image that was made by getting someone from Italy to say they took this phone, made that image and basically establishing the chain, so that any subsequent motion with regard to the phone that Mr. Orense no longer had or, at best, had a diminished property interest in the phone and privacy interest in connection with the materials contained on that phone, and that any delay in the obtaining of the search warrant, that it is not consistent with -- not consistent.  The cases that deal with delay are typically cases where an item is seized here as opposed to something that has already been seized and searched, and then a warrant is obtained later on.

Is that a fair statement?

MR. SULLIVAN:  Yes, your Honor.

THE COURT:  OK.  All right.

MR. SULLIVAN:  And just, we were able to clarify.

The search warrant was obtained on October 24.  We had

NbsWore1

raised with defense counsel in calls about a stipulation, but in terms of when we actually followed up by email, from what we can see on our email, it was November 6.

THE COURT:  November 6.

MR. SULLIVAN:  November 6 that we actually followed up by email about the stipulation.  We don't know in terms of the calls, with respect to the exact date of the calls in which we raised it with defense prior to that, we don't know those dates.  But when we followed up by email, it was November 6.

THE COURT:  OK.

Let me hear from the defense.

First, one of the aspects, Mr. Foy and Mr. Sarraga, that wasn't discussed in the initial motion was the seizure of the phone and then the copying of the phone by the Italian authorities and the production of that copy to the defense.

MR. FOY:  Well, the seizure of the phone and that extraction is not the same extraction done by the government, meaning the government extraction is through a Cellebrite program that kind of parses out the information contained on the phone in a way that's readable and organized.  So the discovery, the production of the phone in discovery is not in that format.

In fact, when we did make attempts to look at it, it's unduly cumbersome, meaning in order to get to a piece of information -- and quite frankly, my assistant, Christopher

NbsWore1

Corcoran, who is sitting in the front row has been charged with the responsibility of doing that. My understanding is that in order to find something, mind you, it's not organized, and we have, like, 140,000 files of this, and it's voluminous. You have to go through, like, let's say 17 folders, folder within folder within folder, to get to ten files and then back all the way out to get to some more information. Right? So it's given to us in a way that's not manageable.

Now, with that said, fine. It's an extraction. You wanted me to talk to the issue of the Italian authorities seizing it. So let me do that.

THE COURT: Basically, the legal issue that the government has raised, I recognize the practical issue, and I can speak to that a little later, but the legal issue is what I'm interested in.

MR. FOY: All right.

So, the legal issue, apparently in this case, our government asked another government to act pursuant to an agreement that they have with each other, to act in their interests, in this government's interests to their criminal investigation. Now, our friends in Italy, who have their own law enforcement and their own issues and their own laws and their own standards, they have an interest in the information as well. Right? Because there's cocaine trafficked to Europe as well. Europe and the United States are the two No. 1

NbsWore1

markets for this type of conduct, this type of crime, for this type of usage. Right? So yes, the Italian authorities can do what they need to do to satisfy their standards, to pursue their investigative interests.

When our government asked another entity or a person, for that matter, to act on their behalf, to forward the interests of their criminal investigation that ultimately would be decided in our courts, under our laws, under our standards, they can't escape our standards, our rules, more importantly, our Constitution, which -- right? Our Constitution is a way of limiting the government -- mostly, mostly, not always. Right?

THE COURT: But there are geographical limits to the Constitution. In other words, the government pointed to a -- I guess what I'm asking is case law, because there are materials that are sought and obtained through mutual legal assistance treaties in criminal matters and where documents were produced, or the like, from a foreign country, but the actual -- I guess what I would need to see is the actual, because the seizure and the search was done in Italy.

Why isn't it like the government obtaining information here from a third party that may have done something that the government couldn't do itself, but the government is able to get that information? I guess what I would like to see is a case that says where the government makes a request pursuant to a treaty and information is obtained, that that information

NbsWore1

then -- in particular, in the Fourth Amendment context, that there still exists a Fourth Amendment challenge to that information.

MR. FOY:  All right.  So, I can tell you right now I can't stand here and tell you a case.  So I'm not going to have a case to articulate and argue.

THE COURT:  Sure.

MR. FOY:  But I'll endeavor to do so.  But I suspect, because my friends at the government have looked into this, and if they can't find it, I don't like my chances of finding it either.  But I'll try, because you never know.

But to talk to you about the example that you used, meaning when a third party acts and does something that the government can't do and how as a private actor they're not bound by the Constitution, that changes when that private actor is acting on behalf of an agreement with the government.  So when the government says private actor, could you go do this thing for us, could you go get this thing, that private actor is not a private actor anymore.  Right?

So the rights, the people that are protected by the Constitution within the framework of our justice system, OK, what happens in the justice system.  Right?  This system right now, what we're doing is a due process system that needs to occur before -- of course, no one's life's in jeopardy here, but liberty is taken.  We have to go through a process that

NbsWore1

acknowledges the rights under the Constitution.

So what happens here?

Our government's agreed with a third entity -- in this case, the Italian government -- to have an arrangement when it comes to investigating criminal activity. Fine. They asked for a seizure, which I don't think there's a problem with them saying could you seize whatever effects the target has. I don't think there's anything wrong with that. In fact, I think the most appropriate thing is seize it. You could possibly even search it for your own investigative needs, but we need the phone so we can do our process before we go into this phone that's at a heightened scrutiny, before we utilize this information that's highly personal and private in the context of our due process, our system. Right?

So I'm taking a more commonsense approach based on principles of law that apply to analogous situations now. Right? And I think one of the potential good things is that if we don't find any case law that's on point, that allows this Court to have more discretion, because now, you need to think about the case, the bigger picture. What does the macro view of it look like? And then let me take a micro evaluation of what actually happened in this case.

What happened?

Our government asked someone to do something that it couldn't do normally. And that's fine that they can do that.

NbsWore1

But when they receive the information and want to utilize it in this process, it has to go through some sort of scrutiny.

Now, we know that they were aware of their opportunity to get the warrant, that they had enough information to seek the warrant.  Once they got the information, and there was a delay in doing it -- the delay wasn't due to anything that Mr. Orense did.  It wasn't due to what the defense did or didn't do or motions or requests I didn't file.  It didn't.  Because they have -- right?  We don't have an obligation to do a thing.

THE COURT:  That's not necessarily true.

MR. FOY:  I understand.

THE COURT:  In the context of the phone that was seized back in 2021 and then produced in 2022.  In other words, my understanding is that there wasn't any motion practice with regard to -- I don't believe there was an extradition challenge here.  Was there one in Italy, do you know?

MR. FOY:  I believe there was some litigation in Italy over -- that's why it took a year to get here.

THE COURT:  Yes.

MR. FOY:  But what you're saying, I know in the factors, in *Smith*, what they talk about, to me that's not a requirement.  It's something to consider as far as the analysis, but it doesn't create an obligation that if I don't do that, if the defendant doesn't ask for things his rights go out the window.  No.  It's one of the factors your Honor should

NbsWore1

consider of the four factors in making this decision.  And I think in different situations, the amount of delay has greater and lesser weight depending on the circumstances.  Right?

*Smith* refers to another case that starts -- U.S. v., starts with an M, where they're talking about an 11-day delay, and although they didn't find the 11-day delay to be unreasonable there, they made it clear it definitely could be, depending on the circumstances that led to the delay.

So in this case, right, because the other cases, we had 11 days, 31 days, and I want to believe there was a 21-day delay in another case.  We're well beyond that.  So I think that increases the weight and importance of the delay for your Honor's consideration and weighing of the factors here.  Right?

So they still, and we haven't gotten to this part; no one's asked the question, why so long?  It can't be because they anticipate the defendant was going to agree to the usage of his phone against him.  I mean that's not the most likely scenario.  I'm not saying there aren't some situations where the defendant wouldn't stipulate.  There are some things I stipulated to in this case.  But it's one of four factors to consider.

So I believe ultimately the reason why the warrant requirement is still required here is because they had another entity working on their behalf.  They asked them to do it.  Our government asked them to go into the phone as opposed to, let's

NbsWore1

say, documents, where they independently go, there's a joint investigation happening independently, and we find out, oh, Mexico has some documents that they got from this target's house, can we get the documents that you received from it?  We didn't ask you to go there, to go get the documents for us. You got them because you were investigating.  Give them to us, and we want to use them.  That's different than go get it for us, go extract it for us so that we can use it.  But they're not using it.  They want to go get a warrant later to use it, and I'm challenging their ability to do so.

(Continued on next page)

THE COURT:  Okay.  But you'll agree with me that the defense knew the phone had been seized.

MR. FOY:  Yes.

THE COURT:  And had -- and I don't know whether a copy or an extraction, although as you mentioned, as a practical matter, it was difficult to do any searching of that.

MR. FOY:  Effective searching.  Based on our expert who had been looking at the phone since we got the government's extraction, the extraction between Italy's extraction and the United States, they're not identical.  There's differences between the two in how it's presented, how you are able to access and see information.

THE COURT:  My understanding is the Cellebrite software or program creates buckets of different materials.

MR. FOY:  Right.

THE COURT:  So such that and, again, I don't profess to know, so that photographs are in one bucket and e-mails are in one bucket, texts are in another bucket for ease of reference.

I don't know whether Cellebrite is something that may be, whether there's commercial software once you have a copy of a phone that can be used to do the same thing that Cellebrite does.  I don't know if Cellebrite is a law enforcement thing or not.

But the issue here I think though is that there hadn't

been a prior challenge to the seizure by the Italians, that search, and the fact that the government now had it in its possession. And so that is a different circumstance than a situation where someone is arrested pursuant to an arrest warrant or not, but a seizure is done, there is an exigent circumstance there where the seizure is done, and then a subsequent search is done. That was the context more I think in *Smith*, in other words where something was seized here, and the government had it and then a subsequent search was done, however many days or weeks or whatever afterwards.

Let me ask, is the witness, do we know status of the witness? Because the jury has been waiting.

THE MARSHAL: Not here.

MR. SULLIVAN: They are, as of seven, eight minutes ago, they're pulling into Pearl Street, so they should be in a building in the Southern District of New York right now.

THE COURT: We've got to find a way where this doesn't happen again. I understand that there's a lot of moving parts and MDC didn't bring the -- and I understand that there's staffing issues at MDC, so when they're moving some folks. But I just want to avoid this happening with other witnesses because it's the same issue, I take it, unless they're in a totally separate facility, the same issue -- are there other witnesses who are detained?

MR. SULLIVAN: There is another in-custody witness

NBS3ORE2

later this week, yes, your Honor.

THE COURT:  So I just ask that the government figure out a way by communicating with MDC, because it sounds as if the agents were there in time but the witness wasn't provided to them.

MR. SULLIVAN:  Yes, your Honor.  I can assure you the agents were there at 8 a.m.  It was communicated he needed to be in court at 10 a.m., he was continuing testimony at 10 a.m. And for whatever reason, it's what the situation is this morning, but we are trying to line up additional resources to make sure it does not happen again.

THE COURT:  All right.  Thank you.

Mr. Foy, I'm sorry, I interrupted.  You were about to say something.

MR. FOY:  Right.  So, I want to kind of clarify the extraction part of this.  This is my novice understanding of what we're talking about.

Italy conducted an advanced logical extraction, the U.S.'s extraction is a full file system extraction.  It is two different types of extractions that reveal different information.

Now, as it stands now, although we're trying to figure some things out, we've received a report that suggests that the Cellebrite and some other documentation shows maybe we're missing files.  I don't know that's the case yet, but we are

trying to figure out. They gave us some information today to look into it that maybe will solve the apparent issue. So, that's still to be determined. But, it is a different type of extraction. They want to do something else to the extraction.

Our point is, the issue of raising it, that we didn't raise it. Well, we raised it pretrial. Now, there's -- we can get a motion schedule, you're supposed to do it and all those things. This isn't an issue about we raised it too late. We raised it when it was most ripe. Could we have raised it earlier in -- yes, of course. Just like they could have gotten a warrant once they got it into their possession. So there is a lot of things that could have happened.

What did happen is we raised it when it became clear that it was going to be used. Now, should we be able to anticipate those things? Yes, the phone -- it is a wonderful tool to get to the bottom where people are -- what they said or what someone said using their device I should say, right. Or the device. So I understand all that.

To me the issue is are we going to respect the Fourth Amendment and the privacy and the heightened scrutiny that we have with these very personal computerized phones. And if we are going to do that, they have to do it without unreasonable delay. And I understand the other examples. But that's why we're asking for this Court, without maybe the guidance of another court who handled the exact same situation, to use its

discretion, obviously in the way that we're asking, basically suppressing the contents or making so they can't use the Cellebrite based on the warrant.

THE COURT:  Okay.  Yes.

MR. SULLIVAN:  Well, one, just while we're going back and forth on this issue.  The agents said they are still waiting to be let in by the marshals downstairs.  They've been waiting for a while can I confer with our colleagues in the back?

With respect to the Italian extraction, just to be clear, it was Cellebrite that the Italian extraction was done on.  In terms of whether it was full file or advanced, I can't speak to that.

There is Second Circuit case law though that electronic evidence obtained pursuant to an MLAT of the United States is not subject to Fourth Amendment concerns.  That's *U.S. v. Getto*, 729 F.3d 221, 224.  In that case, an MLAT was submitted to the Israeli authorities in connection with a U.S. investigation of a foreign national in Israel.  The Israeli authorities then went, pursuant to the MLAT, and obtained in their own legal process some kind of electronic surveillance device with respect to some kind of electronic information. They obtained the information.  The information was used in the U.S. proceeding and a motion to suppress was brought.  And the Court denied the motion.

NBS3ORE2

The MLAT request alone does not give rise to a Fourth Amendment concern, and that is exactly what we have here. The MLAT request was submitted, the Italian authorities went pursuant to their own processes, they obtained the cell phone extraction, and that's what we got in return.

THE COURT: All right.

MR. FOY: Your Honor.

THE COURT: Yes.

MR. FOY: I'm sorry.

THE COURT: Go ahead.

MR. FOY: I have to read the case. But based on what I just heard, you have an Israeli citizen subject to the laws and rules of their own government and certain information was obtained and then shared with the United States.

We don't have that here. My client's not an Italian citizen. He was visiting. He is a visitor there. Right. So that's not someone who -- now, he's in their country, so you got to abide by their laws. I'm not suggesting he is a sovereign person who is acting independently of anything. But it's not the same thing.

I guess it would be different if, of course, this was Venezuela and Venezuela used their laws to obtain information and shared it with the United States, but of course that's not happening. At least yet. Maybe they'll make up later and things will be different. But, for now, for now, those facts

NBS3ORE2

are dissimilar to our facts. In that a citizen subject to its own country's processes, because our process of justice is very different than it is in Israel in what rights you have, what the government is able to do to citizens there. It is very different.

And because he's being subjected to our system, our rules, our laws, then our rights should be attaching to him. Our due process should be attaching to him. That's part of the due process, going to the independent magistrate to provide the information so the Court can make a decision about whether the government can intrude upon this very sensitive, personal computerized phone. Nothing's stopped them from doing it. Nothing.

So, what I'm asking is that this Court makes sure that the government abides by our rules, not try to say, well, some other country you can do other things to him, so we want to be able to use that and then litigate it or use it here. I want the government to use our own rules. When they're trying to seek taking the liberty of someone, they should follow our rules. Not what the they do in Italy or Israel. Let's do it the way we do it. We go to a court.

MR. SULLIVAN: Just to make sure the record is clear. It was actually a U.S. citizen in the *Getto* case in Israel, not a foreign national. And even there the Second Circuit of course made the ruling it did.

THE COURT:  I'm not going to necessarily parse that.  When people are foreign nationals in this country, in the United States, and I don't know whether -- I assume in Italy also, they have the same, here in the United States, the same rights.  If someone is arrested and they are a foreign citizen, they have the same rights as someone who is a citizen.  The process they go through in fact, if you talk about consular notification, there is even an additional step.  But with regard to all the other steps they have, they are entitled to have a lawyer.  They're entitled to -- and they have certain rights in this country.

The issue, the difference that I see in terms of the U.S. asking somebody here to do something for them, to grab something, well, that's within the United States.  So, there is a legal process that has been established through the treaty.  The item itself and the person was in Italy.  Whether an Italian citizen or not, subject to whatever the rules that Italy used.  The request was made to get the information from -- to get the phone, and as far as I know, was an appropriate MLAT request.

So, I'm going to take a look at the cases, and I will render a decision tomorrow consistent with that.

MS. LASKY:  If I may, your Honor, just as we're talking about scheduling.  In addition to putting on Mr. Santos tomorrow, we were also planning to put on Ms. Taul the expert.

So if possible to take that up today as well.

THE COURT:  Do we have a witness?

MR. SULLIVAN:  Yes, we understand he is walking here. He's in shackles, so it is not as fast as a normal person.

