

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

December 5, 2025

<u>BY ECF</u>
The Honorable Vernon S. Broderick
United States District Judge
Southern District of New York
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, New York 10007

Re:    ***United States v. Carlos Orense Azocar*, 21 Cr. 379 (VSB)**

Dear Judge Broderick:

The Government respectfully submits this letter in advance of the December 10, 2025 sentencing of defendant Carlos Orense Azocar ("Orense" or the "defendant"), and in response to the defendant's November 26, 2025 sentencing submission. (Defense Memorandum ("Def. Mem."), Dkt. 119).

The defendant was a Venezuelan-based drug trafficker who trafficked massive amounts of cocaine into the United States. To achieve this scale of drug distribution, the defendant and his drug trafficking organization ("DTO") worked with other drug trafficking organizations, including some of the most powerful organizations in Colombia, Mexico, and elsewhere; bribed high-ranking Venezuelan military and law enforcement officers in exchange for protection for his cocaine shipments; and employed a well-armed security detail that provided protection for the defendant and his cocaine loads. He is responsible for importing a staggering quantity of cocaine into this country and is one of the largest cocaine traffickers ever prosecuted in this courthouse.

The defendant was convicted at trial of (i) conspiring to import five or more kilograms of cocaine into the United States; (ii) using and carrying machineguns during, and possessing machineguns in furtherance of, the cocaine importation conspiracy; and (iii) conspiring to use and carry machineguns during, and to possess machineguns in furtherance of, the cocaine importation conspiracy. The United States Probation Office ("Probation") and the Government calculate the guidelines sentence applicable to his conviction under the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") as life imprisonment, with a mandatory minimum term of ten years' imprisonment on Count One, to be followed by a mandatory minimum of thirty years' imprisonment on Count Two, which must run consecutively to any other term of imprisonment imposed. (Presentence Investigation Report ("PSR"), dated Sept. 26, 2025 at 32; *see also* Def. Mem. at 9 (agreeing with that an aggregate 40-year mandatory minimum sentence applies). Probation recommends that the Court impose a Guidelines sentence of life imprisonment, based on, among other things, the stunning scale of cocaine that the defendant imported to the U.S. for

years, his role atop his cocaine distribution organization, his collaboration with corrupt Venezuelan military and law enforcement officials to facilitate his massive drug trafficking, and his utter failure to accept responsibility for his criminal conduct. The defendant, who objects to the facts in the PSR, seeks a sentence of forty years' imprisonment, based on his personal character, family ties and obligations, proclaimed innocence, his age and health, and the conditions at the Metropolitan Detention Center in Brooklyn ("MDC"). For the reasons that follow, the Government respectfully submits that a life sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing in this case.

## I.      Factual Background

### A.      Overview of the Trial Evidence

The evidence presented at trial established that the defendant was a drug trafficker on the largest scale. The defendant worked with some of the most notorious drug traffickers in the world and Venezuelan government officials to import at least approximately 100 tons of cocaine into the United States over the course of the conspiracy, and who protected his cocaine with military-grade weapons, including machineguns. At trial, the jury heard testimony from four cooperating witnesses who trafficked enormous amounts of cocaine with the defendant—Antonio Arvelaiz Idler ("Arvelaiz"), Ronmel Jose Boada ("Boada"), Roberto Lopez Perdigon ("Perdigon"), and Mario Satizabal Rengifo ("Satizabal"). The jury also heard the testimony of Jennifer Taul, an Acting Group Supervisor and Intelligence Research Specialist with the Drug Enforcement Administration ("DEA"), who described, among other things, drug trafficking routes and pricing; John Miller, a Firearms Enforcement Officer from the Bureau of Firearms, Alcohol, Tobacco, and Explosives, who described the features of firearms used by the defendant's DTO; and law enforcement witnesses who testified about an April 2016 seizure of a ton of the defendant's cocaine near the Dominican Republic. The Government also presented evidence obtained from the defendant's phone, which was seized at the time of his arrest in 2021.

### B.      Background on Cocaine Trafficking

As background, Colombia is the largest producer of cocaine in the world, with approximately 90 to 95 percent of the cocaine consumed in the United States produced in Colombia. (Trial Transcript ("Tr.") 693-94). Cocaine is produced from coca leaf in remote areas of Colombia, oftentimes hidden by a jungle canopy, in clandestine laboratories. (Tr. 694, 697). Cocaine is pressed into a final, brick-shaped product weighing around one kilogram each, and each kilogram contains approximately 15,000 to 35,000 individual doses. (Tr. 697-98). Bricks of cocaine are frequently stamped with a logo or imprint to signify a particular brand. (Tr. 697).

Once manufactured, cocaine typically is transported from Colombia to the United States by the "Central American route" or the "Caribbean route." (Tr. 683-84, 711-13). With respect to the Central American route, from Colombia, cocaine often first is transported to Venezuela, then into Honduras, Guatemala, Mexico, and, ultimately, the United States. (Tr. 711-15). Cocaine is transported into Central America by air and sea, and then typically across the U.S.-Mexico border by vehicle. (Tr. 683-84, 711-13). As to the Caribbean route, cocaine is typically transported by boat to islands in the Caribbean, and then to major ports in the U.S. (Tr. 683-84, 715-16). Cocaine

gets more expensive as it is transported north to the U.S.—which illustrates the profitability of the cocaine trade for massive Venezuela-based drug traffickers such as the defendant. (Tr. 721). For example, in approximately 2016, a kilogram of cocaine in Colombia cost approximately $1,725; a kilogram of cocaine in Venezuela cost approximately $1,850; a kilogram of cocaine in Guatemala or Honduras cost approximately $13,500; a kilogram of cocaine in Mexico cost approximately $16,000; a kilogram of cocaine in Mexico cost approximately $17,000; a kilogram of cocaine in the Dominican Republic cost approximately $8,000; a kilogram of cocaine in Puerto Rico cost approximately $23,000; and a kilogram of cocaine in New York cost approximately $40,000. (Tr. 722-25).

### C.      Orense's Importation of Tons of Cocaine to the United States and Use of Military-Grade Weapons to Protect Cocaine Loads

Some of the most devastating evidence at trial came from the defendant's nephew, Arvelaiz, who provided an insider's view of how the defendant trafficked his cocaine. From approximately 2003 through approximately 2010, Arvelaiz worked for Orense—first as a driver, then as a member of Orense's security detail, and finally as the leader of his security detail who was also responsible for "logistics," which entailed managing the receipt, transportation, and payment for the defendant's cocaine loads. (Tr. 316-18, 374, 444).

Orense's security detail consisted of approximately 15 individuals who protected Orense and his drug trafficking. (Tr. 316-17). Orense armed his security detail with weapons such as automatic rifles, M4s, AR15s, AK-47s, AK-103s, machineguns, Uzi machineguns, and handguns. (Tr. 316-17, 385, 406-08; GX 402, 403, 404, 406, 410). The security detail used weapons like M4s, including to escort cocaine loads and ensure that cocaine was being loaded properly onto planes. (Tr. 408). Soon after Arvelaiz began working for the defendant in 2003, Orense required the security detail to use "selector switches," a device that transforms an ordinary semiautomatic firearm into a fully automatic firearm, in case the security detail needed "greater firing strength." (Tr. 395, 435). The defendant himself often kept a FN P90 submachinegun inside his car and carried a Beretta 92FS on his person. (Tr. 398-400). Arvelaiz also provided three photos of firearms which depict the types of firearms that the defendant required Arvelaiz to use while on the defendant's security detail. (Tr. 415-16; GX 601, 602, 604).