THE COURT:  Let me ask, because I'm not sure if -- so, is there a problem?  I know the witness is shackled to his waist.  Is there a problem with, when he's on the witness stand, not having -- he can still have the cuffs on, but not shackled.

Yes, marshal.

THE MARSHAL:  Your Honor, if you're comfortable with just cuffs, that's okay.  We'll always maintain the legs, but the waistband, that can definitely be removed.

THE COURT:  The only reason because I think he had wanted some water near the end of the day, and he wasn't able to actually, because the -- so I have no problem if the cuffs stay on him, but if we could take it off the waist chain, that would be fine.

Unless, are there any specific reasons -- and by specific reasons, and I'm not saying that this has happened, but has the witness done anything or acted up in such a way that I should be aware of before allowing him to be unshackled from the waist?

THE MARSHAL:  Not from our records.

MR. SULLIVAN:  The government is not aware of any of

NBS3ORE2

that.  We were going to separately raise that with the marshals so he could have water, and there are some photographs he needs to flip through.

THE COURT:  I don't have a problem if the handcuffs are basically not attached to the waist, and that way the witness can flip through things and he can also have a drink of water.

(Recess)

THE COURT:  I'm going on the record.  I guess we can do it both, if you can raise your right hand.

(Interpreters sworn)

THE COURT:  Thank you.  Can we bring the jury out.

MR. SULLIVAN:  Yes, your Honor.

MR. FOY:  Yes.

THE COURT:  Can we bring the jury out?

MR. SARRAGA:  Yes, your Honor.

(Continued on next page)

(Jury present)

THE COURT:  Ladies and gentlemen, I apologize for the delay.  I had some legal issues I had to discuss with the parties, and there were some unexpected issues that also came up that resulted in the delay and us starting with testimony today.

So we're going to continue with the direct examination of Mr. Boada.  You may inquire.

MR. SULLIVAN:  Thank you, your Honor.

RONMEL JOSE BOADA,

    called as a witness by the Government,

    having been previously sworn, testified as follows:

DIRECT EXAMINATION (Continued)

BY MR. SULLIVAN:

Q.  Good morning, Mr. Boada.

A.  Good morning.

Q.  So where we left off yesterday, you recall telling us you had agreed to do this next job on the boat with drugs in 2016?

A.  Yes.

Q.  I wanted to ask you, you told us yesterday that you were approached by somebody in Carupano.  Who was that?

A.  A supposed person called Jose.

Q.  Did you know his last name?

A.  No.

Q.  Had you seen him before?

A.   No.

Q.   If you could tell the members of the jury, where is Carupano in Venezuela?

A.   In the state of Sucre.

Q.   Where is the state of Sucre?

A.   Eight hours away from Caracas.

Q.   If you could, where in Venezuela is -- where in Venezuela is Caracas?

A.   It is the capital.

Q.   So where in relation to north, south, east or west is the state of Sucre?

A.   Towards the coast.

Q.   Is that the northern coast of Venezuela?

A.   Yes.  Towards the south, towards the beach.

Q.   There is a beach in Carupano?

A.   Yes, a lot.

Q.   You told us yesterday that you, after you agreed to do the job, you traveled to Guarico.

A.   Yes.

Q.   That's another state in Venezuela?

A.   Yes.

Q.   Where is the state of Guarico in Venezuela?

A.   It is by the Llanos, Los Llanos, in Zaraza.

Q.   What is Los Llanos?

A.   It is an area in Venezuela where there are a lot of *fincas*,

NBS3ORE2                    Boada - Direct

a lot of cattle ranches, a lot of cultivation, agriculture.

Q.  About how long did it take you and the others that agreed
to do the job to go from Carupano to Zaraza?

        THE INTERPRETER:  Excuse me.  Could you please repeat
the question?

Q.  About how long did it take you and the other individuals
who agreed to do the job to go from Carupano to Zaraza?

A.  Approximately 24 hours.

Q.  If you could, describe for the jury what that ride was
like.

A.  From Carupano, they came by and picked us up and we got
into the SUV, and we went towards Guarico.

Q.  Did you make any stops?

A.  Yes, we stopped to eat and then we continued on.

Q.  How many other individuals were you traveling with?

A.  Two more.

Q.  And was that including Jose or not including Jose?

A.  Yes, of course.  He's the driver.

Q.  So once you arrived in Zaraza, where did you go?

A.  To a hotel, they took us to a hotel.

Q.  Did you stay at the hotel?

A.  Yes.

Q.  How long did you stay at the hotel?

A.  We slept there until the following day in the morning.

Q.  And what happened the next day in the morning?

NBS3ORE2                         Boada - Direct

A.   They came by to pick us up again.

Q.   Who's "they?"

A.   Another person who came to pick us up.

Q.   So not Jose?

A.   No.

Q.   And when you said "pick us up," are you referring to the other guys you were traveling with?

A.   Yes.

Q.   Once you were picked up, where did you go?

A.   To a *finca*.

Q.   How far away is the *finca*?

A.   Approximately 40 to 45 minutes away.

Q.   Describe what you saw when you arrived at that *finca*.

A.   At the *finca*, I saw, there were several people there.  They were armed there at the entrance, at the door.

Q.   The people that you saw were armed?

A.   Yes.

Q.   What were they armed with?

A.   Long guns.

Q.   If you could for the members of the jury describe them; what did they look like?

A.   They had military uniforms.

          MR. FOY:  Objection.

          THE COURT:  Overruled.

Q.   Why did you think they were military uniforms?

NBS3ORE2                    Boada - Direct

A.  Because I know the military uniform.  I'm Venezuelan.

Q.  If you could for the jury describe what it looked like to you.

A.  The uniform?

Q.  Yes.

A.  They're from the national guard.

Q.  You said they were armed with guns?

A.  Long guns.

Q.  So when you arrived at this *finca*, what did you do?

A.  They took us out of the SUV, they called the man, the owner of the *finca*.

Q.  What happened next?

A.  They said let me introduce you to Mr. Carlos Orense.

Q.  Who said that?

A.  One of the people who was there present.

Q.  At the *finca*?

A.  Yes.

Q.  We've been using the term *finca* here.  If you could explain to the members of the jury, what is a *finca*?

A.  A *finca* is a large territory where they keep cattle and things like that.

Q.  So when they said at the *finca* that you were going to meet Carlos Orense, what happened after that?

A.  He came out.  He looked at us, and then he asked if we were the ones who were going to do the job.

Q.   And this guy that came out, where did he come out from?

A.   From a house that was there, the house on the *finca*.

Q.   What did he look like?

A.   He came out wearing a hat.  It was kind of like a white hat.

Q.   Can you describe anything else about him?

A.   He was a fat man.

Q.   About how far away were you from him?

A.   Close, close by, like from here to where you are, more or less.

Q.   Did he say anything else?

A.   No, he just kept -- he just watched us, looked at us, and said are we going to be the ones who were going to do the job. And then we were going to go to another *finca*.

Q.   What happened after that?

A.   They took us to the other *finca*.

Q.   So how long were you at that first *finca*?

A.   Just a few minutes, 10 to 15 minutes.

Q.   Then you said you were brought to a second *finca*.  How far away was that second *finca*?

A.   About 45 minutes away.  Approximately 45 minutes.

Q.   Were you taken there by car?

A.   Yes.

Q.   Who else was with you in the car?

A.   My other companions.

Q.   By companions, who do you mean?

A.   The captain and the other one.

Q.   The other one, who?

A.   My other companion, Nelvi and the driver.

Q.   Were these the other people that were going to do the boat job with you?

A.   Yes.

Q.   Once you arrived at the second *finca*, what did you see?

A.   Several more people who were armed with long guns.

Q.   What did they look like?

A.   They were dressed like laypeople, just regular.

Q.   Did you see anything else on the *finca*?

A.   Two fiberglass speedboats that were parked there.

Q.   Parked where?

A.   In the *finca*, in the upper part of the *finca*, close to the beach.

Q.   Were they in the water or were they on land?

A.   They were on land.

Q.   How big were these boats?

A.   Approximately 32 feet.

Q.   What did they look like?

A.   They were fiberglass speedboats.

Q.   What color?

A.   Color blue.

Q.   So once you arrived at the second *finca*, what, if anything,

did you do?

A.  No, we didn't do anything.  They were just working, doing their thing.

Q.  Who's "they"?

A.  The people who were at the *finca*.

Q.  What were they doing?

A.  They put a speedboat into the ocean at the beach.

Q.  How did they do that?

A.  With a tractor.

Q.  What happened to the other boat that was there?

A.  It remained there.  They just put one in.

Q.  So after they put one boat into the water, what happened after that?

A.  A truck with fuel arrived.

Q.  The fuel for what?

A.  To traffic the drugs.

Q.  What was the fuel supposed to be for in terms of a vehicle or something else?

A.  For the motors, for the engines that are on the speedboat.

Q.  Describe the truck that brought the fuel.

A.  A white Super Duty truck.

Q.  When you say Super Duty, what do you mean?

A.  A cargo truck, a 350.

Q.  Do you know like what brand or who makes the truck?

A.  No, it's a Ford.

NBS3ORE2                          Boada - Direct

Q.   Where was the fuel on the truck?

A.   On the rear platform.

Q.   What was it stored in?

A.   In some blue drums.

Q.   So once the truck arrived with the fuel, what happened after that?

A.   They unloaded the fuel, the workers who were there on the beach.

Q.   And where did they put the fuel?

A.   In the speedboat.

Q.   Once the fuel was loaded, what happened after that?

A.   The other truck came along with the merchandise, with the sacks.

Q.   When you say merchandise, what are you talking about?

A.   The sacks containing the drugs.

Q.   What did this other truck look like?

A.   It was also another white truck, it was also a 350.

Q.   Where were the drugs stored in the truck?

A.   In the rear, in the rear platform.

Q.   So once the truck with the drugs arrived, what, if anything, happened to the drugs?

A.   They took them down and they put them into the speedboat.

Q.   Did you see where inside the speedboat?

A.   Yes, of course, yes.

Q.   Where?

A.   In the front of the speedboat, in the bow.

Q.   So now the fuel's in the speedboat, the drugs are in the speedboat.  What happened after that?

A.   They said that we were to wait for the son of the boss, the patrón, who was going to bring the GPS.

Q.   And did a person arrive with the GPS?

A.   Yes.

Q.   How did you know that?

A.   Because I saw him.

Q.   Once he arrived, what did he do?

A.   They said the son of the boss has arrived.

Q.   Did they call him by any name?

A.   No.

Q.   So once the son of the boss arrived with the GPS, what did he do?

          THE INTERPRETER:  Your Honor may I clarify?

          THE COURT:  Yes.

A.   He asked who the captain was, and the captain raised his hand, he said it's me.  So he put in the coordinates, and gave them to the captain.

Q.   Mr. Boada, you are referring to a captain.  Who is that?

A.   Darvin Espin.

Q.   How did you know he was going to be the captain?

A.   Because he was -- that was the agreement that he made, that he would be the captain.  And I know him, he's a captain.

Q.   What do you mean by that?

A.   That I know him, he lives close to the house.

Q.   To your house?

A.   Yes.

Q.   Where?

A.   Carupano.

Q.   So he's a boat captain in Carupano?

A.   Yes.

Q.   So after the captain gets the GPS coordinates, did there come a point once you left in the boat?

A.   Yes.

Q.   What time of day was that?

A.   Approximately 5:30 to 6 in the evening.

Q.   How many crew were in the boat?

A.   Four.

Q.   That's including yourself?

A.   Yes.

Q.   So once you left in the boat, what happened after that?

A.   We set sail towards the Dominican Republic.

Q.   While you're on boat, what's your role?

A.   None.

Q.   You had nothing to do?

A.   Just as a sailor.  And you know, help them gear the boat and things like that.

Q.   What do you mean by gear the boat?

A.   Yeah, to -- to gear, to pilot the speedboat.

Q.   Did there come a point where you were stopped by the U.S. Coast Guard?

A.   Yes.

Q.   How far along into the trip were you when you were stopped by the U.S. Coast Guard?

A.   We had been on our trip the entire night, and part of the following day.

Q.   So I think you told us before you left around 5:30 or 6 at the end of the day.  You sailed through the night?

A.   Yes, we sailed through the night, and it was the following day that we were approached by the Coast Guard.

Q.   When the Coast Guard approached you, what happened?

A.   They told us to go to the bow of the boat and to turn off the engines.

          THE INTERPRETER:  May the interpreter correct the interpretation.  "We were brought to the bow of the boat and were told to turn off the engines."

Q.   When the Coast Guard first approached the boat, did you all stop right away?

          THE INTERPRETER:  Can you repeat the last part of the question.

Q.   Did you all stop right away?

A.   Yes, of course we did.

          MR. SULLIVAN:  Mr. Sirmon, if we can please pull up

NBS3ORE2                       Boada - Direct

what's in evidence as Government Exhibit 618.

My monitor is not working, but if Mr. Foy is so kind, I'll just look over at his.

MR. FOY:  No problem.

Q.  Mr. Boada, what are we looking at in this photograph?

A.  When we were intercepted by the United States government.

Q.  Are you in this photograph?

A.  Yes, of course.

Q.  Which boat are you on?

A.  In the blue speedboat around the bow.

MR. SULLIVAN:  Mr. Sirmon, if we can please pull up Government Exhibit 632.

Q.  Mr. Boada, do we see you in this photograph?

A.  Yes, of course.

Q.  Which of the individuals are you in that photograph?

A.  The first one that's there.

Q.  The one closest to the camera?

A.  Yes, that's correct.

Q.  I guess it is the one without the hat?

A.  Exactly.

Q.  Can we see where on the boat is the location where the drugs were stored in this shot?

A.  Yes, that's correct.

Q.  Where?

A.  Behind me, by that hatch that is there, that compartment

that's there.

THE INTERPRETER:  Interpreter correction.  "In that compartment that is there by the hatch that's there."

MR. SULLIVAN:  Mr. Sirmon, if we can put up Government Exhibit 634, please.

Q.  Is that the hatch you're referring to there?

A.  Yes.

Q.  Which one are you on the right side of that photograph?

A.  The first one there.

Q.  The one closest to the camera?

A.  Yes.

MR. SULLIVAN:  Mr. Sirmon, if we can put up what's in evidence as Government Exhibit 631.  I'm sorry.  637.

Q.  Mr. Boada, what do you see in this photograph?

A.  Some sacks with the drugs.

Q.  Do you know what kind of sacks those are?

A.  They're corn, sugar sacks.  They are the ones where you put in corn and sugar.  They're straw sacks.

Q.  Where on the boat are we looking at right here?

A.  The bow.

MR. SULLIVAN:  Mr. Sirmon, if we can put up Government Exhibit 638.

Q.  Mr. Boada, what are we looking at in that photograph?

A.  Some other sacks by the farther part of the bow.

Q.  So is this a different compartment than the last photo?

A.   That is a different one.

MR. SULLIVAN:  Mr. Sirmon, if you could put up Government Exhibit 629.

Q.   Mr. Boada, do you recognize what's in this photograph?

A.   Yes.

Q.   What is it?

A.   Where the fuel was contained.

Q.   Where specifically in the photograph is the fuel contained?

THE INTERPRETER:  Would you kindly repeat the question for the interpreter please.

MR. SULLIVAN:  I'll rephrase.

Q.   Where in particular on the boat is the fuel stored?

A.   In the back, in the middle of it.

Q.   Are those the blue drums that you saw at the beach?

A.   Yes, that's correct.

Q.   Mr. Boada, do you see those green canisters there?

A.   Yes, of course I do.

Q.   What's in those canisters?

THE INTERPRETER:  May the interpreter please correct the question for the witness.  The interpreter misinterpreted the question.

A.   Yes, that's also fuel.

Q.   In green canisters?

A.   Yes.

Q.   You mentioned you sailed overnight.  Where do you sleep on

NBS3ORE2                       Boada - Direct

the boat?

A.  You don't sleep.

Q.  Why not?

A.  It's uncomfortable, and we also have to be on the lookout.

Q.  What do you have to be on the lookout for?

A.  Of the coast guards.

          MR. SULLIVAN:  Mr. Sirmon, if you could put up

Government Exhibit 639.

Q.  Mr. Boada, if you can take a look at that and tell us what

we're looking at there.

A.  The steering wheel.  The wheel where you pilot the

speedboat.

Q.  Would you ever pilot the speedboat?

A.  Yes, of course.

Q.  Mr. Boada, do you see those two yellow cases?

A.  Yes, I do.

Q.  What are those?

A.  Where the GPSs were.

          MR. SULLIVAN:  Mr. Sirmon, if we can put up Government

Exhibit 640.

Q.  Mr. Boada, what are we looking at here in this photograph?

A.  The GPS.

Q.  Which of the objects in the photograph is the GPS?

A.  The black one that's there with the antenna.

Q.  You said that the boss's son gave the GPS to the captain.

Did you ever operate the GPS?

A.   No.

MR. SULLIVAN:  Mr. Sirmon, if we can put up Government Exhibit 641, please.