Due to his trusted position in Orense's drug distribution network, Arvelaiz was able to testify regarding numerous conversations between Orense and his co-conspirators and associates about their cocaine trafficking. (Tr. 356, 372-74, 425, 444-46, 453, 633-37). For years, Orense regularly dispatched planes and boats carrying approximately 1,000 kilograms of cocaine to Central America and the Caribbean, a little less than once per week, or approximately 40,000 kilograms of cocaine per year. (Tr. 307-08, 348-49). To accomplish drug trafficking on this scale, Orense partnered with high-profile Venezuelan officials to traffic drugs, including military and law enforcement officials. (Tr. 318). These partners included Pedro Luis Martin Olivares ("Martin"), who was the head of the Venezuelan national intelligence agency, known as DISIP (later renamed SEBIN), and Hugo Carvajal Barrios, a/k/a "Pollo" ("Carvajal"), who was the head of the Venezuelan military intelligence agency, known as DIM. (Tr. 319-22, 346-48, 386-97, 648-69, 865-66). Martin provided logistical support to enable Orense's drug loads to move freely within Venezuela, including official SEBIN credentials, guns, and vehicles. (Tr. 321, 396-97).

Carvajal was Orense's connection to the *Fuerzas Armadas Revolucionarias de Colombia* ("FARC") in Colombia—Orense's main source of supply—and provided Orense with official DIM credentials and vehicles. (Tr. 322, 346-48, 374-75, 397-98). Carvajal recommended Clíver Alcala Cordones ("Alcala"), a general in the Venezuelan military, to provide the military's assistance with drug transport. (Tr. 487-90).[1] Carvajal also allowed Orense's security detail to practice at the shooting range at Fuerte Tiuna, a major Venezuelan military fort. (Tr. 417-18; GX 605).

In addition to Carvajal and Martin, Orense worked with Wilber Varela Fajardo ("Varela"), one of the leaders of the powerful Colombia-based Cartel del Norte del Valle ("NVC"). (Tr. 356-67, 364-65). At trial, Arvelaiz described seeing Varela with Carvajal and Orense at one of Orense's properties in 2004 or 2005, with their respective security details carrying machineguns. (Tr. 356-59). The group discussed a problem with something that had gone to Apure State, in Venezuela, which a witness understood to be a reference to cocaine. (Tr. 361-62). Orense later told Arvelaiz that Varela was a very powerful man from Colombia, that he was having problems with the NVC, and that he was therefore working out of Venezuela. (Tr. 358). Arvelaiz drove Varela's associate, Ramon Quintero Sanclemente ("Quintero"), from the airport to Orense's apartment at the Melia Hotel, for a meeting with Orense. (Tr. 362-64). Arvelaiz described how Quintero's right-hand man was at the meeting and that, although he did not know his name, he knew that the man was called "Pelos." (Tr. 364).

Much of Orense's cocaine was sourced from the FARC in Colombia. (Tr. 372). For example, in 2007, Carvajal admonished the defendant not to be late in his payments to the *pata de goma*—a reference to the FARC. (Tr. 374-75). Orense also obtained some cocaine from a Colombian drug trafficker named Jorge San Martin ("San Martin"), who used large trucks to

---

[1] In approximately March 2020, Nicolas Maduro Moros ("Maduro") was charged in this District in *United States v. Maduro Moros, et al.*, S2 11 Cr. 205 (AKH), with participating in a narco-terrorism conspiracy and other crimes with several other current and former high-ranking members of the FARC and the Venezuelan Government, including Alcala and Carvajal.

On June 29, 2023, Alcala pled guilty, with the benefit of a plea agreement, to a superseding information charging him with providing, and aiding and abetting the provision of, material support or resources to a foreign terrorist organization, *i.e.*, the FARC. On April 11, 2024, the Honorable Alvin K. Hellerstein sentenced Alcala to 260 months' imprisonment.

On June 25, 2025, Carvajal pled guilty, without the benefit of a plea agreement, to (i) participating in a narco-terrorism conspiracy; (ii) conspiring to import more than five kilograms of cocaine into the United States; (iii) using and carrying machineguns and destructive devices during, and possessing machineguns and destructive devices in furtherance of, the cocaine-importation conspiracy; and (iv) conspiring to use and carry machineguns and destructive devices during, and to possess machineguns and destructive devices in furtherance of, the cocaine-importation conspiracy. The aggregate mandatory minimum term of incarceration is 50 years' imprisonment. Carvajal's sentencing proceeding is scheduled for February 23, 2025, before Judge Hellerstein.

As to the remaining defendants charged in S2 11 Cr. 205 (AKH), one of the FARC defendants died in or about March 2022, and the remaining defendants have not been arrested.

transport cocaine from the Colombia to Venezuela. (Tr. 372, 375-81, 472). Arvelaiz described his meetings with San Martin and his associates in connection with four or five 1,000-kilogram loads of cocaine for which Arvelaiz, at Orense's behest, provided approximately two million dollars. (Tr. 372, 375-81, 472).

Orense's customers included some of the most notorious drug trafficking organizations operating at that time, such as the Beltran-Leyva Organization, including the boss, who was known as "Don Arturo," and his associate, "El Indio." (Tr. 469-71, 618-21).[2] Arvelaiz and other security members, sometimes with Orense, traveled to Mexico on multiple occasions to arrange drug business with the Beltran-Leyva Organization. (Tr. 470). The cocaine loads for the Beltran-Leyva organization were delivered by plane to Guatemala, for ultimate distribution to the United States. (Tr. 472-73). For a 1,000-kilogram load, it was estimated that Orense's profit, at Guatemala market prices around the time that Arvelaiz worked for Orense, would amount to approximately $3.5 million. (Tr. 472-73).

After receiving cocaine loads, Arvelaiz was frequently responsible for transporting the cocaine to one of Orense's fincas, or large ranches, in Venezuela, where Orense stored cocaine, weapons, and money, or to another of Orense's properties. (Tr. 352-54, 365-66, 384, 392). Orense's fincas included "Los Garanones," which was located near Zaraza, in Guarico State, and another property near Las Matas, in Apure State. (Tr. 352-54). Arvelaiz escorted trucks carrying loads of cocaine from Caracas to Los Garanones more than twenty times and he and the members of the security detail who accompanied him were armed with machineguns. (Tr. 385). In certain instances, military officers who were carrying machineguns joined Orense's security detail in escorting cocaine loads to Los Garanones, at Carvajal's request. (Tr. 386-88). Once at Los Garanones, the defendant's workers and security detail unloaded the cocaine and stored it in four hidden, underground water tanks that were approximately eight feet long, six feet wide and ten feet high, and were located inside a warehouse on the property. (Tr. 367-68). Orense stamped his bricks of cocaine with different markings or brands, one of which was a two-bolivar bill. (Tr. 368).