Q.   Mr. Boada, what do we see in this photograph?

A.   A radio transmitter.

Q.   What's that for?

A.   To call land.

Q.   What would you need to call land for?

A.   In case of an emergency.

Q.   Do you know if the radio was used on the trip at that point?

A.   No.

Q.   You don't know or it wasn't used?

A.   It was not used.

Q.   Mr. Boada, what happened after the Coast Guard stopped the boat?

A.   They approached us, they were right next to us, they were asking what was in the compartment, and they were told that it was drugs.

Q.   Did you remain on the boat?

A.   Yes, yes, on the side.

Q.   Did there come a point in which you left the boat?

A.   Yes, we were brought onto their cutter, onto their speedboat.

MR. SULLIVAN:  And Mr. Sirmon, if we can put back up Government Exhibit 618.

Q.  Is there a speedboat shown in this photograph?

A.  Yes, it is right there, right next to on the side.

Q.  Once you were brought on to that boat, where did you go?

A.  To the big Coast Guard boat.

MR. SULLIVAN:  Mr. Sirmon, if you can put up Government Exhibit 651.

Q.  Do you see the big Coast Guard boat in that picture?

A.  Yes.

Q.  Which boat is it?

A.  The white one that has the blue and red stripes by the bow.

Q.  Once you were brought on to the big Coast Guard boat, what happened next?

A.  We were brought on to the big Coast Guard boat together with the drugs.

Q.  You saw the drugs brought on to the big Coast Guard boat?

A.  Yes.

Q.  These were the drugs from the small blue boat there?

A.  Yes, that's correct.

Q.  So once you were all brought on to the big Coast Guard boat, what did you do next?

A.  Our photos were taken.

MR. SULLIVAN:  Mr. Sirmon, if you could please put up for just the witness, the Court, and the parties what's been

marked for identification as Government Exhibit 619 --

actually, withdrawn.

Q.  Mr. Boada, do you see the folder in front of you?

A.  I don't see anything.

Q.  To your left.

A.  Oh, yes, yes, I do.

Q.  If you could open the folder and take a look at what's been
marked for identification as Government Exhibits 619 through
622.

        THE INTERPRETER:  The interpreter would like to
correct the interpretation of the sacks.  The interpreter
inadvertently said hay sacks.  The witness said they were pita
sacks.

A.  Yes, this is us.

Q.  Do you recognize these photos?

A.  Of course, yes, of course.

Q.  What are they?

A.  This is me, Nelvi Suarez, Hernan Arias, and Darvin Espin.

Q.  Are these photos of the individuals on your boat?

A.  Yes.

Q.  Do they accurately reflect these individuals at the time
the Coast Guard stopped you?

A.  Right.

        MR. SULLIVAN:  The government offers Government
Exhibits 619 through 622.

THE COURT:  Any objection?

MR. FOY:  Can I see them really quick?  I've seen them before.  I want to make sure I'm thinking of the same one.

MR. SULLIVAN:  Can you move them through just for the parties' computers, just the four photos, 619 through 622.

MR. FOY:  No objection.

THE COURT:  Government's Exhibit 619, 620, 621 and 622 are admitted in evidence.  You may publish them for the jury.

(Government's Exhibit 619, 620, 621, 622 received in evidence)

MR. SULLIVAN:  If can you please put up Government Exhibit 619.

Q.  Mr. Boada, who is this?

A.  That's me.

MR. SULLIVAN:  Mr. Sirmon, if you can put up Government Exhibit 620.

Q.  Who is this, Mr. Boada?

A.  Nelvi Rafael.  He was together with me.

Q.  He was on the boat with you?

A.  Yes.

Q.  Did you know him prior to joining the boat crew?

A.  Yeah, we all knew each other already, yes.

Q.  Where was he from?

A.  From Carupano.

MR. SULLIVAN:  Mr. Sirmon, if we can put up Government

Exhibit 621.

Q.  Who's this?

A.  Hernan Arias Escobar.  He's Colombian.

Q.  Did you know him prior to joining the boat crew?

A.  No.

Q.  What was his role on the boat?

A.  He was in charge or he took care of the cargo.

          MR. SULLIVAN:  Mr. Sirmon, if you can put up Government Exhibit 622.

Q.  Who is this?

A.  Darvin Espin, the captain.

Q.  Did you know him prior to joining the boat crew?

A.  Right.

Q.  Once you were all on the larger Coast Guard boat, did you stay there?

A.  Yes.

Q.  How long were you on that boat?

A.  Approximately three days.

Q.  Where did you go after that?

A.  They took us on to another boat.

Q.  Did you see if the drugs were moved on to that other boat?

A.  Yes, they were too.

Q.  First let me ask you.  What type of boat was that second boat?

A.  An American cutter, Coast Guard cutter.

NBS3ORE2                    Boada - Direct

Q.  Where did that second Coast Guard boat go?

A.  Towards the Dominican Republic.

Q.  Did it stop in the Dominican Republic?

A.  Yes.

Q.  What happened once the boat stopped in the Dominican Republic?

A.  They took us off and they put us into some cars.

Q.  Where did you go?

A.  To the police so that they could take our fingerprints.

Q.  Who's "they"?

A.  Myself and my three companions.

Q.  Who was taking you in these cars for the fingerprints?

A.  The government of the Dominican Republic.

Q.  After you were fingerprinted, what happened after that?

A.  They took us towards an airport.

Q.  Did you go to the airport?

A.  Yes, of course, yes.

Q.  Once you arrived at the airport, what did you see?

A.  An airplane that had the drugs in the rear in a compartment, in a platform.

Q.  What kind of plane was this?

A.  A cargo plane.

Q.  Were you still with the other boat crew members?

A.  Yes.

          MR. SULLIVAN:  Mr. Sirmon, if you can please put up

just on the witness screen, the Court's screen, and the parties' screen Government Exhibit 616.

Q.   Mr. Boada, if you can take a look at that photograph and look up when you're done.

Do you recognize this photograph?

A.   Yes.

Q.   What is it a photograph of?

A.   When we were at the airport.

Q.   Which airport?

A.   In the Dominican Republic.

Q.   Do you see yourself in the photograph?

A.   Yes, of course, yes.

MR. SULLIVAN:   The government offers Government Exhibit 616.

THE COURT:   Any objection?

MR. FOY:   No objection.

THE COURT:   Government Exhibit 616 is admitted in evidence.

(Government's Exhibit 616 received in evidence)

MR. SULLIVAN:   Permission to publish, your Honor.

THE COURT:   You may.

MR. SULLIVAN:   Mr. Sirmon, if we can put that up for the jury, please.

Q.   Mr. Boada, what are we looking at in this photograph?

A.   The four of us, plus a plane, and three other people that

NBS3ORE2                        Boada - Direct

are there.

Q. Which one are you in the photograph?

A. The second one, the second one from the back going this way.

Q. Are you in white?

A. That's right, yes.

Q. And you're second from the rear of those four white individuals?

A. Yes.

Q. Who are the other individuals in the white suits?

A. The captain Darvin Suarez, Nelvi Espin, and Escobar.

Q. Those are the other members of the boat crew?

A. Yes.

Q. At this point in the photograph, could you see where the drugs are?

A. In the rear of the airplane.

Q. Could you see that once you were on the plane?

A. Yes, of course, yes.

Q. So once you were on the plane, what happened after that?

A. They took us towards Miami.

Q. You said "towards." Did you actually land in Miami?

A. Yes.

Q. Once the plane landed in Miami, what happened after that?

A. Some people questioned us.

Q. In Miami?

A.   Yes.

Q.   Were you brought to a prison?

A.   After that, yes.

Q.   Did you see what happened to the drugs after that?

A.   No.

          MR. SULLIVAN:  One moment, your Honor.

          THE COURT:  Okay.

          MR. SULLIVAN:  Nothing further, your Honor.

          THE COURT:  Cross-examination.

CROSS-EXAMINATION

BY MR. FOY:

Q.   Good afternoon, Mr. Boada.

A.   Good afternoon.

Q.   Would you agree that you've agreed to testify in this case
for specific reasons?

A.   Yes.

Q.   And would you agree that one of those reasons is in the
hopes of regaining your freedom sooner rather than later?

A.   Yes, of course.

Q.   How much of your sentence, your 13-year sentence have you
served?

A.   I've completed seven years and seven to eight months, more
or less.

Q.   Would you agree you're also testifying because you also
wish to stay in the United States after you finish your

NBS3ORE2                        Boada - Cross

sentence?

A.   Yes.

Q.   Do you agree you're also testifying because you wish to have your family brought from Venezuela to the United States to be with you?

A.   Yes.

Q.   And one of those family members that you wish to be brought from Venezuela to the United States in exchange for your testimony is your wife, correct?

A.   My children.

Q.   So not your wife, just your children?

A.   No, my children.

Q.   How old are your children?

A.   32, 17, and another one is 30.

Q.   Would you agree that this opportunity to testify, to receive those benefits, you hope to get those benefits through a rule called a Rule 35?  Do you agree with that?

A.   I haven't heard of the Rule 35.

Q.   You haven't heard of Rule 35?

A.   No.

Q.   You haven't heard about the rule that after you're convicted, you can provide substantial assistance and get your sentence reduced?

A.   Okay, yes.

Q.   So you know what a Rule 35 is, correct?

MR. SULLIVAN:  Objection.

THE COURT:  Overruled.  You can answer the question.

A.  Now, yes.

Q.  In fact, isn't it true that on November 8th, 2023, you had a meeting with the government, correct?

A.  Yes.

Q.  And there were DEA agents there at that meeting, correct?

A.  Yes.

Q.  And the assistant U.S. attorneys in court, they were at that meeting, correct?

A.  Yes.

Q.  And they had a Spanish interpreter at the meeting for you so you could communicate with them, correct?

A.  Yes.

Q.  And you've had many meetings with them of that type, the same type that you had on November 8th, 2023, correct?

A.  Yes.

Q.  Isn't it true that on November 8th, 2023, at the meeting with the government, in this case, at the very beginning of that meeting, you specifically asked about the potential Rule 35 and immigration assistance in return -- no.  Let me rephrase the question.

Isn't it true on November 8th, 2023, at the beginning of that meeting, you specifically asked the government about the potential Rule 35 and immigration assistance you were

interested in?

A.   Yes.

Q.   Isn't it true that at that meeting on November 8th, 2023, you reiterated your wishes to not return to Venezuela?

A.   Yes.

Q.   Isn't it true that the government's response was for you to speak to your attorney about it?

A.   Yes.

Q.   Would you agree that the benefit you wish to receive for your testimony is very important to you?

A.   Yes, of course it is.

Q.   Would you agree it's more important to you than the actual outcome of this case?

A.   Yes.

Q.   Isn't it true that you would be willing to say whatever it took to receive the benefit that you're here to get?

A.   Yes.

Q.   Now, you have a prior conviction in Venezuela for drug trafficking, correct?

A.   Yes.

Q.   And you were arrested for that in 2007?

A.   Yes.

Q.   You received a nine-year sentence, correct?

A.   Yes, yes.

Q.   Would it be fair to say that your experience in the

Venezuelan jail was a difficult experience?

A.   Yes.

Q.   Now, I want to talk to you about what was going on with you before that conviction in Venezuela.

A.   Okay.

Q.   You indicated that you were a fisherman at the time, correct?

A.   I have always been a fisherman.

Q.   And it was your role as a fisherman that put you in a position to also assist in the trafficking of cocaine, correct?

A.   Yes.

Q.   And you were aware, when you first engaged in trafficking of cocaine, that it was illegal, correct?

A.   Yes, of course.

Q.   And you understood that if you were caught, there can be serious consequences, correct?

A.   Yes.

Q.   You are aware that one of those consequences was losing your freedom, correct?

A.   Yes.

Q.   You knew that one of those consequences was being separated from your family for an extended period.

A.   Yes.

Q.   You knew it was wrong.

A.   Yes.

NBS3ORE2                     Boada - Cross

Q.  But you did it anyway, correct?

A.  Yes.

Q.  And you did it anyway because of the opportunity to make money, correct?

A.  Yes.

Q.  You made a determination it was more important to get the money than to follow the law, correct?

A.  Yes.

Q.  You decided that it was more important to try to get this money than it was to not put yourself in a position to be separated from your family.

A.  Yes.

Q.  When you went to prison for trafficking cocaine for nine years and got released, you didn't immediately -- meaning the day you got out of prison -- start trafficking drugs, correct?

A.  No, no, no, of course I didn't.

Q.  But approximately four months after your release, you were presented with an opportunity to do so, correct?

A.  Yes.

Q.  And so this was what we were talking about, approximately April of 2016, when this first opportunity to traffic drugs came to you, after your release from prison, correct?

A.  Yes, that's correct.

Q.  So when this opportunity came, the experience of the nine years in prison was fresh in your mind, correct?

A.  Yes.

Q.  Would it be fair to say you definitely didn't want to go back to a Venezuelan prison again?

A.  That's true.

Q.  Why?  Why didn't you want to go back to a Venezuelan prison?

A.  Too much violence.

Q.  So there is a lot of violence that's experienced in a Venezuelan prison?

A.  Yes.

Q.  Are there other reasons you wouldn't want to go back to a Venezuelan prison?

A.  No.

Q.  You were aware that if you took this opportunity, there was a chance you could go to a back to a Venezuelan prison when you agreed to take this opportunity, correct?

A.  Correct.

Q.  Now, although your first arrest and conviction for trafficking drugs was in 2007, you were trafficking drugs long before that, correct?

A.  Starting in 2000, in the year 2000.

Q.  Now, in this case, when you were arrested on April 7, 2016, when you first were taken into custody then, you were asked about your past in drug trafficking, correct?

A.  Yes, that's correct.

NBS3ORE2                    Boada - Cross

Q.   Isn't it true initially you told them that on April 7, 2016, that was the first time you had ever participated in drug trafficking at that time?

A.   Yes, I did.

Q.   And that was a lie, correct?

A.   Yes, it was a lie.  Because at first your nerves betray you, so that is the reason why I said that on that first occasion.

Q.   Well, it wasn't just your nerves, right?  It was because you didn't want to go back to prison, correct?

A.   That too, yes.

Q.   Because you knew there was a large sum of cocaine in the small boat that you were on, correct?

A.   Yes.

Q.   And you knew that there were going to be serious consequences as a result of that being found, correct?

A.   Yes, correct.

Q.   And you were aware that a person who's committed a crime like that, meaning trafficking drugs for the first time, and someone who's committed it repeatedly, might be treated differently as far as the consequences, correct?

A.   Yes, correct.

Q.   But shortly after telling law enforcement that this was your first time trafficking drugs, you did admit to having one prior conviction, correct?

NBS3ORE2                         Boada - Cross

A.   Yes, that's correct.

Q.   And that's when you disclosed that you had a prior conviction in Venezuela, correct?

A.   Yes.

Q.   Now, the lie about doing it one time and then admitting to the one conviction, would you agree that all happened before you even got to the United States?

A.   Yes.

Q.   At some point later, after you get to the United States, you make a decision that you want to cooperate, correct?

A.   Yes.

Q.   And it turns out that not only did you have the prior conviction for trafficking in 2007, and obviously being arrested for what happened in April of 2016, you disclosed more trafficking that had happened between 2000 and 2007, correct?

A.   It was not in 2006.  It was in 2016.

Q.   You're correct.  In 2016.  But you told them about the trafficking that you did between 2000 and 2007.

A.   Yes.

Q.   And it turns out that between 2000 and 2007, on a monthly basis, you would move at least one load of cocaine a month, correct?

A.   Correct.

Q.   And in those loads it would be between 2,000 and 5,000 kilograms of cocaine per load, correct?

A.  Yes, correct.

Q.  For each load, you would receive approximately 15 to $20,000 per load, correct?

A.  Correct.

Q.  And you would receive that money in United States currency?

A.  Yes.

Q.  During this time period, from 2000 to 2007, would you agree that you didn't know anyone by the name of Carlos Orense Azocar?

A.  That's correct.  Until I met him in 2016.

Q.  So, before you get to the United States, but you're in custody, and I'm talking about 2016, would you agree that at no time did you mention the name Carlos Orense Azocar?

THE INTERPRETER:  For the interpreter, at no time did you?

MR. FOY:  Mention the name.

THE INTERPRETER:  Thank you.

A.  Not at that time.  I did not mention him.

Q.  Going back to the time period where you're trafficking drugs on a monthly basis, and you are receiving United States currency, would you agree that was the preferred way of payment to get United States currency?

A.  Yes.  Yes, that's how they make the payments there.

Q.  Well, Venezuela has its own currency, correct?

A.  Yes, correct.

NBS3ORE2                        Boada - Cross

Q.  And what's the currency called?

A.  Right now it is called bolivariano, but at first it was the bolivar.

Q.  During that time period, meaning from 2000 to 2007, if you were in fact trafficking -- or receiving, excuse me, receiving 15 to $20,000 a month over that time period, that's approximately $1.26 million in fees that you received for trafficking drugs, correct?