The defendant protected his cocaine with a veritable arsenal. He stashed hundreds of weapons, including grenades, and thousands of rounds of ammunition, at Los Garanones. (Tr. 369-70, 413, 420-22). Orense also ordered his security detail to position a Browning machinegun—a six-foot long weapon that "sounds like a thunder" when fired—facing the entrance of the finca, in case someone tried to get inside. (Tr. 418-20; GX 409).

Each of the fincas contained makeshift, unpaved airstrips, which Orense used to dispatch cocaine by plane. (Tr. 348, 366). Arvelaiz's job, as head of logistics, included overseeing the dispatching of these planes, including ensuring there was enough fuel, supervising the loading of

---

[2] The Beltran-Leyva Organization was a powerful Mexican drug cartel that was run by five brothers, one of whom was Marcos Arturo Beltran-Leyva. *See* https://insightcrime.org/mexico-organized-crime-news/beltran-leyva-organization-profile/; https://www.state.gov/narcotics-rewards-program-target-information-brought-to-justice/marcos-arturo-beltran-leyva-deceased/. Before Arturo Beltran-Leyva was reportedly killed by the Mexican government, he was charged with narcotics offenses in three districts. *See* 04 Cr. 256 (D.D.C.); 09 Cr. 466 (BMC) (E.D.N.Y.); 09 Cr. 672 (MMR) (N.D. Ill.).

cocaine into the planes, paying the pilots, and keeping Orense informed of the status of the load. (Tr. 440-41, 444). In addition to using clandestine airstrips like the ones on his fincas to dispatch cocaine, the defendant also used an international airport located in Valencia, Venezuela (the "Valencia Airport"). (Tr. 371, 445, 454).

Orense's co-conspirators played different roles in the shipment of cocaine by plane. For example, Carvajal and Martin controlled military and civilian radars and were able to prevent the military and law enforcement from detecting Orense's drug flights. (Tr. 440-48). Perdigon, another Venezuelan drug trafficker, and Vassyly Kotosky Villaroel Ramirez ("Kotosky"), a military officer, also assisted with radars.[3] (Tr. 448-49). Orense paid $600,000 to airport control workers at the Valencia Airport in exchange for assistance with drug flights. (Tr. 445).

The planes that Orense and his co-conspirators used to transport cocaine were often outfitted specifically for cocaine transportation. (Tr. 427-30). For example, the seats were usually removed to make room for additional fuel tanks—necessary to allow the plane to carry its heavy drug load farther—and a special fuel pump, colloquially referred to as an enchonche, was installed to run the added fuel to the plane's main fuel tanks. (Tr. 427-30). Arvelaiz, at Orense's direction, provided pilots with between $150,000 and $200,000 for each drug flight. (Tr. 429). Several different planes were used by Orense for drug trafficking (including Turbo Commanders, Cessnas, King Airs, and an Astra that Orense shared with drug trafficker Alex Del Nogal ("Del Nogal")). (Tr. 426-27, 435-40, 502-03, 635; GX 606 and 607).

When Arvelaiz supervised the loading and transportation of these cocaine loads, Arvelaiz typically carried a machinegun, as did the defendant's other workers. (Tr. 359, 449). On certain occasions, in addition to the security detail, military officers protected the loads. (Tr. 450). On one occasion, armed FARC members also provided security at a ranch in Apure State. (Tr. 450-52).

In addition to planes, Orense dispatched loads of cocaine from the coast of Venezuela by boat, by various routes through the Caribbean, for ultimate distribution to the United States. (Tr. 458-59, 473). A drug trafficker named Chiche Smith was primarily responsible for assisting Orense with his maritime loads of cocaine. (Tr. 459-65). Arvelaiz testified that Chiche Smith was still working for the defendant in 2014 or 2015 because he "spoke to Chiche Smith" around that time and Smith "told [the witness] that they [Smith and Orense] were working hard on—on waters," *i.e.*, continuing to send drug loads by maritime routes. (Tr. 459-64, 460-61).

**D.    Orense's Narcotics Proceeds**

The money that the defendant received for trafficking cocaine was typically in U.S. dollars. (Tr. 497). At times, *millions* of dollars were delivered to Orense by plane (Tr. 398); other times, the defendant did "mirror transactions," in which an individual obtained the drug proceeds in one

---

[3] On March 20, 2013, an indictment was unsealed in the Eastern District of New York charging Kotosky—who it described as "a captain in the Venezuelan Guardia Nacional who arranged for the transportation of the cocaine from the Colombian border to Caracas . . . and from Caracas . . . to various airports and seaports, using official government vehicles, including trucks and cars"— with conspiracy to import cocaine. *See* 11 Cr. 247 (BMC) (E.D.N.Y.).

location and that person then transferred funds to a location accessible to Orense, after taking a commission. (Tr. 498-501).

Around 2010, the defendant asked Arvelaiz to coordinate the transfer of approximately $9 million in narcotics proceeds from the Dominican Republic to Venezuela. (Tr. 507-08). The individual that Arvelaiz asked to do the job went missing with the narcotics proceeds and the defendant, Carvajal, and Martin blamed Arvelaiz. (Tr. 508-10). Orense summoned Arvelaiz to a restaurant in Caracas, with Carvajal and Martin, where they accused Arvelaiz of stealing the missing money, and Arvelaiz denied stealing the money and refused to reimburse them. (Tr. 510). A few months later, two men on a motorcycle shot Arvelaiz in the arm, and Arvelaiz believed that Orense had ordered him to be killed because of the money dispute. (Tr. 510-12) In response, Arvelaiz tried to kill Orense at Los Garanones but, when he did not find Orense there, instead took approximately 80 of Orense's weapons. (Tr. 512-14).

### E.    Orense's Receipt and Sale of Military-Grade Weapons

Orense's primary weapons supplier was a Venezuelan police officer named Renato Chimarosti ("Chimarosti"). (Tr. 422-26). Chimarosti brought weapons to Los Garanones on ten or twelve occasions, each time bringing approximately 200 or 300 firearms—weapons like AK-47s, FAL rifles, M4s, M16s, and handguns—and 50,000 or 100,000 rounds of ammunition. (Tr. 423-24, 426). Orense's security team kept many of these weapons at Los Garanones to protect Orense as well as his finca and the valuable cocaine that was secreted there. (Tr. 425-26).

Orense sold some of the firearms that he did not keep for use by his security detail, and, on one occasion, Orense instructed Arvelaiz to load boxes of AK-47s on two official military SUVs that arrived at Los Garanones. (Tr. 424-26). And, on one occasion, Orense discussed exchanging weapons for cocaine. (Tr. 505). Specifically, Orense stated, in the presence of Arvelaiz at Los Garanones, that it was profitable to exchange a rifle for one or two kilograms of cocaine from "the guerilla," a reference to the FARC. (Tr. 505).

### F.    Orense's Collusion with Corrupt Venezuelan Officials

To ensure the safety of his cocaine loads while they were in transit, Orense bribed military and law enforcement officials, including Alcala and others. For example, in approximately 2008, Orense, accompanied by Arvelaiz and other members of his security detail, met Alcala at a restaurant in Valencia, Venezuela. (Tr. 490). During Orense and Alcala's conversation at the restaurant, Alcala appeared to be somewhat upset or angry about the topic of their discussion. (Tr. 490-91). After the meeting, Orense instructed Arvelaiz to pick up money and provide it to Alcala's "people." (Tr. 491). The following day, at Orense's instruction, Arvelaiz retrieved two long black bags from a house in Valencia that were filled with twenty-dollar bills in U.S. currency, and which was estimated to contain two or three million dollars; delivered the money to armed men in two SUVs; and then called Orense to inform him that the money had been delivered. (Tr. 491-94).