A.  Yes, correct.

Q.  The U.S. dollar's particularly strong compared to the currency in Venezuela, correct?

        MR. SULLIVAN:  Objection.

        THE COURT:  Sustained.  You don't need to answer.

Q.  This money that you were receiving was why the fact that it was wrong wasn't enough for you to refrain from trafficking drugs, correct?

        MR. SULLIVAN:  Objection.

        THE COURT:  Could you rephrase the question.  It was a little --

        MR. FOY:  Yes.

        THE COURT:  Thank you.

Q.  The opportunity to get the money was more important than securing your freedom?

A.  Not so much for securing my freedom.  I just needed the money to move my family forwards, so they could have progress.

THE INTERPRETER:  I would like to make a correction.  "To support my family."

Q.  So, your first interview with law enforcement actually occurred on -- and law enforcement in this case -- actually occurred on April 13, 2016, correct?

A.  Yes.

Q.  And at that time, you told law enforcement that a person by the name of Jose presented this opportunity to transport the drugs that were seized, correct?

A.  Yes.

Q.  You also told him that you were offered $10,000 in order to take the load from Venezuela to the Dominican Republic, correct?

A.  $15,000.

Q.  Well, but at that meeting you told them 10, correct?

A.  I don't remember that moment exactly.

Q.  But later on, you did tell them 15, but initially it started out at 10, correct?

MR. SULLIVAN:  Objection.

THE COURT:  Sustained.

Q.  In fact, at this first meeting, you advised the government that you used to traffic -- transport drugs for a person by the name of Javier, correct?

A.  Yes.

Q.  With Javier it was approximately 1,000 kilograms per

NBS3ORE2                       Boada - Cross

transport, correct?

A.   Yes.

Q.   With these transports you would go out to sea and deliver the thousand kilograms of cocaine to a bigger ship, correct?

A.   Yes.

Q.   So at this meeting --

THE COURT:  Mr. Foy, I don't know whether -- it's 12:45, so if this is a good place to break.

MR. FOY:  It a fine time.

THE COURT:  Okay.  We can take our lunch break.  All right, ladies and gentlemen, we're going to take our lunch break.  Please come back 2 o'clock.

Remember do not discuss the case, no researching anything about the case.  Please leave your pads in the back. And I'll see everybody at 2 o'clock.  Thank you.

(Jury excused)

(Continued on next page)

THE COURT:  The witness can step down off the witness stand.

(Witness temporarily excused)

THE COURT:  Mr. Foy, do you have a sense of about how much more you have?

MR. FOY:  Let me just check the outline.

THE COURT:  Sure.

MR. FOY:  I'm going to say --

THE COURT:  Just an approximation.

MR. FOY:  Less than an hour, but maybe close to an hour but less than.

THE COURT:  Okay.  Is there anything we need to take up before the lunch break?

MS. LASKY:  No, your Honor.  Not from the government.

MR. FOY:  No.

THE COURT:  Thank you very much.  I'll see everyone at 2 o'clock.

(Recess)

(Continued on next page)

NbsWore3

AFTERNOON SESSION

2:00 p.m.

THE COURT:  If we could go on the record.

Is there anything that we need to take up before we get the witness and the jury?

From the government.

MR. SULLIVAN:  Your Honor, I already spoke to Mr. Foy about this, but we just wanted to make a record of it.

At the start of the lunch break, our two case agents, agents Passmore and Brooks, were in the same room as the witness, Mr. Boada.  There were marshals standing at the threshold of the room.  They were working out the transfer of custody from our agents handling him to who was going to sit with him over the lunch break.  Our agents were explaining that they can't because he's on cross-examination.  It was less than five minutes.  I think the witness asked about bathroom and lunch.  There was no substantive exchange.

THE COURT:  OK.  All right.

Thank you.

MR. FOY:  That's fine.

THE COURT:  OK.

Go ahead.

MR. FOY:  I provided the government with four exhibits that I don't necessarily plan to move into evidence, but I may use them to refresh the witness's recollection.  I just wanted

NbsWore3                          Boada - Cross

to provide a copy to the Court.

THE COURT:  Yes, sure.

MR. FOY:  Should I give it to Ms. Tedla?

THE COURT:  I don't know if there's enough space, but you can hand it to my law clerk.  Yes.

MR. FOY:  Thank you.

THE COURT:  OK.  Can we bring the witness in and then get the jury.

MR. FOY:  Your Honor, in the event that I do need to refresh the witness's memory, I don't have it electronically to put on the screen, is it OK if I approach?  Or how do you want that to be handled?

THE COURT:  If you can do it on the screen, that's fine.  You mean approach to hand the witness the document?

MR. FOY:  Correct.  That's what I mean.

THE COURT:  That's fine.

(Continued on next page)

(Jury present)

THE COURT:  You may be seated.

We're going to continue with the cross-examination of Mr. Boada.

Ladies and gentlemen, just to remind you that we are going to break today at 5:15.  OK?

All right.  Go ahead, Mr. Foy.

BY MR. FOY:

Q.  I want to take you back to April 13, 2016.  That was the day that you flew in from the Dominican Republic, in the custody of the United States, into Miami, correct?

A.  Yes.

Q.  And that's when you had that initial meeting, when you initially told federal authorities that you had only done this one time, correct; at that meeting on the 13th?

A.  Yes.

Q.  And as we discussed, you also indicated you changed your story within that meeting to say you had one other time when it had happened, correct?

MR. SULLIVAN:  Objection.

THE COURT:  One moment.

If you could rephrase the question, it's a little confusing.  I know you're referencing your prior question.

MR. FOY:  Right.  Could I just have the question?

THE COURT:  Sure.  The prior question was:  "And

that's when you had that initial meeting, when you initially told the federal authorities that you had only done this one time, correct; at that meeting on the 13th?

"A.  Yes."

MR. FOY:  OK.

THE COURT:  And then you were following it up.

MR. FOY:  Right.

Q.  So still at that same meeting, when you tell them that this is the first time you did it, you changed your position to say you had done it one other time prior to the arrest in this case, correct?

MR. SULLIVAN:  Objection.

THE COURT:  I'll allow it.  Objection overruled.

A.  Yes, correct.

Q.  The next day you were taken, meaning on April 14, 2016, you were taken to a federal detention center in Miami, correct?

A.  Yes.

Q.  And you entered the facility in the early morning hours, at approximately 2:18 a.m., on April 14, 2016?

MR. SULLIVAN:  Objection.

THE COURT:  Sustained.

BY MR. FOY:

Q.  You did enter the facility on April 14, 2016?

A.  Yes.

Q.  And before April 14, 2016, you had never mentioned the name

NbsWore3                          Boada - Cross

Carlos Orense Azocar before that date?

A.  I do not remember, to be exact.

Q.  Well, you know you didn't mention that at your first meeting with the federal authorities, Carlos Orense Azocar, right; you didn't mention it on April 13?

A.  No.

Q.  You didn't mention --

A.  I don't remember.

Q.  You didn't mention in the Dominican Republic, before you got to the United States, Carlos Orense Azocar; you never mentioned that name, right?

A.  Correct.

Q.  OK.  Now, when you get to the federal detention center in Miami, on April 14, 2016, isn't it true that someone approached you inside the facility regarding Carlos Orense Azocar?

A.  Yes, that's correct.

Q.  And this was in April of 2016, when this person approached you, this inmate approached you about that, correct?

A.  Yes, correct.

Q.  And before April 14, 2016, this inmate who approached you, you didn't know that person, did you?

A.  No.

Q.  This person that approached you, isn't it true they asked you about being on a boat from Guarico, Venezuela?

A.  Yes.

Q.  And this stranger who approached you, would it be fair to say that it made you suspicious of them?

A.  Yes, that's correct.

Q.  But this person continued to speak to you and tell you they were from Venezuela, correct?

A.  Yes.

Q.  Now, in your time in an American jail, has it been your experience that when you go into a facility and you see other inmates from Venezuela, that oftentimes that's a reason to kind of get to know each other, because you're from the same country?

A.  Correct.

Q.  And that was your experience in the Miami detention center, isn't that true?

A.  True.

Q.  This person who approached you, when they spoke to you, you hadn't shared any information with them about your case at that point, isn't that true?

A.  No, no.

Q.  But it appeared from their questions they knew something about your case, correct?

THE COURT:  The question you asked was:  "This person who approached you, when they spoke to you, you hadn't shared any information with them about your case at that point, isn't that true?"

NbsWore3                       Boada - Cross

            The answer was, "No, no."

            MR. FOY:  Let me clarify.

Q.  This individual who approached you, they initiated the conversation about your case with you, correct?

A.  Yes, that's correct.

Q.  And would it be fair to say that the way they asked you about your case suggested that they had information about your case that you didn't give them?

A.  Correct.

Q.  For example, the person knew you came from Venezuela, correct?

A.  Yes.

Q.  You hadn't told that person in advance about you coming from Venezuela, correct?

A.  No, because I did not know him.

Q.  All right.  They knew that you were taken into custody on a boat, correct?

A.  Yes, he knew.

Q.  And you had not told him that in advance, correct?

A.  No.

Q.  He knew that cocaine was on the boat that you were taken into custody on, correct?

A.  Correct.

Q.  And you hadn't told him about cocaine being on the boat you were taken into custody on, correct?

NbsWore3                    Boada - Cross

A.   Correct.

Q.   And that person who was asking those questions of you, that person was Antonio Arvelaiz, correct?

A.   I didn't know his name.

Q.   Well, this person told you that he was the nephew of the person whose boat it was, correct?

A.   Yes.

Q.   This person showed you a photograph of a person they said was Carlos Orense Azocar, correct?

A.   Yes, that's correct.

Q.   And this person said I'm the nephew of Carlos Orense, correct?

A.   Correct.

Q.   And when this conversation took place, you were in the medical section of the jail at the time this conversation took place?

A.   Yes.

Q.   Now, when you first got to the Miami detention center, you were housed in a particular section of the prison, correct?

A.   Yes.

Q.   Do you know what a range is?

        THE INTERPRETER:  For the interpreter, R-A-N-G-E?

        MR. FOY:  That is correct.

A.   No.

Q.   Isn't a range a location within a jail, a section of the

NbsWore3                          Boada - Cross

jail, like, for example, R range?

A.  The floor?

Q.  Correct.

A.  Yes, I was on a floor.

Q.  OK.  And this person who said they were the nephew of Carlos Orense, for a short period of time they were on the same floor as you, correct?

A.  No.  I never saw him there.

Q.  So is it your position the only time you saw him was in the medical section?

A.  That's correct.

Q.  And in the medical section, he had a photograph of a person he said was Carlos Orense Azocar?

A.  Yes.

Q.  Now, when this person who says he was the nephew of Carlos Orense was speaking about Carlos Orense, was it clear to you that he didn't like Carlos Orense?

A.  I don't know.  I just know that he was very upset.  Based on the way he was telling me, he was very upset.

Q.  Right.  He referred to Carlos Orense, his uncle, as a cocksucker, correct?

A.  Correct.

Q.  He actually used that word, "cocksucker"?

A.  Yes.

Q.  And he also told you that he's the reason he is in jail,

NbsWore3                          Boada - Cross

correct, meaning Carlos Orense is the reason this nephew is in

jail?  Correct?

A.  Yes.

Q.  After this interaction with this person who says they're

the nephew of Carlos Orense spoke to you, another inmate spoke

to you about Carlos Orense, correct?

A.  Yes.

Q.  And this inmate, did you know this inmate before you got to

the Miami detention center?

A.  No, I never knew him.

Q.  And isn't it true that this inmate told you that that

particular inmate was a former judge or prosecutor in

Venezuela?

A.  Yes.

Q.  And he showed you a picture of Carlos Orense while you were

in the federal detention center in Miami, correct?

A.  Yes.  We were in the visiting room.

Q.  And the picture that that second inmate showed you was the

same picture that the inmate who said he was the nephew, it's

the same picture he showed you, correct?

A.  Yes, that's right.

Q.  At this point, meaning I'm still in April of 2016, would it

be fair to say you're trying to figure out how to make the best

of this situation that you're in?

A.  That's right.

NbsWore3                        Boada - Cross

Q.  And you had an attorney at that time, correct?

A.  Yes.

Q.  And your attorney and you entered into an agreement with the United States government to resolve your case, correct?

A.  Yes.

Q.  And you reached that agreement on July 13, 2016, correct?

A.  Yes.

Q.  That's approximately three months after you come into the facility, correct?

A.  Approximately, yes.

Q.  As part of that agreement, you actually signed a document formalizing your agreement to take responsibility for trafficking narcotics into the United States, correct?

A.  Yes.

Q.  And as part of that agreement, this written agreement, you agreed to the following facts -- that you were on a boat on April 7, 2016, with a large amount of cocaine, correct?

A.  Yes.  But to be specific, it wasn't towards the United States.  I reiterate, it was to the Dominican Republic.

Q.  Well, you agreed that the cocaine that was going to the Dominican Republic was headed to the United States after the Dominican Republic, correct?

A.  My agreement was to take it to the Dominican Republic. Past that, I have no idea what was going to happen to it.

Q.  Well, you pled guilty to agreeing to import narcotics into

NbsWore3                         Boada - Cross

the United States, correct?

A.  Yes, I did.  I took responsibility for it, yeah.  I mean what else was I to do?

Q.  And your role in making that happen was to make sure it got to the Dominican Republic, correct?

A.  Yes.

Q.  And it was your understanding it would be someone else's responsibility in the agreement to get it to the United States, correct?

A.  My responsibility was to take it to the Dominican Republic. I have no knowledge, and I'm going to reiterate it, I didn't know what was going to happen after I took it to the Dominican Republic, where it was going to be sent.

Q.  All right.  But when you pled guilty, it was under oath, correct?

A.  Of course, yes.

Q.  It was under oath like you're under oath here in this courtroom, correct?

A.  Yes.

Q.  And the crime under which you pled guilty requires an admission that the cocaine that you were trafficking was headed to the United States, correct?

A.  I'd have to accept it, because they were never going to understand that those drugs are going straight to the Dominican Republic.  And the people who stopped me or caught me were from

the United States.  Obviously, that it wasn't any good for them to say that it was going to the Dominican Republic.

Q.  So are you saying you agreed to make that admission because that's what you felt like you had to say under the circumstances?

A.  Yes, yes.  I did it.  Yes, I did it.

Q.  Well, let me rephrase the question.

Did you admit to something that was not true when you pled guilty to trafficking narcotics into the United States?

A.  Yes.  No --

THE INTERPRETER:  May the interpreters confer?

Could you please repeat the question?

MR. FOY:  Yes.

Q.  There came a time that you stood before a judge in a court in Miami, correct?

A.  Yes.  True.

Q.  And you were placed under oath before you spoke to the judge about what you did that makes you guilty, correct?

A.  Yes.

Q.  In order to take the guilty plea to the charge, you had to admit that the drugs, the 992 kilograms, were intended to come to the United States, correct?

MR. SULLIVAN:  Objection.

THE COURT:  Sustained.

BY MR. FOY:

Q.  You made an admission that the drugs that were on your boat were headed to the United States, correct?

MR. SULLIVAN:  Objection.

THE COURT:  Sustained.

BY MR. FOY:

Q.  Did you lie to the court in Miami about your role in importing narcotics into the United States?

A.  I don't remember.

Q.  You don't remember if you lied, or you don't remember whether you imported drugs into the United States?

A.  Yeah, that I lied.  Yes, I lied.  I did lie.

MR. SULLIVAN:  Objection.

BY MR. FOY:

Q.  Was this under oath?

A.  Yes.

Q.  And is it your position you lied because you believed that's what you had to say to resolve the case?

MR. SULLIVAN:  Objection.  Your Honor, may we have a sidebar?

THE COURT:  I'll allow the question.  Then we'll have a sidebar.

THE INTERPRETER:  Could you please repeat the question.

THE COURT:  "And is it your position you lied because you believed that's what you had to say to resolve the case?"

NbsWore3                          Boada - Cross

A.   I had never been in front of a judge like that.

            THE COURT:   OK.   You want to come to sidebar?

            (Continued on next page)

NbsWore3                    Boada - Cross

(At sidebar)

MR. SULLIVAN:  Your Honor, the issue we have is --

THE COURT:  He pled to conspiracy.

MR. SULLIVAN:  Yes.  He pled to a maritime vessel conspiracy.  It does not require an admission.  He's taking advantage of this witness's lay understanding and non-English-speaking ability.  This entire line of questioning about lying is entirely improper.

THE COURT:  Do we have the allocution of the witness? I know the stipulated facts --

MR. SULLIVAN:  We have the stipulated facts.

THE COURT:  Because what you were referring to, Mr. Foy?  In other words, you were saying that he had to admit that it was going to the United States.  Was there a document that you were referring to?