Thereafter, Alcala helped Orense with cocaine loads on multiple occasions. For example, on one occasion, Arvelaiz was at a ranch in Apure State to dispatch a plane carrying 1,000 kilograms of cocaine to Guatemala, where members of the Venezuelan armed forces set up a

perimeter. (Tr. 488-89). Orense informed Arvelaiz that Alcala had sent these men to protect the load from interference by law enforcement or other military components. (Tr. 488-89). On another occasion, Arvelaiz was helping to escort a truck carrying a load of cocaine that he obtained from the Colombian border. (Tr. 477-79). At a checkpoint inside Venezuela, Arvelaiz showed his official DIM credentials, but the officers nevertheless demanded to search the truck. (Tr. 478-79). Arvelaiz called Orense to explain the situation; Alcala then called Arvelaiz on Arvelaiz's phone. (Tr. 478). Arvelaiz passed his phone to an officer at the checkpoint, who spoke with Alcala. (Tr. 478). The officer then permitted the convoy containing Orense's cocaine load to proceed, without inspection. (Tr. 478).

In addition to Alcala, the defendant collaborated with numerous other Venezuelan officials to traffic cocaine. Politician Tarek El Aissami [4] provided Orense with information about checkpoints so that a cocaine load could successfully move from Tachira State to Caracas (Tr. 494-95); General Nestor Reverol[5], who was also the head of the Venezuelan antinarcotics agency, and Jesus Itriago[6], who was the head of the antinarcotics unit of a police force in Venezuela, provided advance notice about antidrug operations (Tr. 495-96); and Itriago sold Orense cocaine that his police force seized from other drug traffickers. (Tr. 497).

### G.    Orense's Partnership with Colombian Drug Traffickers to Transport Thousands of Kilograms of U.S.-Bound Cocaine to the Dominican Republic

At trial, Satizabal, a Colombian former drug trafficker, provided further testimony regarding how the defendant ran his drug trafficking empire. Satizabal attended a meeting with the defendant, Varela (one of the leaders of the NVC and Satizabal's boss), and Quintero (a former leader of the NVC running his own drug trafficking organization). (Tr. 753-54, 762-63, 765-75, 778-88). Quintero explained that he had asked Varela to assist with transporting a load of approximately 3,000 kilograms of cocaine bound for Europe that had been stalled in Venezuela. (Tr. 762-63, 779). Varela told Quintero he knew someone in Venezuela who could help, and an introductory meeting was set up at the Melia Hotel in Caracas around September of 2006. (Tr. 762-63, 765, 769-71). To get to the meeting, Satizabal and Quintero flew from Bogota, Colombia to Cucuta, a city at the Colombia-Venezuela border, where they met Nacho Bedoya, Varela's assistant or "secretary." (Tr. 765-67; GX 206). Bedoya, Satizabal, and Quintero then crossed the border into Venezuela and joined a convoy of SUVs in San Cristobal, a city close to the border in Venezuela, carrying multiple armed individuals and military personnel. (Tr. 767-69). They drove approximately 16 hours to Caracas, with the lead SUV—in which uniformed military personnel

---

[4] Tarek El Aissami Maddah was charged in this District with a series of crimes relating to efforts to evade sanctions imposed by the Office of Foreign Assets Control and is a fugitive. *See* S5 19 Cr. 144 (AKH).

[5] Nestor Reverol Torres was charged with narcotics offenses in the Eastern District of New York and is a fugitive. *See* 15 Cr. 20 (ARR) (E.D.N.Y.).

[6] Jesus Alfredo Itriago was charged with narcotics offenses in the Southern District of Florida and is a fugitive. See 13 Cr. 20050 (AHS) (S.D.F.L.). Jesus Alfredo Itriago was charged with narcotics offenses in the Southern District of Florida and is a fugitive. *See* 13 Cr. 20050 (AHS) (S.D.F.L.).

were observed—proceeding first through checkpoints along the route such that the other SUVs in the convoy did not stop at any checkpoints. (Tr. 769-70).

Once they arrived for the meeting at the Melia Hotel in Caracas, Quintero and Satizabal met first with Varela, who said he would introduce them to the individual who could arrange for the transportation from Venezuela of the stalled load of cocaine. (Tr. 770-72). Varela then took Quintero and Satizabal to another room where they all met Orense and Orense's associate, among others. (Tr. 772-74, 787). During the meeting, Orense agreed to help move Quintero's stalled drug load out of Venezuela to Europe. (Tr. 780). Varela proposed that, while Orense worked on setting up the transport, he, Orense, and Quintero partner in immediately transporting approximately 2,000 to 3,000 kilograms of cocaine from Venezuela to the Dominican Republic. (Tr. 780-83). They all agreed to transport an initial 1,200 kilograms via two 600-kilogram plane shipments. (Tr. 780-83). As part of the deal, Quintero agreed to supply the drugs up front from the stalled load, which was stored in Maracaibo, Venezuela. (Tr. 779-83). At the meeting, Satizabal was instructed to immediately coordinate the delivery of the initial 1,200 kilograms with Orense's associate. (Tr. 782). Orense's associate provided Satizabal with the phone number of an individual who would receive the drugs in Venezuela. (Tr. 782-83). Orense told Quintero and Satizabal at the time not to be scared because the Venezuelan military would pick up the drugs. (Tr. 783).

Following the September 2006 meeting, as part of the above-described deal, at least three loads consisting of approximately 600 kilograms each successfully made it to the Dominican Republic. (Tr. 786). Later, upon Satizabal meeting Varela's nephew to settle payment owed to Quintero with respect to the first two loads, Varela's nephew conveyed to Satizabal a proposal by Orense to invest in the next leg of transport for the loads, which Varela's nephew said was from the Dominican Republic to Puerto Rico. (Tr. 787).

### H.    Orense's Smuggling of Narcotics Proceeds from Mexico to Venezuela with Assistance from the Venezuelan National Guard and Roberto Lopez Perdigon

Perdigon's testimony at trial was similarly devastating. In approximately 2006, Orense met in Caracas with Perdigon, who, at the time, worked primarily for Walid Makled Garcia ("Makled").[7] Makled was the leader of one of the largest drug trafficking organizations in Venezuela (the "Makled DTO"). (Tr. 855-57, 862, 868). Perdigon was first introduced to Orense by Kotosky, who was then a captain in the Venezuelan national guard. (Tr. 863-64). Kotosky, who provided Orense with security and logistics assistance in transporting narcotics, had previously worked with Perdigon to smuggle narcotics proceeds through the Maiquetía airport near Caracas, Venezuela (the "Maiquetía Airport"). (Tr. 859-60, 863-68). The meeting took place at Orense's office at the CCCT, a shopping mall and office complex in Caracas. (Tr. 868-69; GX 648). Kotosky attended this meeting, as did Orense's security detail, consisting of several bodyguards armed with "long guns" that appeared to be "AR-15 rifles." (Tr. 870).