MR. FOY:  I guess it should've been within the jurisdiction of the United States.

MR. SULLIVAN:  No.  That is vessel within the jurisdiction.

MR. FOY:  OK.  On a boat within the jurisdiction.

MR. SULLIVAN:  This entire line of questioning needs to be stricken.  It's entirely misleading.

THE COURT:  What I'd like you to do is take a look at the transcript, figure out what you believe should be stricken, and then we can talk about it.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

NbsWore3                    Boada - Cross

MR. FOY:  I'll correct it.

MR. SULLIVAN:  No.

MR. FOY:  I can easily correct it, actually.

MR. SULLIVAN:  Honestly, I think we're past that point.

THE COURT:  Here's the problem.  When you started asking the question, I looked for an allocution of some sort.  Then I saw there was a guilty plea.  One was conspiracy.  The other one was -- and I looked at the stipulated facts, and I didn't see where it said that that's what he was doing.

MR. FOY:  Right.

THE COURT:  How would you propose that you were going to clean it up?

MR. FOY:  Say that he basically said what the elements to the offense of this is here, meaning that he was on a boat, basically mimic the elements of the offense here.  That's all.

THE COURT:  All right.  Well, I'll allow you to try and clean it up, but I'll also hear the government on its motion to strike the prior testimony.

MR. FOY:  OK.

THE COURT:  All right?  But after we see the transcript, and we can figure out what the parameters of that will be question by question and answer by answer.  All right?

Mr. Foy, you can try and see if you can clean it up.

MR. FOY:  OK.

NbsWore3                          Boada - Cross

THE COURT:  Or however you want to do it.  OK?

MR. FOY:  OK.

THE COURT:  All right.  Thank you.

(Continued on next page)

NbsWore3                    Boada - Cross

(In open court)

THE INTERPRETER:  Your Honor, the interpreter would like to make a correction.  Immediately before the interpreters conferred, when the question was asked to the witness, the interpreter inadvertently misinterpreted the question to the witness.

Subsequently, the interpretation was corrected, and the witness was able to answer.

THE COURT:  OK.  All right.  What was the incorrect --

THE INTERPRETER:  I don't remember.

THE COURT:  All right.

THE INTERPRETER:  But we corrected the question.

THE COURT:  All right.

THE INTERPRETER:  Yeah.

THE COURT:  Go ahead, Mr. Foy.

MR. FOY:  I just had another idea.  Can we have a sidebar about what we discussed?

THE COURT:  OK.

MR. FOY:  It will be brief.

THE COURT:  Yes.

(Continued on next page)

NbsWore3                        Boada - Cross

(At sidebar)

MR. FOY:  OK.  I see the error that I made.  So I'm willing to make a motion to withdraw my questions and the answers about the portion about pleading guilty under oath and lying about importation into the United States, because it's clear that this doesn't really require that.

MR. SULLIVAN:  It doesn't require it.

MR. FOY:  Right.

THE COURT:  OK.  All right.  If you want to make that motion, then I will grant the motion.  But we'll have to be sure; the parties should confer to make sure that we're going to excise all of the testimony, because I don't want it to be part of the transcript in case there's a read back or something like that later on.

MR. FOY:  Absolutely.

MR. SULLIVAN:  We'd request a curative instruction to the jury right now while the witness is on the stand.

THE COURT:  What I would say is -- I'd like to get the language of that instruction, if you can work on that.

How much more, Mr. Foy, do you think you have?

MR. FOY:  I don't know.  Maybe 20 minutes.  Maybe.

THE COURT:  OK.

MR. SULLIVAN:  Here's my concern, your Honor.  Right now we have a witness on the stand who's been accused of lying, and if we permit Mr. Foy to continue, every word out of this

NbsWore3                        Boada - Cross

witness's mouth is now viewed through that lens by the jury, I'd prefer if we could take a break now and work out that curative instruction.

THE COURT:  All right.  What I would say is Mr. Foy can withdraw the questions that he had indicated.  Then we'll take a break, and you can work out whatever the language is you believe would be appropriate.  All right?

OK.  Thank you.

(Continued on next page)

NbsWore3                    Boada – Cross

(In open court)

THE COURT:  Mr. Foy.

MR. FOY:  Your Honor, I wanted to make a motion at this time.

THE COURT:  OK.

MR. FOY:  I want to make a motion to withdraw my questions with regards to the conviction for importation.  I misread, made a mistake, confronted the witness with the improper conviction.  I was thinking about something else.  So the idea that he was lying about the importation, that's my mistake, not the witness's mistake, and I'd like to withdraw that and the answers that correspond to that due to my error.

THE COURT:  OK.

Ladies and gentlemen, what's going to happen is, and you may recall in my preliminary remarks I mentioned that things that get stricken you should disregard.  Mr. Foy has made an application that his questions and the witness's answers be stricken, and I'm going to grant that request.  I'll work out with the parties what specific questions and answers will be stricken.

Ladies and gentlemen, what we're going to do now, though, is we're going to take a break for about 10, 15 minutes.  What I'd ask you to do is go back, relax.  Don't talk about the case.  Don't do any research about the case.  And we'll bring you back in about ten minutes.  OK?

NbsWore3                    Boada - Cross

Thank you very much.

(Continued on next page)

NbsWore3                    Boada - Cross

(Jury not present)

THE COURT:  You may be seated.

The witness can step down.  Thank you.

(Witness not present)

THE COURT:  OK.  I'll leave the parties to work that out.  Perhaps what he actually, at least as far as I know, and I'm not entirely familiar with the practice in Florida, but I think what he admitted to is what, in essence, is in the stipulated factual proffer, I guess, which Mr. Foy had handed to me as Defendant's Exhibit 100.  I'm not sure if it's part of the 3500 material or somewhere else.

MR. FOY:  It is not.

THE COURT:  But I assume that that's what the defendant allocuted to, although I don't know.  But I'll leave the parties to work on whatever the instruction may be.

MR. FOY:  So, where I got the document from is from the ECF.

THE COURT:  The docket.

MR. FOY:  The docket, and I just downloaded it. That's where it came from.

THE COURT:  OK.  All right.

If the parties can work on that language, and I'll come back.  And if there's a dispute, I will make a ruling. OK?

MR. SULLIVAN:  Thank you, your Honor.

NbsWore3                          Boada - Cross

THE COURT:  Thank you very much.

(Recess)

(Continued on next page)

NBS3ORE4                Boada - Cross

(In open court; jury not present)

THE COURT:  So I received the proposed instructions agreed to by the parties, and I will read it to the jury before we continue the cross-examination.

MR. SULLIVAN:  So, your Honor, we have two requests. The first is that the defendant be present for when you do read the instruction.

THE COURT:  Yes.

MR. SULLIVAN:  We understand during the break from the interpreters that there might have been a translation issue with respect to one of the questions in the colloquy, and I'll let them elaborate.  And we understand it's all going to be withdrawn and stricken, but we wanted the record to reflect before the Court that there was a slight translation issue.

THE COURT:  All right.  So is it all right if I hear from the interpreters without the witness on the stand and then we can bring the witness?

MR. SULLIVAN:  That's fine by the government.

THE COURT:  Yes.

THE INTERPRETER:  Yes, your Honor.  Without the benefit of the record, just working off of this interpreter's memory, there was a question right before this interpreter asked to confer with her colleague.  It went something along the lines of:  Isn't it true that you lied during your guilty plea when you admitted to bringing drugs into the United

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

NBS3ORE4                    Boada - Cross

States?

The "when you pled guilty" was omitted from the question when it was interpreted into Spanish.  And instead, in Spanish the question sounded something like:  Isn't it true that you lied when you said you brought drugs to the United States.

Essentially, the witness answered the wrong question.

THE COURT:  Okay.  So, but as was indicated, I think that the whole colloquy based upon the guilty plea is going to be stricken.  And so, we can get the witness and then we will bring the jury in, and I will read the proposed curative instruction.  Thank you.

(Continued on next page)

(Jury present)

THE COURT:  Ladies and gentlemen, I heard a little bit of a cheer, which I can only assume that the cookies had arrived.  So ladies and gentlemen, I have the following instruction for you.

So ladies and gentlemen, during cross-examination, you heard some questions about whether the witness lied about knowing that cocaine would be imported into the United States in connection with his guilty plea in 2016.

As you heard before the break, those questions are withdrawn, and the questions and the answers will be stricken from the record.

On July 13, 2016, Rommel Jose Boada entered into a stipulated factual proffer in connection with his plea of guilty to one count of conspiring to possess with intent to distribute cocaine on board a vessel subject to the jurisdiction of the United States, and one count of possessing with intent to distribute cocaine on board a vessel subject to the jurisdiction of the United States.  In the stipulated facts, Mr. Boada did not admit to knowing that the cocaine would be imported into the United States or agreeing to import cocaine into the United States.

The offenses to which Mr. Boada pleaded guilty do not require that Mr. Boada knew the cocaine would be imported into the United States.

Thank you.

Mr. Foy, you may continue.

MR. FOY:  Your Honor, before I do so, I wanted to apologize to the Court, to the government, to the jury, and my client for the error that's caused the delay.  My apologies.

THE COURT:  All right.  You may proceed.

BY MR. FOY:

Q.  Mr. Boada, as part of the sentence to the conviction, the actual sentence was 11 years, not 13 years, correct?

A.  11 years and three months.  135 months.

Q.  There came a time in 2022, specifically in May of 2022, that you made a petition for compassionate release; is that correct?

A.  Yes.

Q.  And that compassionate release application was related to health issues, COVID, and it was an opportunity to get released early, correct?

A.  Yes, that's correct.

Q.  And at that time, the government in Miami had opposed the application; is that true?

A.  Correct.

Q.  And the Court denied your application?

A.  Correct.

Q.  And is it your hope through your efforts through this process that this would actually, this process would actually

NBS3ORE4                     Boada - Cross

result in you getting released early?

A.   Yes, that's correct.

Q.   As part of your sentence on this case, one of the conditions was that you would have to surrender to Immigration for removal after imprisonment, correct?

A.   Correct.

Q.   And it's your hope by testifying in these proceedings that that requirement, that you surrender for deportation, will be reversed, correct?

A.   Correct.

Q.   Now, with regards to the government here in this district, in the Southern District of New York, you do not have a written agreement promising you something specific; is that true?

A.   That's true.

Q.   Earlier on cross-examination, we talked about a photograph that was shown to you while in the Miami federal detention center.  Do you remember me asking you questions about that?

A.   Can you please repeat it?

Q.   Yes.  Isn't it true that you were shown a photograph of Carlos Orense Azocar in the federal detention center in April of 2016?

A.   Yes, that is true.

Q.   Do you know what specific date in April that you were shown that photograph?

A.   I don't remember the exact date.

NBS3ORE4                       Boada - Cross

Q.  But you are clear that you were shown a photo around that time period in the Miami federal detention center?

A.  Yes.

Q.  You do specifically recall being shown that photograph while you were in the medical unit within the facility?

A.  Yes.

Q.  With regards to the photograph that you were shown --withdrawn.

So, you met with the government on July 19, 2016, correct? That was the first time you met to talk about Carlos Orense Azocar?

A.  Yes.

Q.  And would it be fair to say you've had multiple meetings with the government between July 19, 2016, when you initially discussed Carlos Orense Azocar, and today?

A.  Yes.

Q.  Do you have an idea of how many times approximately, not an exact number, approximately how many times you've met with the government between July 19, 2016, and November 27?

Today is the 28th.  November 27, 2023.

A.  Several times, but I don't have an exact number, but several times.

Q.  Would it be fair to say it was more than 10 times?

A.  Yes.

Q.  You think it was about 20 times?

NBS3ORE4                     Boada - Redirect

A.   No, no, not 20.  It does not go up to 20.

Q.   So less than 20 but more than 10; would that be fair to say?

A.   Yes, one can say so.

Q.   Was your last meeting with them yesterday after court on November 27, 2023?

A.   Yes.

Q.   Isn't it true that yesterday, after court, that was the first time you ever disclosed to the government that you were shown a photograph of Carlos Orense Azocar from someone who claimed to be his nephew back in 2016?

A.   That's true.

Q.   Isn't it true that yesterday was the first time you disclosed to the government that another person, another inmate, not the nephew, showed you the same photo while you were in the federal detention center in Miami?

A.   Yes, that is true.

          MR. FOY:  Your Honor, I have no further questions.

          THE COURT:  Okay.  Redirect examination.

          MR. SULLIVAN:  Yes, your Honor.  Just one moment.

          THE COURT:  Sure.

REDIRECT EXAMINATION

BY MR. SULLIVAN:

Q.   Good afternoon, Mr. Boada.

A.   Good afternoon.

Q.  Mr. Boada, you were asked by Mr. Foy here about some of the benefits you hope to receive by testifying here today.  Do you remember that?

A.  Yes, I do remember.

Q.  You had talked about your hope to get out of prison early; do you recall?

A.  Yes, a hope, yes.

Q.  And you talked about your hope to potentially stay in this country; do you recall that?

A.  Yes, I do.

Q.  Has the government made you any promises with respect to getting out of prison early?

A.  No.

Q.  Has the government promised you anything with respect to staying in this country?

A.  No.

Q.  Has the government made you any kind of promise?

A.  No.

Q.  Do you currently have any type of agreement with the government?

A.  No.

Q.  Mr. Boada, Mr. Foy asked you some questions about your meeting with DEA agents and prosecutors; do you recall that?

A.  Yes.

Q.  Did the agent and prosecutors talk to you about lying?

A.   No.   About lying?

Q.   Did they talk to you about lying?

A.   No.

Q.   Well, I'll rephrase.

     Were you given an instruction not to lie?

          MR. FOY:  Objection.

          THE COURT:  Sustained.

          Did you have a discussion with anyone about what would happen if you lied?

          THE WITNESS:  Yes.

Q.   What do you think would happen to you if you lied during your testimony?

A.   I don't know what would happen.

Q.   Well, do you think that you would have any hope of getting out of prison early if you lied?

          MR. FOY:  Objection.

          THE COURT:  I'll allow it.  Overruled.

A.   No, of course not.

Q.   Do you think that you would have any hope of staying in this country if you lied?

A.   No.

Q.   Do you remember when Mr. Foy asked you whether you'd say whatever you had to in court to get those benefits?

A.   Yes.

Q.   You said yes?

NBS3ORE4                        Boada - Redirect

A.   Yes.

Q.   Does that include lying?

A.   Not lying.

Q.   What do you mean by whatever it took?

A.   Well, that is to tell the truth in order to be able to receive whatever the Court grants me.  I don't know.  Any hope there might be.

Q.   Now, Mr. Boada, are you currently serving your sentence?

A.   Yes.

Q.   When do you currently expect to be released from prison?

A.   I don't know.  Whenever is decided.

Q.   How much time do you have left?

A.   I have a year -- a year and -- no, no.  11 months.  11 months.

Q.   And that's without any current reduction in your sentence?

A.   Yes.

Q.   So any reduction in that 11 months remaining would be from 11 months from now?

A.   Yes.

Q.   Mr. Boada, do you remember when Mr. Foy here asked you about a Rule 35?

A.   Yes.

Q.   You said you didn't know what that is; do you recall that?

          THE INTERPRETER:  Can your question be repeated for the interpreter, please.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

NBS3ORE4                      Boada - Redirect

Q.   And you said you didn't know what that is; do you recall that?

A.   Yes, I recall.

Q.   Mr. Boada, are you a lawyer?

A.   No.

Q.   Are you familiar with the legal rules in a U.S. court?

A.   No.

Q.   Mr. Boada, Mr. Foy asked you some questions about your first interviews by U.S. law enforcement when you first landed in the mainland U.S.  Do you remember those questions?

A.   Yes.

Q.   This was right after you were arrested and brought here on the plane?

A.   Yes.

Q.   You told Mr. Foy that during those first interviews, you did not mention Carlos Orense Azocar.  Do you remember that?

A.   Yes, I do.

Q.   And you did not mention a lot of your other drug transportation?

A.   Yes.

Q.   When you first landed that first night in the U.S., during those interviews, did you have an attorney present?

A.   No.

Q.   Did there come a time some months later when you met again with federal agents and you did talk about Carlos Orense?

A.   Yes.

Q.   By that point, did you have an attorney?

A.   Yes.

Q.   Mr. Boada, do you recall Mr. Foy asking you about money you earned transporting drugs?

A.   Yes.

Q.   Do you recall how Mr. Foy led you to that math calculation where it came out to $1.26 million?

A.   Yes.

Q.   That was based on you earning somewhere around 10 to $15,000 per boatload?

A.   Yes.

Q.   Do you recall when you testified on direct speaking about when you first started moving drugs by boat?

A.   Yes.

Q.   Do you recall describing for the jury here that they were smaller boats?

A.   Yes.

Q.   About how much drugs could those smaller boats hold?

A.   300 to 400, depending.

Q.   300 to 400 what?

A.   Kilos.

Q.   And back then, for those smaller boats, what would you earn per boatload?

A.   Between 1,000 to $1,500.

Q.  So, not 10,000 to $15,000 the whole time.

A.  No.  On the small boat, I would make between 1,000 and 1,500.  Later on, when I looked for work in the larger boats, I made between 10 and 15,000.