---

[7] On November 4, 2010, a superseding indictment was unsealed in this District charging Makled with conspiracy to import cocaine. *See* 09 Cr. 614 (RWS) (S.D.N.Y.). Makled was arrested in Colombia and then extradited to Venezuela, where he is currently serving a 14-year sentence.

At the meeting, the defendant explained that he needed to arrange for the transport from Mexico to Venezuela of a large amount of money paid to him by Arturo Beltran, a major Mexico-based narcotics trafficker, for narcotics Orense had sent to Beltran in Mexico. (Tr. 870). Orense wanted Perdigon's and Kotosky's help to transport the money through the Maiquetía Airport and for Perdigon, specifically, to fly it by helicopter back to Caracas and deliver it to Orense. (Tr. 870-71). Orense explained that he needed the help to transport the money to Caracas because, in 2006, a bridge on the highway from the Maiquetía Airport to Caracas had collapsed, and the alternate route involved a long and dangerous trip through the mountains north of Caracas. (Tr. 871-873, 887-98; GX 212). Perdigon agreed to assist Orense and ultimately helped Orense with the transport of the narcotics proceeds on four occasions in exchange for a $50,000 payment per trip. (Tr. 870-71, 889-90). Each time, four individuals arrived at the Maiquetía Airport on a commercial flight from Mexico, each carrying a suitcase containing $1 million. (Tr. 870-71, 889-90). Upon arrival, Kotosky met the passengers and escorted them from the plane directly to Perdigon at another location within the airport so that they would not be searched. (Tr. 870-71, 889-90). There, Perdigon received the money and flew it to his home in Caracas, where he counted it, removed his payment, and then delivered the remaining amount to Orense at his CCCT office. (Tr. 890-91). Orense's bodyguards, each armed with "long guns," or what appeared to be "AR-15s," and wearing credentials of the DISIP, Venezuela's so-called political police, were present for each delivery of the money. (Tr. 865-66, 891). The total amount of narcotics proceeds handled by Perdigon for Orense was approximately $16 million, and Perdigon's total amount in fees was $200,000. (Tr. 890-91).

## I.    Orense's Transportation of 2,000 Kilograms of Narcotics Via Plane Using Venezuelan Military Transponder Codes

A few years later, in 2009, Orense called upon Perdigon again to help arrange for one of his planes loaded with drugs to fly out of Valencia, Venezuela, and ultimately to Guatemala. (Tr. 891). This was intended to be a "black flight," meaning it was to operate without authorization or a flight plan—a common occurrence for planes loaded with drugs. (Tr. 892). Perdigon had significant experience in his work for the Makled DTO arranging for black flights to transit to and from the Valencia Airport, which Makled effectively controlled. (Tr. 857-58, 893). Orense and Perdigon met in 2009 at Orense's office in the Melia Hotel in Caracas to discuss the matter. (Tr. 908; GX 649). Orense's bodyguards, armed with "long guns" and wearing police credentials, were present. (Tr. 908-09). During the meeting, Orense explained to Perdigon that the plane would arrive at the Valencia Airport under a legitimate flight plan and would then need to fly without a flight plan to Orense's finca to be loaded with 2,000 kilograms of cocaine before continuing to Guatemala. (Tr. 892, 908-911, 923-25). The only planes that could fly without a flight plan in Venezuela, however, were military planes with the necessary military transponder codes that would identify the plane as a military flight to radar and air traffic control authorities. (Tr. 894-97). As part of his work in arranging black flights for the Makled DTO, Perdigon regularly obtained the necessary military transponder codes from Robert Pinto, a lieutenant in the Venezuelan National Guard whom he bribed. (Tr. 860, 894-97). Perdigon agreed during the meeting at the Melia Hotel to assist Orense in arranging for the black flight from the Valencia Airport to Orense's finca in Guarico State and then to Guatemala and back. (Tr. 909; 924-25). In exchange, Orense gave Perdigon a 100-kilogram investment in the 2,000-kilogram load, which would be paid out in U.S. dollars upon the load's delivery in Mexico. (Tr. 909-10). In addition,

Orense paid Perdigon $150,000 to cover the cost of obtaining the military transponder codes from Lieutenant Pinto in Venezuelan National Guard. (Tr. 909-10).

After the meeting at the Melia Hotel in Caracas, Perdigon coordinated the purchase of the military transponder codes from Lieutenant Pinto and told Orense when he should send his plane to the Valencia Airport. (Tr. 910-11). Orense told Perdigon what kind of plane would arrive—a turboprop known as a King 300—and provided Perdigon with the plane's registration number, which began with the letter "N," indicating that it was a U.S.-registered aircraft. (Tr. 910-11, 919-21). Upon the arrival of Orense's plane, the pilots parked the plane in an airport hangar owned by Makled, where Perdigon met them and saw Orense's King 300 bearing the N-registration number. (Tr. 921, 923). After he explained to the pilots when to use the various military transponder codes, Orense's plane was refueled and took off for Orense's finca. (Tr. 923-25).

Later, after delivery of the 2,000 kilograms of cocaine, Perdigon received $600,000 for the 100-kilogram investment in the plane load that Orense gave him in exchange for his help. (Tr. 925-26).

### J.    Orense's Plan to Build Additional Boats to Transport U.S.-Bound Drug Loads to the Dominican Republic

After the 2009 black flight arranged by Perdigon, Orense again approached Perdigon in 2012 about another drug trafficking deal—to help build additional speed boats for sending more narcotics loads to the Dominican Republic and then on to Puerto Rico. (Tr. 928, 930-31). Specifically, Orense proposed to send 38-foot speedboats, each carrying 500 kilograms of narcotics and specially outfitted with Volvo 370 engines obtained by Perdigon, to the Dominican Republic. (Tr. 929-31). Orense told Perdigon that the drugs were ultimately bound for Puerto Rico, and that, in exchange for Perdigon's help in procuring the Volvo 370 engines, he would give Perdigon an investment in the drug loads with payments to be made in U.S. dollars. (Tr. 931). Perdigon agreed to help Orense but was ultimately arrested before any boats were launched. (Tr. 931).

### K.    U.S. Law Enforcement's Seizure of a Ton of Orense's Cocaine in April 2016

At trial, the jury also heard testimony from Boada, a Venezuelan fisherman and convicted drug trafficker, who, in April 2016, after having just been released from prison, was recruited to assist with transporting a drug load by boat that belonged to the defendant, in exchange for approximately $15,000. (Tr. 150-52, 199-204). On the morning of April 6, 2016, Boada and several other recruited boat crew members were brought to a finca near Zaraza in Guarico State. (Tr. 151-52, 200-02). At the finca were individuals in Venezuelan military uniforms armed with "long guns." (Tr. 202-03). One of the individuals at the finca told the boat crew that he was going to introduce them to "Carlos Orense," at which point, a "fat man" wearing "kind of like a white hat" exited the house on the finca, looked at the boat crew, and asked if they were the guys that are going to do the job." (Tr. 203-04). Later that morning, Boada and the other boat crew members were then brought to a second finca, with access to a beach along the coast, where several more individuals armed with long guns and two blue, fiberglass speedboats parked on land. (Tr. 204-05). The individuals at this second finca brought one of the speedboats down to the beach and

loaded it with fuel and sacks containing the drugs. (Tr. 206-08, 212-13; GX 637, 638). Then, someone, whom the individuals loading the boat referred to as the "the son of the boss," arrived with a GPS device and programmed it with coordinates before giving it to the boat crew's captain. (Tr. 208-209). Boada and the rest of the boat crew departed from the beach in the speedboat around 5:30 or 6:00 p.m. bound for the Dominican Republic. (Tr. 209).