Q.  Mr. Boada, I think you told us earlier, how far did you go in school?

A.  Sixth grade.

Q.  Why did you stop school?

        MR. FOY:  Objection.

        THE COURT:  One moment.

        I'll allow it.  Objection overruled.

Q.  Why did you stop school?

A.  To work.

Q.  You testified earlier about starting to move drugs on fishing boats around 2000; is that right?

A.  Yes, starting in 2000.

Q.  Why did you decide to transport drugs?

A.  To help my mother.  My mother was a single mother, or she used to be.

        MR. SULLIVAN:  One moment, your Honor.

        THE COURT:  Yes.

        MR. SULLIVAN:  If I could have a moment to confer with co-counsel.

        THE COURT:  Sure.

Q.  All right, Mr. Boada, do you remember when Mr. Foy asked

you some questions about meeting someone at the jail in Miami?

A.  Yes.

Q.  That person said the cocaine load that you were arrested for was Carlos Orense Azocar's?

A.  Yes.

Q.  And he showed you a photograph of Carlos Orense Azocar?

A.  Yes.

Q.  When you saw that photograph, did you recognize the person?

A.  Yes, of course.

Q.  Where had you seen that person before?

A.  At the *finca* in Guarico.

Q.  Which person was he at the *finca* in Guarico?

A.  Carlos Orense.

Q.  Was that the person that was described to you as the boss?

A.  Yes.

Q.  How much time had passed between when you saw Carlos Orense in person, and when you saw that picture that had been shown to you in the Miami jail?

A.  I saw him when we met at the *finca*.  And when we went to the jail in Miami, they showed it to me again.  It was the same person.

Q.  And my question is, about how much time had passed when you saw Carlos Orense at the *finca*, to when you landed in the U.S. and you were shown that picture in the Miami jail?

A.  Approximately 8 to 10 days.

Q.  Did the person, that person in the Miami jail who showed you that picture, did he ask you to cooperate against Carlos Orense?

MR. FOY:  Objection.

THE COURT:  Overruled.  I'll allow it.

THE INTERPRETER:  Could you please repeat the question?

Q.  That person in the Miami jail who showed you the picture, did he ask you to cooperate against Carlos Orense?

A.  No.

Q.  Did that person ask you to lie about Carlos Orense?

A.  He didn't ask me anything.  He just showed me the picture and he said this is my uncle, and I'm here because of my uncle.

Q.  And have you ever seen that person who showed you the photograph since that day?

THE INTERPRETER:  Can you clarify the question, please?

Q.  Have you ever seen the person who showed you that photograph since that day he showed you the photograph?

A.  No.

Q.  Mr. Boada, you were asked some questions by Mr. Foy about your hope to stay in the United States.  Do you recall that?

A.  Yes, I remember.

Q.  And Mr. Foy also asked you about your hope to get your children out of Venezuela; do you recall that?

NBS3ORE4                      Boada - Redirect

A.  Yes, I remember.

Q.  You said that both of those were very important to you.

A.  Yes.

Q.  Do you have concerns about returning to Venezuela after today?

A.  Yes.

Q.  What about your children; do you have concerns if they stay in Venezuela after today?

A.  Yes.

Q.  What are your concerns?

        MR. FOY:  Objection.

        THE COURT:  Overruled.  I'll allow it.

A.  Their safety.

Q.  Why are you concerned about their safety?

A.  Because of the kind of person who has so much power in Venezuela, and that's the reason why I want my family removed from Venezuela.

Q.  What person is that?

A.  This Carlos Orense.

Q.  Why do you think that person has so much power?

A.  That's what I saw.

Q.  What did you see?

A.  A lot of security in the *finca*.

Q.  What specifically about the security made you think he was powerful?

NBS3ORE4                        Boada - Recross

A.   He proved everything there.  He showed it all.

Q.   What did he show?

A.   You know, to have so much security, you have to be a very important person.

Q.   Did the security have guns?

         MR. FOY:  Objection.

         THE COURT:  Sustained.

Q.   Why did you think having so much security made him powerful?

A.   He's proving the power that he has.  I have no security because I'm a nobody.

         MR. SULLIVAN:  One moment, your Honor.

         THE COURT:  Yes.

         MR. SULLIVAN:  Nothing further, your Honor.

         THE COURT:  Okay.  Anything else, Mr. Foy?

         MR. FOY:  Yes.

RECROSS EXAMINATION

BY MR. FOY:

Q.   You are aware that lying to a federal agent can be a crime, correct?

A.   I am aware.

Q.   And early on, you admit that you did lie, as an initial matter, in your interactions with the government in this case, correct?

A.   I lied?

Q.  You said you had only done this one time initially, correct?

A.  Yes.

Q.  That wasn't true, correct?

A.  It wasn't true.

Q.  Then you said I did it twice when I had one conviction, I went to Venezuela, and that wasn't true, correct?

THE INTERPRETER:  Can you clarify the question, please.

MR. FOY:  I will.

Q.  You followed up and you said you did it this time and one other time?

A.  Yes.

Q.  And that wasn't true; it wasn't just two times, correct?

A.  It was several times between 2000 and 2007.

Q.  But initially, you didn't tell them the truth, correct?

A.  Not in the beginning, but later on, yes.

Q.  You weren't charged with lying to the government, correct?

A.  No.

Q.  There was no consequence as a result of you being untruthful to the government, correct?

A.  No.

Q.  Now, when you initially started talking to the government, you did mention some names, correct?

A.  Yes.

NBS3ORE4                     Boada - Recross

Q.  You mentioned Jose who recruited you, correct?

A.  Yes.

Q.  You mentioned an individual by the last name Bermudez to the government, correct?

A.  Yes.

Q.  You mentioned a gentleman by the name of Javier to the government, correct?

A.  Yes.

Q.  And those people actually know who you are, correct?

A.  Yes.

Q.  And you know them as well, correct?

A.  Yes.

Q.  By your own admission, the person you say was the Carlos Orense Azocar you met, you didn't know him before the day you met him, correct?

A.  I saw him at the *finca*, and later on with the picture that I was shown, I remembered him perfectly well, it was the same person.

Q.  Right.  But my question is you didn't know him before that day that you allegedly met him on the *finca*, correct?

A.  No, I didn't know him, no.

Q.  You didn't tell him your name, correct?

A.  No.

        MR. FOY:  If I could just have a moment, your Honor.

        THE COURT:  Yes.

MR. FOY:  Your Honor, I have no further questions.

THE COURT:  Okay.  Mr. Boada, you may step down.

(Witness excused)

THE COURT:  Government's next witness.

MR. SULLIVAN:  The government calls DEA Supervisory Special Agent Jeff Spears.

JEFFREY SPEARS,

    called as a witness by the Government,

    having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. SULLIVAN:

Q.  Good afternoon.

A.  Good afternoon.

Q.  Are you currently employed?

A.  Yes, sir.

Q.  Where are you employed?

A.  Drug Enforcement Administration.

Q.  How long have you been employed by the Drug Enforcement Administration?

A.  A little over 18 years.

Q.  What's your current position there?

A.  Supervisory Special Agent.

Q.  What unit are you the supervisory special agent in?

A.  DEA headquarters, domestic operations, regional and local impact.

NBS3ORE4                      Spears - Direct

Q.   Before that, where were you positioned within the DEA?

A.   Right before that I was with the St. Louis division, I was a resident agent in charge of Cape Girardeau, Missouri.

Q.   And your title's a bit of a mouthful.  Can we just shorten supervisory special agent to SSA; is that all right?

A.   Yes.

Q.   What's a resident agent in charge?

A.   A resident agent in charge is a special agent that's in charge of a regional within -- I was over 18 counties, and I was interacting with the chiefs and sheriffs with over 18 counties in Southeast Missouri.

Q.   Prior to being an agent in charge, what was your position within the DEA?

A.   I was a special agent in the Miami Field Division.

Q.   How long were you a special agent in the Miami Field Division?

A.   Around 10 and a half years.

Q.   Were you a special agent in the Miami Field Division in April of 2016?

A.   Yes, sir.

Q.   What were some of your responsibilities and duties as a special agent in the Miami Field Division?

A.   It would be to report writings, surveillance, undercover activities, prepare affidavits, Title IIIs, intercepts, transports, anything controlling confidential sources, anything

to cultivate evidence to prosecute defendants for drug

trafficking.

Q.   Were you assigned to a particular unit or task force within

the Miami Field Division?

A.   Yes, I was.  With High Intensity Drug Trafficking Area,

which is HIDTA, which we focus on --

Q.   What is High Intensity Drug Trafficking Area?

A.   An area where we focus putting a lot of federal and local

resources together where a lot of different agencies, whether

FBI, HSI, DEA, the local municipalities, the city governments,

and we pretty much work together on different cases to try to

combat whatever crime we're focusing on.  That way if something

HSI is focusing on, if it is drug related, DEA will focus on

it, and gun related, ATF, and so forth.

Q.   Directing your attention to April 13, 2016.  Were you

working that day?

A.   Yes.

Q.   Do you recall being involved with a bulk seizure of

narcotics that day?

A.   Yes, sir.

Q.   What was happening with respect to that seizure on that

day?

A.   On that day, DEA was assisting HSI in an investigation that

they were conducting, and they informed us they needed our

assistance because of the potential that it would be a

significant drug seizure, and they solicited our help based

upon their information.

Q.  What was your specific involvement with the investigation

that day?

A.  That day, I went to the Opa Locka Airport, met with the

Coast Guard as the Coast Guard flew in, they flew in some

cocaine that had been seized, along with four defendants that

they were transporting.

Q.  Was this a Coast Guard plane?

A.  Yes.

Q.  What is Opa Locka Airport?

A.  It is a smaller airport in Miami, near Miami that is more

for executive flights, high-end flights, private planes, that

nature.

Q.  That's where the Coast Guard plane landed?

A.  Yes, sir.

Q.  Were you there when the Coast Guard plane landed?

A.  Yes, sir.

Q.  You mentioned that there were four detained individuals

aboard the plane?

A.  Yes, sir.

Q.  What happened once the plane landed?

A.  Once the plane landed, HSI and myself, we unloaded the

cocaine from the plane and put it into a transport van that

belonged to HSI.  And HSI, also along with DEA assistance,

transported the defendants to FDC, Federal Detention Center in Miami, and myself along with HSI, I followed HSI with a caravan with a van full of cocaine to the HSI facility where the cocaine was stored.

Q.  Were you involved with the transport of the cocaine to the HSI facility?

A.  Yes, sir.  We pretty much caravaned.  Because it is such a significant seizure, we caravaned to the HSI facility.

Q.  I'm sorry.  We've been referring to HSI the whole time. What does HSI stand for?

A.  Homeland Security Investigations.

Q.  What is Homeland Security Investigations?

A.  That's HSI, that they pretty much focus, similar to, they focus on crimes, prosecuting federal crimes for protection of the Homeland Security.  I can't remember which -- similar -- they had the same powers as FBI.  They just do it for a different agency.

Q.  So you were involved with the transport of the drugs to the HSI facility?

A.  Yes, sir.

Q.  Were you driving one of the cars escorting the drugs?

A.  Yes, sir.

Q.  What did you do after that?

A.  After that, the drugs were taken to HSI, delivered into their warehouse, in their facilities where they store the

drugs.  And I participated in the counting of the cocaine, the kilos, as well as making sure that everything was done properly.

Q.  And you mentioned counting the kilos.  Do you remember approximately how many kilos it was?

A.  I know it was close to 1,000.  I don't know the exact count.  But I know it's the largest physical seizure that I ever had in my 24 years of law enforcement.

Q.  Were any photos taken that day?

A.  Yes, sir.

MR. SULLIVAN:  Mr. Sirmon, if we could please put up for the witness what's been marked for identification as Government Exhibit 615.  The witness, the parties and the Court only.

Q.  SSA Spears, I'm showing you what's been marked for identification as Government Exhibit 615.  Do you recognize this photograph?

A.  Yes, sir.

Q.  What do you recognize it to be?

A.  This is the seizure that I was referring to earlier.

Q.  Were you present for this photograph?

A.  Yes, sir.

Q.  Does this accurately reflect and depict the seizure as it appeared at the time of the count?

A.  Yes, sir.

NBS3ORE4                        Spears - Direct

MR. SULLIVAN:  The government offers Government Exhibit 615.

MR. FOY:  No objection.

THE COURT:  Government Exhibit 615 is admitted in evidence.

(Government's Exhibit 65 received in evidence)

THE COURT:  You may publish that for the jury.

MR. SULLIVAN:  Mr. Sirmon, if we can put that up on the jurors' screens please.

Q.  What are we looking at here?

A.  This is the approximately 1,000 kilos of cocaine that were seized that night or that HSI took custody of, and it basically is the black tape around the kilos, and I remember some of the kilos having -- at least some of them having pictures on them. I can't remember if all of them, but I know some of them had photos in addition to the black taping.

Q.  What happened to the drugs after this?

First let me ask you, do you know what happened to the drugs after this?

A.  Yes, sir.

Q.  What happened?

A.  The next day, I remember myself and another DEA agent taking the representative sample and taking it over to the DEA lab.

Q.  What's a representative sample?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A.   It is a sample where you don't have to take the whole bulk seizure, take representatives sample to show, enough to show that it's pretty consistent.  That way you don't have to test every kilo, because that would be cumbersome.  You would test a representative sample.

Q.   So not all approximately 1,000 kilos went to the DEA lab?

A.   No, sir.

Q.   What does the DEA lab do?

A.   DEA lab have chemists that test whatever drug you bring to verify that it is that drug.  And it confirmed that for prosecution purposes.

Q.   You mentioned some black tape around the kilos.  What are you referring to there?

A.   The black tape is what you see, the black wrapping around each kilo.  That pretty much contained to separate each one, to let you know what was 1 kilo.

Q.   Is that part of the packaging?

A.   Yes.

Q.   After the transport of the -- well, let me ask you.  Withdrawn.

     How much was the representative sample that was transferred to the lab?

A.   The representative sample, I can't remember the exact amount.  I think it is probably 20 or so.  But I can't remember.

MR. SULLIVAN:  May I have a moment, your Honor?

THE COURT:  Sure.  Supervisory Special Agent, when you say 20 or so, do you mean 20 or so of the bricks?

THE WITNESS:  Kilos, yes, sir.

THE COURT:  So 20 or so different kilos?

THE WITNESS:  Yes, sir.

THE COURT:  Thank you.

THE WITNESS:  You're welcome.

THE COURT:  Prior to -- did you have a job prior to the DEA?

THE WITNESS:  Yes, sir.

THE COURT:  What was that?

THE WITNESS:  I was a Raleigh police officer, City of Raleigh, for five and a half years.

THE COURT:  Prior to that, were you working or was that your first job?

THE WITNESS:  That was pretty much my first job out of college.

Q.  SSA Spears, you said you couldn't recall the exact amount of the representative sample.  Is there anything that would refresh your memory?

A.  Yes, sir.

Q.  What would that be?

A.  A report or pretty much the amount I signed to transport to the lab.

NBS3ORE4                      Spears - Direct

Q.   When you referenced signing for something, what would you sign?

A.   That would be -- I been out of the field for a while so I have to be --

Q.   Would you have signed a receipt?

A.   Yes, sir.

          MR. SULLIVAN:  May I approach, your Honor?

          THE COURT:  You may.

Q.   SSA Spears, I've just handed you a document.  If you can take a look at that for a minute and look up when you're done.

A.   Yes, sir.

Q.   Do you now recall how much was the representative sample that was transferred to the lab?

A.   Yes, sir.

Q.   How much was it?

A.   It says two 10-kilogram samples of cocaine.

Q.   Two?

A.   It says.

Q.   Let me ask you this.  Were you with another agent when you received the kilos?

A.   Yes, sir.

Q.   Did you both sign for it?

A.   Yes, sir.

Q.   Do you see two signatures?

A.   Yes, sir.

Q.  I'll ask you how much was the representative sample that was transferred to the lab?

A.  The representative sample that was transferred to the lab was -- it says two 10 kilograms.

MR. FOY:  Objection, your Honor.  This is to refresh recollection?

THE COURT:  How soon after the count did you create this document?

THE WITNESS:  This was the next day.

THE COURT:  Okay.  I'll allow it as past recollection recorded.  Go ahead.

Q.  Agent Spears, do you see your signature on what's in front of you?

A.  Yes, sir.

Q.  And what are you signing for on that document?

A.  Signing 10-kilogram sample, and then that was written down twice.  So, I'm signing for a 10-kilogram sample and Agent McNamara signed for a 10-kilogram sample.