On April 7, 2016, less than a day after Boada saw Orense and departed from the second finca, the U.S. Coast Guard interdicted the speedboat in international waters south of the Dominican Republic and boarded it, recovered approximately 990 kilograms of cocaine, and arrested Boada and the other crew members. (Tr. 106-115, 119-133; GX 617, 618, 629-645, 650-51, 901). Visible on photos of the seized cocaine were two-bolivar bills (GX 657)—one of the stamps that Orense used to brand his cocaine (Tr. 368).

### L.      Evidence From Orense's Cellphone

Finally, at trial, the Government presented evidence obtained from Orense's cellphone, which was seized at the time of his arrest in Italy in 2021, and which further corroborated the witnesses' testimony about topics such as the planes that the defendant used to transport drugs and about his relationships with his drug trafficking co-conspirators such as Martin, Del Nogal, and Carvajal. (Tr. 298-303, 1078, 1091-1105, 1117-1128). Such evidence included the following:

#### 1.      Evidence Relating to Orense's Identity and Locations

- Orense's Venezuelan identification card and passport (Tr. 1091-1092, 1093-1094; GX 523, 529, 500-A) and photos of himself. (Tr. 1092-1093; GX 527, 530, 533, 537, 500-A).

- Chats showing Orense continued to reference or be referenced with respect to locations where Orense met with others to organize his drug trafficking business—the Melia Hotel, as of June 15, 2017, and the CCCT, as of December 20, 2017. (Tr. 1125-1127; GX 500-C, 500-C-T).

#### 2.      Evidence Relating to Los Garanones and Orense's Co-Conspirators

- WhatsApp messages between Orense and Carvajal ("Pollo Diputado") in which they refer to one another as "brothers," including March 2017 messages in which Orense requests the help of "Pollo Diputado" regarding "a guy [who] was appointed to INTI in Zaraza" because "work is already being done and there is cattle at the site please thank you," noting that "Jose Manama" is the "new one that was appointed" and 'the one who was there previously was going to hand me the papers in my children's name this week and this gentleman wants to not acknowledge what has been done;" "Pollo Diputado" responded that he had already reached out to the relevant person. (Tr. 1101-1103; GX 512, 512-T, 500-A).

- An August 22, 2018 letter from Jose Manuel Manama on National Land Institute (INTI) letterhead, addressed to National Guard Captain William Mendez, indicating that "Abdonis Jesus Orense Ydler," Orense's son, properly occupies Los Garanones ranch (*i.e.*, one of the locations at which Orense maintained cocaine and firearms), in Zaraza, Guarico State. (Tr. 1094-1096; GX 505, 505-T, 500-A).

- An April 1, 2019 WhatsApp message from Orense to "Daniel Haro3," in which Orense states that his son ("Carlito") had been arrested, to call so he would be released, and that they were not paying attention to the police credentials; and "Daniel Haro3" responded, through voice notes, that he had called "Pedro Luis" and had also called "your son and he is not answering." Two months prior to this exchange, Orense sent "Daniel Haro3" a blog link that included "Luis-Marin-Capos-of-Corruption-in-PDVSA." (Tr. 1119-1121; GX 506, 506-T, 500-A).

- A January 31, 2020 WhatsApp message sent by Orense to "Gordo Moreno," stating that "Zaraza Municipality Agropecuria los garanones," and attaching several photos of a ranch. (Tr. 1096-1098; GX 508, 508-T, 508-A, 508-B, 508-C, 508-D, 508-E, 500-A).

- April 18, 2020 WhatsApp messages between Orense and Del Nogal ("ADN Nuevo") regarding Martin and in which Del Nogal refers to Orense as a "brother." (Tr. 1119; GX 510, 510-T, 500-A).

- An August 17, 2020 WhatsApp message in which Orense sent his son ("Abdonis Italy") a link address including that "Pedro Luis Martin Olivares identified by the United States as a drug trafficker who was thanked by a Chavista mayor for his support." (Tr. 1127; GX 500-C, 500-C-T).

### 3.    Evidence Relating to Private Planes

- A snapshot from a social media page of a pilot from Mexico from October 6, 2020, and his Mexican identification card from August 13, 2020. (Tr. 1098-1099; GX 509-L, 509-M, 500-A).

- Thirteen deleted web searches from November 19, 2017, to December 17, 2017, relating to the purchase of private planes, including the types that Orense used to transport cocaine. (Tr. 1104-05, 1117-1118; GX 500-C at 11).

- An October 1, 2017 WhatsApp message from Orense to "Victor Salon" regarding ten drug traffickers who were arrested by the DEA and Dominican law enforcement on a Lear jet plane, including that Martin's father owned the plane, and that Martin "is the right hand and lieutenant of . . . Carvajal" and that

one of the arrestees was Martin's first cousin. (Tr. 1122-1124; GX 500-C, 500-C-T at 6).

- An October 29, 2019 WhatsApp chat from Del Nogal ("ADN Nuevo") to Orense, in which Del Nogal asks if Orense has a Mexican customer for a new Astra private plane (Tr. 1127-1128; GX 500-C; GX 500-C-T at 10); and an April 27, 2020 message from "Henry Piloto" in which he tells Orense he has an Astra for sale. (Tr. 1128; GX 500-C, 500-C-T at 10).

- A March 14, 2020 WhatsApp chat from Orense to Del Nogal ("ADN Nuevo") regarding a Cessna Citation 525 that crashed in Venezuela. (Tr. 1124-1125; GX 500-C, 500-C-T at 6-7).

- Various photos of damaged planes sent June 11, 2018, and August 13, 2020, including those shown below (Tr. 1096-1098; GX 508-F, 508-G, 508-H, 509-C, 509-F, 509-G, 509-H, 500-A).









**4.    Evidence Relating to Firearms and Ammunition**

- July 18, 2016 WhatsApp messages between Orense and a user identified as "SIERRALTA.PTJ," in which "SIERRALTA.PTJ" attaches a photo of firearms and ammunition, shown below, and noting it was "A photo of what was received." (Tr. 1099-1101; GX 501, 501-A, 501-A-T, 500-A).



## II.    Procedural Background

The defendant was charged by criminal complaint on April 23, 2021, with one count of narcotics importation conspiracy, in violation of 21 U.S.C. § 963 ("Count One"); one count of conspiracy to violate maritime drug enforcement laws, in violation of 46 U.S.C. §§ 70506(b) and 70504(b)(2);[8] one count of possession of machineguns and destructive devices, in violation of 18 U.S.C. §§ 924(c)(1)(A), 924(c)(1)(B)(ii), and 2 ("Count Two"); and one count of conspiracy to possess machineguns and destructive devices, in violation of 18 U.S.C. § 924(o) ("Count Three"). (Dkt. 1).

On June 3, 2021, a grand jury in this District returned an indictment (the "Indictment") charging the defendant with the same offenses set forth in the complaint. (Dkt. 3).