Q.  When you transfer drugs, do you typically have another agent with you?

A.  Yes, sir.

Q.  Do you both have to sign for it?

A.  Yes, sir.

Q.  So you both signed for a 10-kilogram sample of drugs?

A.  Yes.

Q.  Was that the 10-kilogram representative sample that was transferred to the lab?

A.  Yes, sir.

Q.  After the transfer of the 10-kilogram sample to the lab, did you have any further involvement with respect to the drug seizure?

A.  No, sir.

         MR. SULLIVAN:  Nothing further, your Honor.

         THE COURT:  Cross-examination.

CROSS-EXAMINATION

BY MR. FOY:

Q.  Good afternoon.  How are you?

A.  I'm fine, sir.  Good afternoon.

Q.  Good, good.  So the picture that was shown and moved in evidence, I think it was 615?

A.  Yes, sir.

Q.  Would it be fair to say that picture was taken just to confirm the actual seizure?

A.  Yes, sir.

Q.  From a law enforcement perspective, that's done just to corroborate what actually happened, correct?

A.  Yes, sir.

Q.  When you say you signed for the sample, the 10-kilo sample?

A.  Yes, sir.

Q.  That's just a way of confirming when you picked up a piece

NBS3ORE4

of evidence, correct?

A.   Yes, sir.

Q.   And when you transported it to another location, you want to confirm that when you did that, so there's a chain of custody for the item, correct?

A.   Yes, sir.

Q.   So that eliminates any suspicions that maybe something else happened to the package that was maybe improper?

A.   Yes, sir.

Q.   So you did everything as you should have, as it should have been done in this case?

A.   Yes, sir.

MR. FOY:  Thank you.

THE WITNESS:  You're welcome.

THE COURT:  Anything else?

MR. SULLIVAN:  Nothing further.

THE COURT:  Thank you very much.

THE WITNESS:  Thank you, sir.

(Witness excused)

THE COURT:  The government's next witness.

MR. SULLIVAN:  Your Honor, at this time, we'd like to read a stipulation that's been entered between the parties.

Is it hereby stipulated and agreed by and among the United States of America by Damian Williams, United States Attorney for the Southern District of New York, and Kaylan E.

NBS3ORE4

Lasky, Kevin T. Sullivan, and Michael D. Lockard, Assistant United States Attorneys, of counsel, and defendant Carlos Orense Azocar, by and with the consent of his attorneys Jason E. Foy and Eric J. Sarraga, that:

1.   On or about April 7, 2016, United States Coast Guard seized approximately 990 kilograms of suspected cocaine from a go-fast vessel, defined as the boat for this stipulation, in international waters south of the Dominican Republic.

2.   A senior forensic chemist employed by the Drug Enforcement Administration, the DEA, conducted a forensic analysis of a portion of the substances obtained from the boat defined as the sample.  The senior forensic chemist concluded that the substances in the sample contained 9,934 grams of mixtures and substances containing a detectable amount of cocaine.

Government Exhibit 657 is a photograph of the 10 items comprising the sample taken by the senior forensic chemist, and is a true and accurate depiction of the sample as it appeared when the outer packaging was opened by the senior forensic chemist.

Government Exhibit 658 is a photograph of one of the 10 items comprising the sample taken by the senior forensic chemist, and is a true and accurate depiction of the sample as it appeared when the outer packaging was opened by the senior

NBS3ORE4

forensic chemist.

It is further stipulated and agreed that Government Exhibit 657 and Government Exhibit 658 and this stipulation, which is marked as Government Exhibit 901, may be received into evidence as a government exhibit at trial.

Your Honor, at this time the government offers Government Exhibit 901, Government Exhibit 657, and Government Exhibit 658.

THE COURT:  Any objection?

MR. FOY:  No objection.

THE COURT:  Government Exhibits 657, 658, and 901 are admitted in evidence.

(Government's Exhibit 657, 658, 901 received in evidence)

MR. SULLIVAN:  Permission at this time to publish Government Exhibit 657 and 658?

THE COURT:  You may.

MR. SULLIVAN:  Mr. Sirmon, if we could please put up on all screens first Government Exhibit 657.

And now if we could put up Government Exhibit 658.

Mr. Sirmon, you can take that down.

The government now calls DEA Supervisory Special Agent Scott Hacker.

 SCOTT HACKER,

    called as a witness by the Government,

NBS3ORE4                      Hacker - Direct

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. SULLIVAN:

Q.   Good afternoon.

A.   Good afternoon.

Q.   Are you currently employed?

A.   I am.

Q.   Where are you employed?

A.   The Drug Enforcement Administration.

Q.   How long have you been by the Drug Enforcement
Administration?

A.   Just over 25 years.

Q.   What's your current position with the Drug Enforcement
Administration?

A.   My current position is the unit chief of the Tactical Unit
at the DEA Training Academy in Quantico, Virginia.

Q.   Back in 2021, what was your position with the DEA?

A.   At that time I was the country attache for the Rome office
in Rome, Italy.

Q.   What is a country attache?

A.   The DEA has offices throughout the world, and a country
attache is the DEA person that's in charge of that specific
office.  An office may have an area of responsibility beyond
just that country, and they act as the point of contact for the
DEA to liaison between the Drug Enforcement Administration and

NBS3ORE4                    Hacker - Direct

local counterparts in furtherance of drug trafficking investigations.

Q.   As the country attache in the DEA Rome country office, what was the area of responsibility overseen by that country office?

A.   When I arrived in 2016, we covered the Balkans, part of the Balkan countries.  So at that time we had Serbia, Bosnia and Herzegovina, Kosovo, and Montenegro.  Those offices in 2018 became part of the DEA's Zagreb country office in Croatia. Also at the time when I arrived in what remained to be the area of responsibility of the DEA Rome, and remained that way, was Italy, Malta, the city-state of San Marino and the Holy See, the Vatican.

Q.   When did you become the country attache for Italy?

A.   In 2016.

Q.   What were some of your responsibilities and duties as the country attache in Italy?

A.   As I mentioned, my responsibilities included liaison with the country, the host country counterparts in all matters relating to drug investigations tied back to investigations by the Drug Enforcement Administration, both domestic and foreign.

Q.   If we could, Agent Hacker, if we could give the jury an overview.  What position did you hold prior to being the country attache in Italy?

A.   Prior to being the country attache in Italy, I was a group supervisor for an enforcement group in Manchester, New

Hampshire.  Prior to that, I was a DEA special agent in Bangkok, Thailand, in our Bangkok country office.  Prior to that, I was a DEA special agent in New York City for eight years.  Prior to that, I was hired out of the DEA office in Seattle as an agent there for a short time.  And then prior to my time at DEA, I was a Washington state trooper for just under seven years.

Q.  Turning to 2021 and 2022, were you still the country attache in Italy at that point?

A.  Yes, I was.

Q.  And were you involved with the arrest and extradition of an individual wanted by the DEA?

A.  Yes, sir.  Yes, I was.

Q.  Who was that individual?

A.  That was Mr. Carlos Orense Azocar.  Sorry for my pronunciation.

Q.  Generally, what was your involvement with respect to Carlos Orense Azocar's arrest and extradition?

A.  My office received information that the individual was possibly in Italy.  We passed that information off to the Italian authorities in Interpol.  Subsequently, the Italian authorities with the assistance of Interpol located and arrested the defendant.  And at that point, I just became a liaison for DEA information with the assistant U.S. attorney who was stationed in Rome who was liaisoning with the Italian

NBS3ORE4                        Hacker - Direct

legal system as far as the extradition back to the United States.

Q.  Based on your involvement in the arrest and extradition of Carlos Orense Azocar, were you aware of any requests made by the United States authorities of the Italian authorities?

A.  During the investigation, or during the extradition process, I was aware that there was an MLAT, a multilateral agreement treaty that had been submitted by the prosecution here in New York through the assistant U.S. attorney in Rome requesting from the Italians any effects in possession of the defendant at the time of his arrest.

Q.  Generally, what sort of effects or items -- did you say it was an MLAT request?

A.  Yeah, an MLAT for documentation, cellular phones, other electronic devices.

Q.  Directing your attention to June 22, 2022.  Were you working that day?

A.  I was.

Q.  What, if anything, were you involved with that day?

A.  On that day, I was involved with assisting and traveling back to New York with the extradition.  That required the use of a private plane that DEA chartered, and that I was the facilitator for getting us through the airport, liaisoning through.

Q.  Sorry if I missed it.  The extradition of whom?

A.   Mr. Orense Azocar.

Q.   So what happened that day?

A.   That morning we went to the Ciampino Airport, which is a secondary airport in Rome that handles private aircraft.  The chartered aircraft had arrived.  We, myself and the other agents that were part of the security party bringing the defendant back, met with the Italian authorities.  We went to a secure area.  At that point, prior to boarding, we took custody of Mr. Orense, and then we had the transfer of evidence, pursuant to the MLAT, and then we boarded the aircraft.

Q.   Were you present for all of that?

A.   I was.

Q.   Including the transfer of evidence from the Italian authorities to DEA?

A.   Yes.

Q.   What, if anything, was transferred into DEA custody at that point?

A.   I recall there being some documents, there was a cellular phone, I believe his passport.

Q.   What happened after that?

A.   After that, we boarded the aircraft, we flew directly to the Westchester County Airport, White Plains, landed, we were met by DEA agents from the New York Division.

Q.   You were on that flight?

A.   I was.

Q.  Did the plane land anywhere else en route to the Westchester County Airport in White Plains, New York?

A.  No, it did not.

Q.  So what happened once you landed at the Westchester County Airport?

A.  We met with the agents, and we were processed through immigration by Customs, U.S. Customs.  We then transported Mr. Orense down to Brooklyn to be housed in the MDC, Metropolitan Detention Center.

Q.  Were you involved in that transport?

A.  I was.

Q.  Then what happened after that?

A.  After that, I went with the other agents that had been on the flight, we went to the New York Division of the DEA to the non-drug temporary evidence locker, and deposited the evidence.

Q.  What is a non-drug temporary evidence locker?

A.  To process evidence into a field division, there is an evidence custodian that would take that evidence.  In hours when that person is not there, there is a process whereby it is a slot, sort of like a mailbox.  The evidence is then placed in there into a secure vault.  Then during business hours, the agent goes back and recovers that and processes it through into the evidentiary system.

Q.  Were you present for when the evidence was put inside the New York temporary non-drug evidence vault?

NBS3ORE4                     Hacker - Direct

A.  I was.

Q.  What among the items were transferred into that vault in New York?

A.  It was a cell phone and documents.

Q.  Regarding the phone, had that been with you and the DEA team since landing at Westchester County Airport?

A.  Yes.

          MR. SULLIVAN:  One moment, your Honor.

          THE COURT:  Yes.

          MR. SULLIVAN:  Your Honor, may I approach?

          THE COURT:  You may.

Q.  Agent Hacker, I've just handed you what's been marked for identification as Government Exhibit 1.  Take a minute, look at it.  Look up when you're done.

          Do you recognize this item?

A.  It is a DEA evidence envelope.

Q.  Do you see what's contained inside?

A.  I do.  It is a cell phone.

Q.  What do you recognize this item as?

A.  The cell phone that was seized that day.

Q.  Which day?

A.  On the day on the extradition, the 22nd.

Q.  The extradition of whom?

A.  Mr. Orense Azocar.

          (Continued on next page)

NbsWore5                       Hacker - Direct

BY MR. SULLIVAN:

Q.   And how do you know it to be that cell phone?

A.   Looking at the envelope, I can see the case number that came from our special operations division as well as the signatures and the date that it was received.

Q.   And what date was it received?

A.   6/22, 2022.

Q.   And was that the day of the extradition of Carlos Orense Azocar?

A.   It was.

Q.   Who was the agent that's listed there on the sticker?

A.   Special Agent Passmore.

Q.   And were you traveling with Special Agent Passmore that day?

A.   Yes.

Q.   And where were you traveling?

A.   From Rome, Italy, to White Plains, New York.

          MR. SULLIVAN:  One moment, your Honor?

          THE COURT:  Yes.

BY MR. SULLIVAN:

Q.   Agent Hacker, after the transport of the defendant and the property to New York, did you have any further involvement in the investigation?

A.   Not -- prior to this, no.

          MR. SULLIVAN:  OK.  Nothing further, your Honor.

THE COURT:  OK.  Cross-examination.

CROSS-EXAMINATION

BY MR. SARRAGA:

Q.  Good afternoon, Special Agent Hacker.

A.  Good afternoon, sir.

Q.  As the Italy country attache, you testified that you were present at the airport for the extradition of Mr. Orense Azocar.  Is that correct?

A.  Yes, sir.

Q.  And during the extradition, Mr. Azocar's body was turned over to the DEA as well as his cell phone, is that correct?

A.  His body -- yes.  Physical custody, yes, sir.

Q.  And when the Italian authorities arrested Mr. Azocar on behalf of the DEA, they took his phone pursuant to the MLAT treaty agreement, correct?

A.  I know that they took his phone and we recovered it -- the MLAT, yes, sir.

Q.  And based on your personal knowledge, are you aware that they searched his cell phone as well?

A.  I'm not aware of that.

Q.  So if a search of the cell phone did occur, you were not present for that?

A.  I was not present at the time of the arrest by the Italian authorities.

MR. SARRAGA:  Nothing further, your Honor.

THE COURT:  OK.

Anything?

MR. SULLIVAN:  Nothing.

THE COURT:  Thank you very much.

THE WITNESS:  Thank you, sir.

THE COURT:  Take care.

(Witness excused)

MR. SULLIVAN:  Your Honor, may I just retrieve the evidence?

THE COURT:  You may.

The government's next witness.

MS. LASKY:  Yes, your Honor.  The government calls Antonio Arvelaiz.

THE COURT:  OK.

ANTONIO ARVELAIZ,

    called as a witness by the government,

    having been duly sworn, testified through the

    Spanish-language interpreter as follows:

THE COURT:  You may inquire.

DIRECT EXAMINATION

BY MS. LASKY:

Q.  Good afternoon, Mr. Arvelaiz.

A.  Good afternoon.

Q.  Where are you from?

A.  Caracas, Venezuela.

NbsWore5                          Arvelaiz – Direct

Q.   And in what country do you live now?

A.   United States.

Q.   When did you move to the United States?

A.   In November 2012.

Q.   Before you moved to the United States, what was the primary way that you made money?

A.   Drug trafficking.

Q.   What kind of drug?

A.   Cocaine.

Q.   Do you see anyone in the courtroom today with whom you distributed cocaine?

A.   Yes.

Q.   Who?

A.   Mr. Carlos Orense.

Q.   Please identify him by an article of clothing and where he's sitting.

A.   He's sitting over there with a black jacket.

         MS. LASKY:  Let the record reflect that the witness has identified the defendant.

         THE COURT:  The record will so reflect.

BY MS. LASKY:

Q.   Mr. Arvelaiz, what is your relationship to the defendant?

A.   He was married to my mother's sister.

         MS. LASKY:  Mr. Sirmon, please show just the Court, the witness and the parties what has been marked as Government

NbsWore5                    Arvelaiz - Direct

Exhibit 101.

Q.  Do you recognize this?

A.  Yes.

Q.  What is it?

A.  Mr. Carlos Orense.

Q.  Is it a fair and accurate photograph of the defendant?

A.  Yes.

        MS. LASKY:  The government offers Government Exhibit 101.

        THE COURT:  Any objection?

        MR. FOY:  No objection.

        THE COURT:  All right.  Government Exhibit 101 is admitted in evidence.

        (Government Exhibit 101 received in evidence)

        MS. LASKY:  Mr. Sirmon, please publish Government Exhibit 101.

        OK.  You may take that down.

Q.  Mr. Arvelaiz, approximately how many kilograms of cocaine did you distribute?

A.  More than 100 tons.

Q.  And did the defendant distribute cocaine?

A.  Yes.

        MR. FOY:  Objection.

        THE COURT:  I'll allow it.  Overruled.

BY MS. LASKY:

Q.   Approximately what percentage of the cocaine that you distributed was with the defendant?

A.   90 percent.

Q.   Where did that cocaine ultimately go?

A.   To the United States.

Q.   Did you ever carry guns in connection with your cocaine trafficking?

A.   Yes.

Q.   What?

A.   Automatic rifles, handguns.

          MR. FOY:  Objection.

          THE COURT:  Yes.

          THE INTERPRETER:  Correction, your Honor.  Machine guns.

          THE COURT:  OK.

          I'm sorry.  Objection overruled.  I'll allow it.

BY MS. LASKY:

Q.   Why did you --

          THE INTERPRETER:  Sorry.

          Excuse me, your Honor.  Correction.  Please omit the machine guns.  The automatic rifles was the correct translation.

          THE COURT:  OK.  All right.

          Go ahead.