On June 22, 2022, the defendant was extradited from Italy to the United States. (PSR ¶ 65). The defendant was transferred to U.S. custody and transported by plane to the Westchester County Airport, located in White Plains, New York. (Tr. 300-01, 303).

After jury selection on November 20, 2023 and the morning of November 27, 2023, trial commenced on November 27, 2023. (Dkts. 65, 67). On December 12, 2023, the jury returned a verdict convicting the defendant on all three counts. (Dkt. 60). The jury also found that the conspiracy charged in Count One involved five kilograms or more of cocaine and that the offenses charged in Counts Two and Three involved machineguns, but not destructive devices. (Dkt. 60).

---

[8] The Government elected not to proceed on the count alleging that the defendant conspired to violate maritime drug enforcement laws. (Dkt. 47). The Counts are defined herein as they were presented to the jury—in other words, the conspiracy to violate maritime drug enforcement laws count is not defined herein because it was not presented to the jury.

*United States v. Orense Azocar*, 21 Cr. 379 (VSB)                                    Page 17 of 21
Hon. Vernon S. Broderick

### III.    Guidelines, Probation's Recommendation, and Defense Request

The Government calculates that the defendant's offense level as 50 (which is treated as the maximum level of 43, *see* Chapter 5, Part A (comment n.2)) and his Criminal History Category as I, resulting in a Guidelines sentence of life imprisonment, with a mandatory minimum term of ten years' imprisonment on Count One, to be followed by an additional mandatory minimum term of 30 years' imprisonment on Count Three, which must run consecutively to any other term of imprisonment imposed.

Probation has calculated the same Guidelines sentence as the Government and recommends a Guidelines sentence of life imprisonment to be followed by a mandatory minimum of thirty years' imprisonment. (PSR ¶¶ 72-91; PSR at 32). In formulating its recommendation, Probation considered, among other things, that the defendant conspired with others "to distribute thousands of kilograms of cocaine for importation into the United States"; "worked with other drug-trafficking organizations, including some of the most powerful ones in Colombia, Mexico, and elsewhere"; "bribed high-ranking Venezuelan military and law enforcement officers in exchange for protection for his cocaine shipments"; "employed a well-armed security detail that provided protection for his loads of cocaine"; and yet "continues to convey his innocence . . . [and] has not accepted responsibility for his unlawful actions." (PSR at 33-34). Probation also considered the defendant's lack of known criminal history; his family obligations and ties; certain health issues that are being managed with medication; and that he is 70 years old. (PSR at 33-34).

The defendant appears to recognize the accuracy of the Guidelines sentence calculated by Probation and the Government (Def. Mem. at 9-10) in that he acknowledges that the "advisory Guidelines calculations yield a sentence of life imprisonment," while also disputing all facts "in paragraphs 10 through 68 [of the PSR] attributing narcotics trafficking, weapons possession, bribery, or any other criminal conduct to him (Def. Mem. at 10). The defendant requests the mandatory minimum sentence of forty years' imprisonment, principally based on his personal character and family obligations and ties, proclaimed innocence, his age and health, and the conditions at MDC.

### IV.    Applicable Law

As this Court is aware, the Guidelines are no longer mandatory, but they still provide important guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). The Guidelines range is thus "the lodestar" that "'anchor[s]'" the district court's discretion. *Molina-Martinez v. United States*, 578 U.S. 189, 198-200 (2016) (quoting *Peugh v. United States*, 133 S. Ct. 2072, 2087 (2013)).

After making the initial Guidelines calculation, a sentencing judge must consider the factors outlined in 18 U.S.C. § 3553(a), and "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing: "a) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for that offense; b) the

need to afford adequate deterrence to criminal conduct; c) the need to protect the public from further crimes by the defendant; and d) the need for rehabilitation." *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (citing 18 U.S.C. § 3553(a)(2)).

## V.      Discussion

### A.      The PSR's Guidelines Calculation is Correct

The Court should adopt the Guidelines sentence calculated by Probation and the Government, of life imprisonment. The defendant appears to recognize the accuracy of Probation and the Government's calculations (Def. Mem. at 9-10), in that he acknowledges that the "advisory Guidelines calculations yield a sentence of life imprisonment." (Def. Mem. at 10). Nonetheless, the defendant continues to dispute all facts "in paragraphs 10 through 68 [of the PSR] attributing narcotics trafficking, weapons possession, bribery, or any other criminal conduct to him. (Def. Mem. at 10). In objecting to these facts, the defendant—in the face of the mountain of evidence against him that was presented at trial—professes complete innocence and denies all criminal and relevant conduct described in the PSR whole cloth. This position, however, was decisively rejected by the jury in its unanimous verdict finding the defendant guilty on all counts at trial and the PSR's thorough discussion of the defendant's conduct as strongly supported by the trial record. Furthermore, the defendant's objections are contrary to the findings of the Court in its opinion and order, dated May 22, 2025, denying the defendant's post-trial motions for a judgment of acquittal and/or new trial under Federal Rules of Criminal Procedure 29 and 33.[9] (Dkt. 110). Accordingly, the Government submits that the defendant's objections to the PSR—including to paragraphs 10-68—are without merit and should be rejected. *See United States v. Ware*, 04 Cr. 1224 (RWS), 2009 WL 102215, at *2 (S.D.N.Y. Jan. 14, 2009) (rejecting factual objections to PSR as "contrary to the record at trial"); *see also United States v. Juan Antonio Hernandez Alvarado*, 15 Cr. 379 (PKC), Dkt. 326 (March 30, 2021), at 8-9 (Judge Castel overruling post-trial blanket objections to a PSR and noting "There has been no argument advanced to me that the paragraphs are inconsistent with the trial evidence. It is simply the defendant's view is the trial evidence ought not to be believed, which is contrary to the jury's verdict."). The Court should therefore adopt the facts in the PSR and the PSR's calculations of the applicable Guidelines sentence.

### B.      The Court Should Impose a Sentence of Life Imprisonment

The Government respectfully submits that a sentence of life imprisonment would be appropriate in this case.

*First*, the defendant's conduct is indisputably serious and requires just punishment. 18 U.S.C. §§ 3553(a)(1), (a)(2)(A). The defendant was a leader of a highly-sophisticated enterprise that was responsible for transporting and distributing a staggering amount of cocaine—

---

[9] The Government respectfully incorporates herein the Court's review of, and findings with respect to, the evidence at trial, as discussed in its May 22, 2025 opinion and order. (Dkt. 110). The Government further cites to, and incorporates herein, its review of the evidence at trial, as submitted to the Court in opposition to the defendant's Rule 29 and Rule 33 motions. (*See* Dkt. 92 and 105).

approximately 40,000 kilograms per year—to the United States, for many years. (Tr. 307-08, 348-49). The defendant's DTO preyed upon and profited from the addictions of an untold number of users in this country. To traffic drugs at this level, the defendant used an arsenal of military-grade weapons to protect his cocaine; dispatched drugs from private and commercial airstrips; and maintained a fleet of planes and boats for this purpose. The defendant also colluded with and bribed some of the highest-ranking officials in Venezuela—individuals such as Carvajal, Martin, Alcala, Itriago, Reverol, and Aissami—as well as terrorist organizations such as the FARC and notoriously violent organizations such as the Beltran-Leyva Organization, to facilitate these crimes. This was, in short, drug trafficking at the very highest level that relied on rampant violence and corruption. A life sentence is needed to reflect the seriousness of the defendant's cocaine trafficking, to provide just punishment for that dangerous and destructive conduct, and to promote respect for the law prohibiting that conduct.