BY MS. LASKY:

NbsWore5                         Arvelaiz - Direct

Q.   Mr. Arvelaiz, why did you carry guns in connection with your cocaine trafficking?

A.   To protect us and to protect the drug-trafficking business.

Q.   Have you ever spoken to the defendant about firearms?

A.   Yes.

Q.   And why did you speak to the defendant about firearms?

A.   Regarding which ones were better and which ones were not to defend our business.

Q.   Mr. Arvelaiz, we'll come back to the defendant in a moment.

Turning to when you moved to the United States, in 2012, did there come a time after that when you were arrested?

A.   Correct.

Q.   Approximately when were you arrested?

A.   In April 2015.

Q.   And why were you arrested?

A.   For committing fraud and using threats by electronic means.

Q.   And when you say fraud, what kind of fraud were you arrested for?

A.   Fraud for transfers.  Wire fraud.

Q.   And about how much money did you personally make from that scheme?

A.   Two or $3 million.

Q.   Now, after you were arrested, did you plead guilty to any crimes?

A.   Yes.

NbsWore5                      Arvelaiz - Direct

Q.   What prosecutor's office was that agreement with?

A.   In Miami.

Q.   Was that the Southern District of Florida?

A.   Correct.

Q.   And where did you plead guilty?

A.   In the court in Miami.

Q.   When you pled guilty, did you promise to cooperate with the government?

A.   Correct.

Q.   Which crimes did you plead guilty to?

A.   Conspiracy to commit fraud and threats using electronic media -- means.

Q.   What was your sentence for those crimes?

A.   60 months.

Q.   Besides what you pled guilty to, have you also threatened other people?

A.   Yes.

Q.   Did you also commit crimes before you moved to the United States?

A.   Yes.

Q.   Before you moved to the United States, generally, what kind of criminal activity were you involved in?

A.   Drug trafficking, money laundering, fraud and violent crimes.

Q.   Have you been involved in murders?

NbsWore5                      Arvelaiz – Direct

A.  Yes.

Q.  How many murders?

A.  One.

Q.  Have you attempted to murder people?

A.  Yes.

Q.  Around how many people?

A.  Five people.

Q.  And have you shot at people?

A.  Yes.

Q.  Around how many people?

A.  Five people.

Q.  Now, going back to your plea agreement again for a moment, what is your understanding about what that agreement requires you to do?

A.  The plea agreement that I signed with the United States says that I have to cooperate with the government, right from the time that I was incarcerated and even after I've completed my sentence.

Q.  And does that include telling the truth?

A.  That's right.

Q.  At the time that you signed the plea agreement, what was your understanding about what the prosecutors in Florida would do for you?

A.  They were going to help me with some reduction in my sentence.

Q.  Did you have any understanding about what charges you would plead guilty to?

A.  Yes.  They told me that because of my cooperation they would not charge me with drug trafficking nor money laundering.

Q.  Now, around when did you first begin meeting with U.S. law enforcement and prosecutors?

A.  Before I was incarcerated.

Q.  And around when was that?

A.  In 2014.

Q.  After you were arrested, did you continue meeting with law enforcement agents?

A.  That's right.

Q.  And in those meetings, did you tell the government about your drug trafficking?

A.  Yes.

Q.  And about money laundering?

A.  That too.

Q.  And were you charged with drug trafficking?

A.  No.

Q.  Or money laundering?

A.  No.

Q.  You mentioned earlier you were sentenced to 60 months. After you were sentenced, what happened?

A.  I got out and I started to work with federal agencies in the United States, cooperating.

Q.  Did there come a time after you were arrested that you
transferred facilities?

A.  Yes.

Q.  To what facility?

A.  D.R. James in Georgia.  And another prison in Mississippi.
Right now I don't remember the name.

Q.  Did there come a time that you were transferred to Miami to
continue proffers with the government?

A.  That's right.

Q.  And that's FCC Miami?

A.  Yes.

Q.  When you were in Miami, did you speak with anyone who
transported drugs for the defendant?

A.  No.

Q.  Did there come a time when you were in Miami that you met
individuals who worked with the defendant?

A.  Yes.

Q.  Who were those individuals?

A.  Mr. Jorge San Martin, Mr. Ramon Quintero, Mr. Mendez
Ustado.  That's it.

Q.  Did you meet anyone from any boats carrying drugs that the
defendant had sent?

A.  Yes.

Q.  Do you recall their names?

A.  There was one guy whose name was Slader.

NbsWore5                    Arvelaiz - Direct

Q.  Do you recall speaking with anyone else?

A.  No.

Q.  But is it possible that you did?

A.  Possibly, but right now I don't remember.

Q.  Mr. Arvelaiz, a few minutes ago, you described your
agreement.  Did that agreement require you to cooperate with
the government?

A.  Yes.

Q.  Does that include meeting with law enforcement and
prosecutors?

A.  Correct.

Q.  You said you first started meeting with law enforcement --
I believe you said around 2014.

A.  That's right.

Q.  Did you continue meeting with law enforcement in 2015,
after you signed the agreement?

         THE INTERPRETER:  I said 2005 instead of 2015, your
Honor.

A.  Yes.

Q.  With which law enforcement agency have you met since you
signed that agreement?

A.  With the DEA.

Q.  Do you recall if there were any others?

A.  When I was in prison during that time, with ICE and with
the DEA.

NbsWore5                       Arvelaiz - Direct

Q.   And with which prosecutor's offices have you met?

A.   With the office in Miami and -- during my time in prison, with the office in Miami.

Q.   And after prison?

A.   Here in New York.

Q.   And why are you testifying today?

A.   Because it's part of the agreement that I signed with the government.

Q.   Is there anything that you were hoping to gain through testifying?

A.   If I could be helped with my immigration status at any given moment.

Q.   And what is the status -- what is your immigration status in this country?

A.   I'm pending political asylum.

Q.   If you were applying for asylum, why would you need immigration help?

A.   I don't know.

Q.   In connection with your testimony today, has anyone made any promises to you about any benefit that you will receive?

A.   No.

Q.   So, let's turn back to your drug trafficking with the defendant.

A.   OK.

Q.   Where did the defendant live?

A.   In Caracas, Venezuela.

Q.   Do you know how the defendant made most of his money in Venezuela?

A.   Drug trafficking.

Q.   Now, did there come a time when you worked for the defendant?

A.   That's right.

Q.   Around how old were you when you began working for the defendant?

A.   19 to 20 years old.

Q.   Now, generally speaking, what kind of work did you do for the defendant?

A.   I started as a driver, later on as a bodyguard.  And then I joined the logistics of the business.

Q.   And what do you mean by logistics?

A.   The shipment of drugs and the receiving of drugs from Venezuela to other countries.

Q.   A moment ago you mentioned being a bodyguard.  Is that sometimes referred to as security?

A.   Correct.

Q.   Around how many men in total were on the defendant's security detail?

A.   About 15 individuals, more or less.

Q.   And what does a security detail consist of?

A.   Several individuals who safeguard the properties and also

NbsWore5                      Arvelaiz - Direct

the individuals that were with the boss.

Q.   And were they safeguarding -- when you say safeguarding the properties, what do you mean?

A.   The houses, the *finca*s --

THE INTERPRETER:  Ranches.

A.   -- the apartments.  Any locations where the product was located, where there was money.

Q.   And when you say the product, what do you mean?

A.   Cocaine.

Q.   And what, generally speaking, did the security detail use to protect the defendant and his drug trafficking?

A.   We would use automatic rifles, M4s AR15s, AK-47s, machine guns, Uzi machine guns, handguns, communication devices, bulletproof vests.

Q.   You spoke about logistics a moment ago.  Generally speaking, what kinds of activities did you do for logistics for the defendant?

A.   I would oversee the sending out of planes, the receiving of product -- cocaine -- from several *finca*s to other countries.

Q.   Did you have any role with respect to drug proceeds?

A.   Yes.

Q.   What would you do with drug proceeds?

A.   Can you please repeat the question?

Q.   Did there ever come a time that you collected drug proceeds?

NbsWore5                          Arvelaiz - Direct

A.   Yes.

Q.   And did you ever pay bribes to officials?

A.   Yes.

Q.   Between approximately what years did you traffic narcotics with the defendant?

A.   I started working with the defendant in about 2003, and in about 2005 or so in the drug-trafficking business.

Q.   So you began working for the defendant in 2003.  In two -- around what time did you stop working for the defendant?

A.   In the year 2010, maybe 2010, 2011.

Q.   Now, besides the security detail, did other people help the defendant protect his cocaine?

A.   Yes.

Q.   What are some of the general types of people who helped protect the cocaine?

A.   Members of the armed forces in Venezuela, of the police, and on certain occasions of the FARC.

Q.   What, if anything, did the defendant provide to these individuals for their assistance?

A.   Money.

Q.   Now, what, as a general matter, was the defendant's role in the cocaine operation?

A.   He was the boss.

Q.   Did the defendant have partners in his operation?

A.   Yes.

NbsWore5                          Arvelaiz - Direct

Q.   Do you know who his partners were?

A.   Yes.

Q.   How do you know?

A.   Because I saw them in person many times.

Q.   Who were his main partners?

A.   General Hugo Carvajal Barrios, Pedro Luis Martin Olivares.

Q.   And does General Hugo Carvajal Barrios ever go by a nickname?

A.   Yes.

Q.   What is that nickname?

A.   Pollo.

          MS. LASKY:  Mr. Sirmon, please show the Court, the parties and the witness Government Exhibit 102.

Q.   Mr. Arvelaiz, do you recognize this.

     What is it?

A.   Yes.  A photo of Pedro Luis Martin Olivares.

Q.   Is that a fair and accurate photo of Pedro Luis Martin Olivares?

A.   Yes.

          MS. LASKY:  The government offers Government Exhibit 102.

          THE COURT:  All right.  Any objection?

          MR. FOY:  No objection.

          THE COURT:  Government Exhibit 102 is admitted in evidence.

(Government Exhibit 102 received in evidence)

BY MS. LASKY:

Q.  Mr. Arvelaiz, if I refer to Pedro Luis Martin Olivares as Pedro Luis Martin, will you know who I'm referring to?

A.  Yes.

Q.  Who is Pedro Luis Martin?

A.  He was a partner of Carlos Orense, also a good friend of his, and he was also the head of the financial counterintelligence unit in one of the law enforcement units in Venezuela.

        MS. LASKY:  Mr. Sirmon, please publish Government Exhibit 102.

Q.  You mentioned the organization that he was the head of.  Is there an acronym that is sometimes used to refer to that organization?

A.  I don't understand the question.

        THE COURT:  Is there an abbreviation that's used? Just letters?

        THE WITNESS:  For what?

        THE COURT:  For the organization that Pedro Luis Martin was in charge of.

        THE WITNESS:  Yes.

BY MS. LASKY:

Q.  And what was that abbreviation?

A.  DISIP.

Q.   Now, Mr. Arvelaiz, what, generally speaking, was Pedro Luis

Martin's role in the cocaine distribution operation?

A.   Pedro Luis Martin handled --

          THE INTERPRETER:  Interpreter correction.

A.   Pedro Luis Martin provided the logistical support to enable

us to travel freely throughout the state of Venezuela, and he

also provided us with credentials, guns and vehicles.

Q.   When you worked for the defendant, approximately how often

did you see Pedro Luis Martin?

A.   Very frequently.  Sometimes two or three times a week.

Sometimes less than that, but it was -- he was seen there

regularly.

Q.   And when you say seen there, what do you mean?

A.   We used to go to where he had his offices, at the

Helicoide.  Carlos Orense met with him there a lot, and we used

to go there frequently.

          MS. LASKY:  Mr. Sirmon, please show the Court, the

witness and the parties Government Exhibit 103.

Q.   Mr. Arvelaiz, do you recognize this?

A.   Yes.

Q.   What is it?

A.   A photo of General Hugo Carvajal.

Q.   Is it a fair and accurate photo of Hugo Carvajal?

A.   Yes.

          MS. LASKY:  The government offers Government Exhibit

NbsWore5

103.

THE COURT:  All right.  Government Exhibit 103 is admitted in evidence.

(Government Exhibit 103 received in evidence)

MS. LASKY:  Permission to publish?

THE COURT:  You may.

MS. LASKY:  Mr. Sirmon, please publish Government Exhibit 103.

Q.  Now, Mr. Arvelaiz, who is General Hugo Carvajal?

A.  General Hugo Carvajal was the head of military counterintelligence in Venezuela.

Q.  And are certain letters ever used to refer to that organization in the government?

A.  Yes.

Q.  When you worked for the defendant, approximately how often did you see Carvajal?

A.  Many times.

Q.  Are you able to approximate how often?

A.  Yes.  At least four or five times a month.

Q.  Now, what, generally speaking, was Carvajal's role in the cocaine distribution operation?

A.  General Hugo Carvajal provided us also with credentials, with vehicles, and he enabled us to travel freely throughout national territory to make our business fruitful.

THE COURT:  Counsel, it's about 5:15.  As I mentioned

NbsWore5

to the jury, we're going to break at 5:15.  Is now a good time to take a break?

MS. LASKY:  Sure, your Honor.

THE COURT:  All right.

We're going to break for the evening, ladies and gentlemen.  Remember, do not discuss the case.  Go home, relax, and please leave your pads in the back.  Do not discuss the case with each other, with your family.  Do not do any research related to the case.  We'll see you tomorrow morning.  OK?

Thank you very much.

(Continued on next page)

NbsWore5

(Jury not present)

THE COURT:  The witness may step down.

(Witness not present)

THE COURT:  You may be seated.

OK.  In terms of tomorrow, how long do you think Mr. Arvelaiz is going to be on direct examination?

MS. LASKY:  Your Honor, I anticipate it will be a good part of the day.

THE COURT:  OK.  All right.

Mr. Foy, I assume you have a bit of cross-examination.

MR. FOY:  I'm thinking the rest of the day.

THE COURT:  OK.  All right.  Just let me ask the government.  When you say -- until the afternoon, do you think, Ms. Lasky, or at least the morning?

MS. LASKY:  I believe definitely the morning, your Honor.

THE COURT:  OK.

MS. LASKY:  I'm not certain about after.

THE COURT:  All right.  What I will do is in connection with, because you mentioned that you thought we might get to Ms. Taul.

MS. LASKY:  Yes, your Honor.  So both Mr. Santos and Ms. Taul we had slated for tomorrow.  I would think that we would get to one or both, but I guess it depends on cross and how long things take.

NbsWore5

THE COURT:  Yes.  All right.  What I will plan on doing is why don't we plan on getting together tomorrow at nine.  I will make my rulings on the search warrant issue and the testimony of Ms. Taul, and I'll take any additional argument at that time on both of those issues.

I think we've already discussed the issue of the search warrant earlier today, but I think I hadn't heard from the defense after the submission of the government's supplemental disclosure with regard to the expert, I don't believe.  I think you started to do the argument, but I'm not sure if you finished, Mr. Sarraga.  Am I incorrect about that?

MR. SARRAGA:  Your Honor, we did place it on the record.  However, we could renew any arguments tomorrow morning.

THE COURT:  OK.  If all you wanted to do is just renew the prior argument, that's fine.

MR. SARRAGA:  Yes, our motion to preclude the testimony.

THE COURT:  All right.  I'll make those rulings tomorrow morning.

Is there anything else that we should take up right now?

MS. LASKY:  Not from the government.

THE COURT:  All right.

From the defense.

NbsWore5

MR. FOY:  No.  Thank you.

THE COURT:  OK.  I'll see everyone tomorrow morning.

Oh, we won't have an issue, right?  He's not incarcerated.  OK.  Fantastic.

Thank you.

(Adjourned to November 29, 2023, at 9:00 a.m.)

INDEX OF EXAMINATION

Examination of:                                    Page

 RONMEL JOSE BOADA

Direct By Mr. Sullivan . . . . . . . . . . . . . 199

Cross By Mr. Foy . . . . . . . . . . . . . . . . 223

Redirect By Mr. Sullivan . . . . . . . . . . . . 268

Recross By Mr. Foy . . . . . . . . . . . . . . . 278

 JEFFREY SPEARS

Direct By Mr. Sullivan . . . . . . . . . . . . . 281

Cross By Mr. Foy . . . . . . . . . . . . . . . . 292

 SCOTT HACKER

Direct By Mr. Sullivan . . . . . . . . . . . . . 296

Cross By Mr. Sarraga . . . . . . . . . . . . . . 304

 ANTONIO ARVELAIZ

Direct By Ms. Lasky . . . . . . . . . . . . . . 305

GOVERNMENT EXHIBITS

Exhibit No.                                     Received

 619, 620, 621, 622   . . . . . . . . . . . . . 218

 616   . . . . . . . . . . . . . . . . . . . . . 221

 65    . . . . . . . . . . . . . . . . . . . . . 287

 657, 658, 901   . . . . . . . . . . . . . . . . 295

 101   . . . . . . . . . . . . . . . . . . . . . 307

 102   . . . . . . . . . . . . . . . . . . . . . 320

 103   . . . . . . . . . . . . . . . . . . . . . 322