*Second*, the history and characteristics of the defendant speak to the need for a sentence of life imprisonment. *See* 18 U.S.C. § 3553(a)(1). The defendant—in addition to describing certain difficulties with his upbringing—reported to Probation that he "was provided all the necessities needed for a proper upbringing"; had an 11th grade education; and "financially supported himself as a customs director, an inspector and a cattle farm owner." (PSR ¶¶ 33-34). The defendant reported to Probation that he earned a salary as a customs inspector and inspector and as much as $220,000 per year for 18 years as a cattle rancher. (PSR ¶ 115). In other words, despite presumably being able to support himself and his family by honest means, the defendant chose to turn to crime. And the trial evidence made clear why the defendant made this choice: greed. The evidence at trial included testimony regarding the millions of dollars that the defendant himself received; the defendant's many ranches, houses, and apartments; his fleet of planes and cars; the opulent hotels he stayed in; and his phalanx of employees, as well as photos from his phone showing his extravagant lifestyle. (*See, e.g.*, Tr. 398, 472-73, 491-94, 890-91; GX 527, 530, 533, 537, 500-A). That the defendant may at times have been, as the defense asserts, "kind, dependable, selfless, and generous" (Def. Mem. at 2) does not mitigate the vile criminal enterprise that the defendant ran or the corruption and greed that fueled it. That the defendant helped his own family members (Def. Mem. at 4-6) does not take away from the many families whose lives were ruined by the defendant's wildly profitable cocaine enterprise.

That the defendant fully refuses to accept responsibility for his criminal conduct is also relevant to his history and characteristics. (Def. Mem. at 10). While the defendant claims that he does not "seek to relitigate the trial" (Def. Mem. at 1), he, at the same time, wholesale objects to the facts in the PSR (Def. Mem. at 10), and attempts to cast doubt on the trial evidence, principally because it was (1) "historical and dependent on cooperating witnesses" who are "incentivized"; (2) "no physical evidence . . . was ever seized from [the defendant]"; and (3) the jury rejected the government's most serious firearms allegation, acquitting him of the destructive-device object." (Def. Mem. at 8, 10-11). The first argument simply rehashes an argument that jury rejected, and that the defendant raised in his Rule 29 and Rule 33 motions (Dkt. 89 and 99), and, as the Government argues extensively in its oppositions to those motions (*see* Dkt. 92 and 105), which are incorporated herein (*see* n.9, *supra*), the cooperating witnesses' testimony was credible and overwhelmingly established the defendant's guilt. The defendant's second argument ignores that the Government seized the defendant's phone—which contained a trove of damning, corroborative evidence against him—as well as the fact that the Government seized a ton of the defendant's

*United States v. Orense Azocar*, 21 Cr. 379 (VSB)                                    Page 20 of 21
Hon. Vernon S. Broderick

cocaine in April 2016. And the third argument wrongly implies that the jury's conviction of the defendant on Counts Two and Three for use of machinegun counts was somehow less serious than had it been for use of destructive device, even though the penalties are the same.

Moreover, the defendant's years of large-scale cocaine trafficking with some of the most notorious traffickers in Venezuela, Colombia, and Mexico is also relevant to his history and characteristics, underscoring his long-standing criminal livelihood. This factor speaks loudly to the need for a lengthy sentence.

While the Court is, of course, free to take into consideration the various other asserted factors raised by the defense, the Government respectfully submits that they do not merit considerable weight. For instance, the defendant argues that his family ties and obligations serve as a mitigating factor. (Def. Mem. at 3-7). These connections, however, did not stop the defendant from operating a large-scale cocaine trafficking enterprise. The defendant also argues that the conditions of the defendant's incarceration at MDC is a mitigating factor, citing, in part, Judge Furman's opinion in *United States v. Chavez*, F. Supp. 3d 227, 229 (S.D.N.Y. 2024). (Def. Mem. at 8-9). While MDC has had challenges, the conditions are not so poor as to justify a variance. Indeed, as Judge Furman has more recently acknowledged, conditions at the MDC have improved since he issued his opinion in *Chavez*. *See* May 14, 2025 Sentencing Tr., *United States v. Reshard*, 24 Cr. 392 (JMF) at 24 ("I'm certainly more than familiar with the circumstances at the MDC, and the place has still much need for improvement, but it is also a lot better than it was in January of [2024] when I wrote my opinion in *United States v. Chavez* that is cited in the defense's submission."). Nor do the defendant's age or medical conditions (Def. Mem. at 7), which are capable of being treated by the Bureau of Prisons, warrant a large variance.

*Third*, a Guidelines sentence is necessary to afford adequate specific and general deterrence, with general deterrence likely being the more salient consideration. *See* 18 U.S.C. §§ 3553(a)(2)(B). The sentence imposed should send the message that trafficking in cocaine—a substance that causes overdose deaths in this country with unfortunate frequency—will not be tolerated, and that drug traffickers such as the defendant who sell such poison, and thus profit by placing other people's lives at risk, will face significant consequences when they are caught. The need to afford adequate general deterrence is particularly important given the international component of this case. Overseas narcotics traffickers account for a large proportion of the cocaine that is ultimately sold to users in the United States. If they perceive that, even if they are arrested and charged by U.S. law enforcement authorities, they are likely to receive a significant break at sentencing, they will not be deterred from importing their cocaine into this country, where demand and prices are alluring.

*Finally*, and relatedly, the need to protect the public from future narcotics trafficking by the defendant also supports the imposition of a life sentence. *See* 18 U.S.C. §§ 3553(a)(2)(C). The defendant was an experienced and established international cocaine trafficker. A substantial sentence of incarceration will prevent the defendant from returning to his criminal enterprise, and from continuing to endanger the public by plying it with cocaine.

*United States v. Orense Azocar*, 21 Cr. 379 (VSB)                                         Page 21 of 21
Hon. Vernon S. Broderick

## VI.    Conclusion

In short, the defendant was a cocaine trafficker on a massive scale. He relied on an arsenal of high-powered firearms to protect and grow his cocaine distribution network, and he partnered with some of the largest cocaine traffickers and one of the most violent terrorist organizations in the world. And, while that conduct is more than enough to merit a significant sentence, the defendant was also a central participant in rampant and corrosive corruption in Venezuela, as he worked with and bribed multiple Venezuelan officials who aided in his cocaine trafficking. It is no exaggeration to state that he is one of the most prolific international cocaine traffickers prosecuted in this courthouse in the last several years.

For the reasons set forth above, the Government respectfully submits that the Court should impose a sentence of life imprisonment because such a sentence would be sufficient but not greater than necessary to comply with the purposes of sentencing pursuant to 18 U.S.C. § 3553(a).

Respectfully submitted,

JAY CLAYTON
United States Attorney

By:    _____/s/_____

Kaylan E. Lasky
Kevin T. Sullivan
Assistant United States Attorneys

cc:    Eylan Schulman, Esq. (by ECF)